1    DEPOSITION OF CARLTON SPEER
2

3               June 20, 2023
4        IN THE UNITED STATES DISTRICT COURT
      FOR THE EASTERN DISTRICT OF TENNESSEE
5            CAUSE NO. 3:22-cv-00426
6

    CARLTON SPEER, MALENA DENNIS,  )
7    and ZACHARIAH DUNCAN, on their )
    own behalf and on behalf of    )
8    others similarly situated,    )
                                   )
9                     Plaintiffs,  )
                                   )
10          -vs-                   )
                                   )
11   UCOR, LLC,                    )
                                   )
12                    Defendant.   )
    _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _)
13

14   APPEARANCES
15          FOR THE PLAINTIFFS:
16          MR. CLINT J. COLEMAN
               NELSON LAW GROUP
17             10263 Kingston Pike
               Knoxville, Tennessee 37922
18             (865)383-1053
19          FOR THE DEFENDANT:
20          MR. DARIUS WALKER, JR.
               OGLETREE, DEAKINS, NASH, SMOAK
21               & STEWART, P.C.
               Truist Plaza
22             401 Commerce Street, Suite 1200
               Nashville, Tennessee 37219-2446
23             (615)254-1900
24
25          - Appearances Continued -

Page 17

1  terminated.

2      Q.   Have you had any other employment since

3  UCOR?

4      A.   Just North Wind.

5      Q.   Okay.  Did you have any other employment

6  while you were working at UCOR?

7      A.   No.

8      Q.   I want to talk a little bit about your

9  time at UCOR.

10      A.   Okay.

11      Q.   What is your date -- do you remember when

12  you were hired on at UCOR?

13      A.   I think it was like January 1, 2021?

14  Might have been a year before that, 2020.  Yeah,

15  January 1, 2020, I believe.

16      Q.   And what was your role at that time?

17      A.   I was the instrumentation specialist.

18      Q.   And what were your job duties as an

19  instrumentation specialist?

20      A.   I wrote procedures, operating guides.  I

21  would get new equipment ready to deploy to the

22  field, do instrument calibrations, instrument

23  repair.  I did training for a lot of the radcon

24  folks.

25      Q.   Now, is that similar to your job now as a

Case 3:22-cv-00426-TRM-JEM    Document 103-1    Filed 06/03/24    Page 2 of 352
PageID #: 1867                                                          JA 002

1    were hired for a particular function.  Like the

2    radcon -- all the rad techs were all ARS, which was

3    a subcontractor that had the contract for supplying

4    all the rad techs.  And staff aug was just adding an

5    employee or two to fill a position from a, you know,

6    staffing company that was not a in-house UCOR

7    employee.

8              (Defendant's Deposition Exhibit 7 marked

9    for identification.)

10   BY MR. WALKER:

11       Q.   And have the record reflect that I've

12   passed the witness what's been marked as Speer's

13   Deposition Exhibit 7.  Now, that -- do you recognize

14   that document, first?

15       A.   Not particularly, no.

16       Q.   Okay.  At the top right-hand corner, I

17   believe it -- or maybe left-hand corner, your left,

18   my right, it mentions, "Radiation Protection" --

19       A.   Yes.

20       Q.   -- Job Function?

21       A.   Yes.

22       Q.   And then further through the document it's

23   got different levels and their job duties?

24       A.   Yes.

25       Q.   Would you say that that document

Case 3:22-cv-00426-TRM-JEM    Document 103-1    Filed 06/03/24    Page 3 of 352
PageID #: 1868                                                          JA-003

1    that there was a standing order that if you tested

2    positive, it needed to be reported to UCOR.

3         A.   Yes, I was aware of that.

4         Q.   And you were aware of a mask mandate?  Was

5    there a mask mandate at UCOR?

6         A.   Yes.  Off and on.

7         Q.   Okay.  When it was on, did you always wear

8    a mask?

9         A.   No.

10        Q.   Were you aware of other employees that did

11   not always wear their mask?

12        A.   Yes.

13        Q.   And that would have been against the

14   policy strictly?

15        A.   When we were in our own office, with the

16   door closed, we could take the mask off.

17        Q.   Were there any people that you are aware

18   of that did not always adhere to the mask policy?

19        A.   Yes.

20        Q.   And you said that the mask policy was off

21   and on.  Do you have any sense of why masking was

22   required at one point and then it stopped being

23   required, started back or changed?

24        A.   From what I remember, just the level of

25   COVID in the area.  I believe the infection rate had

1    gone up or something and they'd put us back in mask.

2        Q.   So do you believe that UCOR was making

3    these decisions based on their perception of the

4    need for safety?

5        A.   Yes.

6        Q.   So in addition to the standing order, UCOR

7    eventually instituted a mandatory vaccine policy,

8    right?

9        A.   Yes.

10           (Defendant's Deposition Exhibit 8 marked

11   for identification.)

12   BY MR. WALKER:

13       Q.   Let the record reflect I'm passing the

14   witness what has been marked as Speer Exhibit 8.

15   I'll give you a second to look through those

16   documents.  And let me know when you're done.

17       A.   Okay.

18       Q.   Do you recognize those documents?

19       A.   Yes.

20       Q.   And as I understand it, and let me know if

21   I'm correct, there's an announcement of the vaccine

22   policy, there is some frequently asked questions

23   about the policy, and a blank form if you needed to

24   submit an exemption request.

25       A.   Yes.

Case 3:22-cv-00426-TRM-JEM   Document 103-1   Filed 06/03/24   Page 5 of 352
PageID #: 1870   JA-005

1   that I was not aware of that could be forcing these

2   companies to do this or encouraging them to do this.

3       Q.   When you say some behind the scenes force,

4   are you talking political, are you talking media,

5   are you talking somebody paying them?  Like what --

6   can you tell me a little bit about what you mean by

7   that?

8       A.   Maybe political.  It's unknown to me.  I

9   don't know what it was.  But it just seemed like

10  there was some other force behind it besides a

11  health-related issue.

12      Q.   How about the mask mandates?  We talked

13  about them going on and off.  Do you believe that

14  the masking decisions were based on the safety of

15  the workforce?

16      A.   UCOR's decisions, probably, yes.

17      Q.   Did they also have social distancing

18  protocols?

19      A.   Yes.

20      Q.   And protocols for reporting if you test

21  positive for COVID?

22      A.   Yes.

23      Q.   Do you believe that those protocols were

24  instituted for the safety of the workforce?

25      A.   Yes.

1      Q.    Now, in addition to sending out the

2   announcement and giving a blank form for exemption

3   requests -- you filled out one of those forms and

4   requested an exemption; is that right?

5      A.    Yes.

6      Q.    And that was for a religious exemption; is

7   that right?

8      A.    Yes.

9            (Defendant's Deposition Exhibit 9 marked

10   for identification.)

11   BY MR. WALKER:

12      Q.    Let the record reflect I've handed the

13   witness what has been marked as Speer's Exhibit 9.

14   I'll give you a second to look through those

15   documents.  And let me know when you're done.

16      A.    Okay.

17      Q.    And I'll just refer to that as collective

18   exhibit, communications with UCOR.

19      A.    Okay.

20      Q.    Is that fair enough?

21      A.    Yes.

22      Q.    So I want to start just on this first

23   page, it's an Exemption Request Form, and it's got

24   your name, and then inside of the box there is a

25   paragraph about the reasoning for requesting the

1    exemption.  Do you see that?

2         A.   Yes.

3         Q.   Is this something that you filled out

4    yourself?

5         A.   Yes.

6         Q.   Did you get this paragraph from anywhere

7    or is this something you created on your own?

8         A.   I created it on my own, but I looked

9    through other things for inspiration for it.

10        Q.   And what things did you look through?

11        A.   Well, the Bible, the internet.

12        Q.   Any particular websites that you recall?

13        A.   None that I recall, no.

14        Q.   Okay.  Now, you mentioned the Bible.  How

15   do you identify, religion wise?

16        A.   I'm a Christian.

17        Q.   Any particular denomination?

18        A.   Non-denominational.

19        Q.   And how long have you been a Christian?

20        A.   Since I was 11.

21        Q.   Were you baptized?

22        A.   Yes.

23        Q.   When were you baptized, if you remember?

24        A.   When I was 11.

25        Q.   Are you a member of a specific church

Case 3:22-cv-00426-TRM-JEM    Document 103-1    Filed 06/03/24    Page 8 of 352
PageID #: 1873                                                      JA-008

1  right now?

2       A.    Yes.

3       Q.    And what church is that?

4       A.    West End Church of Christ.

5       Q.    How long have you been a member of West

6  End Church of Christ?

7       A.    Twenty years.

8       Q.    So if we look in this paragraph on your

9  exemption request, you've got what I would say

10  are three different distinct reasons that you object

11  to the vaccine.

12       A.    Yes.

13       Q.    And the first -- and correct me if I'm

14  misstating this in any way.  But I would say the

15  first is murder is a sin, the second is it's a sin

16  to indirectly support companies who manufacture the

17  vaccines, and the third is that your body is a

18  temple.

19       A.    Your second one, I don't have anything

20  particular against companies that manufacture

21  vaccines.

22       Q.    So if we look at this, if we look at what

23  you've written here, I believe it is the third

24  sentence, it says, "I believe it is a sin for me to

25  indirectly provide monetary support to those who

1    manufacture these injections regardless of how long

2    ago these abortions took place."

3            So is that a mischaracterization of how you

4    feel or how you felt at the time that you asked for

5    the exemption?

6        A.    I was referring to the companies that make

7    the vaccines from aborted fetuses.

8        Q.    Got it.  So I guess a better question for

9    me is, you felt it was a sin to indirectly support

10   companies who use the aborted fetal cells in the

11   development of the vaccines.

12       A.    Yes.

13       Q.    So I'm going to ask you some questions

14   that are going to be related to each one of those

15   buckets of items.

16       A.    Okay.

17       Q.    The first is that murder is a sin.  How

18   did you learn that the use of the aborted fetal

19   cell lines were used for the development of the

20   vaccine?

21       A.    Internet search.

22       Q.    And about when did you learn that?

23       A.    Probably mid-2021, when they were coming

24   out.

25       Q.    So prior to this COVID-19 vaccine, had you

```
1       A.   That has?

2       Q.   Yes.

3       A.   No.

4       Q.   Do you think that someone can be a

5   Christian and get vaccinated?

6       A.   Yes.

7            MR. WALKER:  I think it might be a good

8        time for a break.

9            (A brief recess was taken.)

10  BY MR. WALKER:

11      Q.   So we talked a little bit about those

12  three buckets of reasons for not wanting to get the

13  vaccine.  Are there any other reasons outside of the

14  ones that are listed there that you did not want to

15  get the vaccine or that you were hesitant to get the

16  vaccine?

17      A.   Well, I didn't believe it was safe or

18  effective.

19      Q.   And when you say that you did not believe

20  it was safe, are you meaning that you did not

21  believe it was safe for your body or you didn't

22  think that it made other people safe?

23      A.   Both.  I didn't think it was safe for me

24  to take it or --

25      Q.   And what helped form the basis of that
```

Case 3:22-cv-00426-TRM-JEM     Document 103-1     Filed 06/03/24     Page 11 of 352
PageID #: 1876

1    belief for you?

2        A.   All the injuries that were being reported

3    in the VAERS database, for one.

4        Q.   What database is that?

5        A.   It's listed there on the exemption request

6    form, it's the V-A-E-R-S, by Health and Human

7    Services.gov.

8        Q.   Any other sources?

9        A.   Anecdotal.

10       Q.   You said anecdotal?

11       A.   Anecdotal evidence, just word of mouth

12   from things that I've been hearing.

13            (Defendant's Deposition Exhibit 10 marked

14   for identification.)

15   BY MR. WALKER:

16       Q.   Let the record reflect I'm handing the

17   witness what has been marked as Exhibit 10.  I'll

18   give you a chance to read through that.  And let me

19   know when you're done.

20       A.   Okay.

21       Q.   Now, what is that?

22       A.   It's a e-mail between Sonja Burchfield and

23   me.

24       Q.   Is that an e-mail that you initiated, or

25   did Sonja initial it?

1    with the former President of the United States?

2         A.   Yes.

3         Q.   And, to your knowledge, what is his

4    affiliation with Truth Social?

5         A.   I just know that he's one of the driving

6    forces behind the launch of it.

7         Q.   And he posts on Truth Social --

8         A.   Yes.

9         Q.   -- regularly?

10        A.   Yes, he does.

11        Q.   Do the posts and information provided --

12   or did the posts and information provided on Truth

13   Social impact your decision as it related to the

14   COVID-19 vaccine?

15        A.   No.

16        Q.   I want to direct your attention to

17   interrogatory 23 and your response.

18        A.   Okay.

19        Q.   And so that interrogatory asks for where

20   you got certain information, I believe, that

21   impacted your decision?

22        A.   Yes.

23        Q.   So you mention the 8kun website?

24        A.   Yes.

25        Q.   How would you describe that website

1  politically?  Would you say that it had a certain

2  political lean?

3       A.   Yes.

4       Q.   And what would that be?

5       A.   Right.

6       Q.   And so that information posted on that

7  website impacted your decision as it relates to the

8  decision on the COVID-19 vaccine?

9       A.   Probably, yes.

10       Q.   You also mention the ZeroHedge website.

11       A.   Yes.

12·       Q.   What is ZeroHedge?

13       A.   It's a financial articles website.

14       Q.   Same question I asked about the 8kun -- if

15  I'm saying that right, I don't know.

16       A.   8kun, yes.

17       Q.   8kun, okay.  For the ZeroHedge website, do

18  you feel that there is a political lean for that

19  website as well?

20       A.   Yes.

21       Q.   And how would you describe it?

22       A.   Right.

23       Q.   And that website impacted your decision as

24  it related to the COVID-19 vaccine.

25       A.   Probably, yes.

```
1        A.    Yes.
2        Q.    I want to go down to the bottom here,
3   where it says Telework.  You marked yes.  Or he
4   marked yes after you told him you would be.  Was
5   your job one that can be done fully remote?
6        A.    Not fully.
7        Q.    So there would have been times that you
8   would have had to come in?
9        A.    Yes.
10       Q.    Did you also do training?
11       A.    Yes.
12       Q.    Did you conduct the training and attend
13  trainings?
14       A.    Yes.
15       Q.    And those trainings were also done in
16  groups; is that right?
17       A.    Yes.
18       Q.    Okay, so after you had the discussion with
19  Ray Parrish, do you recall the next communication
20  that you had with UCOR?
21       A.    Just going through the process, whatever
22  the next process was.  It was another discussion
23  where they threatened me -- threatened to fire me if
24  I didn't take the vaccine.
25       Q.    And I'll direct you to -- I believe it's
```

1        DEPOSITION OF MALENA DENNIS
2
3                June 21, 2023
4        IN THE UNITED STATES DISTRICT COURT
         FOR THE EASTERN DISTRICT OF TENNESSEE
5              CAUSE NO. 3:22-cv-00426
6
         CARLTON SPEER, MALENA DENNIS,  )
7        and ZACHARIAH DUNCAN, on their )
         own behalf and on behalf of    )
8        others similarly situated,     )
                                        )
9                       Plaintiffs,     )
                                        )
10              -vs-                    )
                                        )
11       UCOR, LLC,                     )
                                        )
12                      Defendant.      )
         - - - - - - - - - - - - - - - -)
13
14       APPEARANCES
15              FOR THE PLAINTIFFS:
16              MR. CLINT J. COLEMAN
                   NELSON LAW GROUP
17                 10263 Kingston Pike
                   Knoxville, Tennessee 37922
18                 (865)383-1053
19              FOR THE DEFENDANT:
20              MS. LUCI L. NELSON
                   OGLETREE, DEAKINS, NASH, SMOAK
21                   & STEWART, P.C.
                   The Ogletree Building
22                 300 North Main Street, Suite 500
                   Greenville, South Carolina 29601
23                 (864)271-1300
24
25              - Appearances Continued -

1     Q.   And I know you said it's the same job as

2   you had at UCOR.  Can you tell me about your job

3   duties, please?

4     A.   Basically, I use different instruments to

5   scan items for contamination so that they can be

6   released or dispositioned appropriately.  It's a

7   little bit different than what I did at UCOR, even

8   though it's the same job title.  Some of the things

9   are similar.

10        At UCOR, I worked in the lab, in the count

11   lab, where I used -- I counted air samples and did

12   some surveys.  I would log information in to the

13   computer database, as far as calibration dates.  I

14   did simple repairs that we were allowed to do by

15   contract on different instruments.  I had a lot more

16   job duties at UCOR than I do where I work now.

17     Q.   Do you ever scan people for radiation

18   contamination?

19     A.   Where I am now, mostly just hands.  Like

20   if they touch something and I find something on it,

21   then I'll check their gloves.

22     Q.   Do you do that with a wand?  Or do they

23   put their hands into a machine and --

24     A.   No, I have a 2224 with a 43-93 probe.

25     Q.   Okay, I don't know what that looks like.

1  was where they dropped the air samples off.  We had
2  a small table.  I had to survey that table.
3         I had to survey my work surfaces, because
4  I'm dealing with the air samples that are coming in
5  from the projects, to make sure that I haven't
6  contaminated anything with the air samples.  And
7  that was about the limit was a daily survey of my
8  work areas.
9     Q.    Your job at UCOR had to be done on site,
10  correct?
11     A.    Yes.
12     Q.    Including during the pandemic?
13     A.    Yes.
14     Q.    What happens if an individual is found to
15  have been contaminated?  What's the next step?
16     A.    Well, I would rather -- to be honest with
17  you, I never encountered that.  I can only tell you
18  in theory because it wasn't part of my job scope.
19     Q.    Okay.  Tell me what you understand.
20     A.    If someone were to be contaminated, your
21  first job would be to notify your supervisor.
22  Depending on what's contaminated, obviously.  If
23  their hands are contaminated, you don't want them to
24  touch anything or to touch themselves, anywhere
25  else, to spread that contamination.

1    had earned because we had been there for years.

2              And we were hoping that UCOR would rectify

3    that for us.  And in the end, in their own way, I

4    guess they did, because they offered us to come over

5    and work for them instead of staying with the staff

6    augmentation.  But that wasn't necessarily resolved

7    through this program.  We didn't really get anywhere

8    with this program.

9         Q.   Okay.

10        A.   And that's the point that I was trying to

11   make.

12        Q.   You had COVID-19 in December of 2020,

13   correct?

14        A.   Yes.

15        Q.   All right.  Let's look back at Exhibit 1

16   and your answer to number 21, please.

17        A.   Which page, again?  I'm sorry.

18        Q.   Page 14.

19        A.   Okay.

20        Q.   And you said, "I had COVID-19 in

21   December 2020.  I notified UCOR's medical personnel

22   and followed all of their requirements."

23        A.   Yes.

24        Q.   "I was out of work for approximately 3

25   weeks due to mandatory quarantine procedures,"

1  correct?

2       A.   Yes.

3       Q.   "My symptoms were not severe but included

4  nausea, headaches, body aches, and a mild fever,"

5  correct?

6       A.   Yes.

7       Q.   "During the seven days prior to testing

8  positive, I worked at UCOR and attended Thanksgiving

9  with my mother and two brothers," correct?

10      A.   Yes.

11      Q.   How did you find out that you had

12 COVID-19?

13      A.   We had the little checklist, or whatever,

14 that UCOR had provided, they wanted us to go by.

15 And if you fell under anything that was on that

16 list, then you had to call them and not come in to

17 work.  I woke up that morning, I had a terrible

18 headache, so I called them and asked -- I called the

19 hotline, or the number that they provided, told them

20 I had a headache, because it was on the list.

21      Q.   Did you take a COVID test?

22      A.   They sent me to a clinic.  I had to --

23 well, they didn't send me to the clinic.  I had to

24 find a clinic or a testing center and take a COVID

25 test and send them the results, which I did.

1     Q.    And the result was positive?

2     A.    The result was positive, yes.

3     Q.    Had you been around someone else who had

4   COVID?

5     A.    Not to my knowledge.

6     Q.    Do you know how you contracted it?

7     A.    Nope.

8     Q.    Could you have gotten it at work?

9     A.    There again, I would just be guessing.

10    Q.    But it's possible?

11    A.    Anything's possible.

12    Q.    When did you -- you said in your answer

13  that you notified UCOR's medical personnel, correct?

14    A.    Yes.

15    Q.    When did you notify them?

16    A.    I got up that morning, I looked at the

17  checklist, I had a headache, headache was on the

18  list, and so I notified them instead of going in to

19  work, because that's what we were required to do at

20  the time.

21    Q.    Had you had a headache the day before?

22    A.    No.

23    Q.    Had you had any other symptoms before that

24  morning?

25    A.    No.

1  Q.  How did you know to notify UCOR medical

2  personnel?

3  A.  Because they had a COVID policy that you

4  had to follow every day, they gave us a list, and

5  you had to check that checklist every day before you

6  came in to work.  And if any of the symptoms or

7  anything listed on that was true, then you were

8  required to call before coming in.

9  Q.  And you said you went to work during the

10  seven days prior to testing positive, correct?

11  A.  Whatever days I was scheduled to work

12  before that day, then I was there.  I don't remember

13  the exact date that I tested positive.  To be honest

14  with you, I'm not even -- depending on the day that

15  I tested positive, if that's even like the seven

16  days, I'm not sure.

17  And they may have asked me what I had done

18  in the last two weeks, because it's possible there

19  was a time, and I'm not sure if that exact time, you

20  had to give an account if you had been exposed to

21  anyone within two weeks, or any possibility, or been

22  at a gathering within two weeks.

23  The policies were constantly being changed,

24  so I can't say with certainty that that was the

25  policy at that time, but it could have been.

1     Q.   And the possible accommodations, Weekly

2  Testing?  So when it has the box next to yes

3  checked, was that meaning, yes, you would -- well,

4  the question was, "Would you be able and/or willing

5  to follow any of the possible accommodations listed

6  below?"  Correct?

7     A.   Yes.

8     Q.   And you said yes to Weekly Testing?

9     A.   Yes.

10    Q.   You said yes to a KN95 or N95 Mask

11  Mandate.

12    A.   Yes.

13    Q.   You said yes to Mask Fit (if required).

14    A.   Yes.

15    Q.   You said yes to Job Reassignment?

16    A.   Yes.

17    Q.   You said yes to Isolation or Distancing.

18    A.   Yes.

19    Q.   You said yes to Short-Term Disability.

20    A.   Yes.

21    Q.   You said yes to Daily Self Health Check.

22    A.   Yes.

23    Q.   And you said no to Telework (Temporary).

24    A.   Because I couldn't do my job at home.

25    Q.   And then in the box here it says, "If you

1      Q.   Do you see that?

2      A.   Yes.

3      Q.   And it says, "Without our 2nd Amendment we

4 would be Australia or Austria.  They are still

5 working on it though.  Non-stop."  Did you make that

6 post?

7      A.   Possibly.

8      Q.   What is the significance of that post?

9      A.   I don't remember.  I don't remember what

10 it was in reference to.

11      Q.   Flip back to page 260.

12      A.   Okay.

13      Q.   And there's a post at 18:23, Take This Jab

14 and Shove It Chat --

15      A.   Yes.

16      Q.   -- and it says, "Don't Trust Their

17 Science"?

18      A.   Yes.

19      Q.   Did you make this post?

20      A.   Yes.  It's actually a parody.

21      Q.   Tell me about it.

22      A.   It's just a parody song.

23      Q.   Okay.  And what do you mean when you say

24 it's a parody?

25      A.   Well, the definition of a parody is when

1    you're making fun of something --

2         Q.   What are you making --

3         A.   -- or exaggerating something.

4         Q.   What are you making fun of here?

5         A.   Well, I would say that I'm making fun of,

6    "Hello COVID, we're not friends."  I wasn't friends

7    with COVID.

8         Q.   The end of the -- the final stanza of that

9    first section says, "They need us to trust the

10   science."  Who is "they"?

11        A.   There is no "they."  It's just the song.

12   So you have to find words that fit in.

13        Q.   Well, the title of the song is, "Don't

14   Trust Their Science."  Who is "their"?

15        A.   There was no specific intention when this

16   was written.  It wasn't against any particular

17   person or entity.

18        Q.   The top of the next part says, "The

19   commies need to leave this place."  Who are "The

20   commies"?

21        A.   There again, this wasn't written with

22   intention, it was written as a joke.  They're all

23   over the internet.  If you go on YouTube and you

24   search up "COVID parodies," you'll find a plethora

25   of these.

1    Q.   It says in that same section, "They all
2  run when I talk about The stolen election really
3  freaks them out."  What is that referencing?
4    A.   Which?  Where is it?  Okay.  This?
5    Q.   In the second section it says, "They all
6  run when I talk about the stolen election really
7  freaks them out."
8    A.   Okay.
9    Q.   What is that referencing?
10   A.   The whole thing is referencing a parody of
11  all of the issues that was circulating around in the
12  news cycle and everything at that particular time.
13   Q.   And, again, that stanza, the last line
14  of that section is, "They need us to trust the
15  science"?
16   A.   That's what it says, yes.
17   Q.   And what does that mean, "They need us to
18  trust the science"?
19   A.   There again, it's a parody.  So you're
20  making a joke about something or exaggerating a
21  situation.  It's like watching Saturday Night Live,
22  those are parodies.
23   Q.   The next section says, "Like will they try
24  to force the jab Will we be banned from taxi cabs
25  People lining up for the juice People pushing for

1    masks and boosts People need to hold the line and

2    grow a pair If they dare.  You can shove your

3    science."  What does that part mean?

4         A.   There again, this entire thing is a

5    parody.

6         Q.   A parody of what, though?

7         A.   It's an exaggeration of what's in the news

8    cycle at that time.

9         Q.   What is it an exaggeration of?

10        A.   Whatever was in the news cycle at the time

11   it was written.  There was a lot going on.  You had

12   COVID, you had mandates, you had election stuff all

13   over the place.  It was a plethora of stuff.

14        Q.   The next section says, "We have to take it

15   all back Work hard to make an impact We have to

16   stand for our nation Just say no to their oppression

17   But we're all just waiting for that tweet... On the

18   edge of my seat And ignore their science."

19             What does it mean, "We have to stand for

20   our nation"?

21        A.   Don't we stand for our nation every day?

22        Q.   What does that mean?

23        A.   Exactly that.  I mean, we have a nation.

24   Do you not support your nation?

25        Q.   How does this -- what does that mean, "We

Case 3:22-cv-00426-TRM-JEM    Document 103-1    Filed 06/03/24    Page 27 of 352
PageID #: 1892

1    have to stand for our nation"?

2         A.   I don't know.  It fit in the line, to be

3    honest with you.

4         Q.   Did you write this or did you copy and

5    paste it from somewhere else?

6         A.   I wrote it.

7         Q.   "Just say no to their oppression"?  Whose

8    oppression?

9         A.   There again, it was a parody.  It wasn't

10   talking about anyone in particular.  In general.

11        Q.   The next line is, "But we're all just

12   waiting for that tweet."  What Tweet?

13        A.   I have no idea.  It rhymed.  I needed to

14   figure out something that would fit in there.

15        Q.   And then it says, "And ignore their

16   science"?  What does that mean?

17        A.   It doesn't mean anything because it's a

18   parody.

19        Q.   And when you say the science, are you

20   referencing the vaccine?

21        A.   I had to find a phrase that fit in with

22   just -- trying to alleviate the pressures, which is

23   why you would do a parody.

24        Q.   Well, you posted it in a group chat --

25        A.   Yes.

1    Q.   -- made up of people who were terminated

2  from their jobs for not taking the COVID-19 vaccine,

3  correct?

4    A.   Yes.

5    Q.   So is it fair to say that the science

6  referenced in this parody is referencing the

7  vaccine?

8    A.   In a joking manner, yes.  Don't you think

9  that humor brings a little levity to a situation

10  that you're stressed out about?

11    Q.   At the top of the next page --

12    A.   Which page?

13    Q.   The next page is --

14    A.   261.

15    Q.   Yes, ma'am, that's 261, at the bottom, and

16  that parody carries over, it says, "As a country we

17  all prayed Make Biden Joe go away Take Kamala with

18  you too The CDC and The Who.  And the sign said, the

19  words Let's Go Brandon was written on the subway

20  wall Hear them call FJB don't trust his science."

21  What is FJB?

22    A.   Well, it was a phrase that was going

23  around at the time.

24    Q.   Does that stand for fuck Joe Biden?

25    A.   Yes.

1      Q.   And it says, "don't trust his science"?

2      A.   I don't like Joe Biden.  I mean, I've

3   already stated that.

4      Q.   Look over on page 182.  There's a post at

5   20:55 from Take This Jab and Shove It Chat.  Do you

6   see that?

7      A.   Yes.

8      Q.   And it says, "I'm not surprised.  The

9   biggest unions are far left.  If you follow the

10  money you will find that these unions donate heavily

11  to the organizations that are promoting the assault

12  on your Constitutional rights."  Did you write that?

13     A.   Probably.

14     Q.   What does that mean?  What does this post

15  mean?

16     A.   It means that most unions invest their

17  money into far left causes that are not necessarily

18  aligned with the Constitution.

19     Q.   Can you give me an example?

20     A.   No, not right off the top of my head.

21     Q.   All right.  If you flip back one page,

22  there is a post at 20:46 by someone named Kevin

23  Webster.

24     A.   Okay.

25     Q.   And it says, "From the article: 'Several

Case 3:22-cv-00426-TRM-JEM    Document 103-1    Filed 06/03/24    Page 30 of 352
PageID #: 1895

1    worker or would it be different for some workers?

2    .    A.    I don't know.

3         Q.    Would telework be possible for some

4    positions?

5         A.    I would imagine.  But I -- really, I don't

6    know what their jobs descriptions are, so I can't

7    really answer.  It's possible.

8         Q.    Would it have to be made on a case-by-case

9    basis?

10        A.    I would think so.

11             (Defendant's Deposition Exhibit 13 marked

12   for identification.)

13   BY MS. NELSON:

14        Q.    Ms. Dennis, this is Exhibit 13.  Do you

15   recognize this document?

16        A.    Yes.

17        Q.    Okay.  What is this document?

18        A.    It looks like our Complaint.

19        Q.    Let's look at paragraph 24, which is on

20   page five.

21        A.    Okay.

22        Q.    And it says, "Each Plaintiff requested an

23   accommodation or exemption from the policy to

24   include, inter alia, the ability to work from home

25   and/or that he or she be able to utilized enhanced

1  safety protocols such as mask wearing and/or face
2  shields, social distancing, frequent COVID-19
3  testing, and COVID-19 antibody testing.  Some
4  Plaintiffs unilaterally something pay for such
5  provisions."  Correct?
6      A.   Yes.
7      Q.   This paragraph alleges that each Plaintiff
8  requested an accommodation to include the ability
9  to work from home.  But you didn't make that
10 request, correct?  You did not request to work from
11 home?
12     A.   I personally did not request to work from
13 home because my job duties couldn't be carried out
14 at home, not unless the Department of Energy is
15 going to make my home an RMA.
16     Q.   Do you know if permitting certain workers
17 to work remotely could have caused a union
18 grievance?
19     A.   I have no idea.
20     Q.   You contend -- or I believe you contend --
21 correct me if I'm wrong, but you contend that
22 UCOR's denial of your request for accommodation was
23 unlawful, correct?
24     A.   I would have to refer to my attorneys as
25 to what's considered unlawful.

1           DEPOSITION OF ZACHARIAH S. DUNCAN
2

3                June 20, 2023

4       IN THE UNITED STATES DISTRICT COURT
      FOR THE EASTERN DISTRICT OF TENNESSEE
5          CAUSE NO. 3:22-cv-00426
6

   CARLTON SPEER, MALENA DENNIS,  )
7  and ZACHARIAH DUNCAN, on their )
   own behalf and on behalf of    )
8  others similarly situated,     )
                           )
9              Plaintiffs, )
                           )
10        -vs-          )
                           )
11  UCOR, LLC,             )
                           )
12             Defendant. )
   - - - - - - - - - - - - - - - )
13
14  APPEARANCES
15         FOR THE PLAINTIFFS:
16         MR. CLINT J. COLEMAN
            NELSON LAW GROUP
17          10263 Kingston Pike
            Knoxville, Tennessee 37922
18          (865)383-1053
19         FOR THE DEFENDANT:
20         MR. WILLIAM S. RUTCHOW
        MR. DARIUS WALKER, JR.
21          OGLETREE, DEAKINS, NASH, SMOAK
          & STEWART, P.C.
22          Truist Plaza
         401 Commerce Street, Suite 1200
23          Nashville, Tennessee 37219-2446
         (615)254-1900
24
25        - Appearances Continued -

Case 3:22-cv-00426-TRM-JEM   Document 103-1   Filed 06/03/24   Page 33 of 352   PageID #: 1898

1      Q.   And Y-12 is also at the Oak Ridge

2  facility.

3      A.   That's correct.

4      Q.   In fact, UCOR provides services at Y-12,

5  the Y-12 complex, correct?

6      A.   That's right.

7      Q.   I just want to make sure I've got that

8  clear for the record, as to what Y-12 means.

9      A.   Okay.

10      Q.   Okay.  What was your position at UCOR?

11      A.   I was a material clerk.

12      Q.   What did you do as a materials clerk?

13      A.   We received incoming deliveries and we

14  offloaded them and put them in the computer system

15  and inventory software, and we prepared the

16  deliveries for our delivery trucks, and then I also

17  drove a delivery truck.

18      Q.   Did you apply for any other materials

19  clerks positions after you left UCOR?

20      A.   Yes, I did.  I applied for Oak Ridge

21  National Lab's material clerk.

22      Q.   Anyplace else?

23      A.   That is -- I believe that's it.

24      Q.   Okay.  And how did you go about looking

25  for these jobs that you applied for at Y-12, ORNL,

1      A.    Uh-huh.

2      Q.    Okay.  First paragraph, the Message from

3    Ken reads, "Two weeks ago, I shared with you our

4    concern about the worsening pandemic and the need to

5    keep our entire UCOR family healthy and safe.  The

6    COVID-19 transmission rates locally and nationally

7    continue to increase, mainly because of the highly

8    contagious Delta variant.  To ensure a continued

9    safe work environment, we had two options:  1.

10   Initiate weekly testing for our workers who are not

11   fully vaccinated.  2. Make the vaccination a

12   requirement for all members of the workforce."

13          Did I read that correctly?

14     A.    Yes, you did.

15     Q.    Then in the second paragraph it talks

16   about the decision that they made was, in fact, to

17   require mandatory vaccinations.  And in the middle

18   of that paragraph it says, "Mandatory vaccinations

19   will further enhance workforce safety and will help

20   facilitate a responsible return to normal

21   operations.  It will also avoid issues associated

22   with a lag time between testing and receiving

23   results, which risks putting infected individuals in

24   the workforce."

25          Did I read that correctly?

1    A.    You did.

2    Q.    Okay.  Do you have any reason to doubt

3    that -- the reason that Mr. Rueter put here for why

4    UCOR was making the vaccination mandatory, to

5    further enhance workforce safety and help facilitate

6    a responsible return to normal operations, do you

7    have any reason to doubt that this is the reason why

8    UCOR adopted this mandatory vaccination policy?

9    A.    Part of me wants to, just because UCOR had

10   a hundred percent effective controls in place prior

11   to the vaccine mandate.

12   Q.    Did those controls change over time?

13   A.    It's been a while.  I don't remember

14   exactly how they were at the minute.

15   Q.    So, in your mind, there was no need for

16   the mandatory vaccination because the controls they

17   had in place were sufficient?

18   A.    Yes.

19   Q.    Do you have any reason to believe that

20   UCOR thought that it would enhance the safety of its

21   workforce by adopting this mandatory vaccination?

22   A.    They were already at a hundred percent

23   effectiveness.

24   Q.    So do you think they had some other reason

25   other than to ensure workforce safety to adopt this

1    mandatory vaccination requirement?

2        A.   I can't say their intentions there.  I

3    really don't know.

4        Q.   Well, I'm asking -- the intentions that

5    are on this piece of paper are to enhance workforce

6    safety.  And I'm asking you if you have -- and, you

7    know, what you've told me is, well, they already had

8    a hundred percent.

9        A.   Uh-huh.

10       Q.   So I'm asking you if you -- do you not

11   believe Mr. Rueter's statement that that's why they

12   were adopting the vaccination?

13       A.   I believe Mr. Rueter.  At the same time, I

14   remember that the vice president issued an e-mail

15   just weeks earlier saying that vaccinations would be

16   a choice, tried to calm the fears of the workforce.

17       Q.   And then a few weeks later Mr. Rueter

18   sends this out saying that they have decided to make

19   it mandatory.

20       A.   That's correct.

21       Q.   And you don't recall -- at the time that

22   the mandatory vaccination policy was announced in

23   August, what were the other measures that the

24   company was taking?

25       A.   To the best of my memory, it was masking

1    To whom it may concern," is that your request for a

2    religious exemption?

3         A.   Yes, it is.

4         Q.   Tell me about that process.  First, what

5    did you do to prepare the request form?

6         A.   Well, for months I'd been studying, to

7    make sure that I wasn't just wanting it out of --

8    wanting an exemption out of pridefulness.  I wanted

9    to make sure that it was sound Biblical doctrine

10   that I was claiming.  I knew I couldn't take the

11   vaccine, and I wanted to take every effort I could

12   to find scripture and other -- examples of other

13   Christians who felt the same, see what their

14   arguments were for or against.

15        Q.   Before you were looking for the support

16   for your decision, Biblical support, you just told

17   me you knew you couldn't take the vaccine.

18        A.   Uh-huh.

19        Q.   Why not?

20        A.   My conscience objected to it.  The Holy

21   Spirit just led me to be wary and cautious of it.

22        Q.   Okay.  Is there any specific reason why

23   your conscience was telling you to be wary and

24   cautious?

25        A.   This was the first time I found out about

1    to take vaccines because of what you generally know

2    about what happened with the COVID-19 vaccine and

3    the use of fetal cell lines, correct?

4         A.    Correct.

5         Q.    And the first time you learned of that was

6    when you were researching the COVID-19 vaccine,

7    correct?

8         A.    That's right.

9         Q.    Are there any other medications that you

10   decline to use because of a religious objection?

11        A.    The vaccines would really be the only one

12   that I've looked into.

13        Q.    Okay.  Have you looked into any other --

14   so you haven't looked into any other medications

15   to determine whether or not they were developed

16   using aborted fetal cell lines.

17        A.    I don't -- I try my best not to take any

18   medication, except those to treat my disability,

19   which is migraines.

20        Q.    Okay.  All right.

21        A.    And antibiotics and that sort of thing.

22        Q.    I understand.  Are there any medical

23   procedures that you object -- that you do not --

24   would not -- either do not or would not allow either

25   for yourself or your family due to a religious

1    checked no.  Can you explain that to me, why that

2    box is checked no?

3         A.   I didn't want to be -- what's the word --

4    removed from all co-workers, sitting in my own

5    corner, you know.  If I was sick, I would agree with

6    that, but....

7         Q.   When you say, "if I was sick," if you were

8    symptomatic?

9         A.   If I was symptomatic, yes, I would agree

10   that I would need to isolate, but --

11        Q.   What about if you tested positive but had

12   no symptoms?

13        A.   Yes, also would isolate.

14        Q.   You would isolate as well?

15        A.   Yeah.

16        Q.   And then Short-Term Disability, you

17   checked yes.  Daily Self Health Check, you checked

18   yes.  And then the last one, Telework, neither box

19   is checked and then there's an "N/A" out to the

20   left.  Does that mean not applicable?

21        A.   It does.

22        Q.   Yours is a job that could not be done

23   remotely, correct?

24        A.   Correct.  The delivery portion could not.

25        Q.   And, in fact, you did not work remotely

Case 3:22-cv-00426-TRM-JEM   Document 103-1   Filed 06/03/24   Page 40 of 352
PageID #: 1905

1    action, up to and including termination of your

2    employment at UCOR."  Do you see that?

3         A.    I do.

4         Q.    Did I read that correctly?

5         A.    You did.

6         Q.    So can you tell me ultimately why you

7    refused to get the vaccine?

8         A.    Yeah, it's a -- as you say, it's -- I

9    guess nuanced is a good word.  There's many reasons.

10   I believe my body belongs to God and he has total

11   authority over it.  When my conscience objects to

12   something, Christians are told that we need to obey

13   God rather than man.  Ultimately, I told you, I

14   found out for the first time that fetal cell lines

15   were used during the development process to bring

16   these vaccines to market.  I didn't want to have any

17   part of that.  And the spirit of fear used to push

18   the vaccines, also.  Christians, in the Old and New

19   Testament, were told not to fear, over and over

20   again.  I didn't want to be reactive to fear.

21        Q.    I earlier asked you about other

22   medications, vaccines, medical procedures related to

23   the fetal cell lines.  Any other medications,

24   vaccines, medical procedures that your conscience --

25   what you told me, that your body belongs to God.

1    Q.   If you'd go to the third page, up at the

2  top.  "He reports that his last PCP," which I

3  understand to be primary care provider -- do you see

4  that?

5    A.   What page are you on?

6    Q.   Sorry, it would be the next-to-last

7  page --

8    A.   Okay.

9    Q.   -- of this exhibit.

10    A.   Okay.

11    Q.   It's the next-to-last page of the exhibit,

12  it says that, "He reports that his last PCP was

13  Dr. Randy Denton in Harriman.  He says it has been

14  more than 3 years since he last saw him."

15        So you had not been to see a general

16  practitioner for about three years before this 2021

17  visit?

18    A.   That's right.

19    Q.   And has Ms. Moore, the nurse practitioner,

20  become your primary care physician or healthcare

21  provider since you established with her in May of

22  2021?

23    A.   Yeah, she has.

24    Q.   Did you do any -- once you became aware of

25  the issues with the vaccines, with connection to

1    aborted fetal cells, did you do any research on the

2    medications you have been prescribed to determine

3    whether there were any concerns with those?

4         A.   No, I didn't.

5         Q.   So you don't know one way or the other.

6         A.   I'm not certain, no.

7         Q.   Okay.  And if they had, would you stop

8    taking them?

9         A.   For my migraines, probably not at the

10   moment.

11        Q.   The migraines are just -- it's necessary.

12        A.   Yeah, it's a severe disability, so....

13        Q.   Okay.  And so is it fair to say that in

14   weighing out your decision whether or not to get the

15   vaccine, that your various objections, the climate

16   of fear --

17        A.   Uh-huh.

18        Q.   -- the spirit of fear, I think is what you

19   called it, that your body belongs to God, the issue

20   with the connection to fetal cells -- make sure I

21   understand this -- that if you put that on a scale,

22   would your concerns or doubts about the

23   effectiveness of the vaccine or the necessity of the

24   vaccine, did that weigh into your decision?

25        A.   I would say that weighed into it as well.

1  feel the case is about.

2      Q.   Do you believe that everyone who requested

3  a religious exemption from the vaccine mandate

4  should have had that request granted?

5      A.   In my opinion, it should have been on a

6  case-by-case basis.

7      Q.   Make sure I understand.  That would

8  involve looking at that particular person's

9  description of their religious beliefs and what

10  accommodations could be made for their particular

11  job?  Is that fair?

12      A.   That's fair.

13      Q.   You never made a request to be able to

14  work from home, did you?

15      A.   I did not.

16      Q.   Not something you could do in your job,

17  right?

18      A.   Uh-uh.

19      Q.   Okay.  During the times that the company

20  was requiring employees to wear masks, did you

21  always wear a mask?

22      A.   I wouldn't say that anyone always did.  I

23  tried to be very mindful, especially when I was

24  around others, to have my mask on.

25      Q.   Were there others that weren't quite so

```
 1    mindful?
 2         A.    Yeah, definitely.
 3         Q.    So there were people who didn't wear their
 4    masks more often than you didn't wear your mask.
 5         A.    I would say that, yes.
 6         Q.    Were there people who didn't wear them --
 7    I understand you tried to be very mindful;
 8    particularly, when you were around others.  Were
 9    there other employees who did not wear their masks
10    when they were around others?
11         A.    Yes.  And there was probably times when I
12    might have been one of those as well.
13         Q.    So there wasn't perfect adherence to the
14    company's requirement that people wear masks.  Is
15    that fair?
16         A.    Yes, that's correct.
17         Q.    Are you aware of anyone who -- let me step
18    back.
19              What were the circumstances under which
20    someone should isolate at home?
21         A.    Well, it changed.  At times it was if you
22    had been in contact with someone, and then it turned
23    to if you had been symptomatic.
24         Q.    If you tested positive, was that also a --
25         A.    That would definitely be.
```

## DECLARATION OF CHARLES MALARKEY

Comes now the Declarant, Charles Malarkey, having been duly sworn deposes and says:

1) I am over the age of eighteen and am competent to testify to the facts set forth below of which I have personal knowledge.

2) UCOR is a joint venture between Amentum Services, Inc. and Jacobs Engineering Group, Inc. The purpose of the joint venture is to perform work under the ORNL Operations Clean-Up Enterprise (OOCE) located at the United States Department of Energy's (DOE) Oak Ridge National Laboratory. UCOR performs construction contract work at the DOE's three sites in Oak Ridge, Tennessee. Specifically, UCOR specializes in the safe decommissioning and demolition of former nuclear facilities.

3) I am the Administrative Services Manager for UCOR. I am responsible for oversight of the Benefits, Human Resources, Labor Relations, and Administrative Professional Services organizations and I am responsible for staffing, diversity promotion, employee relations, compensation, benefits, morale and motivation, talent development, labor relations and labor standards administration, and optimization of administrative resources.

4) In this role, I participated in and I am familiar with the process by which UCOR considered individual employees' requests for religious and/or medical accommodations from UCOR's COVID-19 vaccination job requirement.

5) On August 26, 2021, UCOR announced to our employees the mandatory vaccination program. A true and accurate copy of the Information Packet distributed to employees on August 30, 2021 is attached as Exhibit 1.

6) Specifically, UCOR adopted the following policy – UCOR POL-HR-313, COVID-19 Vaccination Policy. "All individuals working for UCOR – including UCOR employees, staff

augmentation employees, and subcontractors employees collectively, 'Members of workforce' must receive and provide proof of having received a full course (two doses of a two-dose vaccine or one dose of a single-dose vaccine) of a COVID-19 vaccine acceptable to UCOR, as defined below. Members of the workforce must provide such proof by utilizing UCOR Medical Services to obtain vaccinations or providing UCOR Medical Services with a copy of their vaccination card."

7) Employees were required to receive their first vaccine dose by October 1, 2021. UCOR also announced to employees that they could apply for a religious exemption by completing Form -3604 UCOR COVID-19 Vaccination Religious Exemption Request Form. A true and accurate copy of this Form is attached as Exhibit 2.

8) Requests for religious exemptions were due to be returned by September 14, 2021. 103 UCOR employees, staff augmentation employees, and subcontractor employees submitted Religious Exemption Request Forms to UCOR or, in the case of staff augmentation and subcontractor employees, to their employers. Ultimately five employees withdrew their requests, leaving 98 religious exemption requests to be evaluated.

9) UCOR created an Accommodation Review Committee made up of experienced Human Resources professionals that included Charlie Malarkey (UCOR Administrative Services Manager), Mary Alice Douglass (Human Resources Manager), Vanessa Holsomback (Senior Human Resources Representative), Len Morgan (Labor Relations Manager), and Ray Parrish (Labor Relations Representative) to evaluate the religious exemption requests from UCOR employees. This Committee has significant experience addressing accommodation requests, including engaging in the interactive process. The Committee reviewed each Religious Exemption Request individually to make a determination on whether or not the employee's

2

request was based upon a sincerely-held religious belief. For purposes of the accommodation process, UCOR did not dispute that each religious exemption request was based upon a sincerely-held belief.

10) A member of the Review Committee then contacted each employee and had an interactive discussion with each employee regarding possible accommodations and documented possible accommodations considered for each employee.

11) Plaintiff Carlton Speer was a Senior Radiological Protection Special Technical Lead for UCOR. His job responsibilities were part of UCOR's efforts to provide personnel, environmental and site area radiological protection and included contamination and radiation exposure control at on-site work locations, air monitoring, dosimetry, calibration of instrumentation and equipment at various site locations, and radiological characterization/survey planning, performance and direction at multiple project areas throughout the worksite. In this position he performed functions of a Radiological Protection Technician and an Instrumentation Technician at an advanced level. The instrumentation for which the Senior Radiological Protection Special Technical Lead is responsible is located on-site and cannot be calibrated off-site. This position must be readily available to be in the field to trouble-shoot instrumentation. A true and accurate copy of the Job Function description for the Radiation Protection Technician job family is attached as Exhibit 3. The Memorandum of Understanding between UCOR and the Atomic Trades & Labor Council ("Union") regarding Mr. Speer's specific job title is attached as Exhibit 4. Mr. Speer performed his job duties on-site, including during the pandemic. Mr. Speer's job duties must be performed on-site; they are not amenable to being performed remotely.

3

12) Mr. Speer submitted a Religious Exemption request. A true and correct copy of his exemption request is attached hereto a part of Collective Exhibit 5. On September 21, 2021, Committee member Ray Parrish engaged in an interactive discussion with Mr. Speer regarding his exemption request, including potential accommodations. A true and correct copy of the Exemption and Accommodation Interactive Discussion Intake and Exemption & Accommodation Review Summary that Mr. Speer and Mr. Parrish completed is also included within Collective Exhibit 5. On October 4, 2021 another member of the Review Committee, Mary Alice Douglass sent Mr. Speer notification that his request for an accommodation had been denied. As discussed in more detail below, the accommodation would represent a greater than minimal impact to UCOR's operations, including impacts on workplace safety and cost.

13) Plaintiff Malena Dennis was a Senior Radiation Protection Technician for UCOR. Her job duties included performing radiological surveys of areas and equipment; pulling air samples in work areas for airborne contamination; radiological surveys of work areas for radiation exposure to the workers and contamination surveys to ensure that workers do not contaminate themselves during work evolutions. Radiation Protection Technicians perform surveys of workers exiting areas to ensure that contamination remains in contamination areas and that good radiological work practices are validated. In the event of a personnel contamination, radiological technicians take the lead in decontamination of the individual and subsequent follow-up with dosimetry for follow-on testing at UCOR's work sites at ORNL. A true and accurate copy of the Job Function description for the Radiation Protection Technician job family is attached as Exhibit 3. Ms. Dennis performed her job duties on-site, including during the pandemic. Ms. Dennis's job duties must be performed on-site; they are not amenable to being performed remotely.

4

14) Ms. Dennis submitted a Religious Exemption request to the Accommodation Review Committee. A true and correct copy of her exemption request is attached hereto a part of Collective Exhibit 6. On September 15, 2021, Committee member Mary Alice Douglass engaged in an interactive discussion with Ms. Dennis regarding her exemption request, including potential accommodations. A true and correct copy of the Exemption & Accommodation Review Summary that Ms. Douglass completed for Ms. Dennis is included within Collective Exhibit 6. On October 4, 2021, Ms. Douglass notified Ms. Dennis that her request for an accommodation had been denied. *Id.* As discussed in more detail below, the accommodation would represent a greater than minimal impact to UCOR's operations, including impacts on workplace safety and cost. *Id.*

15) During her interactive process, Ms. Dennis requested as an accommodation that UCOR "put all unvaccinated in training rooms together to eliminate any concerns for exposure – ease other people's fears." *See* Collective Exhibit 6. This suggestion illustrates the burden on workplace safety posed by Plaintiffs' requested accommodations. Concentrating all unvaccinated employees together would dramatically increase the risk to those employees posed by exposure to COVID-19.

16) Plaintiff Zachariah Duncan was a Material Clerk for UCOR. Mr. Duncan's job duties included physically receiving and offloading deliveries to worksites, delivering and offloading materials and equipment to project teams throughout the UCOR worksites, including ORNL and Y-12, performing physical inventories of personnel property, processing and disposing of excess materials and equipment and transporting materials via trucks and forklifts. A copy of the Staffing Requisition for the Material Clerk position is attached as Exhibit 7. Mr. Duncan

5

performed his job duties on-site, including during the pandemic.  Mr. Duncan's job duties must be performed on-site; they are not amenable to being performed remotely.

17) I participated in the preparation of Staffing Requisitions and job postings prepared in November, 2021 that are referenced in Mr. Duncan's second declaration, including the Staffing Requisition for the position of Material Clerk.  Exhibit 1 to Mr. Duncan's declaration is a partial "screenshot" of a November 2, 2021 job posting for the Material Clerk position.  In these Staffing Requisitions and job postings, UCOR expressly referenced that an applicant must be fully vaccinated or determined eligible for accommodation under the ADA.  The Staffing Requisitions and job postings were focused on ADA accommodations, which was an error on our part.  This omission has been corrected.  UCOR's job postings and Staffing Requisitions now include the following statement to cover all potential accommodation requests:  **"COVID Vaccine:** The COVID vaccine is mandatory for all UCOR employees unless granted an accommodation under applicable state or federal law. This requirement will apply to those working on-site, those teleworking, and all new hires."

18) Mr. Duncan submitted a Religious Exemption request to the Review Accommodation Committee on September 8, 2021.  A true and correct copy of his exemption request is attached hereto a part of Collective Exhibit 8.  On September 15, 2021, Committee member Vanessa Holsomback engaged in an interactive discussion with Mr. Duncan regarding his exemption request, including potential accommodations.  A true and correct copy of the documents summarizing the exemption and accommodation interactive process that Ms. Holsomback completed with Mr. Dennis is included within Collective Exhibit 8.  On October 4, 2021, Ms. Douglass notified Mr. Duncan that his request for an accommodation had been denied.  As

6

discussed in more detail below, the accommodation would represent a greater than minimal impact to UCOR's operations, including impacts on workplace safety and cost.

19) Mr. and Mrs. Casselton were employed as Senior Radiation Protection Technicians with UCOR. Their job duties included performing radiological surveys of areas and equipment; pulling air samples in work areas for airborne contamination; radiological surveys of work areas for radiation exposure to the workers and contamination surveys to ensure that workers do not contaminate themselves during work evolutions. Radiation Protection Technicians perform surveys of workers' exiting areas to ensure that contamination remains in contamination areas and that good radiological work practices are validated. In the event of a personnel contamination, radiation protection technicians take the lead in decontamination of the individual and subsequent follow-up with dosimetry for follow-on testing at UCOR's work sites at ORNL. A true and accurate copy of the Job Function description for the Radiation Protection Technician job family is attached as Exhibit 3. Mr. and Mrs. Casselton performed their job duties on-site, including during the pandemic. Mr. and Mrs. Casselton's job duties must be performed on-site; they are not amenable to being performed remotely.

20) Mr. and Mrs. Casselton submitted Vaccination Religious Exemption Request Forms on September 14, 2021. A true and correct copy of their exemption requests are attached hereto a part of Collective Exhibits 9 and 10. On September 20, 2021, Committee member Ray Parrish met with Mr. Casselton to discuss his exemption request, including any proposed accommodations. A true and correct copy of the documents summarizing the exemption and accommodation interactive process that Mr. Parrish completed with Mr. Casselton is included within Collective Exhibit 9. On September 21, 2021, Human Resources Representative Carolyn Simcox engaged in an interactive discussion with Mrs. Casselton regarding her

7

exemption request and potential accommodations. A true and correct copy of the documents summarizing the exemption and accommodation interactive process that Ms. Simcox completed with Mrs. Casselton is included within Collective Exhibit 10. On October 4, 2021, Ms. Douglass notified both Mr. & Mrs. Casselton that their request for an exemption from the vaccine requirement had been denied. As discussed in more detail below, the accommodations they requested would represent a greater than minimal impact to UCOR's operations, including impacts on workplace safety and cost. In both of their exemption request forms, Mr. & Mrs. Casselton proposed as an accommodation that they would both accept payment of two years of severance and they would end their employment with UCOR. *Id.*

21) As part of UCOR's contractual obligations with DOE, UCOR has an obligation to flow down certain contractual requirements to subcontractors, including Value Added Solutions ("VAS") and Pinnacle Specialty Group ("Pinnacle"). DOE's vaccine mandate policy as well as compliance with applicable EEO laws are part of this flow down of requirements to the subcontractors.

22) The process used to address religious exemption requests with subcontractors was as follows:

a) Employees of subcontractors were informed to submit their religious accommodation requests to their employer for review.

b) Subcontract Employers made a determination if the request was based on a sincerely held religious belief.

c) If the Subcontractor Employer determined that the employee's request was based on a sincerely held religious belief, the Subcontractor Employer was to determine if any accommodations should be considered.

8

d) Subcontractor Employers then notified UCOR of any accommodations requested as a result of their process.

e) UCOR evaluated each accommodation request pursuant to the matrix process described below and made a decision regarding each accommodation request and informed the Subcontractor Employer.

f) UCOR did not direct that any Subcontractor Employer to terminate any of their employees.

23) Costs incurred by subcontractors due to accommodations required to work at the UCOR facilities would be costs passed back to UCOR by the subcontractor.

24) Health and Safety impacts (workplace transmissions) caused by unvaccinated subcontractors would be attributable to UCOR under UCOR's DOE contract.

25) I have reviewed the Declarations of Cynthia Ogle and Ryan LaRochelle.

26) Cynthia Ogle was not a UCOR employee. Her employer, VAS, is a subcontractor to UCOR, with its own workforce. It is my understanding that VAS provides services to the DOE and other DOE prime contractors and that VAS has locations in Aiken, South Carolina and Piketon, Ohio as well as Oak Ridge, Tennessee.

27) Ms. Ogle provided services under VAS's subcontract with UCOR as a Safety Specialist. The job duties of this position include conducting safety related observations of work processes in the field. They are also deployed to conduct accident/injury investigations and assist site Medical and risk management in mitigating concerns related to lost time injuries/illnesses. These job duties are performed on-site and cannot be performed remotely. Ms. Ogle performed her job duties on-site, including during the pandemic. A true and correct copy of the job description for the Safety Specialist position is attached as Exhibit 11.

9

28) Ms. Ogle submitted a Religious Exemption request on August 30, 2021. *See* Exhibit 12. Her employer, VAS followed the process set forth above for consideration of religious exemptions for a subcontractor's employees. Ms. Ogle's request for a religious exemption was denied.

29) The attachment to Ms. Ogle's declaration reflects that she was informed of her termination by Shannon Wheeler, a Senior Employee Relations Specialist for VAS. That notification also informed Ms. Ogle that she would be eligible for health insurance continuation benefits through COBRA.

30) Ryan LaRochelle was not a UCOR employee. His employer, Pinnacle, is a subcontractor to UCOR, with its own workforce. It is my understanding that Pinnacle provides services to the DOE and multiple DOE prime contractors as well as various commercial nuclear power facilities.

31) Mr. LaRochelle provided services under Pinnacle's subcontract with UCOR as a Radiation Protection Supervisor. Radiation Protection Supervisors must be on-site to supervise the field work performed by the Radiological Technicians as well as to address any supervisory issues that arise among the unionized Radiological Technician workforce. Additionally, and critically, Radiation Protection Supervisors are the primary point-of-contact and assume the procedural and regulatory responsibilities for recovery from in-the-field radiological events such as skin contaminations; airborne contamination uptakes; and contamination of clean areas. These job duties cannot be performed remotely. Mr. LaRochelle performed his job duties on-site, including during the pandemic. A true and accurate copy of the Job Function description for the Radiation Protection Supervisor job family is attached as Exhibit 13.

32) Mr. LaRochelle submitted a Religious Exemption request on September 1, 2021. *See* Exhibit 14. His employer, Pinnacle, followed the process set forth above for consideration of religious

exemptions for a subcontractor's employees. Mr. LaRochelle's request for a religious exemption was denied

33) Pinnacle has informed UCOR that Mr. LaRochelle elected to cancel his family health insurance coverage during Pinnacle's enrollment period for 2021. As such, he was not participating in employer-provided medical insurance options at the time of his release from employment by Pinnacle.

34) UCOR did not "jointly" employ Ms. Ogle or Mr. LaRochelle. Specifically as to the claims in this lawsuit, UCOR did not terminate the employment of either Ms. Ogle or Mr. LaRochelle.

35) Based on the contractual relationship between UCOR and its subcontractors, including VAS and Pinnacle, UCOR required subcontractors to implement the vaccine requirement for subcontractor employees as a condition of the contracts. UCOR also provided guidance and direction to subcontractors such as VAS and Pinnacle regarding implementation of the vaccine requirement and consideration of requests for medical and religious accommodations. The subcontractors made decisions regarding accommodation requests from their employees and then provided information to UCOR regarding their implementation of the vaccine requirements and their consideration of requests for accommodations. Once UCOR completed the review of all accommodations requested due to religious exemption requests, UCOR determined that each of the accommodation requests, individually and collectively, would result in an impact on UCOR and its employees that was greater than *de minimis*. That information was communicated to UCOR's Procurement personnel to in turn, inform the Subcontractor Employer that the accommodation request for their employee was denied and the employee could not continue to work under the UCOR contract. For the employees of subcontractors for whom an accommodation request was denied due to a greater than minimal

11

hardship, the Subcontractor Employer then made decisions regarding the employment status of their employees, including whether the employee would be terminated, or, if available, transferred to another contract. UCOR did not make the decision to terminate Ms. Ogle or Mr. LaRochelle.

36) After completing the individual interactive process interviews with each UCOR employee, the Review Team deliberated over each employee's accommodation requests through October 4, 2021.

37) UCOR developed a matrix to evaluate possible accommodations and to evaluate whether the accommodations would impose an undue hardship that was greater than a *de minimis* cost/burden for UCOR.

38) UCOR incorporated into the matrix the following potential accommodations:

- Weekly Testing – Mandatory for all unvaccinated employees
- Enhanced Face Coverings (KN95 Masks) - Mandatory for all unvaccinated employees
- Mask Fit tests (required for KN95 masks) - Mandatory for all unvaccinated employees
- Limited Task Reassignment
- Job Reassignment
- Work location adjustments, Isolation, Distancing
- Leave of Absence
- Daily Self Health Check
- Telework

39) In developing this matrix, we designed the process for the consideration of religious accommodations based on guidance published by the Equal Employment Opportunity Commission (EEOC), specifically, the guidance on "*de minimis* cost" set forth in the EEOC's

12

Compliance Manual on Religious Discrimination, issued on January 15, 2021.[1] That guidance

states that:

> Costs to be considered include not only direct monetary costs but also the burden on the conduct of the employer's business. For example, courts have found undue hardship where the accommodation diminishes efficiency in other jobs, infringes on other employees' job rights or benefits, impairs workplace safety, or causes coworkers to carry the accommodated employee's share of potentially hazardous or burdensome work. Whether the proposed accommodation conflicts with another law will also be considered.

The guidance also notes that "the hiring of additional employees to provide an

accommodation will generally require more than *de minimis* cost to the employer."

40) UCOR included in the matrix the criteria to be considered regarding more than *de minimis*

costs as set forth in the EEOC guidance, including:

- Monetary cost impact
- Decreases workplace efficiency
- Infringes on rights of another employee
- Requires another employee to do more hazardous or burdensome work
- Conflicts with another law or regulation
- Compromises workplace safety

41) As noted in the EEOC guidance, an appropriate "cost" an employer should consider is whether

the accommodation "impairs workplace safety." The health and safety of UCOR employees

is central to UCOR's mission. Safety was a primary concern in evaluating undue hardship

issues. UCOR has a legal and moral obligation to protect the health and safety of its employees.

This obligation based on the OSHA General Duty Clause that requires an employer to furnish

to each of its employees employment and a place of employment which are free from

recognized hazards that are causing or are likely to cause death or serious physical harm to the

employees.

---

[1] https://www.eeoc.gov/laws/guidance/section-12-religious discrimination#h_67399831738041610749896553

13

42) UCOR also considered the monetary costs, both as to each individual accommodation and the cumulative cost of multiple accommodation requests. This consideration of cumulative costs is consistent with additional EEOC guidance that states that a relevant consideration in analyzing undue burden regarding religious accommodation requests to COVID-19 vaccination policies "is the number of employees who are seeking a similar accommodation (i.e., the cumulative cost or burden on the employer)."[2]

43) Specific monetary costs included weekly COVID-19 testing, mask fitting, and purchase of KN-95 masks.

44) Weekly testing is not required for vaccinated employees. Weekly testing is required of anyone who is not vaccinated. To ensure effective and timely testing, UCOR performs COVID-19 testing on-site. The costs associated with weekly testing include both the cost of the test itself as well as the cost of labor hours involved in conducting testing (which also impacts productivity as employees must be away from their work assignment to be do testing and to be tested).

45) UCOR also requires that anyone that is not vaccinated must wear a KN-95 mask as a form of enhanced protection. UCOR purchases KN-95 masks for its employees, including those with at medical exemption to vaccination. UCOR would be required to purchase additional KN-95 masks as well as fit test each employee seeking an accommodation from the vaccination requirements. These ongoing COVID-19 mitigation measures represent substantially more than a *de minimis* cost as compared to an employee receiving the vaccine. UCOR determined

---

[2] https://www.eeoc.gov/wysk/what-you-should-know-about-covid-19-and-ada-rehabilitation-act-and-other-eeo-laws.

that the individual costs for each employee and the total costs for the 98 employees that requested religious accommodations included:

- $370 per employee, per week for testing; $19,240 per year/per employee; and $1,885,520 per year for weekly testing for the 98 employees that sought a religious exemption from receiving the vaccine.

- $10,192 per year for two KN-95 masks per week for 98 employees.

- $375 for an annual mask fit per employee; $36,750 for 98 employees.

46) Attached as Exhibit 15 is a summary of the cumulative costs associated with all employees' religious accommodation requests.

47) UCOR did consider telework as a potential accommodation. Given the nature of UCOR's contract with DOE (decommissioning and demolishing nuclear facilities) there are relatively few job positions that could be performed remotely, even in part. In considering this specific issue, UCOR also considered the burden associated with telework. For employees that may have otherwise been eligible for telework assignments, those employees would still be required to be present on site at regular intervals for meetings and specific work assignments and projects. As such, even employees who may have worked primarily remotely still would be required to comply with the mandatory testing, mask fit and masking requirements.

48) Telework was not a potential accommodation for Plaintiffs Speer, Dennis, or Duncan or for Mr. or Mrs. Casselton, Ms. Ogle or Mr. LaRochelle. Each of these individuals performed job duties that cannot be performed from home. The job duties associated with these positions -- including performing radiological surveys of areas and equipment; calibration of equipment at various work locations; performing safety inspections and investigations; and the acceptance and delivery of supplies and equipment throughout multiple project areas -- require these

<div align="center">15</div>

individuals to be on-site daily. Telework is simply not a workable accommodation for these individuals.

49) Also, UCOR is beginning a new contract with DOE. Contemporaneously with the new contract relationship, UCOR has made a decision to return to an on-site work force as of November 15, 2021. Throughout the pandemic, we have monitored the productivity and efficiency of our remote workforce. While telework has been effective, it has not been as efficient or productive as an on-site work force. As mentioned above, UCOR's contractual responsibilities are primarily to decommission and demolish former nuclear facilities at ORNL. UCOR has determined that returning to a fully on-site workforce will further increase innovation, collaboration, and engagement within and across UCOR's various work groups. The inefficiencies associated with telework represent more than a *de minimis* burden to UCOR's operations.

50) UCOR also determined that indefinite leaves of absence were not a workable accommodation due to the costs associated with backfilling the job duties of UCOR's workforce. Given the nature and history of the pandemic, any such leaves of absence would be indefinite. Hiring and training temporary replacements are burdens on efficiency and productivity. Any person that takes a leave of absence creates a hole in terms of production and work scope. The position has to be backfilled and often other employees must work overtime to cover that. It creates gaps in productivity and can create a potential safety issue because our work force gets stressed trying to pick up the slack. These inefficiencies are exacerbated when UCOR seeks to cover the position with temporary employees. It is more difficult to recruit and hire qualified individuals for indefinite, temporary positions as opposed to full-time, permanent positions, particularly in the current labor market. Temporary positions are less attractive to qualified

16

candidates than full-time, permanent positions, and thus it is more difficult for UCOR to recruit and hire individuals into temporary positions. In addition, the hiring of temporary employees while other employees are on a leave of absence (and still on the company's employee roster) would constitute the hiring of additional employees, which the EEOC has stated is more than a *de minimis* cost.

51) The testing accommodation presents additional costs related to workplace safety. There is a more than *de minimis* increase in risk of getting or transmitting COVID – 19 in the workplace by having unvaccinated employees on-site as compared to fully vaccinated employees.

52) Attached to my declaration is a table that records the consideration of the exemption requests of the named Plaintiff and Mr. & Mrs. Casselton. *See* Table 1. This table is an excerpt from the exemption matrix that UCOR completed for every member of the workforce that submitted a medical or religious exemption request.

53) On October 4, 2021, UCOR informed Plaintiffs Speer, Dennis, and Duncan as well as Mr. and Mrs. Casselton that their religious exemption requests had been denied because the accommodations would create an undue hardship for UCOR due to safety concerns and costs. These employees were given an additional week to receive the vaccination or enter into the progressive discipline process. On October 11, 2021, these employees had failed to receive the vaccination and UCOR gave each employee a written warning. This written warning notified each of these employees that if they continued to fail to comply with the vaccination requirement, they would be subject to additional discipline, up to and including termination of their employment. As of October 18, 2021, these employees had still failed to receive the vaccination and were placed on a leave of absence to allow them time to comply with the vaccination requirement. On October 25, 2021, these employees were placed on an unpaid

17

suspension through October 31, 2021. Each of these five employees were also informed that if they had not initiated the vaccination process prior to November 1, 2021, their employment with UCOR would be terminated effective November 1, 2021. *See* Collective Exhibits 5-6 and 8-10.

54) All three plaintiffs (Speer, Dennis and Duncan) as well as Mr. and Mrs. Casselton declined to comply with the UCOR vaccination policy, entered into UCOR's progressive discipline process and have now been terminated from employment with UCOR effective November 1, 2021.

55) Current UCOR Benefits are active for former employees through the end of the termination month for UCOR employees. Continuation coverage for medical benefits for Plaintiffs Speer, Dennis, and Duncan, as well as Mr. and Mrs. Casselton will be available through COBRA starting December 1, 2021. COBRA continuation forms will be mailed to each employee by UCOR's third party administrator during November.

56) UCOR has had employees that have experienced serious complications from COVID-19 infections, including hospitalizations and, unfortunately, deaths from the virus. Due to UCOR's proactive mitigation measures throughout the pandemic, including adopting the vaccine requirement in the face of the Delta variant, UCOR has, to date, prevented any workplace transmissions of the virus. With the surge of the Delta variant UCOR saw a concerning rise in cases along with a shortage of hospital beds. UCOR also was tracking the likelihood that the federal government would impose vaccine requirements on federal contractors (which did occur on September 9, 2021 with President Biden's announcement of Executive Order 14042). Given all of these factors, UCOR made a decision that requiring the

18

vaccine is the safest way to protect the entire UCOR workforce. The vaccine has been proven to be highly effective and safe in preventing serious illness related to COVID-19.

I declare under penalty of perjury that the forgoing is true and correct.

Executed this 16th day of November 2021.

*Charles Malarkey*

Charles Malarkey

## DECLARATION OF CLINTON T. WOLFLEY

Comes now the Declarant, Clinton T. Wolfley, having been duly sworn deposes and says:

1. I am over the age of eighteen and am competent to testify to the facts set forth below of which I have personal knowledge.

2. UCOR is a joint venture between Amentum Services, Inc. and Jacobs Engineering Group, Inc. The purpose of the joint venture is to perform work under the ORNL Operations Clean-Up Enterprise (OOCE) located at the United States Department of Energy's (DOE) Oak Ridge National Laboratory. UCOR performs construction contract work at the DOE's three sites in Oak Ridge, Tennessee. Specifically, UCOR specializes in the safe decommissioning and demolition of former nuclear facilities.

3. I am the Safety Systems & Services Manager at UCOR LLC.

4. In this role, I am responsible for all environmental, occupational safety and health, industrial hygiene, radiological protection, emergency preparedness, safeguards and security, quality assurance, training, and contractor assurance system programs.

5. In my role as UCOR Safety Systems & Services Manager, I have responsibility for the policies, procedures, and protocols UCOR has established to mitigate onsite COVID-19 infections.

6. Due to the unique nature of its contractual relationship with DOE, UCOR is often subject to different requirements from those of private industry. UCOR is subject to workplace health and safety standards promulgated by both the DOE and the Occupational Safety and Health Administration (OSHA) based on a Memorandum of Understanding between the two federal agencies. These standards include requirements set forth in DOE's COVID-19 Workplace Safety Plan, which incorporates, among other things, the requirements

1

established in the President's Executive Orders. UCOR also complies with the General Duty Clause embodied in the standards of OSHA and DOE by which UCOR must furnish to each of UCOR's employees employment and a place of employment which are free from recognized hazards that are causing or are likely to cause death or serious physical harm to UCOR's employees. This obligation includes protecting UCOR employees from the recognized health hazards caused by the novel coronavirus, or SARS-CoV-2, the potentially deadly virus that can lead to COVID-19.

7. UCOR has aggressively and effectively worked to protect its workforce since the onset of the pandemic in early 2020. The controls used were multi-faceted and are documented in UCOR's *Infectious Disease/Pandemic Response Plan* and in Standing Order (SO) *COVID-19 Enhanced Mission Ready Requirements*. Each of these documents have been modified numerous times as local virus transmission rates, Centers for Disease Control (CDC) guidance, and DOE direction evolved over the past 20 months. The cornerstone to these controls include required use of physical distancing, facial coverings and a COVID-19 vaccination program. UCOR has continually encouraged the workforce to become vaccinated as vaccinations became widely available in early 2021. UCOR began providing vaccinations on a voluntary basis to the workforce at the onsite medical clinic in March 2021.

8. During the late summer of 2021, as the increased positivity rate and spread of the Delta variant across the country and local community resulted in unnecessary loss of life and increased health care costs, UCOR made a decision to require COVID-19 vaccinations as a condition of employment. The CDC determined the best way to slow the spread of COVID-19 and prevent infection by the Delta variant or other variants is to be vaccinated.

The effectiveness of the vaccine to reduce the infection rate and significantly reduce the severity of the illness, including hospitalization and death, has been well documented in numerous scientific studies.

9.  On September 9, 2021, President Biden issued two Executive Orders mandating that all federal employees and federal contractors, as well as subcontractor employees, be vaccinated. Executive Order 14042 created the Safer Federal Workforce Task Force (the Task Force) and required that federal agencies include contract provisions requiring contractors, such as UCOR, to comply with all guidance issued by the Task Force.

10. The Task Force issued guidance on September 24, 2021.

11. The Task Force published the guidance at the following web address: https://www.saferfederalworkforce.gov/contractors/. The guidance requires that federal contractors mandate the vaccination of contractor and subcontractor employees, except in limited circumstances where an employee is legally entitled to an accommodation that does not cause an undue hardship. In those limited circumstances where an accommodation is permitted, the Task Force guidance requires unvaccinated employees to follow masking, physical distancing and testing protocols.

12. As stated in the Task Force guidance for federal contractors:

> **Q: When a covered contractor employee is not vaccinated because a covered contractor has provided the employee with an accommodation, what workplace safety protocols must the employee follow while in a Federal workplace?**
>
> A: The Federal agency will determine the workplace safety protocols that individuals who are not fully vaccinated must follow while in a Federal workplace. As noted in Task Force guidance, in most circumstances individuals who are not fully vaccinated need to follow applicable masking, physical distancing, and testing protocols.[1]

---

[1] https://www.saferfederalworkforce.gov/faq/contractors/

3

13. As part of UCOR's evaluation of potential accommodations, it was determined that for the safety of all employees, and to comply with the Task Force guidance, any unvaccinated employees would be required to undergo weekly COVID-19 testing and enhanced masking requirements. However, testing and masking is not an ideal solution in terms of workplace safety.

14. Weekly testing is not required for vaccinated employees.

15. While all employees must wear face coverings, for enhanced protection from the risks associated with being unvaccinated (risks to the employee and to others), UCOR adopted enhanced masking requirements for unvaccinated employees. Specifically UCOR requires unvaccinated employees to wear KN-95 masks.

16. Vaccinated employees are not required to wear enhanced masks.

17. I was involved in UCOR consideration of testing and masking as potential accommodations to the vaccine requirement. We determined that testing and masking constituted a more than trivial reduction in the level of protection from COVID-19, including variants, when compared to vaccination.

18. Weekly testing and masking are a lower level of workplace control of the hazards associated with COVID-19 than vaccination. Inasmuch as OSHA defines COVID-19 as a workplace illness, UCOR has a responsibility to implement the most effective workplace controls. This would be true even if employees were otherwise eligible for telework, as these employees would still need to return to the worksite periodically. Thus, they would still present an increased safety/health risk to themselves and others as compared to vaccinated employees.

4

19. A specific and significant disadvantage of testing instead of vaccination is that there can be several days of lag time between the test and the results, during which contagious members of the workforce could be spreading the virus. There is a safety risk inherent in this lag time, as an employee can test negative one day and be positive – and at an increased safety risk -- the next day.

20. As a follow-up to the Executive Orders referenced above, the DOE's Oak Ridge Office of Environmental Management (OREM) issued a unilateral contract modification requiring the UCOR workforce to be fully vaccinated by December 8, 2021.

21. The timeline below sets out the work UCOR has done to protect its employees from the health hazards associated with the COVID-19 disease.

| Item | Action | Date | Comments |
|------|--------|------|----------|
| 1 | UCOR issues *Infectious Disease/Pandemic Response Plan*, Rev. 0 | 2/27/2020 | IDPR outlines controls and mitigation methods associated with COVID-19. It has been revised numerous time as CDC and DOE guidance evolved; current version is Rev. 20. |
| 2 | UCOR initiated multidiscipline IDPR Task Team to help guide COVID controls during pandemic. | 3/19/2020 | |
| 3 | OREM issues Partial Stop Work Order to UCOR | 3/31/2020 | |
| 4 | Partial Work Stoppage implemented as directed by OREM | 4/6/2020 | Minimum Essential/limited operations continue. Workforce with portable work works remotely. |
| 5 | UCOR issues Standing Order (SO) *COVID-19 Enhanced Mission Ready Requirements*, Rev 0, requiring self-health checks. | 4/6/2020 | SO has been revised numerous times, currently version is Rev. 10. |
| 6 | UCOR mandated face requirements for face coverings for minimum essential personnel when 6 feet of social distancing cannot be maintained. | 4/9/2020 | Face coverings required for all personnel. |
| 7 | UCOR mandated use of face coverings for entire workforce when | 5/7/2020 | |

5

| | | | |
|---|---|---|---|
| | 6 feet of social distancing cannot be maintained. | | |
| 8 | UCOR returns selected field workforce to site after OREM approval of Resumption and Reconstitution Work Plan | 5/18/2020 | Those with portable work continue to work remotely. |
| 9 | UCOR initiates COVID Crisis Response Team to manage COVID contact tracing for member of the workforce that have been exposed or potentially exposed to COVID-19. | 7/20/2020 | |
| 10 | UCOR initiates voluntary vaccination program in UCOR Medical Clinic | 3/17/2021 | |
| 11 | UCOR requires face covering requirements only for those that are unvaccinated in accordance with CDC guidance. | 5/24/2021 | Vaccinated personnel not required to wear face covering. |
| 12 | UCOR requires face coverings for all personnel in response to changing CDC guidance, regardless of vaccination status. | 8/2/2021 | Vaccinated and unvaccinated personnel are required to wear face covering. |
| 13 | UCOR announces that COVID vaccinations will be required for the workforce as a condition of employment unless an approved medical or religious exemption is obtained. | 8/26/2021 | October 1 deadline for first vaccination; November 1 deadline for fully vaccinated. |
| 14 | President Biden announces executive orders mandating vaccines for federal workers and contractors and announced new requirements for large employers and health care providers that he said would affect around 100 million workers, more than two-thirds of the U.S. workforce. | 9/9/2021 | |
| 14 | OREM issues unilateral contract modification requiring UCOR workforce to be fully vaccinated by December 8, 2021. | 10/15/2021 | |

22. To facilitate the reliable operations required to fulfill UCOR's contractual obligations to the DOE, UCOR announced its vaccine requirement on August 26, 2021.

6

23. On August 30, 2021 UCOR distributed to the Workforce a packet of information regarding the New Vaccine Requirements. A true and accurate copy is attached hereto as Exhibit 1. I was involved in the preparation of this information packet. The purpose of the information packet was to notify employees of the new vaccination requirements and to answer any questions that employees had about the efficacy of the vaccine, the company's decision with respect to the vaccine requirement, and how someone could submit a request for a medical or religious accommodation.

24. As it relates to religious accommodations, UCOR established an Accommodation Review Committee comprised of experienced Human Resources employees. This Review Committee evaluated each staff person's submittal outlining the nature of their requested religious accommodation.

25. Telecommuting was considered as a potential accommodation. Much of the decommission and demolition work at these DOE sites must be performed on site. Given the nature of their job responsibilities, Mr. Speer, Ms. Dennis, Mr. Duncan, Mr. and Mrs. Cassleton, Ms. Ogle, and Mr. LaRochelle have regularly worked on-site during the pandemic. Remote work was not a viable accommodation for any of these individuals due to the nature of their job responsibilities.

26. UCOR made an additional determination that telecommuting would cause an undue hardship due to the classified, collaborative nature of our work and mission. Prolonged telecommuting for months is simply not a viable option for our workforce. Additionally, our experience with the remote work that has occurred has informed us that increased telecommuting has had a negative impact on our work, and or our mission. Long-term work-from-home accommodations runs counter to UCOR's experience that on-site staffing

7

is essential for efficiently, effectively, and safely performing the collaborative work that is fundamental to UCOR's success.

27. As part of my job responsibilities I have studied the guidance from the CDC and OSHA regarding COVID-19, mitigation measures and vaccination. Based on this research, I have concluded that vaccination is the most effective mitigation measure against the COVID-19 disease and to best protect the UCOR workforce. When OSHA published its Emergency Temporary Standard for employees with over 100 employees on November 5, 2021, OSHA referenced numerous studies regarding the increased risk related to remaining unvaccinated. In particular, OSHA warned that "unvaccinated individuals remain at much higher risk of severe health outcomes from COVID-19. Further, unvaccinated workers are much more likely to contract and transmit COVID-19 in the workplace than vaccinated workers."[2]

28. The health and safety of UCOR's employees is of paramount importance to UCOR. Several UCOR employees have contracted COVID-19 (most recently 7 employees in October, 2021). Unfortunately, UCOR also has had employees die due to contracting the COVID-19 disease since the pandemic began. Due to UCOR's mitigation measures, including vaccination, UCOR has not yet had a workplace transmission of COVID-19.

29. UCOR is scheduled to begin transitioning all employees back to on-site work beginning on November 15, 2021.

30. With more individuals returning to in-person work, the risk of workplace transmission necessarily increases. CDC and OSHA continue to recommend that the best measure to mitigate that risk is through maximizing vaccinations.

---

[2] https://www.federalregister.gov/documents/2021/11/05/2021-23643/covid-19-vaccination-and-testing-emergency-temporary-standard.

31. In considering accommodation requests to the vaccine requirement, UCOR determined that allowing members of the workforce to continue to work unvaccinated would increase the risk, by more than a trivial amount, of the spread of COVID-19 to both vaccinated and unvaccinated members of the workforce.

I declare under penalty of perjury that the forgoing is true and correct.

Executed this 16th day of November 2021.

Clinton T. Wolfley

9

1                IN THE UNITED STATES DISTRICT COURT
                FOR THE EASTERN DISTRICT OF TENNESSEE
2

3
     CARLTON SPEER                 )
4    MALENA DENNIS,                )
     and ZACHARIAH DUNCAN,         )
5                                  )
                                   )
6                Plaintiffs,    )
                                   )
7                                  )
                                   )
8    v.                            )No. 3:22-cv-00426-TRM-JEM
                                   )
9                                  )
     UCOR LLC,                     )
10                                 )
                                   )
11               Defendant.     )

12

13          *  *  *  *  *  *  *  *  *  *  *  *  *  *  *

14

15

                 DEPOSITION OF CHARLES MALARKEY
16

17                     April 17, 2024

18

19

20

21   ========================================================
                      Allison Baker, LCR
22                 Licensed Court Reporter
                     P.O. Box 11392
23            Knoxville, Tennessee 37939
                      (865) 696-6323
24              tennreporter@gmail.com

25

1    badge to UCOR employees as to --

2          A       I don't know.

3          Q       Okay.  Who's that prime contractor?

4          A       Wyandotte.  I couldn't tell you how to

5    spell it.  Wyan -- W-Y-A-N-D-O-T-E [sic].

6          Q       Okay.

7                   (Exhibit 7 marked.)

8    BY MR. NELSON:

9          Q       So, Mr. Malarkey, we're going to kind

10   of use your statement to kind of guide some of the

11   questions.  And we may, admittedly, bounce around a

12   little bit, and I'm sorry about that, but that's what

13   we're going to have to do here.

14                  So first of all, if you'll look at

15   this document and see if you recognize it.

16         A       I do.

17         Q       Okay.  And is this a sworn statement

18   or a declaration that you signed under oath back in

19   November of 2021?

20         A       It is.

21         Q       Okay.  All right, so, again, I'm just

22   going to kind of work through this and then fill in the

23   gaps later as we need to.

24                  But on this first page, Number 2, you

25   say, "UCOR performs" -- let's see, I'm somewhere down

1     in here (indicating), "UCOR performs construction work

2     at DOE's three sites in Oak Ridge."

3                    And what are those three sites?

4          A       ORNL --

5          Q       Okay.

6          A       -- which is Oak Ridge National

7     Laboratory, the Y-12 site, and the ETTP -- ETTP, or

8     Heritage Center, it's also referred to -- site.

9          Q       Okay.  And then do you -- you guys

10    have a -- do you have like your own administrative

11    building as well?

12         A       We do.  The Scarboro Road -- there's

13    offices at Scarboro Road and Union Valley.

14    701 Scarboro Road and 100 Union Valley.

15         Q       And what type of work is done at

16    Scarboro Road or who do they -- in other words, is

17    it --

18         A       A lot of engineering.  The

19    administrative services.  Project controls.  The

20    business offices.

21         Q       Okay.  HR?

22         A       Training.

23         Q       HR?

24         A       Yeah.  That's part of administrative

25    services.

```
 1    after Mr. Czakaj reported to you about the medical

 2    accommodation request with respect to the vaccine?  In

 3    other words, what would you do with the information he

 4    gave you?

 5         A      We would make determinations as to

 6    whether or not a -- the person's request for

 7    accommodation could be granted.

 8         Q      So Mr. Czakaj would not have made that

 9    decision already?

10         A      No.

11         Q      Okay.  And how would you weigh whether

12    they could be granted?  What would you -- what factors

13    did you consider?

14         A      The duration of the request.  Some of

15    the -- the nature of the condition.  Because they --

16    some of them were temporary and some were permanent,

17    and so that -- that goes hand in glove with the

18    duration of the request.

19              The -- they -- for instance, somebody

20    might be pregnant, and so if -- if their current

21    condition was going to end and, therefore, the need for

22    the accommodation would only occur as long as the

23    condition, those were factors that we would consider.

24              The -- we'd go through the rest of the

25    review of, you know, what's the request for
```

```
1    accommodation, how -- how could we meet that or not,

2    was there a -- truly a medical reason for the -- did

3    it -- did it meet the medical accommodation, did the

4    doctors, our medical, agree that the medical -- there

5    was a medical reason for the accommodation.

6          Q       Any others?

7          A       There could be, but I don't recall off

8    the top of my head.

9          Q       When Mr. Czakaj brought the

10   information to you guys from a medical standpoint, was

11   there a meeting with you three or were each of you guys

12   sort of able -- like for -- I'm trying to think how to

13   explain my question.

14                 If Mr. Czakaj came to you directly,

15   did you then involve others or did you make the

16   decision?  Same way with Mr. Wolfley, if he went

17   directly to Mr. Wolfley, was Mr. Wolfley able to make

18   the decision without involving the rest of you guys?

19         A       Ultimately, no, he couldn't make that

20   decision by himself.  We typically tried to do those

21   together.  Failing that, for business reasons if we

22   couldn't get together, then he would brief us

23   individually and we would then get back together to say

24   I'm -- I'm in agreement or I'm not agreeing, depending

25   on what it is.
```

```
 1   coming to work, then they'd wear the mask.
 2            Q        Okay.  Okay.
 3            A        Okay.  I'd say it that way.  And get
 4   them set up for -- for that process.
 5                     Some of them could have been eligible
 6   for telework --
 7            Q        Okay.
 8            A        -- in which case we allow them to
 9   telework, based on their job duties.  That's what I
10   recall.  There could be others.
11            Q        Do you remember approximately how many
12   accommodation requests you guys granted on the basis of
13   medical reasons?
14            A        Close to 30, I think.
15            Q        Do you know how many you denied?
16            A        No.
17            Q        Did you deny any?
18            A        I believe we did.
19            Q        Did you deny any where the doctor or
20   Mr. Czakaj said they did have a medical reason for
21   needing the exemption?
22            A        I don't recall for sure, but my belief
23   is no, we did not.  We -- we took medical at their face
24   value.  If we had needed more information, we'd ask for
25   more information, but . . .
```

```
 1          Q         So if Mr. Czakaj -- and I guess maybe
 2    this is the same question, just asked a little
 3    different.  I want to make sure I understand your
 4    answer.
 5                    If Mr. Czakaj said we have found they
 6    do have a legitimate medical reason for the exemption
 7    request, did you approve all of those?
 8          A         I believe the answer is yes.  I don't
 9    recall that -- we did a further evaluation of just
10    looking to see if -- if there was a significant burden
11    to the company to make that request.  So it wasn't just
12    the medical review.  We had to go through our own, you
13    know, was there an undue hardship that would result in
14    a significant cost to the company.  And so we would
15    look at that.  But I -- my recollection is that we did
16    not find any of those, and so we then approved it.
17          Q         Okay.  And so is it true, then, that
18    of all the ones that were denied, Mr. Czakaj would have
19    said there's no medical reason for the exemption?
20          A         Correct.
21          Q         What factors did you look at when
22    deciding when there was an undue hardship for the
23    company on those, meaning on the medical?
24          A         The impact of -- the cost impacts, the
25    health and safety of welfare impacts.  I say -- when I
```

```
 1          Q       No?

 2          A       No.

 3          Q       All right.  At the bottom of this FAQ

 4     we're still looking at, there are some forms

 5     referenced.  And if you flip over a few pages, you'll

 6     find the forms.  I believe the first one's at 326, at

 7     the bottom.

 8                  Did you create these forms?

 9          A       I didn't personally create them, no.

10          Q       Do you know who did?

11          A       It would have been a combination of my

12     staff working with general counsel.

13          Q       Do you know which of your staff and

14     which of general counsel they were working with?

15          A       No.

16          Q       If you would look at the bottom of I

17     believe each of these -- no -- of the first two, it

18     says, "Please return this form to human resources,

19     Vanessa Holsomback."

20          A       Yes.

21          Q       Sort of guide me through the process

22     of when one of these forms -- the first two here --

23     were received from Vanessa Holsomback, what the process

24     was -- was she required to follow when she received

25     these.
```

```
 1            A         Vanessa was one of our team members

 2      that -- in the HR/LR group that was part of the review

 3      process.  And so she was assigned to be the lead to

 4      collect and -- and manage -- lead the process.  She

 5      collected the forms by the due date established, I

 6      guess the 14th.  She put them into a spreadsheet in

 7      terms of the -- the name, number, and position -- who

 8      it was in a spreadsheet.  She then provided copies to

 9      the team minus any name or identifying information

10      because we wanted to do it as a -- a blind process.

11                      We -- we set up, I'll call it, daily

12      meetings -- might have been less frequent than that --

13      but frequent meetings to -- for each team member to

14      review the forms they got in the previous time.

15      Because they came in batches -- or we reviewed them in

16      batches -- they came all by the timeframe, but -- and

17      then we each reviewed the form.

18                      Came back to the team to see did we

19      have any questions, did -- did we have any --

20      individually what -- what recommendations did we have

21      as to whether we thought it was a sincerely-held

22      religious belief or not.  And, you know, she would

23      capture that information.

24                      And then we would -- it -- we then

25      also -- this wasn't necessarily -- this wasn't
```

```
 1    necessarily her coordinating it, but we would then
 2    assign some member of the team to go back out to do an
 3    interactive process with the employee.  Sometimes it
 4    was because -- there were a few cases where it wasn't
 5    obvious whether it was a sincerely-held religious
 6    belief or not, and so we asked more information.  And
 7    then we got back together again to -- to report back,
 8    on any of those, that information.  And then we made
 9    recommendations as a committee.
10         Q        Who were the members of the team that
11    would receive those forms from Vanessa when she would
12    receive them?
13         A        Vanessa, Ray Parrish, Len Morgan,
14    Mary Alice Douglass, myself.  I think that's it.
15         Q        Was Mr. Wolfley in that list or not?
16         A        No.
17         Q        Okay.  Vanessa, Ray Parrish,
18    Mary Alice Douglass, and yourself.
19                  And so she would put it on the
20    spreadsheet.
21                  Was the name of the person on the
22    spreadsheet?
23         A        Not for us to see.
24         Q        Okay.  Okay.  And she would black out
25    or redact the --
```

Page 66

```
1         A        Yeah, she'd redact it.
2         Q        Okay.  Did she -- were like the badge
3    numbers still --
4         A        Every -- everything was redacted.
5    All -- all the -- anything that would be
6    identifiable -- name or badge number would both be
7    identifiable components, and so those -- those were
8    redacted.
9         Q        What about like position title, was
10   that redacted?
11        A        I don't recall.
12        Q        Supervisor's name?
13        A        I'm going to say they were all
14   redacted because we didn't -- we wanted it to be blind.
15   But I -- I, frankly, don't remember.
16        Q        Okay.  And so when she sent that, I
17   think you said you guys then would meet to go through
18   in batches --
19        A        We'd do it individually, and then we'd
20   come back and meet as a group.
21        Q        When you did it individually, would
22   you review the entire batch individually or --
23        A        Yes.
24        Q        Let me keep going.  I'm sorry.
25                 -- or would you guys look at certain
```

1     subsets individually and then come together?

2            A        We'd get a group of 20, and we each

3     individually look at each of those 20.  And then we'd

4     come back as a group to discuss the 20.

5            Q        Okay.  And with the -- at that first

6     meeting the purpose was to weigh whether it was a

7     sincerely-held religious belief?

8            A        Correct.

9            Q        Okay.  And then if you had questions

10    about that, then one of those team members would follow

11    up, am I understanding that right?

12           A        That's correct.

13                    MR. RUTCHOW:  Objection to form.

14    BY MR. NELSON:

15           Q        Okay.

16           A        Yes, one of them would follow up.  In

17    fact -- but for a specific -- if we needed more

18    information, which was -- like I said, that was fairly

19    rare that we had a question about the sincerely-held

20    religious belief.  But we would ask for more

21    information if we needed it.

22                    Then, secondly, we would engage in the

23    interactive process to talk about if -- if this were

24    granted, what was the accommodations that -- that you

25    would want to be considered for.

```
 1   something like that might have come --

 2          Q       Okay.

 3          A       -- or did come.

 4          Q       Did UCOR accommodate those medical

 5   conditions?

 6          A       Yeah, I believe we did.

 7          Q       And do you remember how?

 8          A       Either found a different type of mask,

 9   allowed -- their position allowed for telework, so

10   they -- they were allowed teleworking at the time.

11   Those are what come to mind.  There may have been other

12   things that we did --

13          Q       Okay.

14          A       -- but I don't remember anything.

15          Q       But nobody had submitted a religious

16   objection to any of those things, to your knowledge?

17          A       No.

18          Q       The second part of this Paragraph 8

19   you say, "Ultimately five employees withdrew their

20   requests, leaving 98 religious exemption requests to be

21   evaluated."

22                  Do you see that?

23          A       I do.

24          Q       Do you know why the five employees

25   withdrew their requests?
```

```
 1        A        Not specifically, no.

 2        Q        Did they formally withdraw it or was

 3   there a determination that they weren't sincerely-held?

 4        A        They -- they would have formally

 5   withdrawn it.  We did not -- we did not come to any

 6   determinations that the religious requests were not

 7   sincerely-held.

 8        Q        Okay.  And then the 98 religious

 9   exemptions to be evaluated, that included both the UCOR

10   employees and the people who were reported by the

11   staff aug people?

12        A        Correct.

13                 (Exhibit 8 marked.)

14   BY MR. NELSON:

15        Q        All right, I've handed you Exhibit 8.

16                 Do you recognize the document?

17        A        I do.

18        Q        Okay.  Did you have any role in

19   preparing the form?  And I'm not talking about the

20   handwritten part or the input part, but the actual

21   form.

22        A        Yes.

23        Q        Did you do it yourself?

24        A        No.

25        Q        What was your role?
```

```
 1    don't know if it's significant, just wanted to ask you
 2    about it -- I've seen the actual job descriptions for
 3    Ms. Dennis and Mr. Speer.  But for Zachariah Duncan,
 4    the document that was attached to your declaration was
 5    a staffing requisition for the material clerk position.
 6    And I'll tell you I don't have that with me this
 7    moment.
 8              A       Okay.
 9              Q       Is a staffing requisition document
10    different than a job description?
11              A       It is.
12              Q       Do you know why you referenced the
13    staffing requisition for the material clerk as opposed
14    to a job description?
15              A       I don't.
16              Q       Would you expect there to be a job
17    description for Mr. Duncan's position?
18              A       Yes.
19              Q       Did the committee ever notify the
20    religious requestors which of these
21    accommodations (indicating) the committee decided they
22    could not do versus ones they could do on a
23    individual-type basis?
24              A       I don't recall.
25              Q       Were the decisions made to deny the
```

```
 1    accommodations, were they made on a per batch basis as
 2    you sort of described earlier, where you guys would
 3    look at the forms in batches and then make decisions,
 4    is that how the accommodations were denied, or were
 5    they looked at just sort of globally?
 6         A       Each was looked at individually to
 7    start with, and so each -- each form was completed and
 8    looked at.  And then we held off on any final decisions
 9    to -- when I say each form was looked at, so to decide
10    which accommodation could be yes or no for each of
11    those individually, right.
12         Q       Uh-huh.
13         A       And then the decision on what was
14    going to be the final determination on whether we would
15    grant the exemption or not was done after we had looked
16    at -- at the entire organizational -- entire group of
17    the 98.
18         Q       Okay.  So those --
19         A       And then we went back to each one and
20    said, okay, does that?  The answer's no.  So, yeah.
21         Q       Okay, so the decision to deny was made
22    at one time for all 98?
23         A       Individually, at one time, for all 98.
24         Q       Did you go back --
25         A       But -- like we went back and looked at
```

```
 1    the group and then said, okay, so let's walk our way
 2    through, Joe, Joe Smith, Bobby Smith, Suzy Smith,
 3    what -- based on what we see for each of those and
 4    based on what we see on the cost, the undue hardship,
 5    we went back through and then went through.  So they
 6    were collectively done, but we had to look at each
 7    individual as we did that.
 8            Q       Okay.  Okay.  And obviously the
 9    conclusion was no for all of those, correct?
10            A       Correct.
11            Q       Do you remember -- scratch that.
12                    If you will look at Exhibit 3.
13            (Discussion off the record.)
14    BY MR. NELSON:
15            Q       Do you recognize Exhibit 3?
16            A       I do.
17            Q       Did you create Exhibit 3?
18            A       Yeah.  It's part of the bigger matrix,
19    so yes.
20            Q       Okay.  Yeah.
21            A       My eyesight's gotten worse.  I can't
22    see as well.
23            Q       Well, I think these are hard documents
24    to look at anyway because they're -- have to be
25    shrunken.
```

SPEER vs UCOR LLC

```
 1          A        Yeah, not -- not at all related to

 2     getting the new contract, but related to the health and

 3     safety of your workforce.

 4     BY MR. NELSON:

 5          Q        Okay.  If you'll skip over to

 6     Paragraph 38 of your declaration.

 7          A        Okay.

 8          Q        The enhanced face coverings here, KN95

 9     masks, it says, "Mandatory for all unvaccinated

10     employees."

11                   Was an enhanced face covering

12     requirement, do you know if that was a UCOR requirement

13     or a DOE federal-type requirement?

14          A        I believe that's a UCOR requirement.

15          Q        Okay.  Same with the mask fit test

16     where it says, "Required for KN95 masks.  Mandatory for

17     all unvaccinated employees."

18                   Do you believe that was a DOE/federal

19     requirement or a UCOR requirement?

20          A        UCOR requirement.

21          Q        In Paragraph 39 you begin to go

22     through the EEOC's guidance on religious discrimination

23     and different things.

24                   Did you review that in this

25     September 2021 timeframe that we're looking at when you
```

1    were preparing the matrices?

2           A      Yes.

3           Q      Had you ever consulted the EEOC

4    guidance before in your job?

5           A      Yes.

6           Q      How often would you estimate you've

7    done that?

8           A      Oh, yearly, once a -- once a year,

9    twice a year, something like that.

10          Q      What are some of the purposes, other

11   than for the religious accommodation issue, had you

12   consulted the EEOC's guidance?

13          A      FMLA training or review of FMLA

14   requirements.  ADA requirements.  Discrimination --

15   insight on discrimination laws.  And guidance they

16   provide on any of the standard, you know, harassment,

17   workplace harassment, all those kinds of things.

18          Q      Were you involved in the EEOC process

19   when charges of discrimination were filed by any of the

20   plaintiffs, Ms. Dennis, Mr. Speer, and Mr. Duncan --

21   I'll stop there first -- those three, either of those

22   three?

23          A      I would have been involved at least to

24   be notified that there were charges.  And I -- and I

25   assume someone talked to me about what the charges were

Case 3:22-cv-00426-TRM-JEM    Document 103-1    Filed 06/03/24    Page 92 of 352
PageID #: 1957

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE


CARLTON SPEER                )
MALENA DENNIS,               )
and ZACHARIAH DUNCAN,        )
                            )
                            )
              Plaintiffs, )
                            )
                            )
                            )
v.                           ) No. 3:22-cv-00426-TRM-JEM
                            )
UCOR LLC,                    )
                            )
                            )
              Defendant.  )


\* \* \* \* \* \* \* \* \* \* \* \* \* \* \*


DEPOSITION OF CLINT WOLFLEY


April 16, 2024


=======================================================
Allison Baker, LCR
Licensed Court Reporter
P.O. Box 11392
Knoxville, Tennessee 37939
(865) 696-6323
tennreporter@gmail.com

1    receive revenue from, say, other prime contractors?

2         A        Not to my knowledge.

3         Q        When COVID arrived, I understand there

4    was a temporary work stoppage that was put in place by

5    the DOE; was that right?

6         A        I'm trying to recall all this.  There

7    was a work stoppage.  I'm not familiar if it was a

8    requirement by the Department of·Energy or if we

9    elected to pause work to get a better understanding of

10   what we were going to be facing.

11        Q        Okay.  Were you involved in the

12   decision or implementation of that work stoppage?

13        A        Yes, I would have -- I would have been

14   involved, yes.

15        Q        And tell me about that.  What did you

16   specifically do as part of implementing the work

17   stoppage?

18        A        So one of my roles in the pandemic

19   response was to activate our continuity of operations

20   program which is designed for scenarios such as a

21   pandemic, if you will, with the hopes that you never

22   have to.  But where this ended up becoming, you know,

23   an escalation of an issue across the entire globe and

24   really hitting our -- our area hard as well, my role

25   was to stand up the -- the group, if you will, of

1    professionals and representatives from each of the

2    departments to ensure that we were taking a very

3    thoughtful approach to -- to what our controls would

4    be, how we could operate the -- the organization and

5    also protect human health and life and safety.  So I

6    was in charge of standing up that -- that grouping, if

7    you will.

8         Q       There was a team, I believe, that was

9    formed within UCOR around that timeframe; is that

10   correct?

11        A       That's correct.

12        Q       Who were the members of that team?

13        A       We had representation from project

14   controls, which is our accounting.  We had

15   representation from our --

16        Q       Who was that?  Who was your

17   representation from project controls?

18        A       Brian Kendrick.  That's with a K,

19   Kendrick.

20                We had our occupational medical

21   director.

22        Q       Burt Prater?

23        A       Dr. Burt Prater.

24                We had human resources.

25        Q       Who was the representative from that

Case 3:22-cv-00426-TRM-JEM    Document 103-1    Filed 06/03/24    Page 95 of 352
PageID #: 1960

1    Sorry, I don't --

2              (Discussion off the record.)

3    BY MR. NELSON:

4         Q        The controls that you've identified,

5    did they track with the CDC's guidance exactly?

6         A        We -- we attempted to follow as close

7    as we could, and in some cases implemented changes

8    based on enhanced information that we received.

9         Q        Okay.  I don't know what that means.

10   Enhanced information you received from who?

11        A        So from our -- our occ med director in

12   communication with his counterparts, and from local

13   municipalities, from the department of health.  There

14   were times where there were differences in approach to

15   masking or quarantine, and so we utilized, right, hey,

16   the most available information to us.

17                 A lot of times the CDC information was

18   delayed sometimes in getting out, and so -- wasn't all

19   the -- all the times or in every scenario, but we did

20   our best to track in line with the CDC.  That was --

21   that was our goal.

22        Q        Did you have interactions with members

23   of the department of health during this timeframe?

24        A        Yes.

25        Q        Who at the department of health did

1    you interact with?

2         A       I don't recall specific names.  But,

3    yeah, we -- we were in touch with them to track data

4    and transmission rates and information that could help

5    us on kind of understanding, you know, where the --

6    where the upticks were at locally, and in what

7    communities that it -- we were seeing maybe higher

8    transmission rates, if you will.  So the department of

9    health was a good resource during that time.

10        Q       And when -- are we talking about the

11   State of Tennessee Department of Health?

12        A       Yes.

13        Q       Did you have access to data or

14   information different or in addition to what was just

15   being put out on the department of health's website?

16        A       No, there was no additional data that

17   they were providing to us other than what was there or

18   was posted.

19        Q       Were there -- I guess I understood

20   that you actually interacted with the department of

21   health officials on this.

22                So what was gained or what was the

23   purpose of these interactions with individuals at the

24   department of health separate and apart from what was

25   on their website?

1                    MR. RUTCHOW:  Objection to the form.

2          A          As I mentioned, there were times when

3    they were delayed in their reporting of making that

4    publicly known on their website.  And I don't know all

5    the reasons behind that.  And so they did have hotlines

6    that individuals could call and employers could call to

7    get up-to-date data on local transmission rates.

8                    So that was the benefit for us, being

9    able to call in to the hotline, get information so that

10   we could adjust, right, based upon, as I mentioned,

11   transmission rates versus waiting for it to be uploaded

12   onto their server and then made available.

13   BY MR. NELSON:

14         **Q          And approximately how many times would**

15   **you estimate that you contacted or called the hotline?**

16         A          During the height of the pandemic,

17   probably on a weekly basis --

18         **Q          And were --**

19         A          -- our team would be reaching out to

20   the department of health.

21         **Q          And let me distinguish between you and**

22   **your team --**

23         A          Yes.

24         **Q          -- right.**

25                    **So did you call on a weekly basis?**

Case 3:22-cv-00426-TRM-JEM    Document 103-1    Filed 06/03/24    Page 98 of 352
PageID #: 1963
JA 098

1    were misalignments because of the changing nature of

2    the pandemic.  So yes, there -- there were.

3            Q        Do you remember what any of the

4    misalignments were?

5            A        CDC, as I think we'll all recall, was

6    more prescriptive and changed their recommendations on

7    a regular basis, right, I mean, I think possibly based

8    on data that they had been collecting.  Where -- where

9    OSHA was -- they put out the Emergency Temporary

10   Standard on that with not a lot of guidance, right,

11   other than employers have a -- have a responsibility,

12   right, to mitigate this risk as it relates to

13   employment.

14           And so maybe the misalignment was

15   there wasn't a one-to-one comparison of what you should

16   do from an OSHA standpoint other than, hey, ensure that

17   you are protecting the workforce to the best of your

18   capabilities, right.

19           Q        Okay.  Did you have any interactions

20   with OSHA representatives?

21           A        No.

22           Q        Within UCOR do you have the ultimate

23   responsibility of ensuring compliance with OSHA?

24           A        Yes.

25           Q        Other than people below you, is there

```
 1    anyone else who has similar levels of responsibility
 2    with respect to OSHA?
 3           A        Our CEO --
 4           Q        Okay.
 5           A        -- Ken Rueter.
 6           Q        Did the general duty clause of OSHA
 7    change during COVID?
 8           A        No.
 9           Q        Is it the same clause that's existed?
10    In terms of what it says, did the language exist prior
11    to COVID?
12           A        That -- no, that standard and that CFR
13    did not change --
14           Q        Okay.
15           A        -- for the general duty clause.
16           Q        Was there ever occasion during the
17    COVID timeframe that you believed UCOR was not
18    compliant with the general duty clause of OSHA?
19           A        No.
20           Q        So I guess the flip side of that is,
21    you always believed that with each step UCOR took it
22    was compliant with its obligations under the general
23    duty clause?
24           A        That is correct.
25           Q        Do you remember approximately when you
```

```
 1     received the vaccine?

 2         A      I do not.

 3         Q      Okay.  Was it prior to when the

 4     mandate was put into effect?

 5         A      Yes.

 6         Q      When UCOR announced the mandate in

 7     August of 2021, did you believe -- I'm not asking for

 8     your legal opinion, necessarily -- but did you believe

 9     there was a law that required UCOR to act at that time?

10                MR. RUTCHOW:  Objection to the form.

11                You can answer.

12         A      I -- I don't recall there being a

13     legal requirement at that time.

14     BY MR. NELSON:

15         Q      Tell me kind of how the vaccine

16     mandate came to be agreed upon prior to its

17     announcement to the workforce in August of 2021.  Sort

18     of guide me through that process.

19         A      Yeah.  Part of that task team that we

20     referred to before the break, right, of -- of

21     multidisciplinary representation and also our SOMD who

22     was very familiar with -- with transmittable

23     diseases --

24         Q      What's that mean, SOMD?

25         A      Site occupational medical director.
```

```
 1          Q          Okay.  Dr. Prater?

 2          A          Yeah.  Our -- our MD.

 3          Q          Okay.

 4          A          We utilized that as -- as our, you

 5     know, really an approach to ensure that we had the

 6     right controls in place from as early on in the

 7     pandemic, even through -- throughout the course of it.

 8                     There were studies, there were

 9     communications, there was information that the vaccine

10     was effective in the prevention and the spreading of

11     the virus, and so it was a relatively easy decision to

12     move into that -- that area as a -- and another control

13     to prevent the spread.  And at that time it was the

14     most effective control.  So that's what led to that

15     decision to be made.

16          Q          And the team, you've identified those

17     people.

18                     Was Charlie Malarkey not on that team?

19          A          Charlie was aware.

20          Q          Okay.

21          A          And he -- he participated as needed.

22     Mary Alice, who represented the human resources, was --

23     was a consistent member.

24          Q          Okay.  All right.  And so when the

25     first vaccine was approved -- I want to say December of
```

```
 1      '20, does that sound right to you, approximately

 2      December of 2020?

 3              A       I don't recall --

 4              Q       Okay.

 5              A       -- the exact date.

 6              Q       Okay.  Let's just say when the first

 7      vaccine was approved by the FDA for emergency use

 8      authorization did you guys discuss implementing it at

 9      that time, implementing the mandate?

10              A       We had discussed it, absolutely, with

11      all of our other suite of controls.  And there was

12      members of our workforce that, you know, were -- were

13      very, very eager to get that as well, right.  I think a

14      large number of the population too.  And so we were

15      monitoring that and, you know, ensuring that it indeed

16      was going to have the results that were anticipated.

17                      So I would say from the early -- the

18      earliest on of the announcement of the vaccine, that

19      was something we were considering.

20              Q       Okay.  What kept you from implementing

21      it immediately?

22              A       Like -- as I mentioned, right, we

23      wanted to make sure that, hey, it did meet the intent

24      of what -- what was being prescribed out there.  There

25      were -- that was a volatile timeframe with a lot of
```

Case 3:22-cv-00426-TRM-JEM    Document 103-1    Filed 06/03/24    Page 103 of 352
PageID #: 1968

1    good information, but also misinformation, in the --

2    coming out from various media sources and news reports

3    and studies.  So, you know, we wanted to be very

4    thoughtful and time that appropriately, you know, allow

5    enough time for the experts to -- to truly say, yeah,

6    this is going to be effective.  So we were thoughtful

7    in that approach.

8              Now, we didn't -- we didn't prohibit

9    anybody from -- from going and doing that if they

10   wanted to on their own.  And so, you know, there were

11   members of the workforce and, you know, members of the

12   community that went in right away to have that

13   administered.  So we just wanted to be thoughtful and

14   ensure that it was going to be safe and -- and truly

15   effective.

16        Q        Did you understand, though, when the

17   CDC had approved it that it had sort of met that safety

18   and effectiveness standard to be approved for emergency

19   use --

20              MR. RUTCHOW:  Objection to the form.

21        A        We -- we were aware of that, yes.

22   BY MR. NELSON:

23        Q        To your knowledge did the CDC's

24   impression change over the time period as to whether it

25   was going to actually be effective or safe?

1          A          I think the -- their -- their

2     endorsement of it increased over time.  As more and

3     more time passed and they were to evaluate, you know,

4     with more case studies and more people being vaccinated

5     to -- to prove it was an effective vaccine.

6          **Q          Okay.  And so as I understood, you**

7     **sort of had these monthly standing meetings with the**

8     **team members to discuss the controls and UCOR's**

9     **response.**

10                    **Was the vaccine requirement addressed**

11    **at each of these meetings?**

12                    MR. RUTCHOW:  Objection to the form.

13    Mischaracterizes his prior testimony.

14    BY MR. NELSON:

15         **Q          And if I did, correct me.  I**

16    **understood what I just said to be true, but if I'm**

17    **wrong, please correct me.**

18         A          So those routine meetings -- and you

19    mentioned monthly, those were not monthly with our

20    internal UCOR group --

21         **Q          Okay.  I'm sorry.**

22         A          -- those were very frequent meetings.

23    That was an opportunity for us to discuss the entire

24    approach on the pandemic.  Controls --

25         **Q          Okay.**

 1                    What made you decide in August of 2021

 2     that now is the time to mandate the vaccine?

 3                    MR. RUTCHOW:  Objection to form.

 4          A         Data that we had collected and

 5     feedback from CDC, along with the suite of controls,

 6     that that was the most effective control to mitigate

 7     the spread of COVID-19.

 8     BY MR. NELSON:

 9          Q         Okay.  So guidance from the CDC and

10     consideration of the other suite of controls as

11     compared to the actual vaccine is what necessitated or

12     made the decision for you guys in August of 2021; am I

13     understanding that correctly?

14          A         The -- the -- the information from CDC

15     that was provided on the effectiveness of the -- of the

16     vaccine was a determining factor for us as the most

17     protective control measure that could be deployed by an

18     employer -- and in our case, right, for our entire

19     workforce -- is what led to the vaccine as a mandatory

20     control.

21          Q         And the CDC guidance that you're

22     referencing, is that just what was posted on the

23     agency's website?

24          A         Posted on their website, also their

25     press release conferences that they held on a routine

1    control," you're referring to sort of this suite of

2    controls we've already looked at, right?

3         A       No.  When I'm referring to the most

4    effective control, I'm specifically referring to the

5    vaccine.

6         Q       Well, I know.  But, I mean, most

7    effective as compared to the other controls?

8         A       The most -- most effective control in

9    its entirety.  So with that control put in place, that

10   minimizes the other control -- precautionary controls

11   that we had been implementing for months on end.

12        Q       So it was more effective, for example,

13   than masking?

14        A       Absolutely.

15        Q       Okay.  And so that's sort of what I'm

16   referring to.  When you say most effective, it means

17   it's most effective as compared to the other controls

18   we've identified here?

19        A       The most effective control, yes.

20        Q       Okay.

21        A       Yes.

22        Q       And it was the CDC's statement to that

23   effect that you drew that conclusion?

24        A       Correct.

25        Q       In terms of like OSHA's hierarchy of

1     controls, was it the most effective on OSHA's hierarchy

2     of controls --

3           A        Yes.

4           Q        -- do you know?

5           A        Yes.

6           Q        Wouldn't removal, telework, be a

7     higher control?

8           A        That would be an effective control as

9     well, but telework did not guarantee to the degree of

10    certainty that the spread of virus would not occur.

11    What I mean by that is, although -- teleworking, there

12    is still personal and public interaction that -- that

13    occurred for the bulk majority of individuals --

14    grocery shopping, attending sporting events, and the

15    list could go on and on and on.

16                  So, although effective, right, if you

17    truly isolated or teleworked.  But in -- in a

18    practicality standpoint, it wasn't the -- the preferred

19    or most effective control, which is vaccination.

20          Q        Did OSHA say that too or just CDC?

21          A        CDC said that.  But I recall on the

22    OSHA side they outline a hierarchy of controls, right.

23    And, you know, PPE was a big part of that.  That's

24    actually the lowest level of hierarchy of control.

25    Then you get into administrative.  Then you get into

1    BY MR. NELSON:

2        Q        Is this a document that you have seen

3    before?

4        A        Let me look through it --

5        Q        Okay.

6        A        -- if you'll give me a moment.

7                 I have seen this, yes.

8        Q        Okay.  When did you -- well, how did

9    you come to see this document?

10        A        I don't recall the specifics of how

11    I've -- it could have been part of a briefing, I don't

12    know.

13        Q        Did you have any --

14        A        But it does look familiar.

15        Q        Did you have any role in preparing it?

16        A        No.

17        Q        Do you believe you provided any

18    specific data points that you see on this document?

19        A        Give me a moment to review through it.

20                 I would have provided input associated

21    to column or header 1, cost impacts that correlate to

22    weekly testing, enhanced face coverings, KN95, N95, and

23    also mask fit.

24        Q        Okay, let's look at this.  So

25    the weekly testing, it indicates on here $370 per

Case 3:22-cv-00426-TRM-JEM    Document 103-1    Filed 06/03/24    Page 109 of 352
PageID #: 1974
JA-109

1    employee per test.

2                     Do you see that?

3         A      I do.

4         Q      Is that a number that you calculated?

5         A      Yes.

6         Q      Okay.  And how did it come to be that

7    you provided that number or gave that input on to this

8    document?

9         A      So for the basis of estimate specific

10   to weekly testing, $370 per employer per test, it kind

11   of outlines it in that column of 285 would represent

12   the hourly rate it would take to perform the test, and

13   then the test itself, $85 a test.  So without using my

14   calculator, I think that rolls up to $370 per employee

15   per test.

16        Q      And I guess my question is, were you

17   asked to do it for purposes of being included in a

18   matrix like this for religious exemptions or was that

19   data that you maintained independently or separately

20   from this?

21        A      We would maintain this independently

22   and separately for cost accounting of supplies.  You

23   know, this is -- fits right into the PPE column, which

24   I've got responsibility for.  So, you know, we would

25   track these costs to understand budgets and what we'd

1    the estimating.

2         Q        Have you ever had the government deny

3    one of your REAs?

4         A        Denying isn't a term that we use --

5         Q        Okay.

6         A        -- so no.

7         Q        Okay.  What terms do you use?

8         A        Reject or approve.

9         Q        Okay.  Have you ever had one --

10        A        I'm not aware of any rejection.

11        Q        Okay.  All right, the -- let's see --

12   all right, let's drop down to the next row where it's

13   enhanced face coverings, KN59 and N59, mandatory.

14                 Was that UCOR's decision to make those

15   particular masks mandatory as opposed to, say, a

16   requirement of the government or another agency?

17        A        So at the onset of the pandemic and

18   then as things transpired, the KN95s or equivalent N95s

19   became a requirement.

20        Q        By who?

21        A        By the Department of Energy.

22        Q        Okay.

23        A        And then -- then also recommended by

24   the CDC.

25        Q        Okay.  Recommended by the CDC,

    1    required by the DOE?

    2         A        That's correct.

    3         Q        When, if you recall, did the DOE

    4    require either K95 [sic] or N95 mask?

    5         A        I believe that was when they issued

    6    out Rev. 0 of the Safer Workplace Guidelines for COVID.

    7         Q        Rev. 0?

    8         A        I believe it is Rev. 0, yeah.

    9         Q        Safer Workplace --

   10         A        Guidelines.

   11         Q        -- Guidelines?

   12                  Now, would that have been the one

   13    issued in response to President Biden's executive

   14    order?  Is that --

   15         A        Timing, I'm not -- I'm not familiar on

   16    the timing, if it came out before the executive order

   17    or right after.

   18         Q        Okay.  All right.  And 5,000 masks for

   19    $5,000, two masks per week per employee, are those

   20    numbers that you provided or -- yeah --

   21         A        Yes.

   22         Q        -- that you provided?

   23         A        Yes.

   24         Q        Okay.  And were you -- it appears like

   25    those were a dollar a piece, then, 5,000 masks for

```
 1          A       I was not part of that.
 2          Q       The standing order, what is the
 3   standing order?  How would you describe that document?
 4          A       So a standing order is a control
 5   document that we put in place while we're updating a
 6   policy or procedure.  So it's a stopgap measure to
 7   ensure that, if there is a change of condition, that we
 8   are aware of it, we brief the workforce to it, it's
 9   known while the procedure or policy is being updated to
10   reflect whatever the changed condition is or changed
11   control.  So we had a standing order for COVID in place
12   while we were developing our plan.
13          Q       And so when CDC guidance changed, is
14   that where you would implement those changes is in the
15   standing order?
16          A       That was a mechanism to do that, yes.
17          Q       Were there any other mechanisms?
18          A       A formal procedure or company policy
19   change would be another mechanism to --
20          Q       Were there any formal ones other than
21   the vaccine mandate that was adopted during COVID in
22   response to COVID?
23          A       Were there other formal changes
24   implemented besides the mandate?
25          Q       Right.
```

```
 1        A         Is that the question?

 2        Q         Uh-huh.

 3        A         Yes.  They were several revisions to

 4   the standing order.

 5        Q         And I guess that was my question.

 6   Like did -- the requirements related to COVID, were

 7   they all included in just the standing order as opposed

 8   to a formal official HR policy or a -- or not HR

 9   policy -- just a policy?

10        A         Yeah, the standing order wasn't a

11   catchall of all of the control measures, but it was

12   control measures that needed to be implemented very

13   quickly to ensure safety or continuity of operations.

14        Q         And the controls that were included in

15   the standing order, most of the ones we've looked at in

16   terms of temperature checks, daily self-checks, things

17   of that nature?

18        A         Correct.

19        Q         Okay.  The vaccine was never sort of

20   built into that standing order; is that right?

21        A         I would need to go look at our last

22   rev or revs of the standing order.  I believe that --

23   that standing order was revised, you know, updated well

24   over ten times --

25        Q         Right.
```

```
1            Q        Dust masks.

2            A        Right.

3            Q        So that's not enhanced masks?

4            A        That's not what I'm referring to.

5            Q        Okay.

6            A        Yeah.

7            Q        Enhanced masking refers to KN95 or

8    N95?

9            A        Correct.

10           Q        And your position is that at some

11   point in the pandemic some agency of the federal

12   government required that UCOR require enhanced masks,

13   meaning N95 or KN95?

14           A        I believe so.

15           Q        Okay.

16           A        And that's where we'd have to take a

17   look at the safer federal --

18           Q        Okay.

19           A        -- guidelines and the timelines

20   associated with it.

21           Q        Okay.  All right, and then Number 19

22   you're discussing "A specific and significant

23   disadvantage of testing is that there can be several

24   days of lag time between the tests and the results."

25                    That would have been true throughout
```

1    COVID?  In other words, the lag time would not have

2    been any greater later in the pandemic than it would

3    have been earlier, would it have been?

4         A        So this is in relation to those that

5    don't have symptoms, they're asymptomatic, being

6    tested, but a carrier and also contagious.  Where there

7    were a number of reported -- and that's what made this

8    such a -- a difficult time to manage a pandemic

9    response, is because not all individuals were

10   symptomatic.  They were a carrier of the virus and

11   contagious, but a self health check or other control

12   methods may not catch an indicator that they're a

13   carrier.

14                 Testing fit into that as well.

15   Although tested and being asymptomatic wasn't a

16   guarantee that they were not a contagious provider at

17   that point, hence making the testing not a real

18   reliable at the moment control measure.

19        Q        And then -- but there was a time where

20   even rapid tests UCOR began to accept if they were

21   issued by -- or performed by medical providers; is that

22   right?

23        A        Yes.  There -- you know, we talked

24   about availability of PPE and testing.  You know, there

25   was a lot of tests out there that were not maybe made

```
 1    to the right quality controls that we would expect, so

 2    there was a lot of counterfeit going on as well.  So we

 3    did accept other providers' tests that came from an

 4    official medical licensed provider, and then that was

 5    acceptable.

 6             Q       Okay.  And do you believe at the time

 7    that the vaccine mandate was put into effect, or at

 8    least by the time that decisions were made in terms of

 9    termination, that UCOR had decided to accept rapid

10    tests if provided by medical providers?

11             A       Provided by licensed medical

12    providers.

13             Q       Yes, then?

14             A       Yes.

15             Q       Okay.  Number 20 refers to a

16    unilateral contract modification requiring the UCOR

17    workforce to be fully vaccinated by December 8, 2021.

18                     Is that a matter of -- I mean, did you

19    receive that specific contract modification document?

20             A       I was on distribution for it.

21             Q       Okay.  Was there a time when the

22    government actually said they weren't going to still

23    enforce that requirement?

24             A       Not that I recall.

25             Q       So I think, again going to Number 21
```

1    had any role in with respect to the religious

2    requestors, correct?

3         A       Correct.

4         Q       Go to 27.  You said, "When OSHA

5    published its Emergency Temporary Standard for

6    employees with over a hundred employees on

7    November 5th, 2021" -- I'll stop right there for just a

8    moment.

9              We've talked some about this Emergency

10   Temporary Standard.  Is that the date, to the best of

11   your recollection, that it was first published?

12        A       Yes, I believe so.

13        Q       Okay.  And so that would have been

14   after the mandate was already in effect and my clients

15   were fired from UCOR; is that consistent with your

16   recollection?

17        A       I'd need to go back and look at the

18   timeline.

19        Q       Okay.  You indicate in here, "OSHA

20   referenced numerous studies regarding the increased

21   risks related to remaining unvaccinated."

22              Did you independently review any

23   studies that you can recall?

24        A       Which section are you --

25        Q       I'm sorry, Number 27.  It was the

1    continuation of the sentence I just read.

2         A        Oh.  If you could repeat that question

3    back.  I'm sorry, was reading through that.

4         Q        Yeah.  I'm sorry.

5                  Where it says, "OSHA referenced

6    numerous studies regarding the increased risks related

7    to remaining unvaccinated," have you read any specific

8    of those studies?

9         A        Yes.  Yes.

10        Q        Which ones do you remember --

11        A        I don't --

12        Q        -- reading or all of them?

13        A        I don't recall those specific studies

14   that are on there.  But if you continue on, there's

15   even documentation from OSHA regarding unvaccinated

16   individuals and their risk outcomes associated to the

17   pandemic as well.

18        Q        And just for clarity, I'm not asking

19   if you read what OSHA said.  I'm asking you if you read

20   the actual underlying data that --

21        A        Yes.  I had read a number of cases

22   that were provided.

23        Q        Provided by OSHA?

24        A        No.  No.  No.  By -- by medical -- the

25   medical community.

1          Q          Tell me about that.  Like --

2          A          So these are -- these are case studies

3    provided by the Journal of Medical -- Medicine and the

4    medical professional societies, if you will.

5          Q          Journal of Med -- I didn't catch --

6    Journal of Medicine?

7          A          Yeah.  Journal of Medicine.

8          Q          And you've read studies in Journal of

9    Medicine?

10         A          Correct.

11         Q          Okay.  As it related to the vaccine?

12         A          Correct.

13         Q          Okay.  And where did you access the

14   Journal of Medicine?

15         A          Through Dr. Prater.

16         Q          Okay.  Any other source, medical data,

17   or literature that you remember reviewing?

18         A          No, not the -- not that I can recall.

19         Q          Okay.  How many articles in the

20   Journal of Medicine did you remember reading about the

21   vaccine?

22         A          Too many.

23         Q          Okay.  Multiples?

24         A          Multiple.

25         Q          Okay.  And did he just provide you --

```
 1    did he provide you the entire articles?

 2            A       Yes.

 3            Q       Email?  Print?  How did he give them

 4    to you?

 5            A       I think by -- via print.

 6            Q       Okay.

 7            A       Yeah.

 8            Q       And had you requested that he do that?

 9            A       Yes.

10            Q       And do you remember -- so if the

11    vaccine was first approved in, again, let's assume

12    somewhere in that December 2020 timeframe, had you been

13    reading studies about the development of the -- or,

14    yeah -- case studies about the development of the

15    vaccine or did you first consult these Journal of

16    Medicine after the vaccine had already been approved?

17            A       I would say we were following all

18    aspects of the pandemic from the start through our

19    latest effort.  And that ranged in a variety of topical

20    areas of the vaccine development, what went into it,

21    the projections for efficiency, post studies associated

22    with it at the labs, and then even further studies that

23    have gone in even after the fact.

24            Q       And all of the --

25            A       So all -- all-inclusive --
```

1        Q        Okay.

2        A        -- of education on the vaccine and

3    other controls.

4        Q        And all of the studies that you're

5    referring to having reviewed were in the Journal of

6    Medicine?

7        A        Not all.  That was an example of one

8    that I can recall off the top of my head that I know

9    we -- that was in reference to detailed analytics

10   associated to the vaccine.  There are others, too, I

11   just can't recall what those are off the top of my

12   head.

13       Q        And is there anything about those

14   other documents or literary works that you can

15   identify?  In other words, if not the title of the

16   article, who the publisher was, who, the author,

17   anything like that?

18       A        No, not right now.

19       Q        Okay.  But the ones you do remember is

20   that Dr. Prater would give you Journal of Medicine?

21       A        Uh-huh.

22                (Nods head up and down.)

23       Q        On multiple occasions in print?

24       A        Correct.

25       Q        Okay.  All right, Number 29 says,

Case 3:22-cv-00426-TRM-JEM    Document 103-1    Filed 06/03/24    Page 122 of 352
PageID #: 1987
JA-122

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE

CARLTON SPEER )
MALENA DENNIS, )
and ZACHARIAH DUNCAN, )
)
)
Plaintiffs, )
)
)
)
v. )No. 3:22-cv-00426-TRM-JEM
)
)
UCOR LLC, )
)
)
Defendant. )

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

DEPOSITION OF MARY ALICE DOUGLASS

April 18, 2024

========================================================
Allison Baker, LCR
Licensed Court Reporter
P.O. Box 11392
Knoxville, Tennessee 37939
(865) 696-6323
tennreporter@gmail.com

1    the compensation policies and procedures, our job

2    postings policies and procedures.  Holidays, leave of

3    absences, all of that policy -- all of those policies

4    and procedures I own.

5            Q        Okay.  Does anyone else help you

6    create these HR policies?

7            A        One of my HR reps, you know, she makes

8    the changes or whatever.  I mean, it's not something we

9    do in a vacuum.  Every policy and procedure that I

10   create has -- I designate people within the company to

11   review that -- review those before they go final.

12           Q        Okay.  And then you're responsible for

13   the final say of that policy?

14           A        Yes.

15           Q        Okay.

16           A        And the interpretation.

17           Q        All right, so in 2021 you worked at

18   UCOR LLC.  And it's my understanding that UCOR LLC sort

19   of doesn't exist anymore; is that correct?

20           A        That's correct.

21           Q        Okay.  Do you work for the new entity?

22           A        I do.

23           Q        Okay.  In the same position?

24           A        Yes.

25           Q        Okay.  As best you can remember, in

1    2021 about how many employees did UCOR have?  And for

2    now let's include employees and subcontractors and

3    staff aug.  Just everyone sort of --

4         A         About 2300, maybe.

5         Q         2300.

6                    Do you have any idea what the

7    breakdown was between those who were actually employed

8    by UCOR versus subcontractors or staff-augmentation

9    contractors?

10        A         In 2021 we were probably half and

11   half.  It was pretty close.  We had a lot of staff augs

12   and contractors back then.

13        Q         All right.  And what is a

14   staff augmentation employee?

15        A         Those are subcontractors -- companies

16   who subcontract with UCOR and provide us staffing

17   resources through those companies.

18        Q         Okay.  Is there a difference between a

19   staff augmentation company and a subcontractor?

20        A         In -- in procurement space, there is.

21   I -- I'm -- I don't know exactly how they are

22   differentiated other than -- aside from the way the

23   contracts are structured.

24        Q         Okay.  What's the difference in how

25   the contracts are structured, if you know?

1    don't know.

2            Q        Okay.  And so the emails that were

3    sent out didn't say like this is from the CDC?

4            A        Well, no.  There -- they did reference

5    the CDC and the CDC website for additional information.

6            Q        Okay.

7            A        Yes.

8            Q        At some point, was there -- were

9    employees told to go home and work remotely or anything

10   like that?

11           A        Yes.

12           Q        Do you remember when that was?

13           A        No, not exactly.

14           Q        Do you have an approximation of when

15   that would have been?

16           A        Let me think.  Because that was at

17   the -- my husband was -- was dying of cancer during

18   that time period, so it had to be like in -- it was

19   before August.  So in the spring of 2021?  Is that

20   right?

21           Q        Okay.  Spring of '21 you said?

22           A        Yeah, I think.

23           Q        Okay.

24           A        Right in there.  I don't know.  I

25   can't be sure.

```
 1          Q        Okay.  That's fine.
 2                   Were you sent home to work remotely
 3    during that time?
 4          A        Yes.
 5          Q        Okay.  Do you remember if that time
 6    was paid or unpaid?
 7          A        It was paid.
 8          Q        Do you remember how long the leave
 9    was?
10          A        No, I don't, but it was -- it was
11    lengthy.
12          Q        Okay.  A month?  Two months?
13          A        More than that.
14          Q        More than that?  Okay.
15                   Was that true of the entire workforce
16    or specific to you?
17          A        No, it was the entire workforce for a
18    while, for a short little period.
19          Q        Okay.
20          A        Then we had to come back in, the
21    managers did.
22          Q        Okay.  And during that time did you
23    telework or did you just not work at all or how did --
24    tell me about that.
25          A        I teleworked.
```

1   discuss with one of us and go over the form.  And then
2   we just held on to them.
3           Q       Okay.  Then what happened?
4           A       Then we got together and decided,
5   okay, we've got these 98 forms and -- and -- if there
6   was -- some people's forms had some things in it that
7   we talked through based on, you know, what their
8   position was and what is -- is this something we could
9   do.  And we provided that type of feedback during our
10  discussions with Charlie when we were going through
11  that exemption form.  So this was an ongoing process.
12          Q       Okay.  So you said you got 98.  Did
13  you then review them to determine whether an
14  accommodation was possible for the employee?
15          A       On an individual basis.
16          Q       Okay.  So it wasn't -- was it all
17  98 at once or --
18          A       No.
19          Q       -- per form?
20          A       No.
21          Q       All right, so what did you look at for
22  each employee to determine whether an accommodation was
23  available to that employee?
24          A       We looked at what their -- what their
25  job duties were, where they worked, and -- and, you

1   know, is there any way we could, you know, argue that

2   we could accommodate this person.

3              That's when Charlie had said we've got

4   to get the spreadsheet and look at everybody.  And so

5   we had a series of meetings in developing that, that

6   spreadsheet, to come up with -- I think it was if we

7   did everybody to -- and we're not arguing, we don't

8   say -- we're not saying that we don't believe that

9   these are sincerely-held religious beliefs.

10       Q       Okay.  So you --

11       A       But from a company perspective, UCOR,

12  we've got 98 individuals who are requesting an

13  accommodation for an exemption from what we consider to

14  be the best thing we can do to keep our workforce

15  safe --

16       Q       Okay.

17       A       -- and ensure that we've done

18  everything we need to do to not only keep the

19  individual requesting the exemption, but the workforce,

20  the rest of the workforce, safe.

21       Q       Okay.  So you had collected all

22  98 forms.  And then you went to analyze the forms, and

23  that's when Mr. Malarkey decided to put together what's

24  been marked as Exhibit 2., is that what you're

25  testifying to?

```
 1    wrote that in because she elaborated on that.
 2         Q         Okay.  Does that mean she worked in an
 3    office environment or sort of by herself in the field
 4    or what?
 5         A         I think she works in dosimetry or
 6    instrumentation, somewhere in -- she had an office.
 7         Q         Okay.  All righty, and then on the --
 8    if you'll flip over to the second page.
 9              In the "possible accommodations" box
10    it looks like job reassignment was checked no, and then
11    Ms. Dennis on the first page had checked yes on job
12    reassignment.
13              Do you know why the committee decided
14    Ms. Dennis wasn't eligible for job reassignment?
15         A         No, I don't.
16         Q         Okay.  What factors did you consider
17    to determine if someone was eligible for job
18    reassignment?
19         A         We looked at 98 individuals.  If we
20    had to reassign 98 people -- to go back to the
21    spreadsheet -- to new job assignments, that would be
22    training involved in doing that, relocation, office
23    space, all the things that go with a position
24    reassignment, new learning, do we have 98 opportunities
25    to put people in different positions.
```

Case 3:22-cv-00426-TRM-JEM    Document 103-1    Filed 06/03/24    Page 130 of 352
PageID #: 1995

```
 1                        So we were looking at it as this is

 2       the group, 98 people.  We didn't look at it

 3       individually.  If we had to relocate 98 people to

 4       different jobs, we had to mask 98 people, if we had to

 5       pay for -- if we had to have 98 people have weekly

 6       testing, all of those things.  We didn't look at them

 7       as individuals.  We looked at it collectively as these

 8       are the -- this -- we have 98 exemption requests.

 9            Q       Okay.  Of the 98 religious exemption

10       requests, do you know the breakdown between UCOR

11       employees versus staff aug or subcontractors?

12            A       I should know the exact number, but I

13       can't recall it right now.

14            Q       Do you have an approximation?

15            A       I know that of the 98 -- I just looked

16       this up the other day for somebody -- we had 41 who

17       actually went and got vaccinated.  Because I was

18       looking at the terminations for where we landed as far

19       as terminations were concerned.  Forty-one people

20       actually became vaccinated.

21            Q       Forty-one people who submitted

22       religious exemption requests --

23            A       Religious or medical, whatever, who

24       submitted requests --

25            Q       Okay.
```

```
 1      Ms. Dennis?

 2           A        No.

 3           Q        Why not?

 4           A        Because I firmly believe that the

 5      vaccination was the best avenue at the time for our

 6      employees to -- to help ensure the safety of our

 7      workforce.  I saw -- I know personally people who died

 8      as a result of COVID.  And, I mean, how do you -- I --

 9      I can't put value on an individual's life.  And based

10      on the science that was -- that was available, what I

11      saw, what I read, I -- I believe that the vaccine was

12      the best thing for us to do to protect our workforce.

13      And that's -- I'm a firm believer in that.

14           Q        Okay.  Okay.  If you'll turn back to

15      the first page of Exhibit 8.

16                    You might be able -- if you wrote

17      that, you might be able to read what it says, because

18      I'm having a little bit of trouble.  I see "put all

19      unvaccinated" --

20           A        "Put all" --

21           Q        -- "in," and that's sort of where I --

22           A        -- "in training rooms together to" --

23      something -- "any concern for exposure.  Ease other

24      people's fears."

25           Q        Okay.
```

```
1                IN THE UNITED STATES DISTRICT COURT
               FOR THE EASTERN DISTRICT OF TENNESSEE
2


3
    CARLTON SPEER                    )
4   MALENA DENNIS,                   )
    and ZACHARIAH DUNCAN,            )
5                                    )
                                     )
6                    Plaintiffs,     )
                                     )
7                                    )
                                     )
8   v.                               )No. 3:22-cv-00426-TRM-JEM
                                     )
9                                    )
    UCOR LLC,                        )
10                                   )
                                     )
11                   Defendant.      )

12

13          *   *   *   *   *   *   *   *   *   *   *   *   *

14


15                      DEPOSITION OF LEN MORGAN

16

17                          May 20, 2024

18

19

20

21  ========================================================
                       Allison Baker, LCR
22                  Licensed Court Reporter
                       P.O. Box 11392
23                 Knoxville, Tennessee 37939
                       (865) 696-6323
24                 tennreporter@gmail.com

25
```

1 conversations kind of expanded into our COVID response

2 team where we had Clint Wolfley's people in there who

3 are more the experts, right, and medical and legal

4 saying there's a significant risk to the safety and

5 health of the workforce.

6       And that was our primary focus, is,

7 you know, are we exposing 2400 people or 2300 people,

8 because a hundred people don't want to have the

9 vaccine.  Are we putting those guys at risk where it

10 becomes a workplace --

11       And the significance of that for us

12 was, if we had an individual who could say they --

13 there was no likelihood at all that they got COVID

14 anywhere but from work, it became a workplace

15 recordable injury.  And if they died, it became a

16 workplace death, based on the COVID legislation at the

17 time, which was significant to us, right.

18       Because we hadn't even had an exposure

19 at work.  We did the -- we were doing all the contact

20 tracing.  Every time anybody got sick, called in, we

21 were contact tracing -- Where have you been?  What have

22 you done?  What did you do?  Who have you interacted

23 with?  You know, did you go to the gas pumps?  Did you

24 go to the grocery store -- so that we could show that

25 in all likelihood it could have happened at --

```
 1    anywhere, not just at work, so it wasn't a workplace

 2    injury.

 3                   So it -- it was a big piece of it to

 4    us.  And it's -- and primarily I'd say it's the biggest

 5    piece because, I mean, we -- we live by the mantra of

 6    safety first, right, it's before everything else.  Shut

 7    the work down if we have to if it was unsafe.

 8                   But then the conversations eventually

 9    went to make the legislation spell it out.  If this is

10    an undue burden for the company -- I mean, we had

11    already -- we, in our minds, felt like we can show it's

12    easily an undue burden for safety and health.  When we

13    started doing the economic -- I didn't -- the economic

14    costs got -- were greater than I expected, right.  And

15    I'm a numbers guy.

16                   Of course I went back and started

17    running my own, and I wound up concurring with their

18    numbers.  And, you know, I was relatively close to what

19    their -- I mean, it was a significant outlay of cash

20    every year to accommodate people, doing the testing

21    that was required, plus providing all the additional

22    PPE, the workplace separations.

23                   I would say at that point there was

24    a -- there was more cost associated with our exempt

25    than there would have been our bargaining unit.
```

1    Because bargaining unit, they're going out and they're

2    working -- they're working in groups, but everybody was

3    staying, you know, 6, 10 feet apart, easy to do.  If

4    you take -- take a hundred people in a cubicle area,

5    right, it is hard to -- to meet all the requirements

6    you have to meet to have them in a cubicle.  Because

7    even the top of the cubicle's open.

8                    So it -- the -- the cost for both were

9    pretty significant just on the testing and PPE.  But

10   when you started looking at the office workers, it

11   got -- I'd say it was probably, my opinion, was much

12   more expensive than it would have been for bargaining

13   unit.

14                   Because a lot of our bargaining unit,

15   to your point earlier, right, some of them are in a

16   truck, they're by themselves, they're in a piece of

17   equipment and they're by themselves, they're isolated,

18   so we're pretty safe.  And they're going to be in that

19   same piece of equipment, same truck, every day, you

20   know.

21                   Where an office worker, you got a

22   hundred people in cubes and they're right there in the

23   vicinity of everybody else.  And there's 800 people in

24   cubes around that building, there's a lot to consider,

25   right, safety and health-wise for sure, so . . .

```
 1              Q         And you talk about the workplace, if
 2    it was a reportable workplace injury, does that have an
 3    affect on UCOR's funding or how much --
 4              A         It could have.  It wouldn't,
 5    necessarily, on our funding.  But I will say I have not
 6    been on one contract in the DOE in 30 years now where
 7    there was a workplace death and they didn't have a --
 8    the contractor didn't win the next award.
 9              Q         Oh, really.
10              A         It's happened every time.  Every time.
11              Q         They didn't get the contract?
12              A         They did not.
13              Q         What about like frequent injuries or
14    anything like that?
15              A         They -- they can weigh on whether your
16    next bid is successful or not.  But, I mean, when
17    there's a death, there's a -- it's immediate.  It's
18    like, yeah, we don't need this contractor back, right.
19    They're not going to advertise it, but, you know . . .
20                        Right before I got to Hanford, a guy
21    fell through the roof, Westinghouse lost the contract
22    to Bechtel. We had a guy who was working on a
23    subcontract with Bechtel, fell off a roof, Bechtel
24    didn't get the next contract.
25                        So, I mean, it -- everywhere you go.
```

SPEER vs UCOR LLC

```
 1    Bechtel Jacobs had a guy catch on fire and burn to
 2    death out here in Oak Ridge, right.  They didn't get
 3    the next contract, UCOR did.
 4                   So it kind of goes without saying that
 5    they take a look at -- DOE is taking a very significant
 6    look and weighing a lot in on the safety as far as, you
 7    know, is this a contractor we want doing our work for
 8    us.
 9         Q       So had you guys had a workplace
10    transmission that, say, somebody was in the hospital
11    but didn't die, was that a matter that had to be
12    reported?
13         A       Oh, yes.  It's OSHA recordable, so we
14    would have had to report it.
15         Q       To OSHA?
16         A       Yes.
17         Q       And that's what the DOE would see?
18         A       Yes.  Yeah, we'd report it to DOE, but
19    we'd also -- we have reporting right here at the OSHA
20    on workplace illnesses, injuries, or deaths.
21         Q       And so because you guys were able to
22    determine that there were no transmissions, I guess, is
23    that why you didn't have to report when your employees
24    had COVID?
25         A       Well, we -- we maintained a log,
```

1    right.  They maintained a log of -- and they -- it was

2    detailed.  If you called in and said, hey, I'm running

3    a fever, right, they would tell you stay home, you've

4    got to do a COVID test within so many days.  And then

5    you would get a second phone call, and they -- they

6    would, you know, go back to when you first met your

7    grandmother through to today and say where else could

8    you have gotten this, right.

9                    I mean, because they asked just a

10   series of questions.  You were on the phone for an hour

11   answering questions about you've been to the grocery

12   store?  Nope.  Been to church?  Yep.  When did you go

13   to church?  How long were you there?  Were you wearing

14   a mask?  Was everybody else in the church wearing

15   masks?  Did you open the door or, you know, did

16   somebody open the door for you?

17                    I mean, they were really digging down

18   to the grassroots of this for these -- for these

19   reviews for COVID, which were able to show -- because

20   what the requirements were is you have to contact

21   trace.  It was take them back to the -- during the

22   exposure period, in the last ten days, and find out

23   what they were doing, where they were doing it, is it

24   as -- is it likely that it could have happened anywhere

25   other than the workplace.  If the answer was yes then

```
 1    it wasn't a workplace exposure, so . . .
 2                    And I -- we never had one that didn't
 3    say, well, I've been to the gas station a few times.
 4    And the majority of them, well, I've been to church,
 5    or, you know -- and then we had some that were like,
 6    oh, no, I'm not exposed to anybody.  What about this
 7    picture of you at your girlfriend's bachelorette party
 8    on Facebook.
 9         Q        So they'd have that, too?
10         A        So, yeah, we -- we looked.  I mean,
11    we -- we had to, because we really couldn't risk having
12    a workplace exposure.  I mean, it would have been very
13    easy for DOE to go, it's two weeks, can't have people
14    exposed at work, just shut the project down, everybody
15    been home without pay, you know.
16                    Ultimately, that would be the --
17    probably the worst outcome for having a workplace
18    exposure and just say it's unsafe, if we can't -- if we
19    can't protect the workforce then we're not going to
20    continue doing the work.
21         Q        Okay.  So the -- once you guys -- I
22    think you said, again, were still trying to decide what
23    to do with these people who say they're not going to
24    get the vaccine because of the religious stuff.
25                    Did you guys discuss leave of absence,
```

```
 1           A        Yeah.  And they told us -- they told
 2    me this is what it's going to cost us if we could use
 3    the same provider.  The problem was at the time some of
 4    our providers were so overwhelmed that we were having
 5    to go to other providers that met those criteria.  The
 6    price started going up, right.  I mean, it's nice when
 7    you've got a contract with somebody and -- until they
 8    go, that's too many people, we can't do this.
 9           Q        Uh-huh.
10           A        But it was a -- it was significant, I
11    remember that.  I just don't remember the numbers --
12           Q        Okay.
13           A        -- to be honest with you.
14           Q        Have you ever been involved in --
15    well, before I ask that:
16                    What -- so you talked about kind of
17    the economic cost and the aggregate cost.  Do you
18    remember any other factors you guys looked at as to
19    whether it was an undue burden?
20           A        Yeah.  The safety and health piece of
21    it.
22           Q        Safety and health piece.
23           A        Uh-huh.
24           Q        How did you measure that part of it?
25           A        That was done purely with our safety
```

```
 1    and health department.  I don't know what they used for
 2    that, but it was -- there was significant concern.
 3    Like I said, it goes back to the, you know, safety
 4    first and we've got to protect the rest of the
 5    workforce.
 6                        I looked at it from a bargaining
 7    standpoint, because I had the union saying you let
 8    these guys come back, we're going to have a problem,
 9    right, which meant we're going to be at the bargaining
10    table wanting to know why you're letting a few people
11    come back and putting the rest of my guys at risk.
12                        So they were -- the union was a little
13    more over the top about it, I think, than we were.
14    Because they were, like, it's hard for us to defend.
15    You treat us the same or -- which is why we're in a
16    union -- or you treat us different, and then you get to
17    argue with us about why you feel like it's appropriate
18    to treat somebody differently.
19         Q        Did you have conversations with the
20    union about, well, the ADA by definition means there's
21    accommodations that --
22         A        Oh, yeah.  We had those conversations
23    all the time, right.
24         Q        Okay.
25         A        It's like, I'm not obligated to share
```

1    a -- just a third-party observer.  Whatever information

2    I gave them, they responded to, so . . .

3    BY MR. NELSON:

4         Q        Okay.  All right, so the safety and

5    health piece you said was another factor that added to

6    the undue burden or that was considered as part of the

7    undue burden.

8         A        I think it was the primary factor.

9    And then we got into the cost of it, right, afterwards.

10        Q        Okay.  And so as far as any data that

11   you yourself -- or any factor that you yourself,

12   brought to the table, were those -- did you do that,

13   were there any?

14        A        No.  I mean, we'd just listen and talk

15   through what was being provided to us at the table as a

16   committee, so . . .

17        Q        So safety and health was Wolfley and

18   his group, right?

19        A        Right.

20        Q        And then who provided the economic

21   data that was compiled?

22        A        You know, I don't know.  I would say

23   it -- there was probably some combined effort between

24   our -- our budget folks, our finance folks, and -- and

25   safety and health.  Because I would think safety and

Case 3:22-cv-00426-TRM-JEM    Document 103-1    Filed 06/03/24    Page 143 of 352
PageID #: 2008                                                           JA-143

```
 1              Q         Okay.  For example where the yeses are
 2       checked and the noes were checked, was that done in a
 3       meeting in which you were a part?
 4              A         No, it was not.
 5              Q         And is that true for all of the --
 6              A         Yes.
 7              Q         -- the Number 2s -- the Page 2s?
 8              A         Yes.
 9              Q         Okay.  All right, so you were never a
10       part of the meeting where the yeses were determined and
11       the noes were determined?
12              A         No.  I was at a meeting -- the meeting
13       I was in related to this was when they were developing
14       the form about what are the things --
15              Q         Okay.
16              A         -- that are acceptable and not
17       acceptable and concerns we have with each one of those,
18       so . . .
19              Q         Okay.  Did you ever express an opinion
20       to Mr. Parrish or anybody as to which of these should
21       be yeses and which should be no for any union on
22       employee?
23              A         Probably.  I mean, I would say the job
24       reassignment and the limited task assignment, I would
25       say that if they'd had have asked me that question, I'd
```

```
 1    have said how are you going do that with a union guy,

 2    right.  He has a very specific skill set that we hired

 3    him for, so being able to reassign him to a different

 4    job or different task is -- is probably no.

 5         Q         I mean -- and tell me why that is, why

 6    that as an accommodation could not be done.

 7         A         Well, because of you're -- what you're

 8    doing is you're putting him into a different

 9    classification which falls under the jurisdiction of

10    another union, and the other union's going to say,

11    well, if he's not a member of my union, he's not doing

12    my work, right.

13              If we put him into a position as an

14    exempt person then he would have to apply for a

15    position that would be open.  That would be something

16    that -- but that -- in my opinion, that's not job

17    reassignment or a task reassignment, that's we have

18    open positions you can apply for, right.

19              And obviously we didn't say they

20    couldn't apply for anything, because we support our

21    folks making more money, right, anytime they get an

22    opportunity.

23              So the reassignment piece is really

24    based off -- from our contract requirements --

25    jurisdiction.  So trying to say I'll put you over here
```

1    doing this work, you'll get another union saying that's

2    our -- really our work.  And, like I said, it's easier

3    for the bargaining unit, those tasks, just say no,

4    that's an absolute no.  And telework, absolute no,

5    right.

6          Q      So from like a temporary standpoint,

7    let's say Carl, for example, says, you know, here's

8    another -- it's a nonunion job, here's an open

9    position, I may even take a pay cut, may not, whatever,

10   right --

11         A      Right.

12         Q      -- but temporarily here's a vacancy

13   that I'm qualified for as your assistant, can I hold

14   that job, right, would that have been a problem from

15   the union CBA standpoint?

16         A      It would.  I mean, I've had contracts

17   where it wouldn't have been a problem because we had a

18   process for it.  Our union agreements don't have that

19   process that allows for them to step out of a union

20   role and then come back into it.

21               Previous contracts I've had had a

22   six-month window you could go be an exempt employee,

23   and then in five months and 29 days you fall right back

24   into your old job.  And then you could reapply the next

25   day and go out five months and 29 days.  And we had

1    people that they gamed the system -- I mean, for lack

2    of a better way to say it -- and they would do exempt

3    work but they would still maintain their union

4    benefits, right.

5                    So that was their primary thing,

6    because they were -- the guys there had pensions, so it

7    was important not to lose that pension.  You lost it if

8    you went exempt, and so that was a -- it was built into

9    the union contracts there.

10            Q        Here --

11            A        We don't have that.

12            Q        -- would it violate the CBA if, for

13    example, on a temporary basis you say, hey, we can't

14    accommodate this guy, we're either going to fire him or

15    we could put him over here because he's qualified over

16    here?  Is that something that you guys could have

17    discussed?

18            A        But if I had moved -- I'll just use

19    it -- so if I had a rad supervisor job open, he

20    definitely is qualified to be a rad supervisor if he

21    applies, right.  If we had -- if he said I want to

22    apply for that job just temporarily, right, and then

23    when this is all resolved, I want to move back, he

24    could do that.

25                    But when he moves back, he moves to

```
 1                DEPOSITION OF YOLONDA A. RIGGS
 2
                       October 23, 2023
 3
 4           IN THE UNITED STATES DISTRICT COURT
          FOR THE EASTERN DISTRICT OF TENNESSEE
 5             CAUSE NO. 3:22-cv-00144-CEA-DCP
 6
      YOLONDA RIGGS,                       )
 7                                         )
                            Plaintiff,     )
 8                                         )
                   -vs-                    )
 9                                         )
      UCOR LLC,                            )
10                                         )
                            Defendant.     )
11      _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ )
12
13      APPEARANCES
14                 FOR THE PLAINTIFF:
15            MR. CLINT J. COLEMAN
                   NELSON LAW GROUP
16                 10263 Kingston Pike
                   Knoxville, Tennessee 37922
17                 (865)383-1053
18            FOR THE DEFENDANT:
19            MR. WILLIAM S. RUTCHOW
                   OGLETREE, DEAKINS, NASH, SMOAK
20                    & STEWART, P.C.
                   Truist Plaza
21                 401 Commerce Street, Suite 1200
                   Nashville, Tennessee 37219-2446
22                 (615)254-1900
23
24
25            - Appearances Continued -

                                        Page 1
```

```
 1    asked them to take questions up the chain of
 2    command.  And that may have even been before the
 3    mandate came down.  I'm not positive of that
 4    timeframe.  But we had serious questions about it.
 5         Q.   When you say you had serious questions --
 6         A.   Uh-huh.
 7         Q.   -- and the paperwork that you presented --
 8         A.   Uh-huh.
 9         Q.   -- that was again related to your concerns
10    about the efficacy and the safety of the vaccine?
11         A.   Yes.
12         Q.   All right.  Did these communications that
13    you had with Linda Williams or Joe Biggerstaff or
14    with Dave Sanders, were those all verbal
15    communications?
16         A.   Yes.
17         Q.   So do you have any record of those
18    communications?
19         A.   Not that I -- no.
20              (Defendant's Deposition Exhibit 2 marked
21    for identification.)
22    BY MR. RUTCHOW:
23         Q.   Ms. Riggs, you've been handed a document
24    that's been marked as Exhibit 2 to your deposition,
25    and the title of the document is: UCOR COVID-19
```

Page 44

1    Vaccination Religious Exemption Request Form.

2            Is that your signature down at the bottom

3    of page one of this document?

4        A.    Yes.

5        Q.    And the date is 9/13/2021.  Do you see

6    that?

7        A.    Yes.

8        Q.    Okay.  And do you recall having any

9    conversations with any managers at UCOR, whether it

10   was in the Human Resources Department or your line

11   -- your chain of command, about your objections to

12   the vaccine prior to when you submitted this

13   Religious Exemption Request Form on September 13?

14       A.    Okay, repeat that.

15       Q.    Sure.  I'm trying to get this timeline

16   right.

17       A.    Okay.

18       Q.    The requirement to get vaccinated was

19   communicated in late August --

20       A.    August.

21       Q.    -- of 2021.

22       A.    Yes.

23       Q.    According to this document, you made a

24   request for a religious exemption from the vaccine

25   on September 13, 2021.

Page 45

you get those test results back. You're not supposed to go back to work if a family members has been tested --

A. I'm not sure he has those -- if those dates are right then, because I would not have. Or I do not believe I would have.

Q. Because you're not supposed to go to work while you're waiting on test results from a family member, correct?

A. I believe that to be true, yes.

Q. Okay. You mentioned earlier that you would have to go back and look at some notes that you have. What notes are those?

A. I would have to see, because I tried to go back and capture just....

MR. RUTCHOW: Clint, we're going to make a request for whatever those notes are.

MR. COLEMAN: Okay.

THE WITNESS: Okay. It would have been -- I can do that.

(Defendant's Deposition Exhibit 5 marked for identification.)

BY MR. RUTCHOW:

Q. Ms. Riggs, I'm going to hand you a document that's been marked as Exhibit 5, and it is

# Clinic Visit History

| | |
|---|---|
| Page | 13 / 34 |
| Date | 02/08/2023 |
| Report | ClinicVisitHx 2023-02-08 1542.rpt |
| Created By | Hayes, Deidre / D3H |

**Employee**         RIGGS, YOLONDA (701389)

**Visit Details:**

| | | | |
|---|---|---|---|
| Treatment Date | 09/15/2021 | Arrival Time | 1258 |
| | | Treatment Time | 1258 |
| Revisit | No | Time Taken | 0  mins |
| **Visit Reason** | **COVID-19** | Duty Disposition | Temporarily Not Fit for Duty |
| **Health Center** | **UCOR / ETTP Health Services** | | |
| Practitioner | Karen Rentz | | |

Notes

| Date | Time | Practitioner | Line Out |
|---|---|---|---|
| 09/15/2021 | 1300 | Karen Rentz | No |

EXHIBIT

4

_10-23-23_

OFFICIAL USE ONLY

DEF 000391

OFFICIAL USE ONLY

UCOR
*conty*

# Clinic Visit History

| | |
|---|---|
| Page | 14 / 34 |
| Date | 02/08/2023 |
| Report | ClinicVisitHx 2023-02-08 1542.rpt |
| Created By | Hayes, Deidre / D3H |

**Per Mary Devol:**
Employee called Hotline to state her spouse (ORNL employee) is symptomatic (congestion, SOB/difficulty breathing, coughing- described as dry barking cough, asthma and allergy symptoms) and received (+) test results from PCP (Dr. Denton, Harriman) on evening of 09/14/2021. Employee stated spouse has long history of asthma and allergies and started having symptoms over a week ago, saw his PCP and was put on steroid pack but it was no longer working over the 09/09/2021-09/12/2021 weekend and he had SOB on 09/13/2021 so he went back to PCP and saw different doctor on 09/13/2021 who decided to test him and the test was (+). Employee stated would send test results to Covid19hotline@orcc.doe.gov. Employee stated she does not plan to test but may change her mind and test at RCHD so she can return to work. Employee stated she is asymptomatic.

Employee stated she last worked 09/14/2021 at 100 UV and was in 4 hour Radcon Continuing Training in room 200 and another room with Tim Hughes 635682 (fully vaccinated), other trainer Milt (possibly Milton Paquette 701313 (unvaccinated)) and 10 other students and that Tim Hughes and Milton Paquette have the list of attendees. Employee stated all in the training were masked and followed the SO.

Employee stated she was also at her office at 100 UV room 154 area and was around Kurt Bargiel 709718 (unvaccinated), Cathy Plumley 032259 (fully vaccinated) and Melanie Nelson 710228 (unvaccinated) and all followed the SO and were masked.

Employee stated she and spouse went to Pigeon Forge and "did all the attractions and shopping at Tanger Outlet" over 09/02/2021- 09/06/2021, no masks worn, spouse was having "allergy and asthma issues". Employee stated spouse saw his PCP early in the week of 09/06/2021 possibly on 09/07/2021, was not tested at that time but was put on steroid pack and started to get better though symptoms continued. On 09/11/2021, spouse's grandmother was brought from OH to La Follette for services and burial and extended family came from OH, CO and Crossville. Employee stated the indoor visitation occurred 09/11/2021, 25 persons, only 2 wore masks, employee and her spouse did not mask, employee stated only her spouse was symptomatic but they continued to think it was his allergies and asthma. Employee stated at end of visitation the pastor and 2 missionaries came to the visitation service. On 09/12/2021, employee and spouse attended 2-3 hour outside burial and graveside service with the same 25 out of town relatives, only spouse was symptomatic but no masks were worn since the event was outside. Employee stated on 09/12/2021 she and spouse gave ride to Crossville to one of the relatives, 2-3 hour inside car, no masks worn, employee stated only spouse was having symptoms.

**UCOR Comments:**

**Testing:** Employee stated they have not tested COVID(+) in last 90 days. Employee stated will send test results to Covid19hotline@orcc.doe.gov.

**Family:** Employee, spouse. Employee states only spouse is symptomatic.

**Diligence/SO:** Employee stated follows standing order at work and reports they do not mask in public areas.

**Vaccinations:** Employee has not received either the 1st or 2nd COVID vaccines. Employee stated they have not received a flu vaccination. Employee stated her spouse received 1st COVID vaccine around 09/01/2021.

**Outside Activities:**
09/02/2021 – 09/06/2021, Pigeon Forge, employee & spouse, no masks worn, spouse was having "allergy and asthma issues".

09/11/2021-09/12/2021 - La Follette, funeral, out of town relatives (OH, CO, Crossville), indoor visitation on 09/11/2021 had 25 persons, only 2 wore masks, no one appeared symptomatic other than employee's spouse who was having allergy/asthma issues; on 009/12/2021, outdoor burial and graveside service, 25 persons, no masks, only employee's

OFFICIAL USE ONLY

OFFICIAL USE ONLY

DEF 000392

# Clinic Visit History

| | |
|---|---|
| Page | 15 / 34 |
| Date | 02/08/2023 |
| Report | ClinicVisitHx 2023-02-08 1542.rpt |
| Created By | Hayes, Deidre / D3H |

spouse was symptomatic.

09/12/2021- employee and spouse gave ride to Crossville to cousin who was at the funeral, 2 – 3 hours inside the car, no masks, employee stated no one was symptomatic other than employee's spouse.

CCRT Results:  Employee is quarantined because they have potential exposure to (+), symptomatic spouse. Employee understands they are quarantined for 10 days and are not to RTW until they are contacted by Medical and their Supervisor, they are to report test results to Covid19hotline@orcc.doe.gov, and they may be contacted by DOE Contact tracing team.

Medical Notes: Per Karen Rentz and medical guidelines, employee is on a 10-day quarantine with an expected RTW date of 09-24-2021. Employee's date of exposure was 09-13-2021.

## Allergies

| Allergy | Date | Notes |
|---|---|---|
| Erythromycin | 06/26/2013 | |

## Medications

| Medication | Dose | Start Date | End Date | Practitioner | No Dispensed |
|---|---|---|---|---|---|
| Amlodipine Besylate | | 01/01/2010 | | | |

Did employee die?   ☐

Was employee treated in an emergency room?   ☐

Was employee hospitalized overnight as an in-patient?   ☐

OFFICIAL USE ONLY

DEF 000393
OFFICIAL USE ONLY

# Appendix H – Standing Orders

**SO-UCOR-20-006:** *COVID-19, Enhanced Mission Ready Requirements*, Rev 10, August 12, 2021

---

**UCOR**
an AECOM-led partnership with Jacobs

**Project/Facility Standing Orders (SO)**

| PROJECT(S) and/or FACILITY: UCOR-Wide | | UCOR-Wide: ☒ Yes ☐ No | |
|---|---|---|---|
| **SO No.:** SO-UCOR-20-006 | **Title: COVID-19 Enhanced Mission Ready Requirements** | | **Revision No.:** 10 |
| **Effective Date:** 8/2/2021 | | **Expiration Date:** 2/2/2022 | |

For this SO the Step-Out Criteria will be (New Procedure, Revised Procedure, Work Order, Complete Issue Resolution, or Other):

This Standing Order will be cancelled upon recommendation by the UCOR Safety Systems & Services Manager with concurrence by the UCOR Chief Operating Officer.

| | **Print Name** | **Signature / Date** |
|---|---|---|
| **Prepared By:** | Randy Keyser | RANDALL KEYSER (Affiliate) Digitally signed by RANDALL KEYSER (Affiliate) Date: 2021.07.26 12:35:44 -04'00' |
| **USQD/UCD Preparer / Reviewer:** | Mac Carman | MALCOLM CARMAN (Affiliate) Digitally signed by MALCOLM CARMAN (Affiliate) Date: 2021.07.26 06:12:12 -04'00' |
| **USQD/UCD Number:** USQD-MS-SOUCOR20006-1615 R10 | | |
| **S&H Review By:** | Clint Wolfley | Clinton T. Wolfley Digitally signed by Clinton T. Wolfley Date: 2021.07.28 19:30:24 -04'00' |
| **COO or APM Review/Approval for SOs By:** | Steve Dahlgren | RANDALL KEYSER (Affiliate) Digitally signed by RANDALL KEYSER (Affiliate) Date: 2021.07.28 18:30:56 -04'00' for Steve Dahlgren per TelCom |
| **Timely Order Program SME Approved By:** | Randy Keyser | RANDALL KEYSER (Affiliate) Digitally signed by RANDALL KEYSER (Affiliate) Date: 2021.07.26 18:19:33 -04'00' |
| This Standing Order was replaced by (new procedure, revised procedure, Work Order, Etc. – attach a copy): | | |
| **Cancellation USQD/UCD Preparer / Reviewer:** | | |
| **Cancelled By:** | | **Actual Cancellation Date:** |

Form-1130A (10/18), Rev. 1
PROC-FO-1016

Page 1 of 6

CONFIDENTIAL - Speer002368

 **UCOR**
an AECOM-led partnership with Jacobs

**Project/Facility Standing Orders (SO)**

| | Revision Log | | |
|---|---|---|---|
| Revision No. | Effective Date | Description of Changes | Pages Affected |
| 0 | 4/6/2020 | Initial Issue | All |
| 1 | 4/9/2020 | Added requirements for covering face | 3 |
| 2 | 5/7/2020 | Mandate the use of face covering for all personnel when 6 feet of social distancing cannot be maintained. | 3 |
| 3 | 5/18/2020 | Redefined travel distance and temperature requirements and added daily health checks upon arrival on site. | All |
| 4 | 6/12/2020 | Deleted the requirements for the check stations and revised the language for travel. | All |
| 5 | 6/22/2020 | Combined questions 1 and 3 into question 1 and deleted previous question #5 on travel requirements. | 2 |
| 6 | 9/15/2020 | Clarification for A. ALL PERSONNEL; edit/clarify questions 2 and 3, defining close contact; and, removed question 4 and stated as an ACTION. Also to extend the SO for 6 months due to ongoing COVID restrictions. | All |
| 7 | 12/7/2020 | Added clarifications identified during Management Assessment MA-SE-21-002 and extended the expiration date. | All |
| 8 | 2/16/2021 | Revised to incorporate DOE Order on Mask Wearing and extend the expiration date. | All |
| 9 | 5/24/2021 | Revised to address latest CDC guidance for mask usage for vaccinated and unvaccinated personnel and to require mask usage in personal vehicles used for work-related activities. . | All |
| 10 | 8/2/2021 | Revised to include mask usage for all personnel in response changing CDC guidance | All |

35

CONFIDENTIAL - Speer002369

 **UCOR**
an AECOM-led partnership with Jacobs

**Project/Facility Standing Orders (SO)**

**PURPOSE:**

The purpose of this Standing Order is to protect our workforce and community as part of UCOR's transition to normal operations after the COVID-19 partial shutdown. Under our Continuity of Operations Program, we are responsible for preventing exposure to personnel who will continue working to safely maintain facilities/sites and adhere to legal regulatory obligations, thereby protecting human health and the environment.

**WHAT TO DO:**

This Standing Order applies to all full time and part time employees (e.g., staff augmentation, ROS, subcontractors, visitors, and vendors) reporting to work, including any employee reporting to a UCOR facility or project (e.g., badging, training, material preparation).

**ALL PERSONNEL:**

Prior to reporting to work each day, employees SHALL comply with the following:

**Ask Yourself the following questions:**

1. In the past two weeks have you or anyone in your immediate household had any symptoms related to COVID-19 (e.g., cold, flu, elevated temperature, loss of smell or taste, etc.)?
2. In the past two weeks have you been in unprotected close contact (less than six feet without a face covering) with anyone:
   (a) with COVID-19 symptoms;
   (b) scheduled for COVID-19 testing;
   (c) awaiting test results; or,
   (d) who tested positive for COVID-19?
3. Are you scheduled for COVID-19 testing, or are awaiting test results?

**Perform the following:**

1) Take your temperature. Is your temperature elevated at or above 100.0 degrees Fahrenheit?

If the answer is <u>yes</u> to any of the above, stay at home, contact the UCOR COVID Hotline by calling 865-574-8563 or emailing covid19hotline@orcc.doe.gov, and notify your immediate supervisor.

In addition, if you are symptomatic, contact your personal health care provider

Form-1130A (10/18), Rev. 1
PROC-FO-1018

Page 3 of 6

36

CONFIDENTIAL - Speer002370



**UCOR**
an AECOM-led partnership with Jacobs

**Project/Facility Standing Orders (SO)**

**Note:** In addition to the requirements of this Standing Order, subcontractors shall follow their company policy for returning to work and medical clearance.

**While at work:**

If you experience any symptoms related to COVID-19 (e.g., cold, flu, elevated temperature, loss of smell or taste, etc.):

1. Notify your supervisor
2. Go home
3. Contact UCOR COVID-19 Hotline (865-574-8563)
4. Contact your personal health care provider

**ALL PERSONNEL:**

Face coverings shall be worn, regardless of physical distancing, including all indoor public areas and work areas within a building or leased space. Examples of public areas and work areas include common areas, shared workspaces, open floorplan office spaces, cubicle office spaces, conference rooms, garages, hallways, snack bars, cafeterias, elevators, shipping containers (e.g., container offices, storage connexes, etc.), change rooms and restrooms. Face coverings are also required inside government owned and leased vehicles, as well as personal vehicles being used for work purposes.

The following exceptions apply, and face coverings may be removed when:

1. Outdoors, provided that 6 feet of physical distancing is maintained. Face coverings are not required when briefly passing another individual within 6 feet while in transit (e.g., walking).

2. Alone in one's own office with a door that closes. When more than one person is present in the office, a face covering is required at all times.

3. Eating, drinking, performing personal hygiene activities, or exchanging for a new face covering, provided that 6 feet of physical distancing is maintained.

4. Alone in a vehicle or mobile piece of equipment, including government owned vehicles, leased vehicles and equipment, gator utility vehicles, personal vehicles being used for work purposes, etc.

5. Asked to lower the face covering briefly for identification purposes in compliance with safety and security requirements (e.g., at security checkpoints).

Form-1130A (10/18), Rev. 1
PROC-FO-1018

Page 4 of 6

37

CONFIDENTIAL - Speer002371



**UCOR**
an AECOM-led partnership with Jacobs

**Project/Facility Standing Orders (SO)**

6. Conducting work utilizing controls and/or personal protective equipment identified in a Job Hazards Analysis or similar evaluation, and where the COVID risks are factored into decisions as to appropriate respiratory protection.

   (a) When respiratory protection is required and provides an equivalent or higher level of protection than a face covering, the additional use of face coverings and social distancing is not required.

   (b) Because the air exhaled from a respirator is not filtered, employees wearing respiratory protection must remain at least 6 feet away from employees not wearing respiratory protection (e.g., must remain at least 6 feet from an employee wearing a COVID face covering).

      ■ Face coverings may be worn over valved fit-tested P-95/N-95 respirators, also known as double masking, in lieu of maintaining distance from personnel in the immediate area.

   (c) 6 feet of distance must be maintained while donning/doffing respiratory protection and while transitioning to a COVID face covering, unless personnel within 6 feet are wearing respiratory protection.

**Additional Information:**

Note: Use of filtering face pieces and cloth face coverings by the UCOR workforce in response to COVID-19 concerns is considered a precautionary measure, based on CDC guidance, for personal protection against spread of viral infection among the general population.

1. Face coverings with vents and one-way valves SHALL NOT be used for COVID protection. However, P-95/N-95 style masks with exhalation valves may be worn if your Project Industrial Hygienist has determined it is necessary during a specific work activity to prevent exposure to other hazards.

Form-1130A (10/18), Rev. 1
PROC-FO-1016

CONFIDENTIAL - Speer002372



**UCOR**
an AECOM-led partnership with Jacobs

## Project/Facility Standing Orders (SO)

2. Face coverings shall meet the face coverings guidance supplied by the CDC. Use of bandanas and face shields as face coverings is not allowed. See the following link for CDC guidance. https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/about-face-coverings.html

3. When on a footprint owned or controlled by an entity other than UCOR (e.g., DOE facilities, other DOE Prime contractors, subcontractors, vendors), UCOR employees shall comply with the most stringent controls established by either the other entity or this Standing Order.

Additional information can be found on the COVID-19 Dashboard at http://intranet.ettp.gov/ses/covid.html

**DISTRIBUTION LIST** *(identify Project positions to receive copies):*

| | |
|---|---|
| ▪ Steve Dahlgren | ▪ Woody Strom |
| ▪ Rob Starkey | ▪ Hoss Brown |
| ▪ Dan Macias | ▪ Michelle McNutt |
| ▪ John Wrapp | ▪ Kent Fortenberry |
| ▪ Todd Phillips | ▪ Sam Peck |
| ▪ Ashley Saunders | ▪ Scott Anderson |
| ▪ Charlie Malarky | ▪ Joseph Aylor |
| ▪ Clint Wolfley | ▪ Tim Noe (DOE) |

**RECORDS:** No record are generated as a result of this Standing Order

Form-1130A (10/18), Rev. 1
PROC-FO-1016

Page 6 of 6

39

CONFIDENTIAL - Speer002373

# New Vaccination Requirements

### August 30, 2021



**UCOR**
an Amentum-led partnership with Jacobs

Exhibit
1



## Message from Ken

Two weeks ago, I shared with you our concern about the worsening pandemic and the need to keep our entire UCOR family healthy and safe. The COVID-19 transmission rates locally and nationally continue to increase, mainly because of the highly contagious Delta variant. To ensure a continued safe work environment, we had two options:

1. Initiate weekly testing for our workers who are not fully vaccinated
2. Make the vaccination a requirement for all members of the workforce

In consultation with DOE, labor leadership, and other site contractors, our leadership team has chosen to require vaccinations for all members of the UCOR workforce, including subcontractor and staff augmentation workers. Our decision takes into consideration CDC guidance and recent White House direction regarding mandatory vaccinations and testing. Mandatory vaccinations will further enhance workforce safety and will help facilitate a responsible return to normal operations. It will also avoid issues associated with the lag time between testing and receiving results, which risks putting infected individuals into the workforce. The COVID-19 vaccine has proven to be safe and effective, with most new infections occurring among the non-vaccinated.

Shortly, members of the senior leadership team will share more information with you, including how you may request accommodations for documented disability/health conditions or religious reasons. All members of the workforce are required to provide proof of receiving at least the first vaccine dose by Oct. 1, and the second dose no later than Nov. 1.

We understand that the choice to receive the vaccine is one that, to this point, has been difficult for many of you. If you have questions or concerns about the safety or effectiveness of the vaccine, we encourage you to discuss your concerns with UCOR Medical Services staff or your personal health care provider. You can find additional information on the vaccine on the CDC website.

Thanks for all that you have done during the pandemic to adhere to our COVID-19 Standing Order, which has ensured no workplace transmissions to date. This measure will be a further step to ensure a healthy, COVID-19-free work environment.



To the UCOR Workforce:

As you heard from Ken, UCOR is implementing a requirement for all of our workforce to be vaccinated against COVID-19. We are taking this proactive step in line with our commitment to safety and our culture of caring.

We know many of you have questions or concerns about this decision. We will address some of them here. We have also created a Frequently Asked Questions document that accompanies this message.

First, let's talk about the why. UCOR is deeply committed to keeping you safe and healthy. We have had specific COVID controls in place to help protect every member of our workforce during the pandemic, which so far have prevented any workplace transmission of the virus. However, unless you are practicing those when you are not at work, you leave yourself and your loved ones open to the virus.

The Delta variant of the virus is raging. In some places, the level of cases is higher than it has ever been. Locally, we are seeing a concerning rise in cases along with a shortage of hospital beds.

Given all of those factors, UCOR decided that requiring the vaccine is the safest way to protect our entire work family. The vaccine has been proven to be highly effective and safe in preventing serious illness related to COVID-19. Additionally, the FDA recently gave full approval to the Pfizer vaccine. It is expected that the Moderna vaccine will receive full approval very shortly.

We will accept requests for exemptions due to disability/medical reasons or sincerely held religious beliefs and will review those on a case-by-case basis. If you wish to submit such a request, you must do so by Sept. 14 (more information in the FAQ).

The schedule for implementing the requirement is as follows for **every** member of the UCOR workforce:

- **October 1, 2021:** Provide proof that you have received either the first dose of the Moderna or Pfizer vaccines or the single dose of the Johnson & Johnson vaccine.
- **November 1, 2021:** Provide proof that you have received all required doses of the Moderna or Pfizer vaccines (Johnson & Johnson vaccine is required by Oct. 1).

Note that any member of the workforce who does not comply will face a disciplinary process.

UCOR is continuing to offer vaccinations. Contact UCOR Health Services (865-574-8562 or UCORVaccineScheduling@orcc.doe.gov) to schedule an appointment. Similarly, you may submit a photo or PDF of your proof of vaccination to UCOR Health Services either electronically or in hard copy. If you have already provided that, you do not need to take any other action now.

Our Standing Order will stay in place for now. Everyone needs to continue wearing masks as described in the Standing Order.

If you have additional questions that we haven't addressed or that are not addressed in the accompanying FAQ, please contact Labor Relations, UCOR Health Services, or your human resources department.

Thank you for your ongoing commitment to safety and for all of your hard work as we continue managing through this pandemic.

Sincerely,

Charlie Malarkey                    Clint Wolfley,
Administrative Services          Safety Systems & Services



# Frequently Asked Questions: COVID-19 Vaccine Mandate

**Question:** Why is UCOR mandating the vaccine now?

**Answer:** We have decided to mandate vaccinations because of concern for the safety of our workforce due to the rising rates of COVID-19 transmission and positive cases, particularly the evolving variants, in the areas where our workforce lives and work. At the current time, more than 1,200 vaccines have been administered at UCOR. More and more members of the workforce are scheduling their vaccine appointments. Implementing a mandatory vaccine program will provide additional protection to the entire workforce.

**Question:** Is DOE mandating the vaccine?

**Answer:** At this time, we have not received specific direction from DOE other than encouragement to get our workforce vaccinated.

**Question:** Why aren't we doing the weekly tests for unvaccinated people like some organizations are doing instead of mandating the vaccine?

**Answer:** Vaccination provides superior protection to our workforce compared to periodic testing. An important disadvantage of testing is that there could be several days of lag time between the test and the results, during which contagious members of the workforce could be spreading the virus. Additionally, weekly testing presents a number of challenges including cost, loss of productivity, and ongoing distraction.

**Question:** If masks have been an acceptable control measure so far, then why don't we continue to use them to deal with the hazard?

**Answer:** Due to the Delta variant's high level of transmission in both vaccinated and unvaccinated individuals, UCOR will continue to require face masks during the pandemic. However, in UCOR's hierarchy of controls, PPE such as masks is the last line of defense. UCOR's top priority is to protect our workforce to the best of our ability, including using the most effective means of hazard mitigation. For COVID-19, the best mitigation to protect the entire workforce from the hazard is the vaccination.

**Question:** Where can I get the COVID-19 vaccination?

**Answer:** Vaccinations are available at the UCOR Health Services Clinic on a drop-in or scheduled appointment basis. Contact UCOR Health Services (865-574-8562 or UCORVaccineScheduling@orcc.doe.gov) to schedule an appointment. The vaccine is also widely available at local pharmacies and TN Department of Health offices. Use Vaccines.gov to find a location near you, then call or visit their website to make an appointment.

**Question:** By what date do unvaccinated members of the workforce need to provide proof of vaccination or documented request for exemption?

**Answer:** Deadline dates:



- **September 14, 2021:** UCOR must receive all requests for health or religious accommodation.
- **October 1, 2021:** All individuals must provide proof that they have received one round of vaccination (first dose required for the Moderna or Pfizer vaccines or the single shot for the Johnson & Johnson vaccine).
- **November 1, 2021:** All individuals who did not receive the Johnson & Johnson vaccine must provide proof that they have received all required doses of the Moderna or Pfizer vaccines (Johnson & Johnson vaccine is required by Oct. 1).

**Question:** How do I submit my proof of vaccination?

**Answer:** Provide a .pdf copy or a photo (jpeg file taken with your phone) to UCOR Health Services at UCOR Vaccine UCORVaccineScheduling@orcc.doe.gov. You may also provide a hard copy to UCOR Health Services, located on the second floor of 701 Scarboro.

**Question:** If I have already submitted my proof of vaccination, do I need to do anything else?

**Answer:** If we have your proof of vaccination, we do not need you to take any other action at this time.

**Question:** What do I do if I have lost my vaccination card?

**Answer:** You should contact your provider if you were vaccinated at a medical clinic or pharmacy. Otherwise, you can contact the Tennessee Department of Health to request a card (https://redcap.link/recordrequest).

**Question:** What if I work at ORNL, Y-12, or other non-UCOR property?

**Answer:** The vaccination requirement is company based, not location based. If you are a member of the UCOR workforce (including teleworkers, staff augmentation, subcontractors, etc.), the requirement applies to you regardless of your worksite.

**Question:** Will there be exemptions to the vaccine mandate for health and religious reasons?

**Answer:** You may apply for an accommodation. UCOR will review and consider requests for accommodation to this requirement based on documented disability/medical conditions or sincerely held religious beliefs.

**Question:** How do I make an accommodation request?

**Answer:** Members of the workforce seeking a medical, disability, or religious accommodation must complete the appropriate form:

- *Form-3604_r0_UCOR COVID-19 Vaccination Religious Exemption Request Form*
- *Form-3605_r0_UCOR COVID-19 Vaccination Medical Exemption Request Form*
- *Form-3606_r0_UCOR COVID-19 Vaccination ADA Disability and Accommodation*



*Certification Form*

All three forms are included at the end of this FAQ. They can also be obtained from the UCOR Intranet Forms page: (https://fp.ettp.gov/Forms.aspx)

To make a request, complete the appropriate form and submit it to UCOR Human Resources no later than 5 p.m., Tuesday, September 14. You should submit your completed request form to Vanessa Holsomback, Vanessa.Holsomback@orcc.doe.gov, or provide a hard copy to Vanessa at her office, 701 Scarboro Rd, Room 317.

Applying does not guarantee that you will be granted an accommodation. UCOR will evaluate each accommodation request based on the information received.

**Question:** If I have to travel to receive the vaccine of my choice, will I be paid for the time?

**Answer:** UCOR allows up to four hours of paid time for each dose of the vaccine.

**Question:** If I have to travel to receive the vaccine of my choice, will my mileage be reimbursed?

**Answer:** No. This is not business travel.

**Question:** Will I be eligible for pay if I have an absence related to a reaction to the vaccine?

**Answer:** Yes. You may be paid for up to two days if you are ill due to the shot if UCOR Health Services approves this. You will need to contact UCOR Health Services to use the charge code U717SHOT for this purpose.

**Question:** Will this mandate apply to all members of the workforce, including staff augmentation, subcontractors, and craft workers?

**Answer:** Yes. UCOR is partnering with labor leadership and our staff augmentation/subcontractor partners to implement this new requirement.

**Question:** Will teleworkers be required to be vaccinated?

**Answer:** Yes, the vaccination will be required for the entire UCOR workforce.

**Question:** What happens if a member of the workforce chooses not to get a vaccine?

**Answer:** HR/LR will review each situation of non-compliance with the employee and with their management and determine the appropriate next steps, which could include discipline.

**Question:** How does this requirement impact our COVID-19 Standing Order?

**Answer:** We continue to review the Standing Order and will make changes as necessary. UCOR will include the requirements of the mandatory vaccine program in a new HR Policy that will be implemented by October 1, 2021.



**Question:** Will I have to wear a mask when around an unvaccinated coworker even though I am vaccinated?

> **Answer**: At this time, masks are required regardless of vaccination status (COVID Standing Order). We anticipate masking requirements will change once community transmission levels decline.

**Question:** Will I have to share a lunchroom with a coworker who is exempt from vaccination or will they eat in a different location?

> **Answer:** Possibly. UCOR will continue to implement social distancing, masking requirements, and other controls. Sharing of common spaces while adhering to the current Standing Order are designed to provide a safe workplace.

**Question:** Now that there is talk about booster shots for Pfizer and Moderna, will those also be mandatory?

> **Answer:** The status of boosters is evolving. UCOR is monitoring CDC and Tennessee Department of Health recommendations and guidance regarding booster shots. We will make a determination as more information becomes available.

**Question:** Will the flu shot be mandatory?

> **Answer:** There is no plan to make the flu shot mandatory. There are no CDC recommendations or guidance to require the flu shot.

**Question:** Will visitors have to be vaccinated?

> **Answer:** Visitors will be subject to the mandatory vaccination program if they regularly access the UCOR footprint. Visitors will use a disclosure form. Those who are not fully vaccinated or who decline to provide information about their vaccination status must provide proof of a negative COVID-19 test from within the previous three days prior to entry to a UCOR site/facility.



# UCOR COVID-19 Vaccination Religious Exemption Request Form

| Name: | | Badge No.: | Date: |
|---|---|---|---|
| Position Title: | | Supervisor: | |

UCOR intends to work through an interactive process to provide reasonable accommodations to employees whose sincerely-held religious beliefs preclude them from being vaccinated, and potentially grant an exemption to the COVID-19 Vaccination requirement. The Company will provide an exemption/reasonable accommodation for employees' religious beliefs and practices which prohibit the employee from receiving a COVID-19 vaccine, provided the requested accommodation is reasonable and does not create an undue hardship for the Company or pose a direct threat to the health and/or safety of others in the workplace and/or to the requesting employee.

Please describe below why your sincerely held religious beliefs preclude you from receiving the COVID-19 Vaccination:

**In some cases, the Company will need to obtain additional information and/or documentation about your religious practice(s) or belief(s). We may need to discuss the nature of your religious belief(s), practice(s) and accommodation with your religion's spiritual leader (if applicable) or religious scholars to address your request for an exception.**

If requested, can you provide documentation to support your belief(s) and need for an accommodation?

Yes ☐        No ☐

If no, please explain why:

I verify that the information I am submitting in support of my request for an accommodation is complete and accurate to the best of my knowledge.

Signature: _____    Date: _____

Print Name:

*Please return this form to Human Resources, Vanessa Holsomback, Vanessa.Holsomback@orcc.doe.gov  no later than September 14, 2021.*



an Amentum-led partnership with Jacobs

# UCOR COVID-19 Vaccination Medical Exemption Request Form

| Name: | Badge No.: | Date: |
|---|---|---|
| Position Title: | Supervisor: | |

A Disability/Medical Accommodation is a modification or provision made for an individual with a disability to provide access or enable them to perform the essential functions of a role. If an Employee claims an inability to receive the vaccine due to a disability or medical condition (and is therefore seeking an exemption to the requirement), the Employee must complete and submit the UCOR COVID-19 Vaccination Medical Exemption Request Form. Additionally, the employee must complete the COVID-19 Vaccination ADA Disability and Accommodation Certification Form in consultation with their personal physician. UCOR will engage in a discussion with the Employee and conduct an individualized assessment, taking into account the employee's disability, employee safety, workplace safety, and related factors. UCOR will then determine if it can implement a reasonable accommodation to mitigate risk while allowing the Employee to be present in the workplace.

**Do you wish to request a medical exemption/accommodation from the requirement to be fully vaccinated?**

Yes ☐        No ☐

I agree to meet with UCOR Health Services to discuss my reason for requesting a medical exemption/accommodation from the requirement to be fully vaccinated. In addition to this form, I agree to submit the COVID-19 Vaccination ADA Disability and Accommodation Certification Form, to be completed in consultation with my personal Physician.

Signature: _____        Date: _____

Print Name: _____

*Please return this form to Human Resources, Vanessa Holsomback,* _Vanessa.Holsomback@orcc.doe.gov_



# UCOR COVID-19 Vaccination ADA Disability and Accommodation Certification Form

| Name: | Badge No.: | Date: |
|---|---|---|
| Company: | Phone: | |

All individuals routinely working for UCOR -- including UCOR employees, staff augmentation employees, and subcontractor employees collectively, "Employees" -- must receive, and provide proof of having received a full course (two doses of a two-dose vaccine or one dose of a single-dose vaccine) of a COVID-19 vaccine (Pfizer, Moderna, or Johnson & Johnson). Employees must provide such proof by utilizing UCOR Medical Services to obtain vaccinations or by providing UCOR Medical Services with a copy of their vaccination card.

| Does the employee have a medical condition that would prevent them from complying with the UCOR requirement to be fully vaccinated against COVID-19?   ☐ Yes   ☐ No |
|---|
| If Yes, what is the condition? |
| How long will this inability to become vaccinated against COVID-19 exist for the employee? If unable to provide a date, please list when the employee will be medically evaluated. |
| What adjustments to the work environment or job responsibilities would enable the employee to perform their job safely in a manner to better protect themselves and others from COVID-19? |
| Any Additional Comments or Suggestions: |

Physician Name
and Practice (Print) _____    Phone: _____

Signature: _____    Date: _____

*Please return this form to UCOR Health Services.*

Exhibit 15

Religious Exemption Matrix 6/25/21

| Accommodations | Considerations for Undue Hardship | Cost Impacts [1] | Decreased Workplace Efficiency [2] | Infringes on Rights of Another Employee [3] | Requiring another employee to do more repetitive or burdensome work [4] | Conflicts with another law or regulation [5] | Compromises Workplace Safety or Increases risk of legal liability | General Assumptions | Final Assessment |
|---|---|---|---|---|---|---|---|---|---|
| | Under Title VII, employer must provide a reasonable accommodation for the religious belief, practice, or observance unless it would pose an undue hardship. Undue hardship is evaluated for the individual and for the collective group. "Undue hardship" means more than a minimal burden on operation of the business. | | | | | | | All Employees qualified for consideration of accommodations as having Sincerely-held Religious beliefs. UCOR covers the cost for burden for the accommodations. OSHA General Duty Clauses. Each Employer shall furnish to each of its employees employment and a place of employment which are free from recognized hazards that are causing or are likely to cause death or serious physical harm to its employees. | |
| Weekly Testing (Mandatory) | 98 | $1,404,320/year. Based on $150/per employee per test ($60 per test, $60/hour for employee to administer and track (1/2 hour) 1 hour for employee to be away from work. (208% × $40). Total cost is $14,340 per employee per year. | *PM loss of productivity (2 hrs per week). 10,400 hours per year 5.4 FTEs. | N/A | Field and programmatic impact anticipated associated with time requirement with weekly testing LA. Medical support services and (needs)/coworkers providing additional coverage or support) | N/A | Compromise Workplace Safety and Increases risk of Legal Liability. Weekly testing is the least level of workplace controls as it is the lowest deterrent to transmitting COVID-19. As an OSHA defined workplace illness the responsibility of implementing the most effective workplace controls is a requirement. | [1] Mandatory Testing on a Weekly basis by UCOR unless vaccinated, (3) in the hierarchy of controls, vaccination is a higher level, more effective control than Weekly Testing. | Greater than De Minimis impact from a cost and workplace safety and/ legal liability perspective. Implementing this control measure increases our legal liability (compared to Mandatory Vaccination) and decreases our workplace safety because of an increased likelihood of workplace transmittal Covid-19. In OSHA defined workplace illness, the responsibility of implementing the most effective workplace controls is a requirement. Weekly testing doesn't offer the maximum protection to the workforce. |
| Enhanced Face Coverings (KN95/N95) Mandatory | 98 | $58,331 yearly.   $595/year 5,000 masks for $1.19 per mask for 98 employees. $136/week for 98 employees. | De Minimis | N/A | N/A | N/A | Compromises Workplace Safety and Increases risk of Legal Liability. N95 mask is a lower level of workplace controls as it is a low deterrent to transmitting COVID-19. As an OSHA defined workplace illness the responsibility of implementing the most effective workplace controls is a requirement. Failure to do so is an increased legal liability. | [1] Adequate supply available | Greater than De Minimis from workplace safety and/ legal liability perspective |
| Mask Fit | 98 | $4/year.   1 mask fit per employee per year.   $375 per employee every year. | De Minimis | N/A | N/A | N/A | N/A | [1] Mask Fit Annually | De Minimis |
| Limited Task Reassignment | 24 | De Minimis | *PM loss of productivity (980 hours) | N/A | N/A | N/A | N/A | Assign to work that limits interaction and exposure to other workforce members (if flagging sooner.) | De Minimis |
| Job Reassignment | 1 | De Minimis | De Minimis | De Minimis | N/A | N/A | N/A | [1] A new work assignment exists for the employee and the employee is qualified to do this work and a qualified internal backfill available. Not all employees would require reassignment. (584) expect limited numbers. | De Minimis |
| Work Section Adjustments, Isolation or Distancing | 98 | De Minimis | De Minimis | N/A | N/A | N/A | N/A | [1&2] No renovations or infrastructure modifications needed | De Minimis |
| Leave of Absence | 98 | $322,992 ($20,121 per employee per year) for Mandatory Testing, Mask Fit and Masks. | Impact of hiring replacement or shift gaps, N/A | De Minimis | De Minimis | De Minimis | N/A | N/A | Not all employees would require LOA. | Greater than De Minimis from a efficiency perspective. Replacing employees on LOA would be required to continue to get work done. |
| Daily Self Health Check | 98 | De Minimis | De Minimis | N/A | N/A | N/A | N/A | | De Minimis |
| Telework | 26 | Greater than De Minimis - Total Cost of $1,404,320/year ($10,719 per employee per year) | Decrease Team communication/integration and reduced collaboration | N/A | N/A | N/A | Compromises Workplace Safety and Increases risk of Legal Liability. They will not need to come to work on site and will reduce need to mask and available to work and would require weekly testing, and will be an increased Safety/Health risk for Covid-19 (to self and others) as compared to vaccination. | UCOR has announced Telework/ remote workforce and return back to onsite work with Reprioritization. | Greater than De Minimis from a cost and workplace safety and/ legal liability perspective |
| Final Evaluation of Impact | | De Minimis | De Minimis | De Minimis | De Minimis | De Minimis | Greater than De Minimis.   98 workers with less than the highest level of Covid Controls. Significant increase in risk of getting/or transmitting Covid-19 as compared to Vaccination. | De Minimis | Greater than De Minimis |

JA-172

TABLE 1 – EXEMPTION MATRIX EXCERPT

Exhibit B

| Budget # | Last Name | First Name | Middle Name | SSN/Last 4 | Type of Worker (Facilities / Office Mission) | Religious Exemption — Is this Sincerely Held Religious Belief? | Medical Exemption — EAA UOCB Medical Services from DHEC? | Medical Exemption — EAA UOCB Medical Services request Medical Exemption Request? | Documentation Checking — Is this AAUOCB Mitre with Employee's status Exemption Recommended? | ACCOMMODATIONS — Weekly Testing (Mandatory) | WMSN N/Mask Fit | Job Reassignment | Limited Task Reassignment | Reinforce Distancing | Leave of Absence | Unpaid Health Check | Telework | Increased Cost | Increased Number | Religious Exemption/Accommodation — Anticipate employee leave with higher # error inconvenience | Conflicts another law compensation/workplace regulation | Conflicts workplace safety | Is there others in the Methodist Qualification | Modification of Documentation Request... / Describe the reasonable alternative... |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2?43 | Crenshaw | David | W | UOCB | 1 | Yes | | | Yes | Yes | Yes | No | No | No | No | No | Yes | Yes | Yes | No | No | No | Yes | Request Denied |
| 2?42 | Crenshaw | Dawn | E | UOCB | 1 | Yes | | | Yes | Yes | Yes | No | No | No | No | No | Yes | Yes | No | No | Yes | Yes | Yes | Request Denied |
| 12?48 | Dennis | Indiana | C | UOCB | 1 | Yes | | | Yes | Yes | Yes | No | No | No | No | No | Yes | Yes | Yes | No | No | No | Yes | Request Denied |
| ?0546 | Duncan | Zachariah | S | UOCB | 1 | Yes | Yes | No | Yes | Yes | Yes | No | No | No | No | No | Yes | Yes | No | No | Yes | Yes | Yes | Request Denied |
| 2?067 | Speer | Colton | | UOCB | 1 | Yes | | | Yes | Yes | Yes | No | No | No | No | No | Yes | Yes | Yes | No | No | No | Yes | Request Denied |
| ?0?N | | Ogori | | CPA | 1 | No/A Sub | | | No/A Sub | No/A Sub | No/A Sub | No/A Sub | No/A Sub | No/A Sub | No/A Sub | No/A Sub | No/A Sub | No/A Sub | No/A Sub | No/A Sub | No/A Sub | No/A Sub | No/A Sub | Request Denied |
| ?0624 | Cole | Cynthia | | CPA | 1 | No | | | No | No | No | No | No | No | No | No | No | No | No | No | No | No | No | Request Denied |


**UCOR**
URS | CH2M
Oak Ridge LLC

| Job Function: Radiation Protection | Job Family: Radiation Protection Technicians (RPT) |
|---|---|
| Effective Date: 10-2016 | Approver: |

The following explains the job responsibilities and expectations for all employees who are classified in this job description. This job description is not intended to include an exhaustive list of all responsibilities, duties and skills required. Additional responsibilities may be assigned according to the needs of the Company.

**FUNCTIONAL DESCRIPTION:**
- Demonstrates commitment to UCOR vision and core values
- Participates in work planning and execution to ensure safety and compliance
- Supports company programs for Radiological Control
- Supports the Integrated Safety Management System (ISMS)
- Accountability for the safety of workers, the public and the environment
- Ensures radiological compliance of assigned work activities
- Ensures sound radiation protection principles/practices are incorporated into all work activities

| Classification | Grade | Typical Qualifications and Responsibilities |
|---|---|---|
| Job Title: Jr. Radiation Protection Technician<br>Code Number: T3:235P<br>Exemption Status – Technical NEX | T3 | **Education/Experience:** AA/AS in Radiation Protection, Health Physics, Nuclear Technology, Occupational Safety & Health, Environmental Health or related field, or equivalent combination of education and related work experience (4 years of directly related experience without a degree).<br><br>**Level Specific Responsibilities:**<br>Provides general assistance to radiation protection personnel performing contamination and radiation control functions. As qualified, performs less complex monitoring, surveying and sampling on the project. Must satisfactorily meet the training and certification requirements. |
| Job Title: Sr. Radiation Protection Technician I<br>Code Number: T4:235P<br>Exemption Status – Technical NEX | T4 | **Education/Experience:** AA/AS in Radiation Protection, Health Physics, Nuclear Technology, Occupational Safety & Health, Environmental Health or related field, and 2+ years of experience in Radiation Protection; or equivalent combination of education and related work experience (6 years of directly related experience without a degree).<br><br>NRRPT Certification Desired<br><br>**Level Specific Responsibilities:**<br>The RPT is the key member of the Radiological Protection program workforce who is responsible for executing radiological surveys and implementing worker protection and monitoring requirements. RPT staffing is supplied through a UCOR radiological support services subcontract. RPTs are |

Exhibit 3



<table>
<tr><td></td><td></td><td>responsible for performing monitoring and job coverage activities necessary for compliance with the RPP. They participate in the development of Radiological Work Permits (RWP) that govern the necessary radiological protection and monitoring provisions for radiological work activities based on the pre-job radiological characterization and survey data and the scope of planned work activity. The RPT takes daily direction from the RP Supervisor. RP Supervisors may be supported by Lead RPTs. The Lead RPT may act for the RP Supervisor and is typically delegated a higher level of responsibility than the RPT.<br><br>Provide contamination and radiation exposure control. Perform surveys where procedures have been established. Duties may include working with routine and/or special detection equipment. Perform qualitative mask fit for radiological protection. As assigned by management: perform special studies in the evaluation of radiological protection for personnel, environmental, or plant areas; participate in area specific radiation worker qualification and requalification programs; prepare and maintain records and documentation as appropriate; and provide assistance in the preparation of radiation control documents such as Radiological Work Permits (RWP's), ALARA Management Worksheets (AMW's), etc.</td></tr>
<tr><td>Job Title: Sr. Radiation Protection Technician II<br>Code Number: T5:235P<br>Exemption Status – Technical NEX</td><td>T5</td><td><b>Education/Experience:</b> AA/AS in Radiation Protection, Health Physics, Nuclear Technology, Occupational Safety & Health, Environmental Health or related field and 3+ years of experience in Radiation Protection; or equivalent combination of education and related work experience (7 years of directly related experience without a degree).<br>NRRPT Certification Desired<br><br><b>Level Specific Responsibilities:</b><br>Senior Health Physicists are members of the non-deployed RP team with specialized experience in specific radiological protection disciplines such as internal audits, air monitoring, dosimetry, instrumentation, radiological characterization/survey planning, radioactive material transportation, etc. They may report to the RPM, DPM, or the RPSSL. They provide programmatic support as well as specialized technical support to the projects, as needed.<br><br>Provides contamination and radiation exposure control. Performs or direct surveys where procedures have not been established or where unusual conditions are present or expected. Duties may include working with routine and/or</td></tr>
</table>



**UCOR**
URS | CH2M
Oak Ridge LLC

| Job Title | | Education/Experience |
|---|---|---|
| | | special detection equipment.  Performs qualitative mask fit for radiological protection.  As assigned by management: perform special studies in the evaluation of radiological protection for personnel, environmental, or plant areas; participates in area specific radiation worker qualification and requalification programs; prepares and maintain records and documentation as appropriate; and provides assistance in the preparation of radiation control documents such as Radiological Work Permits (RWP's), ALARA Management Worksheets (AMW's), etc.  May train others. |
| Job Title:  Lead Radiation Protection Technician<br>Code Number: T5:235P<br>Exemption Status – Technical NEX | T6 | **Education/Experience:** AA/AS in Radiation Protection, Health Physics, Nuclear Technology, Occupational Safety & Health, Environmental Health or related field and 7+ years of experience in Radiation Protection; or equivalent combination of education and related work experience (11 years of directly related experience without a degree). .<br>NRRPT Certification strongly preferred.<br><br>**Level Specific Responsibilities:**<br>Lead Health Physicists are members of the non-deployed RP team with specialized experience in specific radiological protection disciplines such as internal audits, air monitoring, dosimetry, instrumentation, radiological characterization/survey planning, radioactive material transportation, etc.  They may report to the RPM, DPM, or the RPSSL.  They provide programmatic support as well as specialized technical support to the projects, as needed.<br><br>Provides contamination and radiation exposure control.  Performs or direct surveys where procedures have not been established or where unusual conditions are present or expected.  Duties may include working with routine and/or special detection equipment.  Performs qualitative mask fit for radiological protection.  As assigned by management: perform special studies in the evaluation of radiological protection for personnel, environmental, or plant areas; participates in area specific radiation worker qualification and requalification programs; prepares and maintain records and documentation as appropriate; and provides assistance in the preparation of radiation control documents such as Radiological Work Permits (RWP's), ALARA Management Worksheets (AMW's), etc.  Leads, directs, and trains others. |
| Job Title:  Radiation Protection Supervisor I<br>Code Number: 26:233P | 26 | **Education/Experience:** Bachelor's degree in Radiation Protection, Health Physics, Nuclear Technology, Occupational Safety & Health, Environmental Health or closely related field |

**January 17, 2016**



| Exemption Status – Exempt | | and 10+ years of experience in Radiation Protection, including at least 3 years in a lead or supervisory position; or equivalent combination of education and related work experience. NRRPT Certification strongly preferred.<br><br>**Level Specific Responsibilities:**<br>• Provides leadership for ensuring radiological compliance in accordance with all applicable rules and regulations and meeting all Radiological Control requirements.<br>• Ensures rad techs safely implement UCOR safety policies, procedures and programs including implementation of the Integrated Safety Management System (ISMS) and 10 CFR 851, Worker Safety and Health Program, on assigned projects.<br>• Supports execution of project work scope as assigned and provides oversight to ensure compliance with applicable safety regulations, DOE Orders and other related requirements.<br>• Supervises HPT's and ensures sound radiation protection practices are accomplished in support of Production Operations activities.<br>• Provides leadership for ensuring the requisite level of conduct of operations, safety management program implementation, and radiological compliance in the planning and execution of these activities.<br>• Provides radiological control leadership and coordination for major project activities supporting accomplishment of critical milestones. Participates in work planning and execution to ensure safety and compliance.<br>• Implements company programs for Radiological Control. Implements and supports the Integrated Safety Management System.<br>• Supports worker involvement in safety and process improvement programs.<br>• Conducts management observations and assessments for safety, Radiological Control and procedural compliance.<br>• Provide day-to-day direction to rad techs.<br>• Demonstrate commitment to UCOR's Vision and its core values<br>• Participates in work planning and execution to ensure safety and compliance<br>• Implements company programs for Radiological Control<br>• Implements the Integrated Safety Management System<br>• Support worker involvement in safety and process improvement programs<br>• Conducts management observations and assessments for |
|---|---|---|

January 17, 2016

Case 3:21-cv-00368-CEA-HBG   Document 16-3   Filed 11/17/21   Page 4 of 8   PageID #: 227

Case 3:22-cv-00426-TRM-JEM      Document 103-1      Filed 06/03/24      Page 177 of 352
PageID #: 2042



| | | |
|---|---|---|
| | | • safety, RadCon, and procedural compliance |
| | | • Provides and manages trained and qualified Health Physics Technicians |
| | | • Support the UCOR ALARA program |
| | | • Accountability for safety of workers, the public and the environment |
| | | • Facilitate the implementation and acceptance of change within the workplace |
| | | • Provide timely guidance and feedback to help others strengthen knowledge, accomplish tasks, or solve problems |
| | | • Set high standards of performance for self and others |
| | | • Interact with others in a way that gives them confidence in one's intentions and those of the organization |
| | | • Maintaining and promoting social, ethical, and organizational norms in conducting internal and external business activities |
| | | • Ensure sound radiation protection principles/practices are incorporated into work activities. |
| | | • Report to the Project Radiological Protection Manager/designee for day-to-day direction and functionally report to the UCOR Safety and Health Manager. |
| | | • Function as the point of accountability for Rad performance in assigned areas. |
| | | • Meet schedule and budget for assigned responsibilities and tasks. |
| | | • Maintain training, required reading and any qualification requirements current. |
| | | • Communicate regularly to direct reports pertinent to information needed to implement ESH Programs in a consistent, compliant, and timely manner. |
| | | • Support the LEAN Program by identifying and working to eliminate waste from work processes. |
| Job Title: Radiation Protection Supervisor II<br>Code Number: 27:233P<br>Exemption Status – Exempt | 27 | **Education/Experience:** Bachelor's degree in Radiation Protection, Health Physics, Nuclear Technology, Occupational Safety & Health, Environmental Health or closely related field and 12+ years of experience in Radiation Protection, including at least 3 years as a radiation protection supervisory experience; or equivalent combination of education and related work experience. NRRPT Certification strongly preferred.<br><br>**Level Specific Responsibilities:**<br>• Provides leadership for ensuring radiological compliance in accordance with all applicable rules and regulations and meeting all Radiological Control requirements.<br>• Ensures rad techs safely implement UCOR safety policies, |

**January 17, 2016**



| | | |
|---|---|---|
| | | procedures and programs including implementation of the Integrated Safety Management System (ISMS) and 10 CFR 851, Worker Safety and Health Program, on assigned projects. |

- Supports execution of project work scope as assigned and provides oversight to ensure compliance with applicable safety regulations, DOE Orders and other related requirements.
- Supervises HPT's and ensures sound radiation protection practices are accomplished in support of Production Operations activities.
- Provides leadership for ensuring the requisite level of conduct of operations, safety management program implementation, and radiological compliance in the planning and execution of these activities.
- Provides radiological control leadership and coordination for major project activities supporting accomplishment of critical milestones. Participates in work planning and execution to ensure safety and compliance.
- Implements company programs for Radiological Control. Implements and supports the Integrated Safety Management System.
- Supports worker involvement in safety and process improvement programs.
- Conducts management observations and assessments for safety, Radiological Control and procedural compliance.
- Provide day-to-day direction to rad techs.
- Demonstrate commitment to UCOR's Vision and its core values
- Participates in work planning and execution to ensure safety and compliance
- Implements company programs for Radiological Control
- Implements the Integrated Safety Management System
- Support worker involvement in safety and process improvement programs
- Conducts management observations and assessments for safety, RadCon, and procedural compliance
- Provides and manages trained and qualified Health Physics Technicians
- Support the UCOR ALARA program
- Accountability for safety of workers, the public and the environment
- Facilitate the implementation and acceptance of change within the workplace
- Provide timely guidance and feedback to help others strengthen knowledge, accomplish tasks, or solve problems



| | | |
|---|---|---|
| | | • Set high standards of performance for self and others<br>• Interact with others in a way that gives them confidence in one's intentions and those of the organization<br>• Maintaining and promoting social, ethical, and organizational norms in conducting internal and external business activities<br>• Ensure sound radiation protection principles/practices are incorporated into work activities.<br>• Report to the Project Radiological Protection Manager/designee for day-to-day direction and functionally report to the UCOR Safety and Health Manager.<br>• Function as the point of accountability for Rad performance in assigned areas.<br>• Meet schedule and budget for assigned responsibilities and tasks.<br>• Maintain training, required reading and any qualification requirements current.<br>• Communicate regularly to direct reports pertinent to information needed to implement ESH Programs in a consistent, compliant, and timely manner.<br>• Support the LEAN Program by identifying and working to eliminate waste from work processes. |

Case 3:21-cv-00368-CEA-HBG   Document 16-3   Filed 11/17/21   Page 8 of 8   PageID #: 231

**MEMORANDUM OF AGREEMENT**
**BETWEEN**
**ARS ALEUT SERVICES, LLC**
**AND**
**ATOMIC TRADES & LABOR COUNCIL (ATLC), AFL-CIO**
**As witnessed by**
**UCOR l CH2M OAK RIDGE (UCOR), LLC**

This Memorandum of Agreement ("MOA" herein) is made and entered into by and between URS|CH2M Oak Ridge UCOR, LLC hereinafter referred to as the Contractor; ARS Aleut Services, LLC, its successors or assigns, hereinafter referred to as "AAS" or "the Subcontractor," and the Atomic Trades and Labor Council (ATLC) and International Chemical Workers Union Local Union 715c, ICWU LU 715, an affiliate of the ATLC, hereinafter referred to as the Union.

## BACKGROUND

Prior to the ATLC organizing the RPTs, a unique position was filled by Carl Spears. This individual hired as a Senior RPT was recognized as having significant advanced skills in Radiation Protection and Radiological instrumentation. As such, the individual was promoted to a "super tech", hereafter known as Sr.Radiological Protection Special Technical Lead. This Memorandum is prepared to ensure retention of the individual and to protect the individual from economic harm because of the union organization of the RPTs. Additionally; this pay rate is based on the individual's technical and operational

1. Both parties agree that Carl Spears performs technical functions of RPT and Instrumentation Technician at a much more advanced level than a lead RPT position requirements.
2. ATLC and AAS agree that the individual plays a significant role in our RadCon process.
3. Carl Spears will be classified as a Sr.Radiological Protection Special Technical Lead.
4. This position requires a technical knowledge and significant skill level exceeding that of an RPT Lead. As such, this individual will be paid 13% above the Sr RPT wage rate as identified in the UCOR/ATLC/AAS Collective Bargaining Agreement.
5. This MOA is a full and complete agreement for the position of the position of Sr Radiological Protection Special Technical Lead.
6. Both parties must agree upon any alterations, changes, additions or deletions to this agreement.
7. This agreement is for this position only and is non-binding, non-precedent setting.
8. Either party may terminate this agreement with a written notification to the other parties. Upon receipt of this notice, a meeting will be held within five (5) business days to discuss options. If no resolution is reached at this meeting, the agreement will terminate at the end of the current pay period.

> Exhibit
> 4

1
July 29, 2019
Case 3:21-cv-00368-CEA-HBG   Document 16-4   Filed 11/17/21   Page 1 of 2   PageID #: 232
Case 3:22-cv-00426-TRM-JEM     Document 103-1     Filed 06/03/24     Page 182 of 352   JA-182
PageID #: 2047

**IN WITNESS WHEREOF, the parties hereto have caused this Memorandum of Agreement to be signed by their authorized representatives on this 29th day of July, 2019.**

**FOR ARS Aleut Services, LLC**

Signature on File
Christine Marsicano, Executive Vice President

**ATOMIC TRADES AND LABOR COUNCIL, AFL-CIO**

Signature on File
Wayne Bolinger, 1st Vice-President

Signature on File
Ginger Brewer, Chief Steward, ICWU LU 715C

**For UCOR, LLC**

Signature on File
Len Morgan, Labor Relations Manager and Ombudsman


**UCOR**
an Amentum-led partnership with Jacobs

# Staffing Requisition

*(NOTE: this page was formerly known as Form-8a, "Job Posting.")*

| | | | |
|---|---|---|---|
| **Classification Title:** | Materials Clerk - XA | **Grade:** | 18XA |
| **Requisition No.:** | 7022BU | **Organization:** | End State and Federal Land Reuse |
| **Location:** | T2 | **Number of Positions:** | 1 |
| **Project Assignment:** | Property, Real Estate and Records | | |
| **Posting Date:** *(Staffing will complete)* | October 25, 2021 | **Closing Date:** *(Staffing will complete)* | November 2, 2021 |

**Duties:**

- Receives and offloads deliveries
- Deliver and offload material and equipment to project teams at ORNL, Y-12, and various other offsite locations
- Perform annual inventories of personnel property
- Process and disposition excess materials and equipment
- Transport materials via trucks, forklifts, etc.
- Routinely lifts, moves, and transports 30 lbs.

**Job-Related Qualifications Required:**

**Must be fully vaccinated against COVID or determined eligible for accommodation under the ADA (American Disabilities Act)**

- High School Graduate/GED
- Must pass a drug screen
- Working knowledge of general math
- Basic computer skills
- Documented, verifiable experience operating inventory tracking software
- Working knowledge of Puridiom preferred
- Three years demonstrated experience in warehousing operations
- Must be able to work in an outdoor environment
- Good communication skills, and be physically able to do considerable walking, lifting, bending, stooping, crouching, carrying, etc.
- Ability to communicate with project teams and customers in a professional manner
- Ability to understand environmental safety, and health requirements applicable to work at a DOE facility
- Ability to work independently on assigned tasks and complete within allotted time
- Must possess a valid Tennessee Driver's License
- Must be able to obtain a Q Clearance
- UCOR forklift certification preferred

**Relocation**: ☐ YES  ☒ NO

**Assignment Ends:** *(Staffing will complete)*

**Contact**
Only web applications will be considered.

For ***External Applicants*** (i.e. non-employees): go to the UCOR web site to submit your cover letter and résumé for a job posting: http://www.ucor.com/workwithus.html

To access the UCOR jobs page directly, use the following link:
https://workforcenow.adp.com/mascsr/default/mdf/recruitment/recruitment.html?cid=2f202184-451c-4a14-845d-4c49cb73912c

**URS | CH2M Oak Ridge LLC (UCOR) prohibits smoking in enclosed areas, including company vehicles.**

Exhibit 7

Form-8 (4/20), Rev. 8



#69

# UCOR COVID-19 Vaccination Religious Exemption Request Form

| Name: Carlton Speer | Badge No.: 710297 | Date: 9/13/2021 |
|---|---|---|
| Position Title: Special Lead RPT | Supervisor: Laura Williams | |

UCOR intends to work through an interactive process to provide reasonable accommodations to employees whose sincerely-held religious beliefs preclude them from being vaccinated, and potentially grant an exemption to the COVID-19 Vaccination requirement. The Company will provide an exemption/reasonable accommodation for employees' religious beliefs and practices which prohibit the employee from receiving a COVID-19 vaccine, provided the requested accommodation is reasonable and does not create an undue hardship for the Company or pose a direct threat to the health and/or safety of others in the workplace and/or to the requesting employee.

Please describe below why your sincerely held religious beliefs preclude you from receiving the COVID-19 Vaccination:

It is my sincerely held belief as a baptized follower of Jesus Christ, that murder is a sin (Exodus 20:13). I believe that human life begins at conception, therefore abortion is a sin. I believe that taking an injection into my body that was produced, manufactured, or developed using the cells derived from an abortion makes me a party to that abortion and therefore a sin. I believe it is a sin for me to indirectly provide monetary support to those who manufacture these injections regardless of how long ago these abortions took place (Romans 6:13). I also believe that when I was baptized into the death of Jesus Christ (Romans 6:3), I was filled with the Holy Spirit by God. I believe my body is the temple of the Holy Spirit who is in me (1 Corinthians 6:19). I believe that Covid drugs by J&J, Moderna, and Pfizer are harmful and by taking these drugs into my body will damage my body (https://Vaers.hhs.gov/data/datasets.html?) and thus damage the temple of the Holy Spirit. I respectfully request reasonable accommodation in my employment with an exemption from receiving the mandated Covid drugs.

**In some cases, the Company will need to obtain additional information and/or documentation about your religious practice(s) or belief(s). We may need to discuss the nature of your religious belief(s), practice(s) and accommodation with your religion's spiritual leader (if applicable) or religious scholars to address your request for an exception.**

If requested, can you provide documentation to support your belief(s) and need for an accommodation?

Yes ☒        No ☐

If no, please explain why:

I verify that the information I am submitting in support of my request for an accommodation is complete and accurate to the best of my knowledge.

Signature: *Carl Speer*                         Date: 9/13/2021

Print Name:   Carlton Speer

*Please return this form to Human Resources, Vanessa Holsomback, Vanessa.Holsomback@orcc.doe.gov  no later than September 14, 2021.*

Form-3604 (8/21), Rev. 0

Exhibit 5

 **UCOR**
an Amentum-led partnership with Jacobs

**Exemption and Accommodation Review –
Interactive Process with Employee**

| Employee Name: | Cvl Speer | Date: | 9-21-21 |
|---|---|---|---|
| Badge No.: | 710 297 | HR/LR Rep: | Reg Parrish |
| Job Title: | Instrumentation Specialist | Organization/Project: | Instrumentation |
| Work Location: | 100 vv | Religious or Medical? | Rel |

*The purpose of this meeting is to review your request for accommodation and discuss potential options for that accommodation, should your exemption be granted. This meeting on potential accommodations is an important part of the interactive process between the Employer, UCOR, and you, the employee. This discussion allows you to provide input regarding reasonable accommodations that you feel would help protect you and the workforce while performing your job duties. The exemption request is still under review, and you will be notified by UCOR if the exemption is granted or not. Until a determination on your exemption request is made, the October 1 deadline for the first vaccine dose is inapplicable. UCOR HR will communicate the final determination to you, in writing, which may include an updated vaccination deadline.*

| Would you be able and/or willing to follow any of the possible accommodations listed below? | | | |
|---|---|---|---|
| Weekly Testing (Mandatory) | ☑ Yes | ☐ No | ☐ Other: |
| KN95/N95 Mask Mandate | ☑ Yes | ☐ No | ☐ Other: |
| Mask Fit (if required) | ☑ Yes | ☐ No | ☐ Other: |
| Job Reassignment | ☑ Yes | ☐ No | ☐ Other: |
| Isolation or Distancing | ☑ Yes | ☐ No | ☐ Other: |
| Short-Term Disability (STD) | ☑ Yes | ☐ No | ☐ Other: |
| Daily Self Health Check | ☑ Yes | ☐ No | ☐ Other: |
| Telework (Temporary) | ☑ Yes | ☐ No | ☐ Other: |

**If you were to not be vaccinated, what accommodations do you feel would be appropriate to allow you to perform your job functions?**

- Mostly work alone. Has an office mate. Get personal office
- Training - In groups of unvaxed

Form-3614 (9/21), Rev. 0 draft

Case 3:21-cv-00368-CEA-HBG   Document 16-5   Filed 11/17/21   Page 2 of 7   PageID #: 235

Case 3:22-cv-00426-TRM-JEM   Document 103-1   Filed 06/03/24   Page 186 of 352   PageID #: 2051   JA-186



**UCOR**
an Amentum-led partnership with Jacobs

## Exemption and Accommodation Review –
## Interactive Process with Employee

| Any other information (personal statement) the employee wishes to provide: |
|---|
| |

*I understand that I have met with a UCOR representative to discuss potential accommodations that would be appropriate for me in the workplace if my exemption request is approved. I understand that a determination has not been made regarding the status of my COVID-19 Vaccination Requirement Religious Exemption Request. Additionally, I understand that the company has not agreed to any accommodations at this time, as my exemption request has been neither approved nor disapproved.*

| Name *(print)*: | Carl Speer | Date: | |
|---|---|---|---|
| Signature: | Carl Speer | Date: | 9-21-21 |

Form-3614 (9/21), Rev. 0 draft

Page 2 of 2

# EXEMPTION & ACCOMODATION REVIEW SUMMARY

| Employee Name:<br>Carl Speer<br>Badge#<br>710297 | Job Function:<br>Instrumentation Specialist<br>Project/Bldg. Location:<br>100 UV | Supervisor |
|---|---|---|
| Interactive Discussion Held with affected employee?<br><br>Yes ☒<br>No ☐ | Date of Discussion:<br>9/21/21<br>Discussion Interviewer:<br>Ray Parrish | Subject: COVID Vaccine Exemption Request |
| Office Worker ☒<br><br>Field Worker ☐ | Exemption Request Type<br><br>Religious ☒<br>Medical ☐ | Comments: |

## RELIGIOUS

| Is this a Sincerely-Held Religious Belief? | Yes ☒ | No ☐ | | | |
|---|---|---|---|---|---|

| Possible Accommodations: | | | | |
|---|---|---|---|---|
| | Weekly Testing (Mandatory) | Yes ☒ | No ☐ |
| | KN95/N95 Mask Mandate | Yes ☒ | No ☐ |
| | Mask Fit (If Required) | Yes ☒ | No ☐ |
| | Job Reassignment | Yes ☐ | No ☒ |
| | Limited Task Assignment | Yes ☐ | No ☒ |
| | Isolation or Distancing | Yes ☒ | No ☐ |
| | Leave of Absence (LOA) | Yes ☒ | No ☐ |
| | Daily Self Health Check | Yes ☒ | No ☐ |
| | Telework (Temporary) | Yes ☐ | No ☒ |

## Medical

| Did UCOR Health Services receive Form 3606? | Yes ☐ | No ☐ |
|---|---|---|
| Did UCOR Health Services approve the Request for Medical Exemption? | Yes ☐ | No ☐ |

| Possible Accommodations: | | | | |
|---|---|---|---|---|
| | Weekly Testing (Mandatory) | Yes ☐ | No ☐ |
| | KN95/N95 Mask Mandate | Yes ☐ | No ☐ |
| | Mask Fit (If Required) | Yes ☐ | No ☐ |
| | Job Reassignment | Yes ☐ | No ☐ |
| | Limited Task Assignment | Yes ☐ | No ☐ |
| | Isolation or Distancing | Yes ☐ | No ☐ |
| | Leave of Absence (LOA) | Yes ☐ | No ☐ |
| | Short-Term Disability (STD) | Yes ☐ | No ☐ |
| | Daily Self Health Check | Yes ☐ | No ☐ |
| | Telework (Temporary) | Yes ☐ | No ☐ |



*Interoffice Memorandum*

**To:** Speer, Carton L, 710297

**From:** Mary Alice Douglass, Human Resources Manager

**Date:** October 4, 2021

**File:** HR-21-0311

**Subject:** COVID Vaccination Exemption Request Determination

The exemption request you submitted as it relates to the requirement for mandatory vaccination against COVID has been reviewed by the UCOR Accommodation Review Committee and is hereby dispositioned as follows:

**Basis for Exemption Request:**    **Religious**    ☒

**DETERMINATION:**    **Sincerely held religious belief**    **YES** ☒    **NO** ☐

**Undue hardship to UCOR**    **YES** ☒    **NO** ☐

Although your Exemption Request was determined to meet the threshold of a sincerely held religious belief, granting accommodations to the mandatory vaccination would create an undue hardship to the Company. As OSHA has defined COVID-19 as a workplace illness, employers are required to provide the most effective workplace controls to ensure all employees' health and safety. Mandatory vaccination provides the highest level of protection for you and the rest of UCOR's workforce from a workplace transmittal of COVID-19. Based on our interactive discussion of possible accommodations with you and our review of all the religious exemption requests in total, the Company has determined that the accommodations requested would represent a greater than minimal impact to workplace safety, cost and risk of legal liability. As such, your Exemption Request is denied.

**REQUEST FOR ACCOMMODATION:**

**APPROVED** ☐    **DENIED** ☒

You have until close of business on Thursday, October 7, 2021 to provide UCOR with proof that you have received either the first dose of the Moderna or Pfizer vaccines or the single dose of the Johnson & Johnson vaccine. If you fail to meet this deadline, you will enter the progressive discipline process.

MAD:cam

File-DMC-RC

Form-3 (3/20), Rev. 1



*Interoffice Memorandum*

| | |
|---|---|
| ***To:*** | Speer, Carlton L., 710297 |
| ***From:*** | Mary Alice Douglass, Human Resources Manager |
| ***Date:*** | October 11, 2021 |
| ***File:*** | HR-21-0351 |
| ***Subject:*** | Written Warning Discipline – Failure to Comply with Mandatory COVID Vaccination Requirement |

You were notified of the need to comply with UCOR's mandatory October 1, 2021 date for vaccination against COVID.

To date, you still have not received the vaccination, as required by UCOR.

Therefore, you are being issued this Written Warning Discipline for failure to comply with the mandatory vaccination requirement.

If you fail to provide proof that you have received either the first dose of the Moderna or Pfizer vaccine or the single dose of the Johnson & Johnson vaccine at a minimum, by close of business, Thursday, October 14, 2021, you will be placed on a mandatory Leave of Absence for a period of ++ consecutive calendar days, effective October 18, 2021. You may use your existing vacation/Paid Time Off (PTO) to cover the absence or if vacation/PTO is not available, you will be placed in unpaid status for the duration of the absence. ↳*7 Dur*

If you have not received the initial dose of the vaccine by Close of Business on Thursday, October 14, 2021, you are required to turn your badge in to your supervisor prior to leaving work.

If you initiate actions to obtain the vaccination during the leave period, you may return to work once you have provided proof of receipt of the initial vaccine dose to UCOR Medical. The timeline for you to become fully vaccinated will begin upon receipt of the first vaccination.

Additionally, upon receipt of this Written Warning for failure to comply with UCOR's vaccination mandate, you will be required to:

- Fully comply with the COVID Standing Order
- Fully comply with the safety protocols for unvaccinated personnel set-forth in the UCOR Duty Disposition Report from Medical

Your continued failure to comply with the mandatory requirement for vaccination during your leave of absence period or any of the aforementioned requirements will result in additional disciplinary action, up to and including termination of your employment at UCOR.

ACKNOWLEDGEMENT:

*Carlton Speer*
Employee Name (Printed)

*Carl Speer*                 **10-11-21**
Employee Name (Signature)        Date

MAD:cam

File-DMC-RC

 **UCOR**
an Amentum-led partnership with Jacobs

*Interoffice Memorandum*

| | |
|---|---|
| *To:* | Speer, Carlton L, 710297 |
| *From:* | Mary Alice Douglass, HR Manager |
| *Date:* | October 25, 2021 |
| *File:* | HR-21-0393 |
| *Subject:* | Unpaid Suspension – Failure to Meet COVID Vaccination Mandate |

In accordance with UCOR POL-HR-313, *COVID-19 Vaccination Policy*, "*All individuals working for UCOR -- including UCOR employees, staff augmentation employees, and subcontractors employees collectively, "Members of the workforce" must receive and provide proof of having received a full course (two doses of a two-dose vaccine or one dose of a single-dose vaccine) of a COVID-19 vaccine acceptable to UCOR, as defined below. Members of the workforce must provide such proof by utilizing UCOR Medical Services to obtain vaccinations or providing UCOR Medical Services with a copy of their vaccination card.*"

This policy requirement becomes effective for existing members of the workforce on November 1, 2021.

You were recently placed on mandatory Leave of Absence (LOA), allowing you time in which to comply with the mandatory vaccination requirement. During this initial LOA period, you were allowed to utilize existing PTO/vacation to cover the absence period.

To date, you remain unvaccinated.

Therefore, effective today, Monday, October 25, 2021, you are being placed on UNPAID suspension through October 31, 2021. You may not use your existing PTO/vacation to cover the absence period. You will be placed in unpaid status for the remainder of the LOA period.

If you do not initiate the vaccine process, prior to November 1, 2021, your employment with UCOR will be terminated in absentia, effective November 1, 2021.

If you have any questions, please contact Vanessa Holsomback at (865) 576-1277 or Ray Parrish at (803) 767-9237.

MAD:cam

Attachment:


cc/att: File-DMC-RC

23 ✓



# UCOR

an American-led partnership with Jacobs

## UCOR COVID-19 Vaccination Religious Exemption Request Form

| Name: Malena C. Dennis | Badge No.: 712849 | Date: 09/07/2021 |
| Position Title: Sr. RPT | Supervisor: Laura Williams | |

UCOR intends to work through an interactive process to provide reasonable accommodations to employees whose sincerely-held religious beliefs preclude them from being vaccinated, and potentially grant an exemption to the COVID-19 Vaccination requirement. The Company will provide an exemption/reasonable accommodation for employees' religious beliefs and practices which prohibit the employee from receiving a COVID-19 vaccine, provided the requested accommodation is reasonable and does not create an undue hardship for the Company or pose a direct threat to the health and/or safety of others in the workplace and/or to the requesting employee.

Please describe below why your sincerely held religious beliefs preclude you from receiving the COVID-19 Vaccination:

> To Whom It May Concern,
>
> I have held my religious beliefs since childhood. I worked within youth ministry for year as well as teaching Sunday School classes for awhile. God has long instilled within me a belief in the sanctity of life. We are told in Genesis 1:27 that we are created in God's image. I could list multiple verses throughout the Bible that not only tell us God is our creator but that we are so important to Him that He had a relationship with us and knew us before we were ever born.
>
> Many vaccines are created using aborted fetal cells at some point in the development and/or testing process. All of the COVID-19 vaccines available are connected in some way to abortion. I believe abortion is the taking of innocent life and is a sin against God. I cannot in good conscience, knowingly, go against my belief system and take any vaccine or partake in any medical process that has resulted from aborted babies. The Bible tells us that we shall not kill, particularly in the books of Genesis, Exodus and Deuteronomy. I believe that all life is precious and comes from God regardless of conception. There are many verses in the Bible that demonstrate God not only cares for us but He had a relationship with us before we were even born. An example of this Psalms 139:13-16. "...thou has covered me in my mother's womb." (Please see attached for additional comments.)

**In some cases, the Company will need to obtain additional information and/or documentation about your religious practice(s) or belief(s). We may need to discuss the nature of your religious belief(s), practice(s) and accommodation with your religion's spiritual leader (if applicable) or religious scholars to address your request for an exception.**

If requested, can you provide documentation to support your belief(s) and need for an accommodation?

Yes ☑   No ☐

If no, please explain why

I verify that the information I am submitting in support of my request for an accommodation is complete and accurate to the best of my knowledge.

Signature: *Malena C. Dennis*    09/07/2021   Date:

Print Name: *Malena C. Dennis*

*Please return this form to Human Resources, Vanessa Holsomback, Vanessa.Holsomback@orcc.doe.gov no later than September 14, 2021.*

Form-3604 (8/21), Rev 0 Draft

Page 1 of 2

Exhibit 6

My faith is a big part of my life and all decisions I make from the smallest to the biggest. I cannot just set my beliefs aside because of what someone else believes I should do or has a different outlook or belief system. Every day is a walk of faith. The Bible tells me to "fear not" over three hundred times and have faith in God who has power over not only fleshly body but my soul. To go against His word is a sin and against everything I believe in. It puts my eternal soul in jeopardy and I cannot do that. It is based on the above reliefs that I ask for my religious exemption to be approved. Fortunately, I perform a job duty that requires very limited, if any, contact with other workers. Thank you for your consideration of my request.



**UCOR**
an Amentum-led partnership with Jacobs

**Exemption and Accommodation**
**Interactive Discussion Intake**

| Employee Name: | MaLeNa DeNNis | Date: | 9 15 21 |
|---|---|---|---|
| Badge No.: | 71284q | HR/LR Rep: | Mae |
| Job Title: | Se RPT | Organization/Project: | 100 UV |
| Work Location: | 100 UV | Religious or Medical? | |

*The purpose of this meeting is to review your request for accommodation and discuss potential options for that accommodation, should your exemption be granted. This meeting on potential accommodations is an important part of the interactive process between the Employer, UCOR, and you, the employee. This discussion allows you to provide input regarding reasonable accommodations that you feel would help protect you and the workforce while performing your job duties. The exemption request is still under review, and you will be notified by UCOR if the exemption is granted or not. Until a determination on your exemption request is made, the October 1 deadline for the first vaccine dose is inapplicable. UCOR HR will communicate the final determination to you, in writing, which may include an updated vaccination deadline.*

| Would you be able and/or willing to follow any of the possible accommodations listed below? | | | |
|---|---|---|---|
| Weekly Testing (Mandatory) | ☑ Yes | ☐ No | ☐ Other: |
| KN95/N95 Mask Mandate | ☑ Yes | ☐ No | ☐ Other: |
| Mask Fit (if required) | ☑ Yes | ☐ No | ☐ Other: |
| Job Reassignment | ☑ Yes | ☐ No | ☐ Other: |
| Isolation or Distancing | ☑ Yes | ☐ No | ☐ Other: Already isolated 99% time |
| Short-Term Disability (STD) | ☑ Yes | ☐ No | ☐ Other: |
| Daily Self Health Check | ☑ Yes | ☐ No | ☐ Other: |
| Telework (Temporary) | ☐ Yes | ☑ No | ☐ Other: |

**If you were to not be vaccinated, what accommodations do you feel would be appropriate to allow you to perform your job functions?**

Work in courtro

X put all unvaccinatid in of air rooms toplu to eliminate any conciw for exposure — Ease other peoples fears

Form-3614 (9/21), Rev. 0 draft

Page 1 of 2



**Exemption and Accommodation
Interactive Discussion Intake**

| Any other information (personal statement) the employee wishes to provide: |
|---|
| |

*I understand that I have met with a UCOR representative to discuss potential accommodations that would be appropriate for me in the workplace if my exemption request is approved. I understand that a determination has not been made regarding the status of my COVID-19 Vaccination Requirement Religious Exemption Request. Additionally, I understand that the company has not agreed to any accommodations at this time, as my exemption request has been neither approved nor disapproved.*

| Name *(print)*: | Malena Dennis | Date: | 9/15/2021 |
|---|---|---|---|
| Signature: | Malena Dennis | Date: | 09/15/2021 |

Form-3614 (9/21), Rev. 0 draft

Page 2 of 2

# EXEMPTION & ACCOMODATION REVIEW SUMMARY

| | | |
|---|---|---|
| Employee Name: Malena Dennis<br><br>Badge# 712849 | Job Function: Sr. RPT<br><br>Project/Bldg. Location: 100 UNV | Supervisor: Laura Williams |
| Interactive Discussion Held with affected employee?<br><br>Yes ☒  No ☐ | Date of Discussion: 9/15/21<br><br>Discussion Interviewer: MAD | Subject: COVID Vaccine Exemption Request - Religious |
| Office Worker ☒<br><br>Field Worker ☐ | Exemption Request Type<br><br>Religious ☒<br>Medical ☐ | Comments: |

## RELIGIOUS

| | | | | |
|---|---|---|---|---|
| Is this a Sincerely-Held Religious Belief? | | Yes ☒ | No ☐ | |

| Possible Accommodations: | | | | | |
|---|---|---|---|---|---|
| | Weekly Testing (Mandatory) | Yes | ☒ | No | ☐ |
| | KN95/N95 Mask Mandate | Yes | ☒ | No | ☐ |
| | Mask Fit (If Required) | Yes | ☒ | No | ☐ |
| | Job Reassignment | Yes | ☐ | No | ☒ |
| | Limited Task Assignment | Yes | ☒ | No | ☐ |
| | Isolation or Distancing | Yes | ☒ | No | ☐ |
| | Leave of Absence (LOA) | Yes | ☐ | No | ☒ |
| | Daily Self Health Check | Yes | ☒ | No | ☒ |
| | Telework (Temporary) | Yes | ☐ | No | ☒ |

## Medical

| | | | | |
|---|---|---|---|---|
| Did UCOR Health Services receive Form 3606? | | Yes ☐ | No ☐ | |
| Did UCOR Health Services approve the Request for Medical Exemption? | | Yes ☐ | No ☐ | |

| Possible Accommodations: | | | | | |
|---|---|---|---|---|---|
| | Weekly Testing (Mandatory) | Yes | ☐ | No | ☐ |
| | KN95/N95 Mask Mandate | Yes | ☐ | No | ☐ |
| | Mask Fit (If Required) | Yes | ☐ | No | ☐ |
| | Job Reassignment | Yes | ☐ | No | ☐ |
| | Limited Task Assignment | Yes | ☐ | No | ☐ |
| | Isolation or Distancing | Yes | ☐ | No | ☐ |
| | Leave of Absence (LOA) | Yes | ☐ | No | ☐ |
| | Short-Term Disability (STD) | Yes | ☐ | No | ☐ |
| | Daily Self Health Check | Yes | ☐ | No | ☐ |
| | Telework (Temporary) | Yes | ☐ | No | ☐ |

 **UCOR**
an Amentum-led partnership with Jacobs

*Interoffice Memorandum*

| | |
|---|---|
| *To:* | Dennis, Malena C, 712849 |
| *From:* | Mary Alice Douglass, Human Resources Manager |
| *Date:* | October 4, 2021 |
| *File:* | HR-21-0275 |
| *Subject:* | COVID Vaccination Exemption Request Determination |

The exemption request you submitted as it relates to the requirement for mandatory vaccination against COVID has been reviewed by the UCOR Accommodation Review Committee and is hereby dispositioned as follows:

**Basis for Exemption Request:**    **Religious**    ☒

**DETERMINATION:**    **Sincerely held religious belief**    YES  ☒    NO  ☐

  **Undue hardship to UCOR**    YES  ☒    NO  ☐

Although your Exemption Request was determined to meet the threshold of a sincerely held religious belief, granting accommodations to the mandatory vaccination would create an undue hardship to the Company. As OSHA has defined COVID-19 as a workplace illness, employers are required to provide the most effective workplace controls to ensure all employees' health and safety. Mandatory vaccination provides the highest level of protection for you and the rest of UCOR's workforce from a workplace transmittal of COVID-19. Based on our interactive discussion of possible accommodations with you and our review of all the religious exemption requests in total, the Company has determined that the accommodations requested would represent a greater than minimal impact to workplace safety, cost and risk of legal liability. As such, your Exemption Request is denied.

**REQUEST FOR ACCOMMODATION:**

  **APPROVED**  ☐    **DENIED**    ☒

You have until close of business on <u>Thursday, October 7, 2021</u> to provide UCOR with proof that you have received either the first dose of the Moderna or Pfizer vaccines or the single dose of the Johnson & Johnson vaccine. If you fail to meet this deadline, you will enter the progressive discipline process.

MAD:cam

File-DMC-RC

Form-3 (3/20), Rev. 1



**UCOR**
an Amentum-led partnership with Jacobs

*Interoffice Memorandum*

| | |
|---|---|
| *To:* | Dennis, Malena C., 712849 |
| *From:* | Mary Alice Douglass, Human Resources Manager |
| *Date:* | October 11, 2021 |
| *File:* | HR-21-0334 |
| *Subject:* | Written Warning Discipline – Failure to Comply with Mandatory COVID Vaccination Requirement |

You were notified of the need to comply with UCOR's mandatory October 1, 2021 date for vaccination against COVID.

To date, you still have not received the vaccination, as required by UCOR.

Therefore, you are being issued this Written Warning Discipline for failure to comply with the mandatory vaccination requirement.

If you fail to provide proof that you have received either the first dose of the Moderna or Pfizer vaccine or the single dose of the Johnson & Johnson vaccine at a minimum, by close of business, Thursday, October 14, 2021, you will be placed on a mandatory Leave of Absence for a period of 14 consecutive calendar days, effective October 18, 2021. You may use your existing vacation/Paid Time Off (PTO) to cover the absence or if vacation/PTO is not available, you will be placed in unpaid status for the duration of the absence.

If you have not received the initial dose of the vaccine by Close of Business on Thursday, October 14, 2021, you are required to turn your badge in to your supervisor prior to leaving work.

If you initiate actions to obtain the vaccination during the leave period, you may return to work once you have provided proof of receipt of the initial vaccine dose to UCOR Medical. The timeline for you to become fully vaccinated will begin upon receipt of the first vaccination.

Additionally, upon receipt of this Written Warning for failure to comply with UCOR's vaccination mandate, you will be required to:

- Fully comply with the COVID Standing Order
- Fully comply with the safety protocols for unvaccinated personnel set-forth in the UCOR Duty Disposition Report from Medical

Your continued failure to comply with the mandatory requirement for vaccination during your leave of absence period or any of the aforementioned requirements will result in additional disciplinary action, up to and including termination of your employment at UCOR.

ACKNOWLEDGEMENT:

Malena C. Dennis
_____
Employee Name (Printed)

Malena C. Dennis      10-11-21
_____   _____
Employee Name (Signature)     Date

MAD:cam
File-DMC-RC



**UCOR**
an Amentum-led partnership with Jacobs

*Interoffice Memorandum*

| | |
|---|---|
| *To:* | Dennis, Malena C, 712849 |
| *From:* | Mary Alice Douglass, HR Manager |
| *Date:* | October 25, 2021 |
| *File:* | HR-21-0380 |
| *Subject:* | Unpaid Suspension – Failure to Meet COVID Vaccination Mandate |

In accordance with UCOR POL-HR-313, *COVID-19 Vaccination Policy*, *"**All individuals working for UCOR -- including UCOR employees, staff augmentation employees, and subcontractors employees collectively, "Members of the workforce" must receive and provide proof of having received a full course (two doses of a two-dose vaccine or one dose of a single-dose vaccine) of a COVID-19 vaccine acceptable to UCOR, as defined below. Members of the workforce must provide such proof by utilizing UCOR Medical Services to obtain vaccinations or providing UCOR Medical Services with a copy of their vaccination card."***

This policy requirement becomes effective for existing members of the workforce on November 1, 2021.

You were recently placed on mandatory Leave of Absence (LOA), allowing you time in which to comply with the mandatory vaccination requirement. During this initial LOA period, you were allowed to utilize existing PTO/vacation to cover the absence period.

To date, you remain unvaccinated.

Therefore, effective today, Monday, October 25, 2021, you are being placed on UNPAID suspension through October 31, 2021. You may not use your existing PTO/vacation to cover the absence period. You will be placed in unpaid status for the remainder of the LOA period.

If you do not initiate the vaccine process, prior to November 1, 2021, your employment with UCOR will be terminated in absentia, effective November 1, 2021.

If you have any questions, please contact Vanessa Holsomback at (865) 576-1277 or Ray Parrish at (803) 767-9237.

MAD:cam

Attachment:

cc/att: File-DMC-RC

 **UCOR**
an Amentum-led partnership with Jacobs

**Exemption and Accommodation
Interactive Discussion Intake**

| Employee Name: | Zachariah Duncan | Date: | 9/15 |
|---|---|---|---|
| Badge No.: | 71456 | HR/LR Rep: | Vanessa Holsombeck |
| Job Title: | Material Clerk | Organization/Project: | |
| Work Location: | | Religious or Medical? | Religious |

*The purpose of this meeting is to review your request for accommodation and discuss potential options for that accommodation, should your exemption be granted. This meeting on potential accommodations is an important part of the interactive process between the Employer, UCOR, and you, the employee. This discussion allows you to provide input regarding reasonable accommodations that you feel would help protect you and the workforce while performing your job duties. The exemption request is still under review, and you will be notified by UCOR if the exemption is granted or not. Until a determination on your exemption request is made, the October 1 deadline for the first vaccine dose is inapplicable. UCOR HR will communicate the final determination to you, in writing, which may include an updated vaccination deadline.*

| Would you be able and/or willing to follow any of the possible accommodations listed below? | | | |
|---|---|---|---|
| Weekly Testing (Mandatory) | ☑ Yes | ☐ No | ☐ Other: ~~Will Consider~~ Wed 9/15/21 |
| KN95/N95 Mask Mandate | ☑ Yes | ☐ No | ☐ Other: |
| Mask Fit (if required) | ☑ Yes | ☐ No | ☐ Other: |
| Job Reassignment | ☑ Yes | ☐ No | ☐ Other: |
| Isolation or Distancing | ☐ Yes | ☑ No | ☐ Other: |
| Short-Term Disability (STD) | ☑ Yes | ☐ No | ☐ Other: |
| Daily Self Health Check | ☑ Yes | ☐ No | ☐ Other: |
| Telework (Temporary) | ☐ Yes | ☐ No | ☐ Other: N/A |

| If you were to not be vaccinated, what accommodations do you feel would be appropriate to allow you to perform your job functions? |
|---|
| Under current controls you cant think of anything else. |

**Exhibit 8**

**UCOR**
an Amentum-led partnership with Jacobs

| Any other information (personal statement) the employee wishes to provide: |
| --- |
| |

*I understand that I have met with a UCOR representative to discuss potential accommodations that would be appropriate for me in the workplace if my exemption request is approved. I understand that a determination has not been made regarding the status of my COVID-19 Vaccination Requirement Religious Exemption Request. Additionally, I understand that the company has not agreed to any accommodations at this time, as my exemption request has been neither approved nor disapproved.*

| Name *(print):* | Zach Duncan | Date: | 9/15/21 |
| --- | --- | --- | --- |
| Signature: | | Date: | 9/15/21 |

Form-3614 (9/21), Rev. 0 draft

Page 2 of 2



## UCOR COVID-19 Vaccination Religious Exemption Request Form



| Name: Zachariah Duncan | Badge No.: 71456 | Date: 9/8/21 |
|---|---|---|
| Position Title: Material Clerk | Supervisor: Matt Finley | |

UCOR intends to work through an interactive process to provide reasonable accommodations to employees whose sincerely-held religious beliefs preclude them from being vaccinated, and potentially grant an exemption to the COVID-19 Vaccination requirement. The Company will provide an exemption/reasonable accommodation for employees' religious beliefs and practices which prohibit the employee from receiving a COVID-19 vaccine, provided the requested accommodation is reasonable and does not create an undue hardship for the Company or pose a direct threat to the health and/or safety of others in the workplace and/or to the requesting employee.

Please describe below why your sincerely held religious beliefs preclude you from receiving the COVID-19 Vaccination:

> Please see my attached letter.

**In some cases, the Company will need to obtain additional information and/or documentation about your religious practice(s) or belief(s). We may need to discuss the nature of your religious belief(s), practice(s) and accommodation with your religion's spiritual leader (if applicable) or religious scholars to address your request for an exception.**

If requested, can you provide documentation to support your belief(s) and need for an accommodation?

Yes ☒      No ☐

If no, please explain why:

I verify that the information I am submitting in support of my request for an accommodation is complete and accurate to the best of my knowledge.

Signature: _____      Date: 9/8/21

Print Name: Zachariah Duncan

*Please return this form to Human Resources, Vanessa Holsomback, Vanessa.Holsomback@orcc.doe.gov no later than September 14, 2021.*

Form-3604 (8/21), Rev. 0

Page 1 of 1

7, September 2021

To whom it may concern,

I am a baptized follower of Jesus Christ seeking religious exemption from UCOR's new COVID-19 vaccination requirement. This letter will explain why the teachings of the Holy Bible and my spiritual convictions prevent me from taking the available COVID-19 vaccines.

I.) My body belongs to God alone. As a Christian, I believe the Spirit of Jesus Christ lives within me. The Holy Spirit guides me through my decision making in everyday life. This is especially true for the products I choose to consume. If I believe a product (ie: alcohol, drugs etc) could potentially harm or defile the temple of the Holy Spirit (my body), then it is my responsibility as a Christian to stay away from that product. I absolutely believe that there exists a potential for the COVID-19 vaccine to cause me harm. The long-term side effects of the vaccines are absolutely unknown and will remain unknown for many years to come. Any "scientific" claims that tout the future safety and efficacy of the COVID vaccines are pure speculation. As a Christian I feel the duty and responsibility (from the Holy Bible) to protect my body from taking this gamble.

> 1 Corinthians 6:19 Do you not know that your bodies are temples of the Holy Spirit, who is in you, whom you have received from God? You are not your own; 20 you were bought at a price. Therefore honor God with your bodies.(1)

The apostle Paul tells me to live peaceably with all men, if it is possible. All men includes UCOR and I have always given my best effort to honor the wishes and rules of my employer. This is evident by my safe work record and lack of disciplinary issues. However, the possibility of me being able to conform to UCOR's latest mandate does not exist. This is a line I cannot cross, because my body belongs to God alone and He has impressed upon me to decline the vaccine.

Jesus said to give to the government the things which are the government's and give to God the things that are God's. My body does not belong to the USA, the DOE, UCOR or any other organization. My body belongs to God and He alone guides my decisions.

> Mark 12:17 Then Jesus said to them, "Give back to Caesar what is Caesar's and to God what is God's." And they were amazed at him. (1)

The Communion of Reformed Evangelical Churches issued a statement which echoes my convictions:

> Therefore, we state our unequivocal support for the right of refusal of mandatory medical procedures, whether ordered by a branch of civil government, an employer, or any other institution to which an individual is subject or dependent- in the event that an individual sincerely believes his or her life, health, wellbeing, or morality is potentially threatened by such procedures or products, or in the event that a parent has the same concern for his or her child.(2)

**II.)** According to sources I will list below, each of the available COVID-19 vaccines made use of fetal cell lines derived from aborted children in some stage of their development or testing. I cannot knowingly receive any form of medical treatment that would cause me to benefit from an abortion. My participation in the unjust loss of a human life would far outweigh any medical benefit I might receive from the vaccine. The scripture within the Holy Bible makes this abundantly clear to me.

> (1)Proverbs 6(16) "There are six things that the Lord hates, seven that are an abomination to him: (17) Haughty eyes, a lying tongue, and hands that shed innocent blood..."

> (1)Psalm 127:3 "Children are a heritage from the Lord, offspring a reward from him."

> (1)Matthew 18:10 (Jesus speaking) "See that you do not despise one of these little ones, for I say to you that their angels in heaven continually see the face of My Father who is in heaven."

> (1)Romans 3:8 "Why not say-as some slanderously claim that we say-"Let us do evil that good may result"? Their condemnation is just!

John Piper, (theologian, pastor and former professor at Bethel University) had this to say regarding the Covid-19 vaccines and Christians benefiting from abortion:

> "So, if we really believe that the killing of unborn children is abhorrent to God and falls into the category of the shedding of innocent blood, for which God's judgement fell, we should not think of turning this wickedness into a wonder drug to save our lives." (3)

> Also,
> "...if an ordinary citizen avoids using a medication that they know has been developed specifically through such harvesting and research, the aim is that the Christian conscience is preserved and Christ is made much of as more valuable than any security or safety or health we might get through sin."(3)

I have held a sincere pro-life stance and respect for the unborn since I was a child. In high school I worked with school administration to remove a fetus from our science lab. There was no appreciation for the lost human life among students that age. Children were constantly mocking and making light of the baby. The lack of respect for the fetus by the students, drove me to ask the school administration for its relocation to an institution where it would be respected.

**III.)** I have prayed continually and sought out the wisdom of others, including my pastor to reach my conclusion. My pastor encouraged me to seek wisdom from God and advised me that if God speaks, I must listen. The Spirit of Jesus has made it abundantly clear to me that I must not take any of the currently available vaccines. This does not mean that I believe it is a sin for anyone

else to take the vaccine, nor do I pass judgement on anyone who chooses to. The scripture teaches that Christians must do what is right in the eyes of God. God has different plans for each Christian and each can have differing convictions.

>(1)James 4(17): If anyone, then, knows the good they ought to do and doesn't do it, it is sin for them.
>(1)Romans 14(5) One person considers one day more sacred than another; another considers every day alike. Each of them should be fully convinced in their own mind.

In conclusion, I do not take my decision to decline the COVID-19 vaccine lightly. I take much pride in what we have achieved together at UCOR. I am asking UCOR for accommodation to the mandate so that I may be able to continue to the company mission while retaining my spiritual integrity.

Thank you, Zachariah Duncan

(1)The Holy Bible, New International Version

(2)Communion of Reformed Evangelical Churches, https://crechurches.org/statements/CREC-Statement-Religious-Medical-Exemption.php

(3)John Piper, https://www.desiringgod.org/interviews/can-i-take-a-vaccine-made-from-aborted-babies

(4)The Lozier Institute Lists a number of COVID-19 Vaccines which utilize aborted fetal cells - https://lozierinstitute.org/update-covid-19-vaccine-candidates-and-abortion-derived-cell-lines/

(5)The Pfizer Vaccine utilized aborted fetal cells - https://www.biorxiv.org/content/10.1101/2020.09.08.280818v1.full

(6)The Moderna Vaccine utilized aborted fetal cells - https://www.nature.com/articles/s41586-020-2622-0

(7) The Johnson & Johnson Vaccine utilized aborted fetal cells - https://www.janssen.com/emea/emea/janssen-vaccine-technologies

(8)Sputnik V Vaccine citing trial tests of their manufacturers = https://sputnikvaccine.com/about-vaccine/human-adenoviral-vaccines/

(9)Sputnik V manufacturers acknowledge usage of aborted fetal cells -
http://actanaturae.ru/2075-8251/article/view/10302/106

(10)The UK Government acknowledges AstraZeneca's usage of aborted fetal cells -
https://www.gov.uk/government/publications/regulatory-approval-of-covid-19-vaccine-
astrazeneca/information-for-healthcare-professionals-on-covid-19-vaccine-astrazeneca-
regulation-174

(11)The Vaxxart Vaccine utilized aborted fetal cells -
https://www.biorxiv.org/content/10.1101/2020.09.04.283853v1.full

(12)The Altimmune Vaccine utilized aborted fetal cells -
https://clinicaltrials.gov/ProvidedDocs/67/NCT03232567/Prot_000.pdf

(13)The COVAXX Vaccine utilized aborted fetal cells -
https://www.biorxiv.org/content/10.1101/2020.11.30.399154v1.full

(14)The Medicago Vaccine utilized aborted fetal cells -
https://www.medrxiv.org/content/10.1101/2020.11.04.20226282v1.full-text

(15)The Novavax Vaccine utilized aborted fetal cells -
https://science.sciencemag.org/content/370/6520/1089

(16)PittCoVacc utilized aborted fetal cells -
https://www.thelancet.com/journals/ebiom/article/PIIS2352-3964(20)30118-3/fulltext

(17)The Walter Reed Vaccine utilized fetal cells -
https://www.biorxiv.org/content/10.1101/2021.04.28.441763v1.full

(18)The Sanofi Vaccine utilized aborted fetal cells - https://www.nature.com/articles/s41541-
021-00324-5

(19)The Inovio Vaccine utilized aborted fetal cells - https://www.nature.com/articles/s41467-020-
16505-0

(20)The Arcturus Vaccine utilized aborted fetal cells –
https://www.biorxiv.org/content/10.1101/2020.09.03.280446v1

(21)The Imperial College Vaccine utilized aborted fetal cells -
https://www.biorxiv.org/content/10.1101/2020.04.22.055608v1

(22)The Providence Vaccine utilized aborted fetal cells -
https://www.biorxiv.org/content/10.1101/2021.05.11.443286v1

(23)CoronaVac utilized aborted fetal cells -
https://science.sciencemag.org/content/suppl/2020/05/05/science.abc1932.DC1

(24)The CanSino Vaccine utilized aborted fetal cells -
https://science.sciencemag.org/content/suppl/2020/05/05/science.abc1932.DC1

(25)The ImmunityBio Vaccine utilized aborted fetal cells –
https://www.biorxiv.org/content/10.1101/2020.07.29.227595v1.full

(26)The Institut Pasteur Vaccine utilized aborted fetal cells -
https://www.pnas.org/content/pnas/117/51/32657.full.pdf

(27)The Rega Vaccine utilized aborted fetal cells - https://www.nature.com/articles/s41586-020-3035-9

(28)The Anhui Zhifei Vaccine utilized aborted fetal cells -
https://www.cell.com/cell/fulltext/S0092-8674(20)30812-6

(29)The Clover Vaccine utilized aborted fetal cells -
https://www.biorxiv.org/content/10.1101/2020.09.24.311027v1.full

(30)The HeLa Cells were harvested without informed consent –

https://pages.jh.edu/jhumag/0400web/01.html

I am asking UCOR to consider allowing me to continue my duties under the current controls (masking, social distancing and isolating when symptomatic). Evidence below shows that the current controls have proven to be effective and that my vaccination status has little to no effect on the transmission of the virus at UCOR.

1.) UCOR's current controls (masking, social distancing and isolating when symptomatic) have proven to be 100% effective throughout the entire pandemic. 0 workplace transmissions is an achievement we can all be proud of and a testament to the effectiveness and design of these controls.

2.) My vaccination status has little impact on the transmission of the virus as the vaccines have limited impact on Delta Variant transmission. CDC Director Rochelle Walensky said in a CNN interview that, "They (vaccines) continue to work well with delta with regard to severe illness and death, but what they can't do anymore is prevent transmission." (1.)

A recent post in the UCOR Q&A revealed that a significant portion of UCOR's COVID cases were in fully vaccinated personnel. The Delta variant is likely to have increased the number of breakthrough cases since this was posted on the Q&A board. Breakthrough cases are unfortunately, statistically significant worldwide.

Recent Israeli reports support this claim. According to Meredith Wadman of Science.org, "Israel has among the world's highest levels of vaccination for COVID-19, with 78% of those 12 and older fully vaccinated, the vast majority with the Pfizer vaccine. Yet the country is now logging one of the world's highest infection rates, with nearly 650 new cases daily per million people. **More than half are in fully vaccinated people, underscoring the extraordinary transmissibility of the delta variant** and stoking concerns that the benefits of vaccination ebb over time." (2.)

1.) Center for Disease Control Director, Rochelle Walensky
https://www.realclearpolitics.com/video/2021/08/06/cdc_director_vaccines_no_longer_prevent_you_from_spreading_covid.html
2.) Meredith Wadman,
https://www.science.org/news/2021/08/grim-warning-israel-vaccination-blunts-does-not-defeat-delta

# EXEMPTION & ACCOMODATION REVIEW SUMMARY

| Employee Name: Zachariah Duncan<br>Badge# 71456 | Job Function: Material Clerk<br>Project/Bldg. Location: | Supervisor<br><br>Matt Friley |
|---|---|---|
| Interactive Discussion Held with affected employee?<br><br>Yes ☑   No ☐ | Date of Discussion: 9-15-21<br>Discussion Interviewer:<br>Vanessa Holsombach | Subject: COVID Vaccine Exemption Request |
| Office Worker ☐<br><br>Field Worker ☑ | Exemption Request Type<br><br>Religious ☑<br>Medical ☐ | Comments: |

## RELIGIOUS

| Is this a Sincerely-Held Religious Belief? | Yes ☑ | No ☐ | | |
|---|---|---|---|---|

| Possible Accommodations: | | | | | |
|---|---|---|---|---|---|
| | Weekly Testing (Mandatory) | Yes ☑ | No ☐ | | |
| | KN95/N95 Mask Mandate | Yes ☑ | No ☐ | | |
| | Mask Fit (If Required) | Yes ☑ | No ☐ | | |
| | Job Reassignment | Yes ☑ | No ☐ | | |
| | Limited Task Assignment | Yes ☑ | No ☐ | | |
| | Isolation or Distancing | Yes ☑ | No ☐ | | |
| | Leave of Absence (LOA) | Yes ☑ | No ☐ | | |
| | Daily Self Health Check | Yes ☑ | No ☐ | | |
| | Telework (Temporary) | Yes ☐ | No ☑ | | |

## Medical

| Did UCOR Health Services receive Form 3606? | Yes ☐ | No ☐ |
|---|---|---|
| Did UCOR Health Services approve the Request for Medical Exemption? | Yes ☐ | No ☐ |

| Possible Accommodations: | | | |
|---|---|---|---|
| | Weekly Testing (Mandatory) | Yes ☐ | No ☐ |
| | KN95/N95 Mask Mandate | Yes ☐ | No ☐ |
| | Mask Fit (If Required) | Yes ☐ | No ☐ |
| | Job Reassignment | Yes ☐ | No ☐ |
| | Limited Task Assignment | Yes ☐ | No ☐ |
| | Isolation or Distancing | Yes ☐ | No ☐ |
| | Leave of Absence (LOA) | Yes ☐ | No ☐ |
| | Short-Term Disability (STD) | Yes ☐ | No ☐ |
| | Daily Self Health Check | Yes ☐ | No ☐ |
| | Telework (Temporary) | Yes ☐ | No ☐ |



**UCOR**
an Amentum-led partnership with Jacobs

*Interoffice Memorandum*

| | |
|---|---|
| ***To:*** | Duncan, Zachariah S, 071456 |
| ***From:*** | Mary Alice Douglass, Human Resources Manager |
| ***Date:*** | October 4, 2021 |
| ***File:*** | HR-21-0276 |
| ***Subject:*** | COVID Vaccination Exemption Request Determination |

The exemption request you submitted as it relates to the requirement for mandatory vaccination against COVID has been reviewed by the UCOR Accommodation Review Committee and is hereby dispositioned as follows:

**Basis for Exemption Request:**      **Religious**     ☒

**DETERMINATION:**      **Sincerely held religious belief**    **YES** ☒    **NO** ☐

       **Undue hardship to UCOR**    **YES** ☒    **NO** ☐

Although your Exemption Request was determined to meet the threshold of a sincerely held religious belief, granting accommodations to the mandatory vaccination would create an undue hardship to the Company. As OSHA has defined COVID-19 as a workplace illness, employers are required to provide the most effective workplace controls to ensure all employees' health and safety. Mandatory vaccination provides the highest level of protection for you and the rest of UCOR's workforce from a workplace transmittal of COVID-19. Based on our interactive discussion of possible accommodations with you and our review of all the religious exemption requests in total, the Company has determined that the accommodations requested would represent a greater than minimal impact to workplace safety, cost and risk of legal liability. As such, your Exemption Request is denied.

**REQUEST FOR ACCOMMODATION:**

       **APPROVED** ☐        **DENIED** ☒

You have until close of business on <u>Thursday, October 7, 2021</u> to provide UCOR with proof that you have received either the first dose of the Moderna or Pfizer vaccines or the single dose of the Johnson & Johnson vaccine. If you fail to meet this deadline, you will enter the progressive discipline process.

MAD:cam

File-DMC-RC

Form-3 (3/20), Rev. 1


**UCOR**
an Amentum-led partnership with Jacobs

*Interoffice Memorandum*

| | |
|---|---|
| *To:* | Duncan, Zachariah S., 071456 |
| *From:* | Mary Alice Douglass, Human Resources Manager |
| *Date:* | October 11, 2021 |
| *File:* | HR-21-0335 |
| *Subject:* | Written Warning Discipline – Failure to Comply with Mandatory COVID Vaccination Requirement |

You were notified of the need to comply with UCOR's mandatory October 1, 2021 date for vaccination against COVID.

To date, you still have not received the vaccination, as required by UCOR.

Therefore, you are being issued this Written Warning Discipline for failure to comply with the mandatory vaccination requirement.

If you fail to provide proof that you have received either the first dose of the Moderna or Pfizer vaccine or the single dose of the Johnson & Johnson vaccine at a minimum, by close of business, Thursday, October 14, 2021, you will be placed on a mandatory Leave of Absence for a period of 14 consecutive calendar days, effective October 18, 2021. You may use your existing vacation/Paid Time Off (PTO) to cover the absence or if vacation/PTO is not available, you will be placed in unpaid status for the duration of the absence.

If you have not received the initial dose of the vaccine by Close of Business on Thursday, October 14, 2021, you are required to turn your badge in to your supervisor prior to leaving work.

If you initiate actions to obtain the vaccination during the leave period, you may return to work once you have provided proof of receipt of the initial vaccine dose to UCOR Medical. The timeline for you to become fully vaccinated will begin upon receipt of the first vaccination.

Additionally, upon receipt of this Written Warning for failure to comply with UCOR's vaccination mandate, you will be required to:

- Fully comply with the COVID Standing Order
- Fully comply with the safety protocols for unvaccinated personnel set-forth in the UCOR Duty Disposition Report from Medical

Your continued failure to comply with the mandatory requirement for vaccination during your leave of absence period or any of the aforementioned requirements will result in additional disciplinary action, up to and including termination of your employment at UCOR.

ACKNOWLEDGEMENT:

*Zach Duncan*
Employee Name (Printed)

_____        10/11/21
Employee Name (Signature)                              Date

MAD:cam

File-DMC-RC


**UCOR**
an Amentum-led partnership with Jacobs

*Interoffice Memorandum*

| | |
|---|---|
| *To:* | Duncan, Zachariah S, 71456 |
| *From:* | Mary Alice Douglass, HR Manager |
| *Date:* | October 25, 2021 |
| *File:* | HR-21-0381 |
| *Subject:* | Unpaid Suspension – Failure to Meet COVID Vaccination Mandate |

In accordance with UCOR POL-HR-313, *COVID-19 Vaccination Policy, "All individuals working for UCOR -- including UCOR employees, staff augmentation employees, and subcontractors employees collectively, "Members of the workforce" must receive and provide proof of having received a full course (two doses of a two-dose vaccine or one dose of a single-dose vaccine) of a COVID-19 vaccine acceptable to UCOR, as defined below. Members of the workforce must provide such proof by utilizing UCOR Medical Services to obtain vaccinations or providing UCOR Medical Services with a copy of their vaccination card."*

This policy requirement becomes effective for existing members of the workforce on November 1, 2021.

You were recently placed on mandatory Leave of Absence (LOA), allowing you time in which to comply with the mandatory vaccination requirement. During this initial LOA period, you were allowed to utilize existing PTO/vacation to cover the absence period.

To date, you remain unvaccinated.

Therefore, effective today, Monday, October 25, 2021, you are being placed on UNPAID suspension through October 31, 2021. You may not use your existing PTO/vacation to cover the absence period. You will be placed in unpaid status for the remainder of the LOA period.

If you do not initiate the vaccine process, prior to November 1, 2021, your employment with UCOR will be terminated in absentia, effective November 1, 2021.

If you have any questions, please contact Vanessa Holsomback at (865) 576-1277 or Ray Parrish at (803) 767-9237.

MAD:cam

Attachment:


cc/att: File-DMC-RC

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE

CARLTON SPEER, MALENA DENNIS, and ZACHARIAH DUNCAN, on their own behalf and on behalf of all others similarly situated,

        Plaintiffs,

v.

UCOR LLC,

        Defendant.

)
)
)
)
)
)
)
)
)
)
)
)
)

No.: 3:22-cv-00426

---

## PLAINTIFF CARLTON SPEER'S ANSWERS TO DEFENDANT'S FIRST SET OF INTERROGATORIES

---

Plaintiff Carlton Speer, by and through counsel, hereby responds to Defendant's First Set of Interrogatories as follows:

### INTERROGATORIES

1.    Identify each and every individual whom you believe to possess knowledge of any discoverable facts relating to the subject matter of this litigation, regardless of whether you may use such individual to support your claims. For each such individual, describe what knowledge you believe such individual possesses.

**ANSWER:**   **See Plaintiff's Initial Disclosures.**

2.    Identify each and every person with whom you have communicated either orally or in writing, other than your attorneys, with regard to the allegations in the Amended Complaint, including but not limited to putative class members and/or any other persons currently or formerly employed by UCOR. For each such person, state the date of each

1

communication, the persons present during each communication, and the content or substance of each communication.

**ANSWER:**      **Pursuant to FRCP 33(d), responsive documents are attached to Plaintiff's RFPD responses as Exhibits 4, 11, Supplemental Response Exhibit 2, and Telegram group chat.**

3.      Describe in detail your efforts to obtain employment since August 1, 2021, including the name and address of each potential employer to whom you applied and the position applied for, the date on which you applied to each potential employer, whether you received any offers of employment, the details of any such offer (including the position, pay and benefits offered), whether you rejected any such offers of employment and, if so, your reason for doing so.

**ANSWER:**      **I attempted to remain employed by UCOR between August 1, 2021 and November 1, 2021 by requesting a reasonable accommodation for my sincerely held religious beliefs. Thereafter I applied for the following jobs:**

**Applied for Engineer position at Mirion on 9/28/2021 Davaar Noble - rejected due to vaccine mandate which was set to begin 2 weeks after application was submitted**

**Applied for Radiological Control Technician at North Wind Portage for temporary job in Zion Ill - accepted at $45/hr. no benefits.**

**Answering further, and pursuant to FRCP 33(d), responsive documents are attached to Plaintiff's RFPD responses as Exhibits 8, 9, and 10, as well as Supplemental Response Exhibits 1 and 3.**

4.      Describe how you have been employed since your employment with Defendant ended, including the name and address of each employer, the position(s) you held with each employer, the name(s) of your supervisor(s) with each employer, the dates on which you were

2

or have been employed by each employer, the reason(s) you left the employ of any such employer, your salary with each employer, your gross weekly compensation received as a result of employment with each employer, and a description of any and all benefits you receive or received from each such employer.

ANSWER:     Pursuant to Rule 33(d) of the FRCP, Plaintiff directs Defendant to Exhibits 7-10, and Supplemental Response Exhibits 1 and 3 provided in response to Defendant's RFPDs which are responsive to this interrogatory.

By way of further response, I had the following jobs:

Radiological Control Technician at North Wind Portage for temporary job in Zion Ill - accepted at $45/hr. no benefits. Address

North Wind Portage
1425 Higham Street
Idaho Falls, Idaho 83402
Phone: 208-557-7820

11/1/2021 to 1/15/2022  Radiological Control Tech     $45.00/hr.
No Benefits
Supervisor- Jim Lavendar

1/15/2022 to 10-28-2022  Radiological Engineer     $50.00/hr.
Full Benefits
Supervisor – Steve Green

10-28-2022 to Present  Project Chemist     $55.00/hr.
Full Benefits
Supervisor – Andy Williams

As Radiological Engineer and Project Chemist – allowed partial remote work.

3

5. State each and every period during which you were unable to seek, obtain or hold employment for any reason from the time your employment with Defendant ended up to the date of trial. For each such period, state the reason(s).

**ANSWER:** **None.**

6. Please identify with specificity each source of income you have had during the last three years, including for each such source the date or dates upon which you received that income, the amount received on a periodic basis and the total amount received, and identify each document pertaining to this income.

**ANSWER:** **Pursuant to FRCP 33(d), please see Exhibits 7-10, and Supplemental Response Exhibits 1 and 3 provided by Plaintiff in response to Defendant's RFPDs. Plaintiff derived income from the employment sources listed in response to Interrogatory 4.**

7. Identify each and every application you have made in the last ten (10) years for public or private unemployment, workers compensation, disability, social security or other benefits, including the nature of the benefit, the entity that provides that benefit, the entity with which you filed a claim, the date(s) your claim was filed, whether your application for the benefits was granted, and if so, the date(s) the benefit was received and the payment amount, the total amount received, the date of expiration or eligibility, the current status of your claim, the total amount of payments that you reimbursed back to the providing entity and the reasons for doing so.

**ANSWER:** **None.**

4

8.    Identify the amount of money (if any) you are seeking from Defendant in this action, including the basis for your claim that you are entitled to each such amount, and the methodology or formula you used to calculate your entitlement to each such amount.

ANSWER:    **I do not have personal knowledge of this information. Through my attorney, I intend to employ an economic expert to calculate these losses. However, the following is my lawyer's answer, which I believe to be true and correct and therefore adopt it as my own:**

***Legal counsel's answer:** Plaintiff and the putative class cannot presently calculate the amount because, among other reasons, the amount will change based on changes to Plaintiff's wages, benefits, and out-of-pocket expenses. Plaintiff will provide the economic expert's interim report (which will be supplemented closer to trial to reflect these same subsequent changes) pursuant to the Court's Scheduling Order and the Federal Rules of Civil Procedure.*

*By way of further response, Plaintiff's claim to back pay will be calculated in part by multiplying his hourly wage of $43.94 by the average number of hours he worked per week as shown in Defendant's records. The back pay period will be calculated from November 1, 2021 through the anticipated date of the jury's verdict. All other calculations and economic data will be contained in the expert's report.*

9.    Identify every physician, counselor, therapist, or other healthcare professional from whom you have sought treatment in the last ten years.

ANSWER:    **Dr. Cheri Johnston, MD**
**Tennova Primary Care - Farragut**
**10800 Parkside Dr, Suite 330**
**Knoxville, TN 37934**
**(865) 647-3650**

**Dr. Justin Jenkins, DO**
**UT Medical Center**
**7503 Northshore Drive**
**Knoxville, TN 37919**
**(865) 531-1300**

**Dr. Nathan Leavitt**

5

West Knoxville Medical & Chiropractic
6216 Highland Pl Way Suite #201
Knoxville, TN 37919
(865) 280-0947

Chad Johnson, Acupuncture,
25 Reed Street STE 200,
Asheville, NC 28803
(828) 263-6239

Dr. Paul Nations, DDS,
Cedar Bluff Dental Center, Inc.
9221 Middlebrook Pike, Suite 201
Knoxville, TN 37931
(865) 693-6933

Dr. Ryan Skinner, MD,
Blount Memorial Physicians Group
220 Associates Blvd,
Alcoa, TN 37701
(865) 238-6400

Dr. Mathew Doppett,
Southeastern Dermatology
323 Chapman Hwy Suite 100,
Knoxville, TN 37920
(865) 474-8800

Dr. Christopher Kulisek, MD
10810 Parkside Dr I,
Knoxville, TN 37934
(865) 218-7444

Dr. Clay Stalcup, MD
11606 Chapman Hwy #2,
Seymour, TN 37865
(865) 609-6980

Dr. Sunil Johns, MD
6600 Nightingale Ln
Knoxville, TN
(865) 632-5885

6

10. Have you ever received any treatment or counseling for any mental, psychiatric, psychological, or emotional issues? If yes, identify every physician, counselor, therapist, or other healthcare professional from whom you have received such treatment, state when you received such treatment, and state whether such treatment was specifically related to the claims in your Complaint.

ANSWER: No.

11. Identify all medications, whether over-the-counter or prescription, that you have ever taken (including but not limited to Tylenol, Advil, Aspirin, Aleve, Pseudoephedrine, Benadryl, Claritin, Robitussin, Mucinex, Tums, Maalox, Pepto-Bismol, Preparation H, or Lidocaine/Lidoderm), including the name of the medication, the age you first used it/them, whether you continue to use it/them, and your reasoning for no longer using it/them if you stopped using them.

ANSWER: **Objection. Plaintiff objects to this interrogatory because it is overly broad in its temporal scope and subject matter. He also objects on the ground that is unduly burdensome because it purports to require him to recall every medication, even over-the-counter medicine, he has ever taken for the entirety of his life. Plaintiff further objects on the ground that such request is disproportionate to the needs of the case because the information sought is irrelevant.**

12. Describe your objection to the use of the COVID-19 vaccines, particularly the Moderna and Pfizer vaccines that were not developed by using fetal cell lines?

ANSWER: **I disagree that these vaccines "were not developed by using fetal cell lines." Even AP News (while trying to spin its narrative) acknowledges Pfizer "used a fetal cell line when testing the efficacy of its vaccine." It also said: "In a paper published in September 2020 detailing the vaccine's development and success in mice and monkeys, Pfizer and**

7

BioNTech scientists said that the vaccine had been tested using the HEK293T cell line."[1]

It is my sincerely held belief as a baptized follower of Jesus Christ, that murder is a sin (Exodus 20:13). I believe that human life begins at conception, therefore abortion is a sin. I believe that taking an injection into my body that was produced, manufactured, or developed using the cells derived from an abortion make me a party to that abortion and therefore is a sin. I believe it is a sin for me to indirectly provide monetary support to those who manufacture these injections regardless of how long ago these abortions took place (Romans 6:13). I also believe my body is the temple of the Holy Spirit who is in me (1 Corinthians 6:19). I believe that Covid drugs by J & J, Moderna, and Pfizer are harmful and by taking these drugs into my body will damage my body and thus damage the temple of the Holy Spirit

My body belongs to God. I am not my own; I was bought with a price. Therefore, I must not do anything to my body that in my spirit I sincerely believe is contrary to God's will for me or will not bring glory to God.

Governments and media outlets all over the world were relentless in trying to provoke fear of COVID-19 and the consequences of not following their orders, but the Bible says Christians were not given a spirit of fear but of power, love, and a sound mind.

I do not believe most politicians, government leaders, media companies, or large corporations share my religious beliefs, especially on a national and international scale. Therefore, the more I saw these people trying to create fear and hostility (against the unvaccinated) and engage in covert and overt actions to silence people who disagreed with them – especially people within the medical community – it became clear that I should not accept into my body the product they were mandating. My beliefs were only reinforced when a Pfizer executive's emails were leaked to Project Veritas confirming that Pfizer was attempting to cover up the fact that aborted fetal cell lines were used during the development of their vaccine. I am strongly opposed to abortion because life is given and created by God. Accepting the vaccine would go against my deeply held spiritual conviction.

There are many instances in the Bible when Christians refused to follow the king's mandates because to them, to follow the king's orders would violate their spiritual convictions. Chapter 1 in the book of

---

[1] https://apnews.com/article/fact-checking-529913215948, October 7, 2021.

8

**Daniel provides an example. Even then, the king accommodated Daniel's and his friends' sincere beliefs.**

13.     Identify your religion and the how long you have practiced that religion. Identify every church, or other house of worship, that you have been a member of or attended in the last ten (10) years, including the regularity of your attendance.

      **ANSWER:**   **I am a Christian. My church membership is as follows:**

                       **West End Church of Christ. I attended services here regularly until approximately 2021 and since then have attended occasionally.**

                       **Zion Church of Christ. I have attended services here frequently since I began working in Zion, Illinois.**

14.     Aside from religion, do you have any other feelings towards the COVID-19 vaccines that are currently available in the US? If so, please describe any such feelings towards the COVID-19 vaccines that are currently available in the US.

      **ANSWER:**   **My problems with the vaccine stem from my religious beliefs as stated in interrogatory answer No. 12. As with everything, I try to subject my thoughts to the testing of scripture and the Holy Spirit. 2 Corinthians 10:5 says: "We demolish arguments and every pretension that sets itself up against the knowledge of God, and we take captive every thought to make it obedient to Christ."**

                       **Answering further, through the lens of my religious beliefs, I am skeptical of the vaccines because they are untested and experimental, contain harmful ingredients, are unreliably effective, come with insufficient safety information, and have unknown long-term effects.**

15.     Have you ever eaten and/or consumed any products produced by Pepsi, Nestle, Kraft, Campbell Soup, or Coca-Cola? If so, please identify the product, the age you first ate

it/them, whether you continue to eat it/them, and the age you stopped eating it/them and your

reasoning for no longer eating it/them if you stopped eating it/them.

> **ANSWER:** **Objection. This interrogatory is overly broad as to its temporal scope and subject matter, is disproportionate to the needs of the case, and is unduly burdensome because it asks Plaintiff to identify everything he has ever consumed for the entirety of his lifetime, by age, manufactured by companies having thousands of products. For example, Nestle has more than 2,000 *brands* within its portfolio, each of which contains numerous products.[2] Likewise, Kraft has over 200 brands sold in over 200 countries, each of which sells its own line of products.[3]**

16.     Have you ever received any vaccination other than the COVID-19 vaccination? If

so, please identify any such vaccine that you received, the age you first received the vaccine,

whether you continue to receive any such vaccine(s), and the age you stopped receiving the

vaccine(s) and your reasoning for no longer receiving the vaccine(s).

> **ANSWER:** **As a minor child I received all required vaccinations to attend public schools.in the 1970's. I received the flu vaccine periodically in my 40's. I stopped receiving vaccines in my early 50's as I learned about the negative health effects and the ingredients.**

17.     Identify each and every document relating to Defendant and/or your employment

with Defendant which you have obtained and/or currently possess.  For each document

identified, identify how you came to obtain that document or have that document in your

possession.

> **ANSWER:** **Objection.  The interrogatory is overly broad, unduly burdensome, and disproportionate to the needs of the case because it purports to require Plaintiff to identify every document he ever obtained that in**

---

[2]*See*, Brands, Nestle.com, *https://www.nestle.com/brands#:~:text=We%20have%20more%20than %202%2C000global%20icons%20to%20local%20favorites*, (last accessed April 25, 2023).
[3]*See* Kraft Heinz, A Global Food Powerhouse, https://www.kraftheinzcompany.com/ KraftHeinzCompany_FactSheet.pdf, (last accessed April 25, 2023).

10

any way "related to" Defendant or his work, without limitation of time, subject-matter, or relevance.

18.     Identify and provide the contact information and/or user names for Plaintiff from March 1, 2020 to the present, specifically including telephone number(s) (including cellular telephone numbers and service providers), home address(es), email address(es), social networking profiles (such as Facebook, LinkedIn, Twitter, etc.) and internet service provider(s).

     **ANSWER:**     **Carlton Speer**
                     **865-740-6440**
                     **Provider: AT&T**

                     **1706 Mountain Lake Ln**
                     **Knoxville, TN 37922**

                     **realtimerad@yahoo.com**
                     **realtimerad@gmail.com**
                     **Carlton.Speer@ORCC.gov**
                     **Carl.Speer@northwindgrp.com**
                     **ISP – Charter**
                     **Reddit-realtimerad**
                     **Stocktwits-realtimerad**
                     **Truth Social -radpro1**

19.     Did you record any of your conversations with any employee, agent, or representative of Defendant and/or any related entity? If so, how did you record such conversations, on what dates did you record them, and where does the device on which you recorded those conversations presently reside? If any of these recordings have been destroyed, deleted, or lost, explain how, when, and why that happened.

     **ANSWER:     No.**

11

20.    Identify each and every individual you contend belongs to the putative class(es) alleged in the Amended Complaint.

**ANSWER:**    **I do not have personal knowledge of this information, but in general I believe every person who UCOR fired for refusing to get the COVID vaccine on the basis of a religious objection, rather than offering a reasonable accommodation to him or her, should be included in this lawsuit.  Additionally, the following is my lawyer's answer, which I believe to be true and correct and therefore adopt as my own:**

*<u>Legal counsel's answer</u>: Plaintiff references and incorporates the class description included within her motion for certification of the class. Plaintiff does not know the identity of each such person, but the following individuals have expressed a desire to be represented by the class and by class counsel:*

| | |
|---|---|
| 1. | *Adamo, Steven* |
| 2. | *Adam, Tammy* |
| 3. | *Baker, Dale Jr.* |
| 4. | *Bargile, Kurt* |
| 5. | *Bates, Randy* |
| 6. | *Bock, Tom* |
| 7. | *Burchfield, Neil* |
| 8. | *Casselton, Dave* |
| 9. | *Casselton, Dawn* |
| 10. | *Cox, Matthew* |
| 11. | *Cross, Karen* |
| 12. | *Curtis, Ryan* |
| 13. | *Davis, Sara* |
| 14. | *Dawkins, Barbara* |
| 15. | *Dennis, Malena* |
| 16. | *Duncan, Zach* |
| 17. | *Ford, Alan* |
| 18. | *Geier, Nicole  Dosimetry* |
| 19. | *Justice, Charlie* |
| 20. | *Larochelle, Ryan* |
| 21. | *LaRue, Nathan* |
| 22. | *Mathes, Chris* |
| 23. | *McKillip, Bruce* |
| 24. | *Morrow, Tyler* |
| 25. | *Norman, Derek* |
| 26. | *Ogle, Cynthia* |
| 27. | *Phillips, Ledeana* |
| 28. | *Quindry, Brandon* |
| 29. | *Riggs, Yolonda* |
| 30. | *Smith, Tyler* |
| 31. | *Speer, Carlton* |

12

|  |  |
|---|---|
| 32. | *Tucker, Colby* |
| 33. | *Williams, Jeff* |
| 34. | *Williams, Laura* |
| 35. | *Bett, Chet* |
| 36. | *Livingston, J. D.* |
| 37. | *Webster, Kevin* |
| 38. | *Gary, Myron* |
| 39. | *Burchfield, Sonja* |
| 40. | *Wallace, Darrell* |
| 41. | *Cooley, Bonnie* |
| 42. | *Bates, T.* |
| 43. | *Vadurina, Dennis* |
| 44. | *Cooper, Ramona* |

21.     Identify whether you have had COVID-19 and, if so, the date on which you tested positive, what symptoms you experienced, how long you had symptoms or negative consequences from your illness, whether you notified your employer, and describe your activities during the seven days prior to testing positive.

**ANSWER:**     **I have never tested positive for COVID-19.**

22.     Identify whether you received a COVID-19 vaccine after being terminated and, if so, identify the vaccine manufacturer, the date(s) on which your received the vaccine and any booster(s), and why you received the vaccine.

**ANSWER:**     **I have never received any COVID-19 vaccine.**

23.     Identify all sources of information (including individual people, news articles, and online sources) upon which you rely or relied for your information about: (1) the vaccine in general; and (2) why your religious beliefs prohibit you from taking the vaccine.

**ANSWER:**     **People:  Melina Dennis, Yolanda Riggs, Laura Williams**
                **Sources:  Internet, 8kun, ZeroHedge**
                **Source regarding religious beliefs:  Holy Bible**

13

## VERIFICATION

I, Carlton Speer, do swear or affirm that the answers given to Defendant's First Set of Interrogatories are true and correct to the best of my knowledge, information, and belief.

BY: _____

CARLTON SPEER

06/06/2023

DATE: _____

**\*Above is a certified e-signature of the signatory, evidenced by the attached Signature Certificate. Pursuant to 15 U.S.C. § 7001 and the Uniform Electronic Transactions Act (UETA), this certified e-signature shall be given equal weight and legal validity as a verified or notarized signature.**

1

# citrix | RightSignature

## SIGNATURE CERTIFICATE

**REFERENCE NUMBER**
C39CFDF6-0DD9-4411-8AB6-48220D2BABA3

### TRANSACTION DETAILS

**Reference Number**
C39CFDF6-0DD9-4411-8AB6-48220D2BABA3
**Transaction Type**
Signature Request
**Sent At**
06/05/2023 17:33 EDT
**Executed At**
06/06/2023 09:11 EDT
**Identity Method**
email
**Distribution Method**
email
**Signed Checksum**
d35cc5601ac641d672b392aac36ec69453022a66cfd8f3ec1ed3b4eb8e35be45
**Signer Sequencing**
Disabled
**Document Passcode**
Disabled

### DOCUMENT DETAILS

**Document Name**
Verification Page
**Filename**
verification_page.pdf
**Pages**
1 page
**Content Type**
application/pdf
**File Size**
86.4 KB
**Original Checksum**
5d93314e30f75c9a04488bdcb114d0cff8dc8d0ff198b691621205213e46a2f0

## SIGNERS

### SIGNER

**Name**
Carlton Speer
**Email**
realtimerad@yahoo.com
**Components**
2

### E-SIGNATURE

**Status**
signed
**Multi-factor Digital Fingerprint Checksum**
f866c256b58e64f295828477ac4fdd618dcda7015059a512e2328af0eb68c904
**IP Address**
130.41.46.12
**Device**
Microsoft Edge via Windows
**Drawn Signature**

*Carl Speer*

**Signature Reference ID**
1D280E2A
**Signature Biometric Count**
2

### EVENTS

**Viewed At**
06/06/2023 09:10 EDT
**Identity Authenticated At**
06/06/2023 09:10 EDT
**Signed At**
06/06/2023 09:11 EDT

## AUDITS

| TIMESTAMP | AUDIT |
|---|---|
| 06/05/2023 17:33 EDT | Angela Detoro (angela@nlgattorneys.com) created document 'verification_page.pdf' on Chrome via Windows from 50.254.254.73. |
| 06/05/2023 17:33 EDT | Carlton Speer (realtimerad@yahoo.com) was emailed a link to sign. |
| 06/06/2023 09:09 EDT | Carlton Speer (realtimerad@yahoo.com) viewed the document on Microsoft Edge via Windows from 130.41.46.12. |
| 06/06/2023 09:10 EDT | Carlton Speer (realtimerad@yahoo.com) viewed the document on Microsoft Edge via Windows from 52.203.138.229. |
| 06/06/2023 09:10 EDT | Carlton Speer (realtimerad@yahoo.com) authenticated via email on Microsoft Edge via Windows from 130.41.46.12. |
| 06/06/2023 09:11 EDT | Carlton Speer (realtimerad@yahoo.com) signed the document on Microsoft Edge via Windows from 130.41.46.12. |

RESPECTFULLY SUBMITTED,

_s/ Clint J. Coleman_____
JESSE D. NELSON (BPR # 025602)
CLINT J. COLEMAN (BPR # 038413)
NELSON LAW GROUP, PLLC
10263 Kingston Pike
Knoxville, TN 37922
(865) 383-1053
jesse@nlgattorneys.com
clint@NLGattorneys.com

*Attorneys for Carlton Speer, Malena Dennis,
and Zachariah Duncan, on their own behalf
and on behalf of all others similarly situated*

CERTIFICATE OF SERVICE

I certify that this document or pleading was served via e-mail on all individuals
authorized and directed to receive such service. Dated: June 7, 2023.

William S. Rutchow
Darrius Walker, Jr.
401 Commerce Street, Suite 1200
Nashville, TN 37219
William.rutchow@ogletree.com
Darrius.walker@ogletree.com

Luci L. Nelson
300 North Main St., Suite 500
Greenville, SC 29601
luci.nelson@ogletree.com

_s/ Clint J. Coleman_____

16

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TENNESSEE**

| | | |
|---|---|---|
| CARLTON SPEER, MALENA DENNIS, and ZACHARIAH DUNCAN, on their own behalf and on behalf of all others similarly situated, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | No.: 3:22-cv-00426 |
| UCOR LLC, | ) ) | |
| Defendant. | ) ) ) | |

**PLAINTIFF MALENA DENNIS'S ANSWERS TO DEFENDANT'S**
**FIRST SET OF INTERROGATORIES**

Plaintiff Malena Dennis, by and through counsel, responds to Defendant's First Set of Interrogatories as follows:

**INTERROGATORIES**

1.      Identify each and every individual whom you believe to possess knowledge of any discoverable facts relating to the subject matter of this litigation, regardless of whether you may use such individual to support your claims. For each such individual, describe what knowledge you believe such individual possesses.

   **ANSWER:      See Plaintiff's Initial Disclosures.**

2.      Identify each and every person with whom you have communicated either orally or in writing, other than your attorneys, with regard to the allegations in the Amended Complaint, including but not limited to putative class members and/or any other persons

1

currently or formerly employed by UCOR. For each such person, state the date of each

communication, the persons present during each communication, and the content or substance

of each communication.

> **ANSWER:** To the best of my recollection I communicated with the following individuals regarding the allegations in the Amended Complaint:
>
> **Carlton Speer**
> Type of Communication: Oral and written
> Date: Various communications on unknown dates, with the exception of various communications via Telegram (attached in response to Defendant's RFPDs, Bates Nos. 001-443)
> Content: Conversations about this case, updates to case, COVID-19, UCOR vaccine policy.
>
> **Laura Williams**
> Type of Communication: Oral and written
> Date: Various communications on unknown dates, with the exception of various communications via Telegram (attached in response to Defendant's RFPDs, Bates Nos. 001-443)
> Content: Conversations about this case, updates to case, COVID-19, UCOR vaccine policy.
>
> **Jeff Williams**
> Type of Communication: Oral and written
> Date: Various communications on unknown dates, with the exception of various communications via Telegram (attached in response to Defendant's RFPDs, Bates Nos. 001-443)
> Content: Conversations about this case, updates to case, COVID-19, UCOR vaccine policy.
>
> **Yolonda Riggs**
> Type of Communication: Oral and written
> Date: Various communications on unknown dates, with the exception of various communications via Telegram (attached in response to Defendant's RFPDs, Bates Nos. 001-443)
> Content: Conversations about this case, updates to case, COVID-19, UCOR vaccine policy.
>
> **Kurt Bargiel**
> Type of Communication: Oral and written
> Date: Various communications on unknown dates, with the exception of various communications via Telegram (attached in response to Defendant's RFPDs, Bates Nos. 001-443)

2

Content: Conversations about this case, updates to case, COVID-19, UCOR vaccine policy.

Terry Dennis (Husband)
Type of Communication: Oral
Date: Various communications on unknown dates
Content: Conversations about vaccines, COVID-19, this case, UCOR's vaccine policy, and my termination

Joe Biggerstaff
Type of Communication: Oral
Date: Unknown but likely occurring in September and October 2021.
Content: Conversations about UCOR's vaccine policy, my religious objection, and my impending termination

David Sanders
Type of Communication: Oral
Date: Unknown but likely occurring in September and October 2021
Content: Conversations about UCOR's vaccine policy, my religious objection, and my impending termination

Mary Alice Douglas (UCOR HR)
Type of Communication: Oral and written
Date: Unknown but likely occurring in September and October 2021
Content: UCOR's vaccine policy, my religious objection, and my impending termination

Christy Martin (UCOR HR)
Type of Communication: Oral and written
Date: Unknown but likely occurring in September and October 2021
Content: UCOR's vaccine policy, my religious objection, and my impending termination

Ray Parish (UCOR HR or similar position)
Type of Communication: Oral and written
Date: Unknown but likely occurring in September and October 2021
Content: UCOR's vaccine policy, my religious objection, and my impending termination

Ginger Brewer (Union rep)
Type of Communication: Oral
Date: Unknown but likely occurring in September and October 2021
Content: UCOR's vaccine policy, my religious objection, and my impending termination

3

3.      Describe in detail your efforts to obtain employment since August 1, 2021, including the name and address of each potential employer to whom you applied and the position applied for, the date on which you applied to each potential employer, whether you received any offers of employment, the details of any such offer (including the position, pay and benefits offered), whether you rejected any such offers of employment and, if so, your reason for doing so.

ANSWER:      I attempted to remain employed by UCOR between August 1, 2021 and November 1, 2021 by requesting a reasonable accommodation for my sincerely held religious beliefs.  I applied to the following jobs between November 1, 2021 and January 2022:

Powell Animal Hospital
205 Star Mountain Way, Powell, TN

Paragon/SCIS
517 Callahan Dr., Knoxville, TN
Job: Field investigator

ECR Software
Address unknown
Job: Technical Support Analyst

HEP
Address unknown
Job: Admin Assistant

FedEx Ground
10601 Murdock Dr., Knoxville, TN
Job: Warehouse Package Handler

Oculus Imaging
2450 EJ Chapman Drive, #104, Knoxville, TN
Job: Admin Assistant

Comprehensive Health Services
Address unknown
Job: Admin Assistant

Accenture
1965 Marriott Dr., Louisville, TN
Job: Payroll Services

4

**Riverdale Nursery**
**3220 Rush Miller Rd., Knoxville TN**
**Job: Production Manager**

**Tombras**
**620 South Gay St., Knoxville TN**
**Job: Project Manager Intern**

**Apollo Retail Specialist**
**Address unknown**
**Job: 3D Scanning Technician**

**Texas Roadhouse**
**Address unknown**
**Job: Server**

**CookOut**
**Address unknown**
**Job: Cashier**

**Food City**
**Address unknown**
**Job: Do no recall**

**Kindercare**
**9200 Gulf Park Dr., Knoxville TN**
**Job: Childcare worker**

**GEM Technologies, Inc.,**
**2033 Castaic Ln., Knoxville TN**
**Job: RAD Tech**
**Job offer made and accepted; Date of hire approximately January 26, 2022**

**I did not receive any offers of employment except from GEM Technologies where I remain employed.**

4.      Describe how you have been employed since your employment with Defendant ended, including the name and address of each employer, the position(s) you held with each employer, the name(s) of your supervisor(s) with each employer, the dates on which you were or have been employed by each employer, the reason(s) you left the employ of any such employer, your salary with each employer, your gross weekly compensation received as a result

5

of employment with each employer, and a description of any and all benefits you receive or received.

> **ANSWER:** **GEM Technologies, Inc.**
> **Job: Rad. Tech.**
> **January 26, 2022 – present**
> **Pay: $44.09 per hour**
> **Gross Pay: Hourly rate multiplied by hours worked per week**
> **Benefits: Health/dental/vision insurance, Short term disability, and long term disability.**

5.     State each and every period during which you were unable to seek, obtain or hold employment for any reason from the time your employment with Defendant ended up to the date of trial. For each such period, state the reason(s).

> **ANSWER:** **I cannot answer for time periods "up to the date of trial" because such time is in the future. Through the date of my signature below, there were no periods that I could not work except so far as I could not work for UCOR after November 1, 2021  because it refused to reasonably accommodate my religious beliefs, and I could not hold comparable employment from November 1, 2021 through January 2022 because such work was not offered to me.**

6.     Please identify with specificity each source of income you have had during the last three years, including for each such source the date or dates upon which you received that income, the amount received on a periodic basis and the total amount received, and identify each document pertaining to this income.

> **ANSWER:** **I received wage income from UCOR until November 1, 2021. Thereafter, I received unemployment benefits until I was able to secure employment from GEM Technologies, Inc. in late January 2022. I also cashed out part of my 401k in November or December 2021.**

6

7.    Identify each and every application you have made in the last ten (10) years for public or private unemployment, workers compensation, disability, social security or other benefits, including the nature of the benefit, the entity that provides that benefit, the entity with which you filed a claim, the date(s) your claim was filed, whether your application for the benefits was granted, and if so, the date(s) the benefit was received and the payment amount, the total amount received, the date of expiration or eligibility, the current status of your claim, the total amount of payments that you reimbursed back to the providing entity and the reasons for doing so.

      **ANSWER:**    **I received unemployment benefits from November 2021 until January 2022. I have not filed a claim for any of the other benefits described.**


8.    Identify the amount of money (if any) you are seeking from Defendant in this action, including the basis for your claim that you are entitled to each such amount, and the methodology or formula you used to calculate your entitlement to each such amount.

      **ANSWER:**    **As a layperson I do not have personal knowledge of the economic harms the law says an employer must pay a victim of discrimination nor do I know how such amounts are calculated. I intend to employ an economic expert to calculate these losses and will rely on my attorney's advice regarding what the law says about such matters. However, the following is my lawyer's answer, which I believe to be true and correct and therefore adopt it as my own:**

            ***Legal counsel's answer:  Plaintiff and the putative class cannot presently calculate the amount because, among other reasons, the amount will change based on changes to Plaintiff's wages, benefits, and out-of-pocket expenses.  Plaintiff will provide the economic expert's interim report (which will be supplemented closer to trial to reflect these same subsequent changes)  pursuant to the Court's Scheduling Order and the Federal Rules of Civil Procedure.***

            ***By way of further response, Plaintiff's claim to back pay will be calculated in part by multiplying her hourly wage of $38.88 by the average number of hours she worked per week as shown in Defendant's records.  The back pay period will be calculated from***

<div align="center">7</div>

*November 1, 2021 through the anticipated date of the jury's verdict. All other calculations and economic data will be contained in the expert's report.*

9.     Identify every physician, counselor, therapist, or other healthcare professional from whom you have sought treatment in the last ten years.

**ANSWER:**     **Udit Chauduri, M.D.**
**Summit Medical Group**
**1275 Dick Lonas Rd NW**
**Suite 201**
**Knoxville, TN 37909**

**John Stuhl**
**Clinical Psychologist**
**109 Stekoia Ln,**
**Knoxville, TN 37912**

10.     Have you ever received any treatment or counseling for any mental, psychiatric, psychological, or emotional issues? If yes, identify every physician, counselor, therapist, or other healthcare professional from whom you have received such treatment, state when you received such treatment, and state whether such treatment was specifically related to the claims in your Complaint.

**ANSWER:**     **John Stuhl**
**Clinical Psychologist**
**109 Stekoia Ln,**
**Knoxville, TN 37912**

**I treated with Mr. Stuhl in approximately 2014-2015. The treatment was unrelated to any matter at issue in this case.**

11.     Identify all medications, whether over-the-counter or prescription, that you have ever taken (including but not limited to Tylenol, Advil, Aspirin, Aleve, Pseudoephedrine, Benadryl, Claritin, Robitussin, Mucinex, Tums, Maalox, Pepto-Bismol, Preparation H, or Lidocaine/Lidoderm), including the name of the medication, the age you first used it/them,

8

whether you continue to use it/them, and your reasoning for no longer using it/them if you stopped using them.

> **ANSWER:** **Objection. Plaintiff objects to this interrogatory because it is overly broad in its temporal scope and subject matter. She also objects on the ground that is unduly burdensome because it purports to require her to recall every medication, even over-the-counter medicine, she has ever taken for the entirety of her life. Plaintiff further objects on the ground that such request is disproportionate to the needs of the case because the information sought is irrelevant.**

12. Describe your objection to the use of the COVID-19 vaccines, particularly the Moderna and Pfizer vaccines that were not developed by using fetal cell lines?

> **ANSWER:** **I am not aware of any vaccine, including the ones identified in the interrogatory, that were not developed from, through the use of, or as a result of testing on aborted fetal cells, so I cannot answer the interrogatory in a way that assumes the opposite. By way of further response, I am religiously opposed to abortion and the use of aborted fetal cells. I believe what the Bible says about a Christian's body being a temple that should be used to glorify God. And while I am imperfect and sinful, I am deeply and fundamentally opposed to interjecting into my body a substance that I believe used, came from, or traces its existence to aborted fetal cells.**
>
> **I also religiously object to receiving anything into my body that I believe in my own conscience and spirit should not be received. Romans 14 says that nothing is unclean in itself, but if someone regards something as unclean, then for him to bring that into his own body would be a sin. I believe a vaccine that came into development through the use of aborted fetal cells to be unclean and must not be injected into my body**

13. Identify your religion and the how long you have practiced that religion. Identify every church, or other house of worship, that you have been a member of or attended in the last ten (10) years, including the regularity of your attendance.

> **ANSWER:** **I am a Christian. I derive my core values and foundational beliefs from the Bible, which I believe is the authoritative word of God. I was a member of Fincastle Church of God where I taught Sunday School from the early 1990s until approximately 2011 when I moved away. I then attended a Church of God closer to my home in Clinton, TN**

9

where I worked with the youth. I stopped attending that church in approximately 2014 and began participating in worship services through online platforms, including Facebook groups (such as One of His Disciples) and Fincastle Church of God. I also listen to Youtube Bible studies as well as sermons from Les Feldick. I practice my religious beliefs daily through prayer, scripture reading, and discussions with other believers about the Bible and its application to our lives.

14.     Aside from religion, do you have any other feelings towards the COVID-19 vaccines that are currently available in the US? If so, please describe any such feelings towards the COVID-19 vaccines that are currently available in the US.

ANSWER:     All of my feelings about the COVID-19 vaccine go hand-in-hand with my religious beliefs. My religious beliefs, convictions, and worldview are the lens through which I form opinions about the world. I do not believe most of our political leadership to share – and in many cases believe them to be openly hostile to – my religious convictions. Being "fully convinced in my own mind" (Romans 14:5) that I should not receive the vaccine into my body and that to do so would be a sin, I cannot take the vaccine.

15.     Have you ever eaten and/or consumed any products produced by Pepsi, Nestle, Kraft, Campbell Soup, or Coca-Cola? If so, please identify the product, the age you first ate it/them, whether you continue to eat it/them, and the age you stopped eating it/them and your reasoning for no longer eating it/them if you stopped eating it/them.

ANSWER:     Objection. This interrogatory is overly broad as to its temporal scope and subject matter, is disproportionate to the needs of the case, and is unduly burdensome because it asks Plaintiff to identify everything she has ever consumed for the entirety of her lifetime, by age, manufactured by companies having thousands of products.   For example, Nestle has more than 2,000 *brands* within its portfolio, each of which contains numerous products.[1] Likewise, Kraft has over 200

---

[1]*See*, Brands, Nestle.com, *https://www.nestle.com/brands#:~:text=We%20have%20more%20than %202%2C000global%20icons%20to%20local%20favorites*, (last accessed April 25, 2023).

10

**brands sold in over 200 countries, each of which sells its own line of products.**[2]

16.    Have you ever received any vaccination other than the COVID-19 vaccination? If so, please identify any such vaccine that you received, the age you first received the vaccine, whether you continue to receive any such vaccine(s), and the age you stopped receiving the vaccine(s) and your reasoning for no longer receiving the vaccine(s).

      **ANSWER:**    **I believe I received whatever vaccines I was required to receive to attend public schools in approximately 1974. I received a Tetanus shot as a child. In the mid-2000s I received a Hepatitis shot. I received approximately two or three flu vaccinations from UCOR's medical staff in approximately 2015 or 2016. However, I was not aware until approximately 2018 that aborted fetal cells were used in the development of vaccines. I will no longer receive vaccines into my body.**

17.    Identify each and every document relating to Defendant and/or your employment with Defendant which you have obtained and/or currently possess. For each document identified, identify how you came to obtain that document or have that document in your possession.

      **ANSWER:**    **Objection. The interrogatory is overly broad, unduly burdensome, and disproportionate to the needs of the case because it purports to require Plaintiff to identify every document she ever obtained that in any way "related to" Defendant or her work, without limitation of time, subject-matter, or relevance.**

18.    Identify and provide the contact information and/or user names for Plaintiff from March 1, 2020 to the present, specifically including telephone number(s) (including cellular

---

[2]*See* Kraft Heinz, A Global Food Powerhouse, https://www.kraftheinzcompany.com/ KraftHeinzCompany_FactSheet.pdf, (last accessed April 25, 2023).

11

telephone numbers and service providers), home address(es), email address(es), social networking profiles (such as Facebook, LinkedIn, Twitter, etc.) and internet service provider(s).

**ANSWER:** **Malena Dennis**
**7504 Lancashire Blvd., Powell, TN 37849**
**(423) 437-1745**
**Phone provider – Verizon and AT&T**

**Email: malenadennis@icloud.com; just_me_mm@hotmail.com; beingmeisez@hotmail.com**

**I frequently create email addresses for purposes other than communication – for example, login information for a website, accepting discounts in exchange for giving an email address, etc. I do this to avoid being inundated with spam. The email addresses listed above are my "real" email addresses. I don't remember or keep track of these other addresses, and I have never communicated about this case or any matter at issue in this case through those "special purpose" email addresses.**

19.     Did you record any of your conversations with any employee, agent, or representative of Defendant and/or any related entity? If so, how did you record such conversations, on what dates did you record them, and where does the device on which you recorded those conversations presently reside? If any of these recordings have been destroyed, deleted, or lost, explain how, when, and why that happened.

**ANSWER:**     **No.**

20.     Identify each and every individual you contend belongs to the putative class(es) alleged in the Amended Complaint.

**ANSWER:**     **As a layperson I am not aware of the legal terms and legal framework applied in such a matter, but in general I believe every person who UCOR fired for refusing to get the COVID vaccine on the basis of a religious objection rather than offering a reasonable accommodation to him or her should be included in this lawsuit. Additionally, the following is my lawyer's answer, which I believe to be true and correct and therefore adopt as my own:**

12

*Legal counsel's answer: Plaintiff references and incorporates the class description included within her motion for certification of the class. Plaintiff does not know the identity of each such person, but the following individuals have expressed a desire to be represented by the class and by class counsel:*

1.   *Adamo, Steven*
2.   *Adam, Tammy*
3.   *Baker, Dale Jr.*
4.   *Bargile, Kurt*
5.   *Bates, Randy*
6.   *Bock, Tom*
7.   *Burchfield, Neil*
8.   *Casselton, Dave*
9.   *Casselton, Dawn*
10.  *Cox, Matthew*
11.  *Cross, Karen*
12.  *Curtis, Ryan*
13.  *Davis, Sara*
14.  *Dawkins, Barbara*
15.  *Dennis, Malena*
16.  *Duncan, Zach*
17.  *Ford, Alan*
18.  *Geier, Nicole Dosimetry*
19.  *Justice, Charlie*
20.  *Larochelle, Ryan*
21.  *LaRue, Nathan*
22.  *Mathes, Chris*
23.  *McKillip, Bruce*
24.  *Morrow, Tyler*
25.  *Norman, Derek*
26.  *Ogle, Cynthia*
27.  *Phillips, Ledeana*
28.  *Quindry, Brandon*
29.  *Riggs, Yolonda*
30.  *Smith, Tyler*
31.  *Speer, Carlton*
32.  *Tucker, Colby*
33.  *Williams, Jeff*
34.  *Williams, Laura*
35.  *Bett, Chet*
36.  *Livingston, J. D.*
37.  *Webster, Kevin*
38.  *Gary, Myron*
39.  *Burchfield, Sonja*
40.  *Wallace, Darrell*
41.  *Cooley, Bonnie*
42.  *Bates, T.*

13

43. *Vadurina, Dennis*
44. *Cooper, Ramona*

21.     Identify whether you have had COVID-19 and, if so, the date on which you tested positive, what symptoms you experienced, how long you had symptoms or negative consequences from your illness, whether you notified your employer, and describe your activities during the seven days prior to testing positive.

> **ANSWER:** **I had COVID-19 in December 2020. I notified UCOR's medical personnel and followed all of their requirements. I was out of work for approximately 3 weeks due to mandatory quarantine procedures. My symptoms were not severe but included nausea, headaches, body aches, and a mild fever. During the seven days prior to testing positive, I worked at UCOR and attended Thanksgiving with my mother and two brothers.**

22.     Identify whether you received a COVID-19 vaccine after being terminated and, if so, identify the vaccine manufacturer, the date(s) on which you received the vaccine and any booster(s), and why you received the vaccine.

> **ANSWER:** **I have not received the COVID-19 vaccine.**

23.     Identify all sources of information (including individual people, news articles, and online sources) upon which you rely or relied for your information about: (1) the vaccine in general; And (2) why your religious beliefs prohibit you from taking the vaccine.

> **ANSWER:** **Objection. The interrogatory is unduly burdensome and disproportionate to the needs of the case because (1) Plaintiff estimates she has read hundreds of articles and reports concerning the vaccine from a wide variety of sources such the CDC, NIH, and a variety of online news sources and platforms, and (2) UCOR agreed that Plaintiff's religious beliefs were sincerely held. To the extent not objectionable, Plaintiff states:**
>
> **My religious beliefs and convictions derive from the Bible, teachings I received through church services, and perspectives of other Christians.**

14

<u>VERIFICATION</u>

I, Malena Dennis, do swear or affirm that the answers given to Defendant's First Set of Interrogatories are true and correct to the best of my knowledge, information, and belief.

*Malena Dennis*

BY: _____
              MELENA DENNIS

              06/05/2023

DATE: _____

**\*Above is a certified e-signature of the signatory, evidenced by the attached Signature Certificate. Pursuant to 15 U.S.C. § 7001 and the Uniform Electronic Transactions Act (UETA), this certified e-signature shall be given equal weight and legal validity as a verified or notarized signature.**

13



# citrix | RightSignature

## SIGNATURE CERTIFICATE

| REFERENCE NUMBER |
|---|
| 2AFEDF67-1268-42D0-83B1-BD4D52B20DE8 |

### TRANSACTION DETAILS

**Reference Number**
2AFEDF67-1268-42D0-83B1-BD4D52B20DE8

**Transaction Type**
Signature Request

**Sent At**
06/05/2023 17:19 EDT

**Executed At**
06/05/2023 17:59 EDT

**Identity Method**
email

**Distribution Method**
email

**Signed Checksum**
f5eab2e910d6c1d21a6727025b3a882c6eb23fc2e983f65cbc52178d7f6057d8

**Signer Sequencing**
Disabled

**Document Passcode**
Disabled

### DOCUMENT DETAILS

**Document Name**
Pl S Answers To First Set Of Interrogatories - Malena Dennis

**Filename**
pl_s_answers_to_first_set_of_interrogatories_-_malena_dennis.pdf

**Pages**
14 pages

**Content Type**
application/pdf

**File Size**
252 KB

**Original Checksum**
2c579f0004cbb043868d3850f4d58cb92e8dcde538fb9a94366b426156789622

## SIGNERS

### SIGNER

**Name**
Malena Dennis

**Email**
malenadennis@icloud.com

**Components**
2

### E-SIGNATURE

**Status**
signed

**Multi-factor Digital Fingerprint Checksum**
9cf859db14497595d15e1b9ff97b16204ab74a73a612740c5746ddf630fd9d6e

**IP Address**
166.196.89.71

**Device**
Mobile Safari via iOS

**Typed Signature**

*Malena Dennis*

**Signature Reference ID**
183BB0CE

### EVENTS

**Viewed At**
06/05/2023 17:47 EDT

**Identity Authenticated At**
06/05/2023 17:59 EDT

**Signed At**
06/05/2023 17:59 EDT

## AUDITS

| TIMESTAMP | AUDIT |
|---|---|
| 06/05/2023 17:19 EDT | Angela Detoro (angela@nlgattorneys.com) created document 'pl_s_answers_to_first_set_of_interrogatories_-_malena_dennis.pdf' on Chrome via Windows from 50.254.254.73. |
| 06/05/2023 17:19 EDT | Malena Dennis (malenadennis@icloud.com) was emailed a link to sign. |
| 06/05/2023 17:47 EDT | Malena Dennis (malenadennis@icloud.com) viewed the document on Mobile Safari via iOS from 166.196.89.71. |
| 06/05/2023 17:59 EDT | Malena Dennis (malenadennis@icloud.com) authenticated via email on Mobile Safari via iOS from 166.196.89.71. |
| 06/05/2023 17:59 EDT | Malena Dennis (malenadennis@icloud.com) signed the document on Mobile Safari via iOS from 166.196.89.71. |

RESPECTFULLY SUBMITTED,

*s/ Jesse D. Nelson*
JESSE D. NELSON (BPR # 025602)
CLINT J. COLEMAN (BPR # 038413)
NELSON LAW GROUP, PLLC
10263 Kingston Pike
Knoxville, TN 37922
(865) 383-1053
jesse@nlgattorneys.com
clint@NLGattorneys.com

*Attorneys for Carlton Speer, Malena Dennis,*
*and Zachariah Duncan, on their own behalf*
*and on behalf of all others similarly situated*

<u>CERTIFICATE OF SERVICE</u>

I certify that this document or pleading was served via e-mail on all individuals authorized and directed to receive such service. Dated: June 7, 2023.

William S. Rutchow
Darrius Walker, Jr.
401 Commerce Street, Suite 1200
Nashville, TN 37219
William.rutchow@ogletree.com
Darrius.walker@ogletree.com

Luci L. Nelson
300 North Main St., Suite 500
Greenville, SC 29601
luci.nelson@ogletree.com

*s/ Jesse D. Nelson*

16

| | |
|---|---|
| CARLTON SPEER, MALENA DENNIS, and ZACHARIAH DUNCAN, on their own behalf and on behalf of all others similarly situated, | ) ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) No.: 3:22-cv-00426 ) |
| UCOR LLC, | ) ) |
| Defendant. | ) ) |

**PLAINTIFF ZACHARIAH DUNCAN'S ANSWERS TO DEFENDANT'S FIRST SET OF INTERROGATORIES**

Plaintiff Zachariah Duncan, by and through counsel, hereby responds to Defendant's First Set of Interrogatories as follows:

**INTERROGATORIES**

1.      Identify each and every individual whom you believe to possess knowledge of any discoverable facts relating to the subject matter of this litigation, regardless of whether you may use such individual to support your claims. For each such individual, describe what knowledge you believe such individual possesses.

**ANSWER:     See Plaintiff's Initial Disclosures.**

2.      Identify each and every person with whom you have communicated either orally or in writing, other than your attorneys, with regard to the allegations in the Amended Complaint, including but not limited to putative class members and/or any other persons currently or formerly employed by UCOR. For each such person, state the date of each

1

communication, the persons present during each communication, and the content or substance

of each communication.

> ANSWER:    To the best of my recollection I communicated with the following
> individuals regarding the allegations in the Amended Complaint:
>
> Shanna Duncan (wife) – various communications over the phone and
> in person;
> Date of communications – multiple;
> Persons present – Zachariah and Shanna Duncan;
> Content – Various aspects of UCOR's vaccine mandate, termination of
> employment.
>
> Darrell Duncan (father) - various communications over the phone
> and in person;
> Date of communications – multiple;
> Persons present – Zachariah and Darrell Duncan;
> Content – Various aspects of UCOR's vaccine mandate, termination of
> employment.
>
> Kyle Beverly (my former Pastor);
> Phone communication regarding UCOR's vaccine mandate and his
> advice that I seek God's will concerning my decision and to follow
> where God leads me
> Date of communication – unknown.
>
> Cody Mullins;
> Text message communications;
> Pursuant to FRCP 33(d), responsive documents are attached as
> Exhibit 6 to Plaintiff's Responses to Defendant's RFPDs.
>
> Plaintiff also communicated via telephone with the following
> individuals regarding religious exemptions, possibility for seeking
> legal relief, and obtaining an attorney. These conversations occurred
> on various unknown dates:
>
> Myron Gary;
> Nathan LaRue;
> Steve Adammo;
> Ramona Cooper;
> Bonnie (last name unknown);
> Carlton Speer
> Malena Dennis.

3. Describe in detail your efforts to obtain employment since August 1, 2021, including the name and address of each potential employer to whom you applied and the position applied for, the date on which you applied to each potential employer, whether you received any offers of employment, the details of any such offer (including the position, pay and benefits offered), whether you rejected any such offers of employment and, if so, your reason for doing so.

**ANSWER:** **I attempted to remain employed by UCOR between August 1, 2021 and November 1, 2021 by requesting a reasonable accommodation for my sincerely held religious beliefs. Thereafter, the jobs I recall applying for were:**

**Y-12 National Security Complex**
**Job: Janitor**
**301 Bear Creek Rd Y-12, Oak Ridge, TN 37830**
**Applied approximately May 2022**
**Received interview; no offer received**

**Smith & Wesson**
**Job: Procurement Specialist and Customer Order Representative**
**1036 Proffitt Springs Rd., Maryville, TN 37801**
**Applied approximately September 2022 and January 2023**
**Two phone interviews; no offer received**

**Lucky Gunner**
**Job: Customer Experience Team Member**
**Address unknown**
**Applied September 2022**
**No interview; no offer**

**Range USA**
**Job: Associate**
**620 Corporate Point Way, Knoxville, TN 37932**
**Applied December 2022**
**No interview; no offer**

**UPS**
**Job: Seasonal Helper (Driver)**
**251 Hannah Dr, Oliver Springs, TN 37840**
**Applied December 2022**
**Offer received; offer declined because it was different than the job for which I applied. It was a part-time warehouse position with no benefits**

3

**Optics Planet (remote position)**
Job:  procurement specialist
Applied approximately June 2022
No interview; no offer

**ORNL**
Job:  Materials Clerk
PO Box 2008, Oak Ridge, TN 37831
Applied January 2023
No interview; no offer

**Harriman Utility Board**
200 N. Roane St., Harriman, TN 37748
Job:  Maintenance worker
Applied December 2022
No interview; no offer

**Well's Lawn and Fence (no formal application submitted)**
Job title: Laborer
Pay: $10/hr.
Hired March 2022 and worked through June 2022
I left this employment to do a residential remodeling job for my pastor

**Roane State Community College**
701 Briarcliff Ave., Oak Ridge, TN
Job:  Maintenance worker
Salary: $32,000
Dates employed:  3/10/23 – current

4.      Describe how you have been employed since your employment with Defendant ended, including the name and address of each employer, the position(s) you held with each employer, the name(s) of your supervisor(s) with each employer, the dates on which you were or have been employed by each employer, the reason(s) you left the employ of any such employer, your salary with each employer, your gross weekly compensation received as a result of employment with each employer, and a description of any and all benefits you receive or received from each such employer.

**ANSWER:**      **Pursuant to Rule 33(d) of the FRCP, Plaintiff directs Defendant to Exhibits 7, 8, and 9 provided in response to Defendant's RFPDs which are responsive to this interrogatory.**

4

**By way of further response, I had the following jobs:**

**Well's Lawn and Fence**
**March 2022 – June 2022**
**Job title: Laborer**
**Pay: $10/hr., approximately 40 hours per week**
**I left this employment to accept work doing residential remodeling.**

**Matt Cooke**
**July 2022 – September 2022**
**556 Hickory Star Rd., Maynardville, TN**
**Job Title: Laborer – residential construction**
**Pay: $6,000 for completion of the job**
**This was a limited engagement job so it ended when the work was complete**

**Roane State Community College**
**Oak Ridge, Tennessee**
**Salary: $32,000**
**Start date: 3/10/23 – current**

5. State each and every period during which you were unable to seek, obtain or hold employment for any reason from the time your employment with Defendant ended up to the date of trial. For each such period, state the reason(s).

    **ANSWER:** **I was unable to work for a few weeks after UCOR terminated me because I needed to find childcare for my daughter. From approximately 12/1/21 through today, none.**

6. Please identify with specificity each source of income you have had during the last three years, including for each such source the date or dates upon which you received that income, the amount received on a periodic basis and the total amount received, and identify each document pertaining to this income.

    **ANSWER:** **Pursuant to FRCP 33(d), please see Exhibits 7, 8, and 9 provided in my response to Defendant's RFPDs. I earned income from the employment sources listed in response to Interrogatory 4. I also earned income from the sale of my home in 2022, and I made withdrawals from my 401k.**

5

7.    Identify each and every application you have made in the last ten (10) years for public or private unemployment, workers compensation, disability, social security or other benefits, including the nature of the benefit, the entity that provides that benefit, the entity with which you filed a claim, the date(s) your claim was filed, whether your application for the benefits was granted, and if so, the date(s) the benefit was received and the payment amount, the total amount received, the date of expiration or eligibility, the current status of your claim, the total amount of payments that you reimbursed back to the providing entity and the reasons for doing so.

     **ANSWER:    None.**


8.    Identify the amount of money (if any) you are seeking from Defendant in this action, including the basis for your claim that you are entitled to each such amount, and the methodology or formula you used to calculate your entitlement to each such amount.

     **ANSWER:    I do not have personal knowledge of this information.  Through my attorney, I intend to employ an economic expert to calculate these losses.  However, the following is my lawyer's answer, which I believe to be true and correct and therefore adopt as my own:**

     *<u>Legal counsel's answer</u>:  Plaintiff and the putative class cannot presently calculate the amount because, among other reasons, the amount will change based on changes to Plaintiff's wages, benefits, and out-of-pocket expenses.  Plaintiff will provide the economic expert's interim report (which will be supplemented closer to trial to reflect these same subsequent changes)  pursuant to the Court's Scheduling Order and the Federal Rules of Civil Procedure.*

     *By way of further response, Plaintiff's claim to back pay will be calculated in part by multiplying his hourly wage of $34.50 by the average number of hours he worked per week as shown in Defendant's records.  The back pay period will be calculated from November 1, 2021 through the anticipated date of the jury's verdict.  All other calculations and economic data will be contained in the expert's report.*

6

9. Identify every physician, counselor, therapist, or other healthcare professional from whom you have sought treatment in the last ten years.

**ANSWER:**  **Dr. Timothy Trone**
**Otolaryngologist**
**Vanderbilt Bill Wilkerson Center**
**1215 21st Ave., S.**
**Nashville, TN 37232**

**Dr. Henry Hooker**
**Neurologist**
**Cumberland Neurology Group**
**Physicians Plaza, Suite 350**
**988 Oak Ridge Turnpike**
**Oak Ridge, TN 37830**

**Dr. Randy Denton**
**Roane County Family Practice**
**1855 Tanner Way Suite 200**
**Harriman, TN 37748**

**Jessica Moore, FNP-C**
**Summit Medical**
**1018 US-321 N**
**Lenoir City, TN 37771**

**Clark Eckert**
**Chiropractor**
**Eckert Chiropractic**
**1062 Oak Ridge Turnpike Suite B**
**Oak Ridge, TN 37830**

**Low T Center**
**11039 Parkside Dr.**
**Knoxville, TN 37934**

10. Have you ever received any treatment or counseling for any mental, psychiatric, psychological, or emotional issues? If yes, identify every physician, counselor, therapist, or other healthcare professional from whom you have received such treatment, state when you received such treatment, and state whether such treatment was specifically related to the claims in your Complaint.

7

> **ANSWER:** I took medication for anxiety and depression for a few months in approximately 2014.
>
> I was treated by Jessica Moore in the spring of 2022 for sleeplessness and anxiety related to my termination from UCOR.

11. Identify all medications, whether over-the-counter or prescription, that you have ever taken (including but not limited to Tylenol, Advil, Aspirin, Aleve, Pseudoephedrine, Benadryl, Claritin, Robitussin, Mucinex, Tums, Maalox, Pepto-Bismol, Preparation H, or Lidocaine/Lidoderm), including the name of the medication, the age you first used it/them, whether you continue to use it/them, and your reasoning for no longer using it/them if you stopped using them.

> **ANSWER:** Objection. Plaintiff objects to this interrogatory because it is overly broad in its temporal scope and subject matter. He also objects on the ground that is unduly burdensome because it purports to require him to recall every medication, even over-the-counter medicine, he has ever taken for the entirety of his life. Plaintiff further objects on the ground that such request is disproportionate to the needs of the case because the information sought is irrelevant.

12. Describe your objection to the use of the COVID-19 vaccines, particularly the Moderna and Pfizer vaccines that were not developed by using fetal cell lines?

> **ANSWER:** I disagree that these vaccines "were not developed by using fetal cell lines." Even AP News (while trying to spin its narrative) acknowledges Pfizer "used a fetal cell line when testing the efficacy of its vaccine." It also said: "In a paper published in September 2020 detailing the vaccine's development and success in mice and monkeys, Pfizer and BioNTech scientists said that the vaccine had been tested using the HEK293T cell line."[1]
>
> My body belongs to God. I am not my own; I was bought with a price. Therefore, I must not do anything to my body that in my spirit I sincerely believe is contrary to God's will for me or will not bring glory to God.

---

[1] https://apnews.com/article/fact-checking-529913215948, October 7, 2021.

8

Governments and media outlets all over the world were relentless in trying to provoke fear of COVID-19 and the consequences of not following their orders, but the Bible says Christians were not given a spirit of fear but of power, love, and a sound mind.

I do not believe most politicians, government leaders, media companies, or large corporations share my religious beliefs, especially on a national and international scale. Therefore, the more I saw these people trying to create fear and hostility (against the unvaccinated), engage in covert and overt actions to silence people who disagreed with them – especially people within the medical community, and demand blind allegiance to a product that would be injected into my body, it became clear that I could not accept into my body the substance these institutions were forcing on me. My beliefs were only reinforced when a Pfizer executive's emails were leaked to Project Veritas confirming that Pfizer was attempting to cover up the fact that aborted fetal cell lines were used during the development of their vaccine. I am strongly opposed to abortion because life is given and created by God. Accepting the vaccine under all these circumstances would violate my deeply held spiritual convictions.

There are many instances in the Bible when Christians refused to follow the king's mandates because to them, to follow the king's orders would violate their spiritual convictions. Chapter 1 in the book of Daniel provides an example (yet even then, the king accommodated Daniel's and his friends' sincere beliefs).

My body belongs to God, not my employer or the government. When Vickie Holsamback asked me if I had any comments on my last day at work, I responded, "I feel UCOR is attempting to make me choose between my career and my God, and I will choose my God every time."

13.     Identify your religion and the how long you have practiced that religion. Identify every church, or other house of worship, that you have been a member of or attended in the last ten (10) years, including the regularity of your attendance.

ANSWER:     I am a Christian. My church membership is as follows:

North Rockwood Baptist Church (1990-2014)
The Potter's House Fellowship (2014-2021)
Maynardville Fellowship (2021-present)

I have also occasionally attended Grace Community Baptist.

9

14.     Aside from religion, do you have any other feelings towards the COVID-19 vaccines that are currently available in the US? If so, please describe any such feelings towards the COVID-19 vaccines that are currently available in the US.

> **ANSWER:**     **My problems with the vaccine stem from my religious beliefs as stated in interrogatory answer No. 12.  As with everything, I try to subject my thoughts to the testing of scripture and the Holy Spirit.  2 Corinthians 10:5 says: "We demolish arguments and every pretension that sets itself up against the knowledge of God, and we take captive every thought to make it obedient to Christ."**

15.     Have you ever eaten and/or consumed any products produced by Pepsi, Nestle, Kraft, Campbell Soup, or Coca-Cola? If so, please identify the product, the age you first ate it/them, whether you continue to eat it/them, and the age you stopped eating it/them and your reasoning for no longer eating it/them if you stopped eating it/them.

> **ANSWER:**     **Objection. This interrogatory is overly broad as to its temporal scope and subject matter, is disproportionate to the needs of the case, and is unduly burdensome because it asks Plaintiff to identify everything she has ever consumed for the entirety of her lifetime, by age, manufactured by companies having thousands of products.   For example, Nestle has more than 2,000 *brands* within its portfolio, each of which contains numerous products.[2] Likewise, Kraft has over 200 brands sold in over 200 countries, each of which sells its own line of products.[3]**

16.     Have you ever received any vaccination other than the COVID-19 vaccination? If so, please identify any such vaccine that you received, the age you first received the vaccine,

---

[2]*See*,     Brands,     Nestle.com,     *https://www.nestle.com/brands#:~:text=We%20have%20more%20than %202%2C000global%20icons%20to%20local%20favorites,* (last accessed April 25, 2023).

[3]*See*     Kraft     Heinz,     A     Global     Food     Powerhouse,     https://www.kraftheinzcompany.com/ KraftHeinzCompany_FactSheet.pdf, (last accessed April 25, 2023).

whether you continue to receive any such vaccine(s), and the age you stopped receiving the vaccine(s) and your reasoning for no longer receiving the vaccine(s).

> **ANSWER:** **I received the typical childhood vaccines. I also received the flu vaccine and the T-Dap vaccine in approximately May 2020. When talk of a COVID vaccine began to circulate, I learned for the first time that aborted fetal cells were used in the development of vaccines. With everything else that was occurring involving COVID-19, including the government's demand that we submit our bodies to the government's will rather than the leading of the Holy Spirit, I knew that for me to take the vaccine would be a sin.**

17. Identify each and every document relating to Defendant and/or your employment with Defendant which you have obtained and/or currently possess. For each document identified, identify how you came to obtain that document or have that document in your possession.

> **ANSWER:** **Objection. The interrogatory is overly broad, unduly burdensome, and disproportionate to the needs of the case because it purports to require Plaintiff to identify every document he ever obtained that in any way "related to" Defendant or his work, without limitation of time, subject-matter, or relevance.**

18. Identify and provide the contact information and/or user names for Plaintiff from March 1, 2020 to the present, specifically including telephone number(s) (including cellular telephone numbers and service providers), home address(es), email address(es), social networking profiles (such as Facebook, LinkedIn, Twitter, etc.) and internet service provider(s).

> **ANSWER:** **Zachariah Duncan**
> **zduncan2321@gmail.com**
> **(865)566-6550 (Straight Talk Wireless)**
>
> **Addresses:** **1492 Buttermilk Rd., Kingston, TN 37763**
> **117 Rolling Acres Dr., Rockwood, TN 37854**
> **1261 Post Oak Valley Rd., Rockwood, TN 37854**
>
> **Social Networking : Gab.com - Slimdee21**
> **Twitter - Slimd2321**

11

**I had a Facebook account but deleted it in 2020.**

19.    Did you record any of your conversations with any employee, agent, or representative of Defendant and/or any related entity?  If so, how did you record such conversations, on what dates did you record them, and where does the device on which you recorded those conversations presently reside?  If any of these recordings have been destroyed, deleted, or lost, explain how, when, and why that happened.

**ANSWER:    No.**

20.    Identify each and every individual you contend belongs to the putative class(es) alleged in the Amended Complaint.

**ANSWER:    I do not have personal knowledge of this information, but in general I believe every person who UCOR fired for refusing to get the COVID vaccine on the basis of a religious objection rather than offering a reasonable accommodation should be included in this lawsuit. Additionally, the following is my lawyer's answer, which I believe to be true and correct and therefore adopt as my own:**

*<u>Legal counsel's answer</u>:  Plaintiff references and incorporates the class description included within his motion for certification of the class. Plaintiff does not know the identity of each such person, but the following individuals have expressed a desire to be represented by the class and by class counsel:*

*1.     Adamo, Steven*
*2.     Adam, Tammy*
*3.     Baker, Dale Jr.*
*4.     Bargile, Kurt*
*5.     Bates, Randy*
*6.     Bock, Tom*
*7.     Burchfield, Neil*
*8.     Casselton, Dave*
*9.     Casselton, Dawn*
*10.    Cox, Matthew*
*11.    Cross, Karen*
*12.    Curtis, Ryan*
*13.    Davis, Sara*
*14.    Dawkins, Barbara*
*15.    Dennis, Malena*
*16.    Duncan, Zach*

12

17.  *Ford, Alan*
18.  *Geier, Nicole  Dosimetry*
19.  *Justice, Charlie*
20.  *Larochelle, Ryan*
21.  *LaRue, Nathan*
22.  *Mathes, Chris*
23.  *McKillip, Bruce*
24.  *Morrow, Tyler*
25.  *Norman, Derek*
26.  *Ogle, Cynthia*
27.  *Phillips, Ledeana*
28.  *Quindry, Brandon*
29.  *Riggs, Yolonda*
30.  *Smith, Tyler*
31.  *Speer, Carlton*
32.  *Tucker, Colby*
33.  *Williams, Jeff*
34.  *Williams, Laura*
35.  *Bett, Chet*
36.  *Livingston, J. D.*
37.  *Webster, Kevin*
38.  *Gary, Myron*
39.  *Burchfield, Sonja*
40.  *Wallace, Darrell*
41.  *Cooley, Bonnie*
42.  *Bates, T.*
43.  *Vadurina, Dennis*
44.  *Cooper, Ramona*

<u>VERIFICATION</u>

I, Zachariah Duncan, do swear or affirm that the answers given to Defendant's First Set of Interrogatories are true and correct to the best of my knowledge, information, and belief.

BY: _____
          ZACHARIAH DUNCAN

          06/06/2023
DATE: _____

**\*Above is a certified e-signature of the signatory, evidenced by the attached Signature Certificate. Pursuant to 15 U.S.C. § 7001 and the Uniform Electronic Transactions Act (UETA), this certified e-signature shall be given equal weight and legal validity as a verified or notarized signature.**

13

# citrix | RightSignature

## SIGNATURE CERTIFICATE



**REFERENCE NUMBER**
E2324E93-0FA9-4F6B-9B66-DE120C480E1A

### TRANSACTION DETAILS

**Reference Number**
E2324E93-0FA9-4F6B-9B66-DE120C480E1A

**Transaction Type**
Signature Request

**Sent At**
06/05/2023 17:10 EDT

**Executed At**
06/06/2023 12:28 EDT

**Identity Method**
email

**Distribution Method**
email

**Signed Checksum**
2d7135d435ce8f3ff23a86dc649f6f668be9bf87c4a3beccec22f60cee1f2ca1

**Signer Sequencing**
Disabled

**Document Passcode**
Disabled

### DOCUMENT DETAILS

**Document Name**
Pl S Answers To First Set Of Interrogatories - Zachariah Duncan

**Filename**
pl_s_answers_to_first_set_of_interrogatories_-_zachariah_duncan.pdf

**Pages**
14 pages

**Content Type**
application/pdf

**File Size**
241 KB

**Original Checksum**
53e076886aca8fd42a0a687f27b47d73729afbba9ade554e36a2a0d2d3249dc7

## SIGNERS

### SIGNER

**Name**
Zach Duncan

**Email**
zduncan2321@gmail.com

**Components**
2

### E-SIGNATURE

**Status**
signed

**Multi-factor Digital Fingerprint Checksum**
305ed51fcae4b23e9797020b93f7c244df60ad08f8b3ca7844a9e421be08f3b7

**IP Address**
174.235.33.144

**Device**
Mobile Safari via iOS

**Drawn Signature**

*[signature]*

**Signature Reference ID**
30BAFFBF

**Signature Biometric Count**
2

### EVENTS

**Viewed At**
06/06/2023 12:28 EDT

**Identity Authenticated At**
06/06/2023 12:28 EDT

**Signed At**
06/06/2023 12:28 EDT

## AUDITS

| TIMESTAMP | AUDIT |
|---|---|
| 06/05/2023 17:10 EDT | Angela Detoro (angela@nlgattorneys.com) created document 'pl_s_answers_to_first_set_of_interrogatories_-_zachariah_duncan.pdf' on Chrome via Windows from 50.254.254.73. |
| 06/05/2023 17:10 EDT | Zach Duncan (zduncan2321@gmail.com) was emailed a link to sign. |
| 06/06/2023 12:28 EDT | Zach Duncan (zduncan2321@gmail.com) viewed the document on Mobile Safari via iOS from 174.235.33.144. |
| 06/06/2023 12:28 EDT | Zach Duncan (zduncan2321@gmail.com) authenticated via email on Mobile Safari via iOS from 174.235.33.144. |
| 06/06/2023 12:28 EDT | Zach Duncan (zduncan2321@gmail.com) signed the document on Mobile Safari via iOS from 174.235.33.144. |

RESPECTFULLY SUBMITTED,

_s/ Clint J. Coleman_
JESSE D. NELSON (BPR # 025602)
CLINT J. COLEMAN (BPR # 038413)
NELSON LAW GROUP, PLLC
10263 Kingston Pike
Knoxville, TN 37922
(865) 383-1053
jesse@nlgattorneys.com
clint@NLGattorneys.com

*Attorneys for Carlton Speer, Malena Dennis,
and Zachariah Duncan, on their own behalf
and on behalf of all others similarly situated*

## CERTIFICATE OF SERVICE

I certify that this document or pleading was served via e-mail on all individuals authorized and directed to receive such service. Dated: June 6, 2023.

William S. Rutchow
Darrius Walker, Jr.
401 Commerce Street, Suite 1200
Nashville, TN 37219
William.rutchow@ogletree.com
Darrius.walker@ogletree.com

Luci L. Nelson
300 North Main St., Suite 500
Greenville, SC 29601
luci.nelson@ogletree.com

_s/ Clint J. Coleman_

# CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act of 1974.  See enclosed Privacy Act Statement and other information before completing this form.

| Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|
| ☐ FEPA | |
| ☒ EEOC | 494-2022-00680 |

**Tennessee Human Rights Commission** and EEOC

*State or local Agency, if any*

| Name *(indicate Mr., Ms., Mrs.)* | Home Phone *(Incl. Area Code)* | Date of Birth |
|---|---|---|
| Mr. Carlton Speer, (Class reps.) | (865) 556-6550 | |

| Street Address | City, State and ZIP Code |
|---|---|
| 1706 Mountain Lake Lane | Knoxville, Tennessee 37922 |

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others.  *(If more than two, list under PARTICULARS below.)*

| Name | No. Employees, Members | Phone No. *(Include Area Code)* |
|---|---|---|
| UCOR LLC | 1,000+ | (865) 241-0053 |

| Street Address | City, State and ZIP Code |
|---|---|
| 701 Scarboro Rd. | Oak Ridge, Tennessee 37830 |

| Name | No. Employees, Members | Phone No. *(Include Area Code)* |
|---|---|---|
| | | |

| Street Address | City, State and ZIP Code |
|---|---|
| | |

**DISCRIMINATION BASED ON** *(Check appropriate box(es).)*

☐ RACE ☐ COLOR ☐ SEX ☒ RELIGION ☐ NATIONAL ORIGIN
☐ RETALIATION ☐ AGE ☐ DISABILITY ☐ GENETIC INFORMATION
☐ OTHER *(Specify)*

DATE(S) DISCRIMINATION TOOK PLACE
Earliest: August 26, 2021    Latest:
☒ CONTINUING ACTION

THE PARTICULARS ARE *(If additional paper is needed, attach extra sheet(s)):*

Respondent UCOR LLC ("UCOR") is a contractor which contracts through the United States Department of Energy.  UCOR specializes in deactivation and demolition of former nuclear facilities.  It also utilizes subcontractors whose employees are required to abide by the same relevant employment policies applicable to UCOR employees.  UCOR is a joint employer with respect to these subcontractor employees.

On August 26, 2021, UCOR announced that it would be requiring all employees to be vaccinated against COVID-19.  This requirement applied to all of UCOR's nearly 2,000 employees and subcontractors and was announced to be a condition of employment.  UCOR gave its workers until November 1, 2021, to receive their final vaccination dose, i.e., if employees remained unvaccinated beyond November 1, 2021, they were to be terminated.  The company claimed it would consider exemptions for disability/medical reasons, as well as religious exemptions, on a case-by-case-basis.

Charging Parties consist of a class of employees of UCOR and its subcontractors (collectively "Charging Parties") who applied for religious exemptions through UCOR's internal procedure.  In their respective accommodation requests, Charging Parties informed UCOR of their sincerely held religious belief that the use of vaccinations is sinful where, as here, the vaccine was developed (either directly or through testing) using fetal cell lines derived from fetal tissue from aborted fetuses, and that their religion made it a sin to use anything derived from abortion.

| I want this charge filed with both the EEOC and the State or local Agency, if any.  I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – *When necessary for State and Local Agency Requirements* |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.  SIGNATURE OF COMPLAINANT |
| 12/02/2021 *[signature]* | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE *(month, day, year)* |
| Date    Charging Party Signature | |

RECEIVED
DEC 02 2021
EEOC Nashville Area Office

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | ☐ FEPA<br>☒ EEOC | |

| Tennessee Human Rights Commission | and EEOC |
|---|---|
| *State or local Agency, if any* | |

THE PARTICULARS ARE *(If additional paper is needed, attach extra sheet(s)):*

Following Charging Parties' submissions in support of their stated religious beliefs, UCOR conceded that Charging Parties' beliefs are sincerely held. UCOR also presented and/or discussed with Charging Parties a list of potential accommodations from which they could indicate their respective agreements or rejections. The proposed or potential accommodations UCOR identified included, among others, that the employees be allowed to continue to work without getting the vaccine and instead work remotely or on-site using mitigation strategies such as mask wearing, physical distancing, and periodic COVID-19 testing. Many employees agreed that all of the listed accommodations would be acceptable; the remaining employees agreed to a majority of the potential or proposed accommodations; and multiple employees offered their own proposed accommodation(s), such as purchasing the COVID tests, changing work shifts or locations to minimize proximity to other (vaccine-protected) employees, etc. Nevertheless, UCOR decided that it would reject every religious-based accommodation (all the while granting the same accommodations to employees whose accommodations were medical or disability-related). UCOR mandated that its subcontractors also enforce its decision not to offer any religious-based accommodations to those employees who performed work for UCOR.

The Charging Parties and those similarly situated held steadfast to their religious beliefs and refused to receive the vaccine. As a result, on November 1, 2021, UCOR terminated or caused to be terminated each such person. Thereafter, UCOR began seeking applicants for the job vacancies created by Charging Parties' terminations; UCOR's job postings affirmed the willingness to comply with the ADA's accommodation requirement but, by implication, not Title VII's religious accommodation requirement. Specifically, the posting(s) referenced the ADA but not Title VII. Upon information and belief, UCOR has rejected each candidate who requested a religious accommodation to the vaccine and/or replaced Charging Parties with people who do not share Charging Parties' sincerely held religious beliefs with respect to the vaccine.

UCOR's across-the-board rejection of each and every religious-based accommodation amounts to intentional religious discrimination in violation of Title VII of the Civil Rights Act of 1964.

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – *When necessary for State and Local Agency Requirements* |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.<br>SIGNATURE OF COMPLAINANT |
| 11/02/2021    *[signature]*<br><br>———————————   ———————————————<br>*Date*         *Charging Party Signature* | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE *(month, day, year)* |

EEOC Form 5 (11/09)

# CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form.

| Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|
| ☐ FEPA | |
| ☒ EEOC | 494-2022-00694 |

**Tennessee Human Rights Commission** and EEOC

*State or local Agency, if any*

| Name *(indicate Mr., Ms., Mrs.)* | Home Phone *(Incl. Area Code)* | Date of Birth |
|---|---|---|
| Mr. Zachariah Duncan (Class reps.) | (865) 556-6550 | |

| Street Address | City, State and ZIP Code |
|---|---|
| 4092 Buttermilk Rd. | Kingston, Tennessee 37763 |

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. *(If more than two, list under PARTICULARS below.)*

| Name | No. Employees, Members | Phone No. *(Include Area Code)* |
|---|---|---|
| UCOR LLC | 1,000+ | (865) 241-0053 |

| Street Address | City, State and ZIP Code |
|---|---|
| 701 Scarboro Rd. | Oak Ridge, Tennessee 37830 |

| Name | No. Employees, Members | Phone No. *(Include Area Code)* |
|---|---|---|
| | | |

| Street Address | City, State and ZIP Code |
|---|---|
| | |

**DISCRIMINATION BASED ON** *(Check appropriate box(es).)*

☐ RACE  ☐ COLOR  ☐ SEX  ☒ RELIGION  ☐ NATIONAL ORIGIN
☐ RETALIATION  ☐ AGE  ☐ DISABILITY  ☐ GENETIC INFORMATION
☐ OTHER *(Specify)*

**DATE(S) DISCRIMINATION TOOK PLACE**
Earliest: August 26, 2021  Latest:

☒ CONTINUING ACTION

**THE PARTICULARS ARE** *(If additional paper is needed, attach extra sheet(s)):*

Respondent UCOR LLC ("UCOR") is a contractor which contracts through the United States Department of Energy. UCOR specializes in deactivation and demolition of former nuclear facilities. It also utilizes subcontractors whose employees are required to abide by the same relevant employment policies applicable to UCOR employees. UCOR is a joint employer with respect to these subcontractor employees.

On August 26, 2021, UCOR announced that it would be requiring all employees to be vaccinated against COVID-19. This requirement applied to all of UCOR's nearly 2,000 employees and subcontractors and was announced to be a condition of employment. UCOR gave its workers until November 1, 2021, to receive their final vaccination dose, i.e., if employees remained unvaccinated beyond November 1, 2021, they were to be terminated. The company claimed it would consider exemptions for disability/medical reasons, as well as religious exemptions, on a case-by-case-basis.

Charging Parties consist of a class of employees of UCOR and its subcontractors (collectively "Charging Parties") who applied for religious exemptions through UCOR's internal procedure. In their respective accommodation requests, Charging Parties informed UCOR of their sincerely held religious belief that the use of vaccinations is sinful where, as here, the vaccine was developed (either directly or through testing) using fetal cell lines derived from fetal tissue from aborted fetuses, and that their religion made it a sin to use anything derived from abortion.

I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures.

I declare under penalty of perjury that the above is true and correct.

12/02/2021
*Date*

*Zach Duncan*
*Charging Party Signature*

NOTARY – *When necessary for State and Local Agency Requirements*

I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.
SIGNATURE OF COMPLAINANT

SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE *(month, day, year)*

RECEIVED
DEC 0 2 2021
EEOC Nashville Area Office

**Exhibit 2**

EEOC Form 5 (11/09)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | ☐ FEPA<br>☒ EEOC | |

| **Tennessee Human Rights Commission** | and EEOC |
|---|---|
| *State or local Agency, if any* | |

THE PARTICULARS ARE *(If additional paper is needed, attach extra sheet(s)):*

Following Charging Parties' submissions in support of their stated religious beliefs, UCOR conceded that Charging Parties' beliefs are sincerely held. UCOR also presented and/or discussed with Charging Parties a list of potential accommodations from which they could indicate their respective agreements or rejections. The proposed or potential accommodations UCOR identified included, among others, that the employees be allowed to continue to work without getting the vaccine and instead work remotely or on-site using mitigation strategies such as mask wearing, physical distancing, and periodic COVID-19 testing. Many employees agreed that all of the listed accommodations would be acceptable; the remaining employees agreed to a majority of the potential or proposed accommodations; and multiple employees offered their own proposed accommodation(s), such as purchasing the COVID tests, changing work shifts or locations to minimize proximity to other (vaccine-protected) employees, etc. Nevertheless, UCOR decided that it would reject every religious-based accommodation (all the while granting the same accommodations to employees whose accommodations were medical or disability-related). UCOR mandated that its subcontractors also enforce its decision not to offer any religious-based accommodations to those employees who performed work for UCOR.

The Charging Parties and those similarly situated held steadfast to their religious beliefs and refused to receive the vaccine. As a result, on November 1, 2021, UCOR terminated or caused to be terminated each such person. Thereafter, UCOR began seeking applicants for the job vacancies created by Charging Parties' terminations; UCOR's job postings affirmed its willingness to comply with the ADA's accommodation requirement but, by implication, not Title VII's religious accommodation requirement. Specifically, the posting(s) referenced the ADA but not Title VII. Upon information and belief, UCOR has rejected each candidate who requested a religious accommodation to the vaccine and/or replaced Charging Parties with people who do not share Charging Parties' sincerely held religious beliefs with respect to the vaccine.

UCOR's across-the-board rejection of each and every religious-based accommodation amounts to intentional religious discrimination in violation of Title VII of the Civil Rights Act of 1964.

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – *When necessary for State and Local Agency Requirements* |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.<br>SIGNATURE OF COMPLAINANT |
| 12/02/2021     *Zach Duncan* | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE *(month, day, year)* |
| *Date*     *Charging Party Signature* | |

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | ☐ FEPA ☒ EEOC | 494-2022-00682 |

| Tennessee Human Rights Commission | and EEOC |
|---|---|
| State or local Agency, if any | |

| Name (indicate Mr., Ms., Mrs.) | Home Phone (Incl. Area Code) | Date of Birth |
|---|---|---|
| Ms. Malena Dennis, (Class reps.) | | |

| Street Address | City, State and ZIP Code |
|---|---|
| 7504 Lancashire Blvd. | Powell, Tennessee 37849 |

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. (If more than two, list under PARTICULARS below.)

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| UCOR LLC | 1,000+ | (865) 241-0053 |

| Street Address | City, State and ZIP Code |
|---|---|
| 701 Scarboro Rd. | Oak Ridge, Tennessee 37830 |

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| | | |

| Street Address | City, State and ZIP Code |
|---|---|
| | |

| DISCRIMINATION BASED ON (Check appropriate box(es).) | DATE(S) DISCRIMINATION TOOK PLACE |
|---|---|
| ☐ RACE ☐ COLOR ☐ SEX ☒ RELIGION ☐ NATIONAL ORIGIN ☐ RETALIATION ☐ AGE ☐ DISABILITY ☐ GENETIC INFORMATION ☐ OTHER (Specify) | Earliest: August 26, 2021  Latest: ☒ CONTINUING ACTION |

THE PARTICULARS ARE (If additional paper is needed, attach extra sheet(s)):

Respondent UCOR LLC ("UCOR") is a contractor which contracts through the United States Department of Energy. UCOR specializes in deactivation and demolition of former nuclear facilities. It also utilizes subcontractors whose employees are required to abide by the same relevant employment policies applicable to UCOR employees. UCOR is a joint employer with respect to these subcontractor employees.

On August 26, 2021, UCOR announced that it would be requiring all employees to be vaccinated against COVID-19. This requirement applied to all of UCOR's nearly 2,000 employees and subcontractors and was announced to be a condition of employment. UCOR gave its workers until November 1, 2021, to receive their final vaccination dose, i.e., if employees remained unvaccinated beyond November 1, 2021, they were to be terminated. The company claimed it would consider exemptions for disability/medical reasons, as well as religious exemptions, on a case-by-case basis.

Charging Parties consist of a class of employees of UCOR and its subcontractors (collectively "Charging Parties") who applied for religious exemptions through UCOR's internal procedure. In their respective accommodation requests, Charging Parties informed UCOR of their sincerely held religious belief that the use of vaccinations is sinful where, as here, the vaccine was developed (either directly or through testing) using fetal cell lines derived from fetal tissue from aborted fetuses, and that their religion made it a sin to use anything derived from abortion.

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – When necessary for State and Local Agency Requirements |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. SIGNATURE OF COMPLAINANT |
| 12/02/2021 *Malena Dennis* | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (month, day, year) |
| Date — Charging Party Signature | |

RECEIVED
DEC 02 2021
EEOC Nashville Area Office

Exhibit 3

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | ☐ FEPA <br> ☒ EEOC | |

| **Tennessee Human Rights Commission** | and EEOC |
|---|---|
| *State or local Agency, if any* | |

THE PARTICULARS ARE *(If additional paper is needed, attach extra sheet(s)):*

Following Charging Parties' submissions in support of their stated religious beliefs, UCOR conceded that Charging Parties' beliefs are sincerely held. UCOR also presented and/or discussed with Charging Parties a list of potential accommodations from which they could indicate their respective agreements or rejections. The proposed or potential accommodations UCOR identified included, among others, that the employees be allowed to continue to work without getting the vaccine and instead work remotely or on-site using mitigation strategies such as mask wearing, physical distancing, and periodic COVID-19 testing. Many employees agreed that all of the listed accommodations would be acceptable; the remaining employees agreed to a majority of the potential or proposed accommodations; and multiple employees offered their own proposed accommodation(s), such as purchasing the COVID tests, changing work shifts or locations to minimize proximity to other (vaccine-protected) employees, etc. Nevertheless, UCOR decided that it would reject every religious-based accommodation (all the while granting the same accommodations to employees whose accommodations were medical or disability-related). UCOR mandated that its subcontractors also enforce its decision not to offer any religious-based accommodations to those employees who performed work for UCOR.

The Charging Parties and those similarly situated held steadfast to their religious beliefs and refused to receive the vaccine. As a result, on November 1, 2021, UCOR terminated or caused to be terminated each such person. Thereafter, UCOR began seeking applicants for the job vacancies created by Charging Parties' terminations; UCOR's job postings affirmed its willingness to comply with the ADA's accommodation requirement but, by implication, not Title VII's religious accommodation requirement. Specifically, the posting(s) referenced the ADA but not Title VII. Upon information and belief, UCOR has rejected each candidate who requested a religious accommodation to the vaccine and/or replaced Charging Parties with people who do not share Charging Parties' sincerely held religious beliefs with respect to the vaccine.

UCOR's across-the-board rejection of each and every religious-based accommodation amounts to intentional religious discrimination in violation of Title VII of the Civil Rights Act of 1964.

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – *When necessary for State and Local Agency Requirements* |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. <br> SIGNATURE OF COMPLAINANT |
| 12/02/2021     *Malena Dennis* | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE *(month, day, year)* |
| *Date*     *Charging Party Signature* | |

Take This Jab and Shove It Chat
12 October 2021
Channel «Take This Jab and Shove It Chat» created

B

21:23
Barbara
Awesome

LW

21:24
Laura Williams
Perfect Name 👍 😊

T

21:25
Take This Jab and Shove It Chat
Yay ... We will be able to move information, ask questions, etc in here so much easier!

B

21:25
Barbara
So perfect..

T

21:28
Take This Jab and Shove It Chat
Some of the folks do not have telegram accounts ... at least not yet. Hopefully they will create an account. We can do group chats as well. This is just the best forum available right now to communicate with a large group of people.

LW

21:29
Laura Williams
That's great, Good Job Malena!!!

B

21:29
Barbara

T

This FUW 12.10.2021 21:29:40



B

21:30
Barbara

L

Lorrie 11.10.2021 09:18:58
Now, we find out the mandate isn't even on paper yet!
https://thefederalist.com/2021/10/07/joe-bidens-vaccine-mandate-doesnt-exist-its-just-a-press-release/

T

21:32
Take This Jab and Shove It



002

T

21:33
Take This Jab and Shove It



B

21:36
Barbara

E

Edward Snowden 10.10.2021 19:45:49
Video file
Not included, change data exporting settings to download.
01:55, 21.6 MB
Dr Peter McCullough on the the experimental covid vaccine deaths and disabilities....

.."The disability we're going to see due to these vaccines will go down in history as an unbelievable atrocity"..

👓 t.me/EdwardSnwdn

B

21:37
Barbara

B

Bluksu 10.10.2021 19:39:41
Video file
Not included, change data exporting settings to download.

003

05:01, 41.3 MB
Jewish history expert said: the holocaust was possible because of German loyalty to their government and predicted a new holocaust because of the same blind Government-Layality in the USA! Exactly like it comes true now: in the time of Pharma-Fascists tyranny!

Ernst Zündel Being Interviewed by Jewish Journalist Tsadok Yecheskeli from The Jewish Newspaper Yedioth Ahronoth In 1997 In His Home in Toronto/Canada.

 t.me/BLMnews

B

21:38
Barbara

H

Habnab 09.10.2021 07:59:30
Video file
Not included, change data exporting settings to download.
01:27, 7.4 MB
Mandatory vaccination is against the law!!!

t.me/JuAssange

B

21:43
Barbara

D

Dr Jane Ruby 12.10.2021 20:06:59
**Exemptions Are Compliance**

**Repetitive Testing Is Compliance**

**SILENCE IS COMPLIANCE**

You cannot comply your way out of tyranny.

B

21:43
Barbara

D

004

Dr Jane Ruby 12.10.2021 19:54:44

HUGE

https://www.redvoicemedia.com/2021/10/judge-hands-ny-health-care-huge-victory-grants-injunction-against-covid-vaccine/

T

21:47
Take This Jab and Shove It Chat
https://trendingpolitics.com/jen-psaki-accidentally-confirms-that-no-biden-federal-vaccine-mandate-actually-exists-knab/?utm_source=mgshow

B

22:04
Barbara

V

Vaccine Police 05.10.2021 00:09:39
IF YOUR BOSS THREATENS YOU WITH FIRING IF NOT VACCINATED DON'T REFUSE:

The secret is NOT to refuse the jab and do not sign anything!

From a lawyer:

If you are being forced to Vax in order to keep your job, here's a great way to handle it. (Conditional acceptance)

The secret is NOT to refuse it.

"I write with regard to the matter of potential covid vaccine and my desire to be fully informed and appraised of ALL facts before going ahead. I'd be most grateful if you could please provide the following information, in accordance with statutory legal requirements.":

1. Can you please advise the approved legal status of any vaccine and if it is experimental?

2. Can you please provide details and assurances that the vaccine has been fully, independently and rigorously tested against control groups and the subsequent outcomes of those tests?

3. Can you please advise the entire list of contents of the vaccine I am to receive and if any are toxic to the body?

4. Can you please fully advise of all the adverse reactions associated with this vaccine since it's introduction?

5. Can you please confirm that the vaccine you are advocating is NOT experimental mRNA gene altering therapy?

6. Can you please confirm that I will not be under any duress from yourselves as my employers, in compliance with the Nuremberg Code?

7. Can you please advise me of the likely risk of fatality, should I be unfortunate to contract Covid 19 and the likelihood of recovery?

8. Can you please advise me if I were to experience any adverse reactions is the manufacturer of the vaccine liable? If the manufacturer isn't liable will the

005

company I'm currently employed with with be responsible & liable as it is their request that I have the vaccine in order to carry on my employment?

Once I have received the above information in full and I am satisfied that there is NO threat to my health, I will be happy to accept your offer to receive the treatment, but with certain conditions – namely that:

1. You confirm in writing that I will suffer no harm.

2. Following acceptance of this, the offer must be signed by a fully qualified doctor who will take full legal and financial responsibility for any injuries occurring to myself, and/or from any interactions by authorized personnel regarding these procedures.

3. In the event that I should have to decline the offer of vaccination, please confirm that it will not compromise my position and that I will not suffer prejudice and discrimination as a result?

I would also advise that my inalienable rights are reserved.

The point is that if they CANNOT provide that information you've NOT refused.
13 October 2021

T

09:02
Take This Jab and Shove It
https://trendingpolitics.com/federal-judge-in-texas-halts-united-airlines-enforcement-of-employee-vaccine-mandate-knab/?utm_source=mgshow

T

12:10
Take This Jab and Shove It
https://youtu.be/FUXGB5FzhPc
Take This Jab and Shove It Chat started voice chat

T

14:11
Take This Jab and Shove It Chat
https://trendingpolitics.com/donald-trump-finally-puts-to-rest-a-major-question-people-have-about-his-vaccine-position-knab/

T

15:53
Take This Jab and Shove It Chat
https://m.theepochtimes.com/approved-version-of-pfizers-covid-19-vaccine-still-not-available-in-us_4046513.html?utm_source=partner&utm_campaign=ZeroHedge

T

18:41
Take This Jab and Shove It Chat

https://www.youtube.com/watch?v=Uc4VmKSvRmI

B

20:55
Barbara
Yesssss

NG

21:37
Nicole Geier

G

Gov. Ron DeSantis 13.10.2021 21:00:06
No one should lose their job because of COVID shots.

**HealthyFla** fined Leon County more than $3.5 million for violating Florida law after the county fired 14 employees for not complying with the county's forced vaccination policy.

**Follow me on Telegram**
@RonDeSantisTelegram

T

21:42
Take This Jab and Shove It Chat
In reply to this message
Truth

LW

21:43
Laura Williams
In reply to this message
🙏
14 October 2021

B

04:49
Barbara

J

Josh 13.10.2021 08:53:50
https://youtu.be/qr_F_XQrukM

007

NG

08:35
Nicole Geier
Video file
Not included, change data exporting settings to download.
02:50, 7.5 MB

LW

14:20
Laura Williams

L

Leaked Q Evidence 03.10.2021 19:43:01
Video file
Not included, change data exporting settings to download.
38:02, 55.2 MB
Vaccine Exemption HIJACKERS Exposed!

T

14:22
Take This Jab and Shove It Chat
I have some information to post that we all need to be concerned about. I am trying to find it for our area. Buckle up folks.
14:34
On a brighter note .... I walked out my office today for the last time and I had my little American flag and I waved it all the way out the door US

T

15:17
Take This Jab and Shove It Chat

M

Major Patriot 14.10.2021 12:02:08



@MajorPatriot

T

15:21
Take This Jab and Shove It
https://www.law.cornell.edu/uscode/text/21/360

This is absolutely important for you to understand. I know many folks do not want to take the Covid vaccine but they are okay with taking others such as Flu, shingles, etc. Make sure you understand this what is in this link.

T

15:25
Take This Jab and Shove It Chat
https://www.sciencedirect.com/science/article/pii/S1201971221007980

T

16:16
Take This Jab and Shove It Chat
Sorry to load the chat down ... If it's not of interest to you then please ignore ☺

DC

16:22
David Casselton
Can whoever is admin add Dawn Casselton to the group. She is not received anything. Thanks

T

16:23
Take This Jab and Shove It Chat
In reply to this message

009

Absolutely .... does she have a telegram account?

DC

16:23
David Casselton
Yes

T

16:25
Take This Jab and Shove It Chat
In reply to this message
Let me look on the list Carl gave me and see if it will work ... give me one second.
16:29
In reply to this message
I added her!

DC

16:34
David Casselton
Thanks
16:35
FYI. After the email from Cynthia ogle yesterday. Security came and wakes her offsite.
16:35
Walked

T

16:37
Take This Jab and Shove It Chat
In reply to this message
No problem .... if you run across anyone else who isn't on here and would like to be let them know if they create an account I will add them. I tried to add numerous people.
16:38
In reply to this message
That just about says it all ... doesn't it.

B

18:54
Barbara

O

OfLoveNLight 13.10.2021 12:05:46
Video file
Not included, change data exporting settings to download.

010

03:32, 18.6 MB

💥 💥 News:
I'll say it again. They lie!!!

💥 Please listen, this is very important information!

LW

19:23
Laura Williams
Video file
Not included, change data exporting settings to download.
02:08, 2.1 MB

T

19:27
Take This Jab and Shove It Chat
In reply to this message
I have 3 words for resident Joe .... Let's go Brandon!

B

19:45
Barbara


NG

19:54
Nicole Geier
In reply to this message



20:00
Deleted Account
I just got off the phone with somebody that told me the inspector general for DOE is opposed to mandating the vaccine they believe it's illegal and that we need to call that hotline each of us individually and bombard them with our concerns about this so that they will have to investigate. He's going to text me the number. We need to talk about this more on Monday. He wants to meet us if the time is right for him to be able to come by.

T

20:17
Take This Jab and Shove It Chat
In reply to this message
Thank you for sharing this information. We will put it on the agenda for discussion on Monday.

011

B

20:35
Barbara

L

Leaked Q Evidence 14.10.2021 14:08:01
Video file
Not included, change data exporting settings to download.
00:15, 695.0 KB
Why do the protected need to be protected from the unprotected by forcing the unprotected to use the protection that didn't protect the protected in the first place.
✖

DC

21:45
David Casselton



21:45
My dad lives in SC and sent me this.

B

21:50
Barbara

T

This FUW 14.10.2021 21:50:44

012



15 October 2021

LW

09:57
Laura Williams
https://youtu.be/adFcmjo0--w

Long but excellent info

T

10:24
Take This Jab and Shove It Chat
https://patentimages.storage.googleapis.com/68/80/73/6a17a66e9ec8c5/US11107588.pdf

This is a Pfizer patent application that was approved. Is the purpose of this to remote contact trace all vaccinated humans worldwide who are or will be connected to the "internet of things" by frequencies? Read and decide for yourself.

TA

11:21
Tammy Adams
Thanks for the invite!!

T

11:31
Take This Jab and Shove It Chat
In reply to this message
Absolutely! Good to see you here ☺

T

013

12:23
Take This Jab and Shove It Chat
https://youtu.be/ebNSL83Ns_4

T

13:09
Take This Jab and Shove It Chat
https://www.cnbc.com/2021/07/30/cdc-study-shows-74percent-of-people-infected-in-massachusetts-covid-outbreak-were-fully-vaccinated.html

TA

13:10
Tammy Adams
Can you invite Colby Tucker?

T

13:20
Take This Jab and Shove It Chat
In reply to this message
Does he have a Telegram account? I entered his info with the number I have and he does not come up.

TA

13:21
Tammy Adams
I told him to download it. Let me check

T

13:21
Take This Jab and Shove It Chat
In reply to this message
Okay … let me know and I will get him added.

TA

13:24
Tammy Adams
He has it now

T

13:27
Take This Jab and Shove It Chat
In reply to this message
As soon as he shows up ... I will add him. I tried again under the number I have available for him and he didn't show up. It may take a few minutes ... I will try again.

TA

14:02
Tammy Adams
Thanks

TA

18:34
Tammy Adams
Awesome! Hope we get the same!!
18:34



DC

19:14
David Casselton
We need to find out what judge this is.

TA

19:15
Tammy Adams
Yes. I haven seen the actual article yet, someone sent it to me

NL

19:15
Nathan LaRue
I think it said Judge Atchley

DC

015

19:16
David Casselton
We looked it up. It's Judge atchley. You can read the whole case at mocotoday.com

T

19:20
Take This Jab and Shove It Chat
Yes it was Judge Atchley.

T

21:48
Take This Jab and Shove It
As many of you have heard UTB was granted their TRO preventing them from being placed on unpaid leave. This sets a precedent in our local area and is positive news. I know many of you are anxious for an update and under the stressful conditions we are all experiencing information cannot come quick enough. Thursday was a hard day for all of us. We are here to support and encourage one another through this difficult time.

This will be a quick update but we wanted to let everyone know the lawyer was out of town last week working on a case but they have also been working on our TRO. We will be contacting them first thing Monday to move forward. We originally had a group meeting scheduled for Monday at 4:30pm. We would like to move that to an earlier meeting time of 12:30. Hopefully, this will not be an inconvenience. If you cannot make this time we will send a detailed update out to everyone and feel free to reach out with any suggestions or questions you may have. We currently have 51 names on our list. If there is anyone you have spoken to or know of that was denied religious accommodations let us know so we can reach out to them. We appreciate everyone's effort in getting this list together.

We also wanted to let you know the name was changed on our fundraiser to remove UCOR's name in light of the email they sent out on Thursday. We want to thank everyone for their support. Below is our fundraising link. Please share the link to help in this effort. All of the money raised will be used to pay for legal representation for all UCOR employees who are being discriminated against for their sincere religious beliefs. Any excess funds that are not needed to pay legal fees will be evenly distributed to UCOR employees who have been terminated because their exemption request was denied and they did not subsequently take the vaccine.
To donate to the fund please click here https://www.givesendgo.com/StopUCOR

Please continue to pray for our group and our country.
16 October 2021

NL

09:53
Nathan LaRue
I just researched this this morning, to make sure what I heard was accurate info. According to the CDC in a report released on 10/12, double jabbed people that get breakthrough C-19, 43% of females die, and on the over 65 group 85% die.

https://www.cdc.gov/vaccines/covid-19/health-departments/breakthrough-cases.html

KB

10:15
Kurt Bargiel

016

The way I read it those are the percentages within the group of people that either died or were hospitalized after fully vaccinated. It says the total number is 31,895. That is a lot but would be a tiny percentage of everyone vaccinated.
10:19
It's also likely a small percentage of the "rare" breakthrough cases.

TA

10:23
Tammy Adams
Did anyone else receive a vial to spit in for the open enrollment for insurance?

NG

10:27
Nicole Geier
In reply to this message
Just opened. No vial in mine. 10+ years ago Covenant Health insurance did that for smoking

LW

10:27
Laura Williams
Both Jeff and I got an enrollment package but didn't open it. Will check when we get home.

TA

10:28
Tammy Adams
It was separate
10:29
It's from Aetna. Maybe it's not for them, just weird

LW

10:30
Laura Williams
Oh okay. Don't know. Several weeks ago Aetna sent both me and Jeff a kit to submit poop for colorectal cancer. They went into the trash!

TA

10:30
Tammy Adams
Lol

LW

10:31
Laura Williams
Ridiculous

017

KB

10:33
Kurt Bargiel
I hope they went in the trash empty.

LW

10:33
Laura Williams
😄👍

NG

10:33
Nicole Geier
In reply to this message
Did it have instructions or anything else with it? There are legit 100s of reasons for sputum test. Covid, TB, nicotine

LW

10:35
Laura Williams
The outside of the package said what it was. I didn't bother opening it up. 
10:35
You could tell some contraption was in it.
10:42
https://t.me/plandemik1984/2879

TA

10:46
Tammy Adams
I believe that! I saw a nurse saying people were fine until they put them on a ventilator, then dead by the next day! She said because Medicare pays them $39,000 for every Covid death

DC

10:53
David Casselton
Spit test was probably sent out to check your DNA to make sure the people still working actually took the jab.

TA

10:55
Tammy Adams
Lol I wouldn't doubt it. If that's the case all the ones with fake cards will get fired.

018

DC

10:55
David Casselton



10:56
Found the top one rather funny

TA

11:15
Tammy Adams
OMG

T

11:36
Take This Jab and Shove It Chat
What happened to pre-existing conditions do not matter, therefore, no one would need to spit in a vial for any reason. Also, unless I'm wrong you don't have to pass a physical in order to get insurance thru your employer so it doesn't matter if you smoke etc. So, I'll keep my spit.

TA

11:45
Tammy Adams
Me too!

LW

13:16
Laura Williams
Yup, ain't sending poop either😂

KW

13:40
Kevin Webster
Are we all meeting at Aubrey's in oak ridge Monday at 12:30?

DC

13:49
David Casselton
I'll be there

TA

13:50
Tammy Adams
Me too

T

14:04
Take This Jab and Shove It Chat
In reply to [this message](this message)
Yes 😊

NL

14:43
Nathan LaRue
I will not be able to make it, but can someone take notes and fill me in? I definitely want to be included in the class.

KB

15:07
Kurt Bargiel
I believe anyone with the same circumstances as the named plaintiff or plaintiffs are covered under a class action. The suits I have seen list as the plaintiff, one or several names then say "and et al", meaning "and the like".

B

15:20
Barbara

CC

Craig Cordeau 16.10.2021 08:49:02
Video file
Not included, change data exporting settings to download.
14:49, 58.8 MB

020

MC

16:03
Matthew C
Are we getting anywhere ?

LP

16:03
Ladeana Phillips
Exactly what I was thinking

DC

16:18
Dawn Casselton
Well from what I saw and heard everything was positive that passed

T

16:19
Take This Jab and Shove It Chat
I heard from the attorney's office this evening and I am waiting for paperwork they are sending me. Unless I understood them incorrectly they are ready to file if this paperwork is in order.

DC

16:19
Dawn Casselton
That's good news


16:22
Deleted Account
These didn't "pass". They were voted on in Committee and approved to move to the General House Chamber for House vote. If they pass the House, the bill moves on to the Senate. If they pass through Senate, the bills go to Lee for signing or veto. If he veto's, then it goes back to House for reconsideration and supermajority vote, then goes to Senate for the same. If it also passes Senate by supermajority, then the veto is over-ridden, and it becomes law.

There is still a LONG way to go in this process.

DC

16:24
Dawn Casselton
Well thanks for bursting my happy bubble Dennis

MC

16:25
Matthew C
What didnt pass

DC

16:25
Dawn Casselton
So is part of it the Labor and Commerce meeting that is showing in progress?

LW

16:26
Laura Williams
I think we all need to write to Lee and tell him he needs to write an executive order to protect US!!!

KB

16:26
Kurt Bargiel
You can be happy Dawn, whatever they just did had to be done as part of the process.


16:28
Deleted Account
What Kurt just said....its a long and convoluted process. This was only the first part of about 6 or 7 steps that it needs to go through.
16:30
Could get even longer if the House sends to Senate, and Senate marks it up with proposed changes and sends it back to the House for reconsideration before going to Lee's desk on the first round.

And yes, I aced Civics class in HS and Poli-Sci in college. Its why I hate politics now.....

TA

16:34
Tammy Adams
That's great news Carl
16:36
I agree we should all be writing gov Lee
16:37
Sorry Malena, great news

T

16:37
Take This Jab and Shove It Chat
In reply to this message
 No worries .... it's all good!

078

12:02
Tammy Adams
Me too

NL

12:05
Nathan LaRue
I was told by Ucor hr that unpaid leave wasn't an option

T

12:05
Take This Jab and Shove It Chat
In reply to this message
Absolutely, and in the meantime this "vaccine" is gene-therapy and destroys your ability to fight off the variants. One shot greatly reduces your autonomous immune system and each shot reduces it even more. This is why we have seen a resurgence of cases. The original jab fought against only one strain and while it may have had some efficacy against the "original" it still greatly weakened your system against other things and all variants. Honestly, I hope I am wrong. I hope that many of the doctors are wrong. I hope God intervenes.
12:06
In reply to this message
Well they won't do that unless they are ordered by the court not to terminate us. That is what the injunction is for.

NL

12:08
Nathan LaRue
In regards to the injunction I'm thinking in an article that the UTB employees had to pay a $5000 bond back around Oct 18 is that something that we may face.

T

12:11
Take This Jab and Shove It Chat
In reply to this message
I honestly don't know. I would have to see it and what it pertained to and even then this would ultimately be a question for Jesse.

NL

12:12
Nathan LaRue
I understand

T

12:14
Take This Jab and Shove It Chat
Now and throughout this process, the best thing all of us can do is pray. Prayer changes thing. Pray for your family, pray for each other, pray for our country and pray for our world.

TA

20:22
Tammy Adams
That is crazy! I will see what I can find out, I know a few people that work there

20:24
Deleted Account
I can see how DoE with OSHA could try it...because OSHA is calling it an issue of workplace safety from airborne contaminant, and we know that the vax doesn't prevent you from being a carrier, that they could say that anyone you come in contact with at home has to be vaxxed as well so that YOU don't bring it to work.

T

20:32
Take This Jab and Shove It Chat
They will go to any lengths to get folks to take this "jab" .... take this for example:

https://nypost.com/2021/11/09/brothel-offers-vaccinations-and-free-sexual-session-in-bold-incentive-program/
20:34
the only good thing about this is it's not here in our country but still made the New York Post .... why even print an article like that. We are in bizarro world for sure.

T

20:49
Take This Jab and Shove It Chat
https://www.washingtonpost.com/archive/politics/2001/08/30/suit-accuses-pfizer-of-rights-violations/a11b32b2-8044-4bc6-b299-df1270ecda88/
20:50
Older article but this speaks to the fact that they have no moral compass.

LP

20:51
Ladeana Phillips
It's never going to end. Booster after Booster, if you live with someone that's not vaccinated and so on and so on. They make it up as they go to pressure everyone under all circumstances.

JL

20:52
JD Livingston
In reply to this message
You are correct.

T

20:53
Take This Jab and Shove It Chat
In reply to this message
It won't end until people remember to stand on what is morally right and say no.

155

Laura Williams
In reply to this message
So can't do it on line?

TA

11:19
Tammy Adams
I'm not sure. I had read that you do it over the phone but the lady that does it is off on Friday. I'm hoping she calls Monday so I don't have to go there

DW

11:19
Darrell Wallace
Thank for update

TA

11:26
Tammy Adams
Malena, can you add Ramona Cooper? She just messaged me. I didn't know she had gotten fired. She applied for both and got turned down for both. She downloaded telegram

DC

11:44
Dawn Casselton



11:44
I really want to say yes to this

KW

11:45
Kevin Webster
I mean, Biden's presidency is a major disaster...
11:46
I think it means things like hurricanes though.

RF

12:10
Ryan Frenchman
Grave danger

12:31
Deleted Account
Is there any other kind?

DC

13:22
Dawn Casselton
Anyone else file online yet?
13:24



13:25
I was denied for performing customary duties in my spare time? For a potential customer of my employer.
13:25
Not denied, discharged.

TA

13:29
Tammy Adams
What? That's crazy

RF

13:30
Ryan Frenchman
I wonder if Jesse would like to see that haha.

DC

163

13:37
Dawn Casselton
I sent it already to them.

T

14:22
Take This Jab and Shove It Chat
In reply to <u>this message</u>
Yes ... if I don't have her number I will need it in order to add her though. You can DM or text it to me and I will add her.
14:22
or give her my number and she can text it to me .... whichever you like.

KW

14:32
Kevin Webster
They hadn't put any reason for my discharge in on my paperwork or the unemployment site.

TA

14:39
Tammy Adams
Thanks Malena. I will get it to you. She downloaded the app, can you invite her that way?

DC

15:19
Dawn Casselton
In reply to <u>this message</u>
Did you work for UCOR or one of the other subs? My separation notice directly from UCOR only had VQ-381.
It looks like unemployment pulled the discharge info from UCOR because they also had a complete breakdown of my quarterly earnings up until my termination date.
15:23
I felt like a horrible person filing the unemployment online and having to admit that I violated company policy it made me feel like I was a bad worker. But believe me anywhere I could write that they terminated me because they denied my religious exemption request and they would not accommodate me I let them know. And that I did not work anywhere or for anyone else.

KW

15:26
Kevin Webster
In reply to <u>this message</u>
Yeah, I was an electrical supervisor for UCOR. I worked around your husband some. We met at the lunch meeting. I likewise wrote how they denied my religious exemption everywhere.

KB

15:27
Kurt Bargiel
We actually didn't violate the policy, they violated the law by denying the accommodations that were allowed in their own policy. But that's just my opinion and you see where that got me.

T

164

T

20:21
Take This Jab and Shove It Chat
In reply to this message
Me too Nathan. We are not alone. It is stressful but I would do the same thing again without hesitation.

RF

20:23
Ryan Frenchman
Looks like Y12 has the opportunity to hire some great people that just recently became available lol

KW

20:46
Kevin Webster
https://share.newsbreak.com/5qouagem

From the article:
"Several of the nation's largest labor unions are suing over President Joe Biden's vaccine and testing requirements, not to overturn them, but to expand them to cover more businesses."

Seriously?
20:48
Just in case anyone still had question as to wether your unions were really for your rights.

BQ

20:50
Brandon Quindry
I just might leave the 818 if they are with this.

KW

20:51
Kevin Webster
I'm very tempted to be done with the IBEW and ATLC as well.


20:54
Deleted Account
From the article:

"We believe that we all have to do our part to help our communities return to normal and that the COVID vaccine or test mandate should be broader in scope to also apply to employers with less than 100 employees," Bragg said. "An exemption for these employers undermines the effort to protect public health."

Let me fix that for Mr. Bragg...

"An exemption for these small employers undermines the union bosses who need workers to pay dues. If those workers go to small non-union employers, then all of us bosses lose that revenue stream and can't take the summer vacations to Cabo or Jamaica."

There ya go...fixed it.

KW

20:55
Kevin Webster
Nice edit!

BQ

20:55
Brandon Quindry
Like i told everyone I worked with at ORNL i went 20 years without the union just fine and I can do it again. There's always a way to make money

T

20:55
Take This Jab and Shove It Chat
In reply to this message
I'm not surprised. The biggest unions are far left. If you follow the money you will find that these unions donate heavily to the organizations that are promoting the assault on your Constitutional rights.

LW

21:12
Laura Williams
I believe Y12 RPTs are Union.

TA

21:13
Tammy Adams
They are. ATLC but got a better deal than we did

B

21:47
Barbara
In reply to this message
So true!

KB

21:49
Kurt Bargiel
Texas vs. Biden and the Federal Contractor Mandate, highlights by the source.
21:49
47656_po7nwd9t7rcgfvs_TX_AG_Vaccine_Mandate_TRO_(1).pdf
634.9 KB

TA

22:34

21:34
Kurt ... don't make me come over there with your killjoy attitude lol!!

KB

21:48
Kurt Bargiel
In reply to this message
Dang it, I was going to respond again to Barbara saying that the injunction smack down was much more than a glimmer!
Dennis, lawsuits against the federal worker and contractor mandates have already been filed, I think I posted one here the other day.

DC

22:16
Dawn Casselton
https://www.google.com/amp/s/www.foxnews.com/politics/federal-contractor-vaccine-mandate-james-comer.amp
19 November 2021

JL

12:21
JD Livingston
In reply to this message
Adding to that, if anyone thinks they are going to quit or give up on their elections tactics, you are safely mistaken. They have worked to hard at their scheme to just give it up. They will cheat and steal until they have complete control.

TA

12:34
Tammy Adams
Truth

RF

14:08
Ryan Frenchman
Here comes the riots.

TA

14:10
Tammy Adams
Funny thing that no blacks were involved but BLM is there! And one of them was a pedophile. I think the truth prevailed in this whole thing.

T

14:36
Take This Jab and Shove It Chat
In reply to this message
I wonder how many are making out their Christmas lists. You know that pair of shoes equates to justice.

TA

15:07

195

Tammy Adams
https://www.newsbreakapp.com/n/0d18bnBd?pd=0174yuTE&lang=en_US&s=i0 .

RF

15:07
Ryan Frenchman
Lol.
15:11
Hey, I know your probably sick of me bugging you all, but No Vax Required, looking for RPTs in Mobile AL. Long term $38/hr and 151/day UNTAXED Diem. No receipts required.

T

15:30
Take This Jab and Shove It Chat
In reply to this message
You're not bugging anyone. I appreciate you letting all of us know of opportunities that are out there.

LW

16:27
Laura Williams
In reply to this message
When does the job start and end? OT?

RF

16:37
Ryan Frenchman
Looks like they work 5x10s. There will be other positions hopefully in January and it should be at least another year long.

LW

16:41
Laura Williams

16:54
In reply to this message
Sorry couple more questions. Is the work at a power plant? Any test to study for?

RF

17:18
Ryan Frenchman
Not power plant work no test. Decommissioning a Barge that has some mild contamination

LW

19:46
Laura Williams
Cool! Thank you!

196

You mean "rare breakthrough infections "? 😳

RF

18:19
Ryan Frenchman
Yes my bad.

TA

18:21
Tammy Adams
If you think about it, this could be Gods way of protecting us since the vaccinated are the ones getting sick and spreading the virus 😳

T

18:23
Take This Jab and Shove It Chat
Don't Trust Their Science

Hello COVID, we're not friends
Your variants will never end
You've come back as Delta and Omicron
Winter's coming and it's game on
I'm freaking sick of what fake news is showing
They are lame
They need us to trust the science

The commies need to leave this place
I want them all out of my face
They all run when I talk about
The stolen election really freaks them out
They're working hard on the great reset to get back in line
So little time
They need us to trust the science

Like will they try to force the jab
Will we be banned from taxi cabs
People lining up for the juice
People pushing for masks and boosts
People need to hold the line and grow a pair
If they dare
You can shove your science

We have to take it all back
Work hard to make an impact
We have to stand for our nation
Just say no to their oppression
But we're all just waiting for that tweet …On the edge of my seat
And ignore their science

260

As a country we all prayed
Make Biden Joe go away
Take Kamala with you too
The CDC and The Who
And the sign said, the words Let's Go Brandon was written on the subway wall
Hear them call
FJB don't trust his science

RF

18:23
Ryan Frenchman
My fear is that they are actually giving the sheep the vaccine for a real disease they will release in a few years that kills the free thinking group. And now they have zero resistance.

TA

18:27
Tammy Adams
I truly believe the rapture is going to happen soon and we won't have to worry about it. Just watch what's going on across seas

KB

18:27
Kurt Bargiel
In reply to this message
That could be, but their plan was flawed in that their release this time was too weak of an actual threat so they have instead created the optimal conditions for the greatest pushback.

T

18:32
Take This Jab and Shove It Chat
In reply to this message
I had a good chuckle … thought I would share 

DC

21:01
David Casselton
My buddy Contacted me tonight and told me that watts bar Needs senior techs badly 48 an hour for a fully Qualified senior per nuke plant Qualifications. No shot required. Call Bartlett nuclear aka BHI energy.
21:02
For a Steam generator replacement. Should be several months of work

KB

21:06
Kurt Bargiel
That's awesome Dave, thanks.

DC

21:06

261

SS

05:48
Steve Scavone
Morning Amanda. Was the message from the CNS CEO and COO a widely distributed message that can be accessed from outside of CNS? It references the Office of Management and Budget as well as the Safer Federal Workforce Task Force but, I can find anything that supports their statement on either as it relates to mandate suspension.

LW

15:56
Laura Williams

L

Liberty Overwatch 13.12.2021 15:54:48
**US Supreme Court Refuses to Halt NY Vax Mandate for Healthcare Workers**

Via @disclosetv

"JUST IN - U.S. Supreme Court **declines to block New York vaccine mandate** for health care workers. The mandate does not allow religious exemptions.

This is the first landmark decision regarding compulsory vaccinations in the United States by SCOTUS.

Only 3 dissents were Alito, Gorsuch, and Thomas. Roberts, Barrett, and Kavanaugh sided with the liberals.

Now, thousands of New York healthcare workers face the loss of their jobs and eligibility for unemployment benefits."

- https://t.me/disclosetv/6019

First page of Gorsuch's dissent:

https://twitter.com/kimberlyrobinsn/status/1470481049977303045?s=12

RC

16:12
Ramona Cooper
This is so sad!! 😢

LW

16:16
Laura Williams
It sure is. When we think there is no way this craziness can continue, they show us it can.

RC

278

16:17
Ramona Cooper
Yes and the world is getting much worse!

T

16:36
Take This Jab and Shove It Chat
The world has been this way for a long time, they just weren't so in your face with it.

RF

16:41
Ryan Frenchman
Can you imagine if Americans were unarmed how quickly they would force everyone?

TA

16:45
Tammy Adams
In reply to [this message](#)
Truth

T

16:45
Take This Jab and Shove It Chat
In reply to [this message](#)
Without our 2nd Amendment we would be Australia or Austria. They are still working on it though. Non-stop.

RC

16:48
Ramona Cooper
I pray all the time! I think this is the scariest times I've seen! I stay scared and don't want to go no where!!

T

16:51
Take This Jab and Shove It Chat
In reply to [this message](#)
Do not fear is referenced in the Bible
365 times. If God is with you, who can come against you. Take your power back, the evil of this world has no power over you except what you allow.

TA

16:52
Tammy Adams
Amen

279

T

09:18
Take This Jab and Shove It Chat
In reply to this message
We have to keep moving forward and be positive! It's hard some days I know but we also knew going in that this was going to be a LONG drawn out process.
09:19
In reply to this message
Will keep you in prayers 
3 August 2022

KW

06:26
Kevin Webster
Here is some thought provoking activity for the day. At y12's UPF project the unvaccinated have to be tested for Covid weekly. Everyone has to wear a mask indoors. Vaccinated people who are "exposed" can choose to quarantine if they want, non-vaccinated must quarantine for 3 days, and Covid positive people have to quarantine for 5 days.

Vaccinated people spread it just as easily though?

K

06:30
Karen
Lol, what a mess. And Biden had the vax and boosters and had or still has his second bout of Covid. All of it is nonsensical.

KW

06:35
Kevin Webster
In reply to this message
Absolutely. It's very discriminatory on my mind and absolutely all about coercion and control.

K

06:47
Karen
In reply to this message
Yes sir! I'm disgusted with the whole deal. But I won't back down!

T

06:51
Take This Jab and Shove It Chat
In reply to this message
It's extremely controversial. I have to be tested weekly. I tell them every week that I am being punished for not taking the vaccine because that is exactly what it feels like. I told her if you can catch it, you can spread it so if it is that big of a concern they should be testing all or none. It's very stressful. Not only that I have

414

to drive all the way to Hardin Valley in traffic to get there before they close. I have to suck up the gas cost and I don't get paid for my time. So yeah, very frustrating.

RF

07:57
Ryan Frenchman
You know your doing Christianity right when it inconveniences this life.

KW

08:47
Kevin Webster
In reply to this message
Yeah, the form they want you to sign says "I hereby voluntarily..." I always line out the voluntarily part and insert "under threat of disciplinary action" at least be honest about what you are forcing people.

AM

10:39
Amanda McCann
In reply to this message
Line it out and write "as directed by CNS management"

Also, I recently read a study from the UK stating vaccinated ppl are more likely to spread the virus.
There's apparently some belief that the naturally immune or those of us unjabbed who have had Covid, don't harbor the virus.

KW

11:14
Kevin Webster
In reply to this message
That's good wording. I'll add that to my weekly modification.

I don't think I know any unvaccinated person that has had it in the last six months or at least if they did they were asymptomatic.

LW

16:25
Laura Williams
https://www.washingtonexaminer.com/opinion/people-lost-their-jobs-over-vaccines-that-dr-birx-said-she-knew-didnt-work

KW

16:30
Kevin Webster
"Personally, I am vaccinated and boosted. I did it not because I am considered in one of the at-risk categories for COVID but because I was told the vaccines would prevent me from unintentionally spreading it to other people, including my parents, who are in the at-risk categories, should I contract it. Unfortunately, I still contracted COVID and still spread it to my mother. If I had known what Birx said she knew, I can safely say I would have never

chosen to get vaccinated."

^ this right here. How many people say the same thing?
16:31
Oh, and this

"The people should demand accountability for these transgressions. Birx's stunning admission warrants more outrage and media scrutiny than it has received in the past week. Otherwise, why should anyone trust anything the government says ever again, especially during a national emergency?"

TA

17:09
Tammy Adams
Truth. We have a lot of vaccinated and boosted that have it at y12 right now

K

20:59
Karen
I'm unvaccinated and had COVID, my Mom is in the "at risk" catagory but she chose to take the vaccine as well as the boosters. Am I at risk or is she. Can I pass it to her or she to me? It felt like a bad case of flu to me other than losing my smell and taste. Are the elderly not at higher risk when getting flu or pneumonia? COVID is the same
4 August 2022

AM

20:17
Amanda McCann
Accountability.
Can we pursue restitution from the FDA? "Dr" Fauci? Sec if Energy?
Any or all of the above?
18 August 2022

SD

18:07
Sara Davis
Any word about our lawsuit?

DC

19:23
David Casselton
Following. For information too.

TA

20:19
Tammy Adams

416

Me too

DW

20:24
Darrell Wallace
Nov 1 will be a year we need to know something I know it take time

T

20:42

🙏🙏

TA

20:56
Tammy Adams
In reply to this message
Thanks Malena

T

20:59
Take This Jab and Shove It Chat
In reply to this message
You're welcome! Trust me, I would love to come in here and give you guys a big update of fantastic news. Hopefully, one day in the near future I will get to do that. I'll see what I can do for you guys.

SD

21:56
Sara Davis
Should we run another pr campaign and start asking for more money?? The first rum was very effective and I think sentiment is good right now to aid wronged workers...
22:07
By that I mean just recycle our original message to friends and family from the money website
22:09
Or contact the Liberty Council...
20 August 2022

KW

18:19
Kevin Webster

417

| | |
|---|---|
| **From:** | Rueter, Kenneth J (KR1) [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=1F3A8B2CAD51449A8A171F857E4717AB-KR1] |
| **Sent:** | 10/25/2021 8:26:51 AM |
| **To:** | Fortenberry, Kent (JF4) [kent.fortenberry@orcc.doe.gov]; Anderson, Scott A. (SA2) [scott.anderson@orcc.doe.gov]; Saunders, Ashley H (AH1) [ashley.saunders@orcc.doe.gov]; Dahlgren, Steve T (ZSR) [steve.dahlgren@orcc.doe.gov]; Aylor, Joseph S. (JAB) [joseph.aylor@orcc.doe.gov]; Wolfley, Clinton T (CW3) [clinton.wolfley@orcc.doe.gov]; Malarkey, Charles J (CM9) [charles.malarkey@orcc.doe.gov]; Kendrick, Bryan (DRK) [bryan.kendrick@orcc.doe.gov]; Atkinson, Bobby W (BA2) [bobby.atkinson@orcc.doe.gov]; Jarrell, Roger A (RJ2) [roger.jarrell@orcc.doe.gov] |
| **Subject:** | OSHA COVID Fatality Enforcement - Failure to Protect against a life safety hazard |

Kent, Scott, Ashley, Steve, Joe, Clint, Charlie, Bryan, Bobby, and Roger

FYSA - First OSHA Civil enforcement for COVID work place fatality - wrongful death. We are tracking this progressions through OSHA office of enforcement. Let's hope it does not progress further to any criminal actions

It is unclear how DOE under 851CFR will align to this 1904CFR COVID action

https://journaltimes.com/news/local/racine-county-company-fined-by-osha-after-worker-dies-from-covid/article_5a705c85-4c0a-56e5-8a42-e589d14192ce.amp.html

https://www.osha.gov/news/newsreleases/region5/10212021

Failure to provide effective/protective measures and ensuring they are followed is the principle non-compliance. Another vivid reminder of our general duty responsibilities as prescribed under our COVID SO and Federal Vaccine Mandate

Ken

CONFIDENTIAL - Speer001239

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE

CARLTON SPEER, MALENA DAVIS,　　　　)
and ZACHARIAH DUNCAN,　　　　　　　　)
　　　　　　　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　　)
　　　　　　　　Plaintiffs,　　　　　　　　)
　　　　　　　　　　　　　　　　　　　　)
v.　　　　　　　　　　　　　　　　　　　)　　　　No.: 3:22-cv-00426
　　　　　　　　　　　　　　　　　　　　)
UCOR LLC　　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　　)
　　　　　　　　Defendant.　　　　　　　　)
　　　　　　　　　　　　　　　　　　　　)

---

## DEFENDANT'S REPONSE TO PLAINTIFFS' FIRST SET OF INTERROGATORIES TO DEFENDANT

---

Defendant UCOR, LLC ("UCOR") makes the following answers, responses and objections to Plaintiffs' First Set of Interrogatories. Each of the following responses is made subject to any and all objections as to competence, relevance or other grounds that would require exclusion of such statement if made by a witness present and testifying in court. Any and all such objections and grounds are expressly reserved and may be interposed at the time of the trial. To the extent any such answer contains or refers to matters otherwise protected from discovery by the work product doctrine or the attorney-client privilege, no waiver is intended; nor is any waiver intended as to any other matters which are or may be subject to such protection or are otherwise privileged.

Except for the explicit facts stated therein, no incidental or implied admissions are intended. The fact that Defendant has answered any Interrogatory or part thereof is not an

1

admission or acceptance by Defendant of the existence of any facts set forth or assumed by such Interrogatory.

Defendant has not fully completed discovery or preparation for trial in this action. The responses herein and any documents produced are based only upon information presently available to Defendant and are given in a good faith effort to comply with Plaintiffs' requests. It is anticipated that further discovery, independent investigation, legal research and analysis may supply additional documents, add meaning to known documents, and/or establish entirely new factual conclusions and legal contentions with respect to documents currently in the possession or under the control of Defendant. The following responses, therefore, are given without prejudice to Defendant's rights to produce pursuant to the Federal Rules of Civil Procedures any documents which may subsequently be discovered or determined to be relevant to the subject matter of this action. They should not be construed as prejudicing or in any way limiting Defendant with respect to further discovery, research, analysis or proof.

Defendant generally asserts the attorney-client and work product privileges as to any and all relevant documents which may exist and which are subject to these privileges.

Defendant generally objects to Plaintiffs' interrogatories as seeking information that is confidential, classified and/or subject to U.S. export control regulations to protect national security interests. Defendant will produce responsive documents subject to the parties' agreed protective order.

Defendant generally objects to Plaintiffs' interrogatories to the extent they seek information regarding a putative class. The Court has denied Plaintiffs' motion for class certification.

2

These responses and all documents produced pursuant hereto are solely for the purpose of and in relation to this action. Each response and document produced is given subject to all appropriate objections which would require the exclusion of any document in any proceeding. All such potential objections and grounds therefore are reserved and may be interposed at such proceeding.

## **INTERROGATORIES**

1.     Please identify all persons with actual or potential knowledge of the facts or issues you believe to be relevant to this lawsuit, and for each such person, briefly describe the fact(s) or issue(s) about which he or she is believed to have information. If you assert that any such person may not be contacted except through Defendant's counsel, please explain the basis for such assertion.

**ANSWER:** Defendant objects to this Interrogatory as overly broad, unduly burdensome, and not proportional to the needs of this case to the extent it seeks to have Defendant identify every person who has any actual or potential knowledge, including a scintilla of second-hand knowledge of facts or issues related to Plaintiffs' claims. Subject to and as limited by this objection, Defendant refers Plaintiffs to individuals identified in Defendant's Rule 26 disclosures. As for Plaintiffs' separate interrogatory sub-part seeking an explanation for why any individuals should be contacted through Defendant's counsel, Defendant refers Plaintiffs and their counsel to Tennessee Rule of Professional Conduct 4.2 and the Comments thereto.

2.     Please state each named Plaintiff's rate of pay as of the last date he/she worked for Defendant in his/her regular job, and give the monetary value of the benefits to which he/she was then entitled or, barring unforeseen circumstances, would have been entitled to receive in the subsequent twelve months, including pay raises. For each benefit described, please delineate the

3

amount each party paid for the benefit. (*Note: for purposes of this interrogatory, the word "benefits" means those perks, advantages, monies, and entitlements that are separate from hourly wages, such as health/dental/vision/life/disability insurance, 401k, profit-sharing, paid vacation, sick days, cash bonuses, gifts, awards, gas cards, company car, company-paid cell phone, company-furnished laptop, travel discounts, etc.).

**ANSWER:** Defendant objects to this Interrogatory to the extent it seeks information regarding benefits to which Plaintiffs were "entitled" as opposed to those benefits in which Plaintiffs participated as seeking information that is overly broad and not relevant to the subject matter of Plaintiffs' claims. Defendant also objects to this Interrogatory to the extent it seeks to have Defendant create information that may not exist as to the monetary value attributable to any particular employee of any particular fringe benefit. With regard to future pay and benefits, the question calls for speculation. Subject to and as limited by these objections, in general, ATLC fringe benefits are worth 27.21% and the 401K benefit is worth 6.45%.

- Speer: $42.24 per hour.
- Dennis: $37.38 per hour.
- Duncan: $20 per hour.

3. Please identify and describe any written or recorded statement(s) of any person with knowledge of the facts at issue in this case which are in the possession of Defendant or anyone acting on behalf of Defendant, including the identity of the person giving and taking the statement, the date the statement was given and/or taken, and the substance of the statement.

**ANSWER:** This interrogatory asks Defendant to identify any statement (regardless of the subject matter of the statement) made by a person who also has knowledge of the facts at issue in this case. The interrogatory, as drafted, is not limited to statements setting forth information

4

regarding the facts in this case. Defendant objects to this request as overly broad on this basis. Subject to and as limited by this objection (and assuming that Plaintiffs intended to request information as to statements about the facts at issue in this case), Defendant states as follows:

- Declaration of Carlton Speer dated October 28, 2021
- Declaration of Malena Dennis dated October 28, 2021
- Declaration of Malena Dennis dated October 29, 2021
- Declaration of Zachariah Duncan dated October 28, 2021
- Declaration of Zachariah Duncan dated November 10, 2021
- Declarations of Charles Malarkey (11/16/21) and Clinton Wolfley (11/16/21) filed with the Court in Case No. 2:21-cv-368
- Declaration of Laura Williams dated November 24, 2021
- Transcript of deposition of Carlton Speer
- Transcript of deposition of Malena Dennis
- Transcript of deposition of Zachariah Duncan

Although not directly related to Plaintiffs' claims, Defendant also identifies the following:

- Declaration of Ryan LaRochelle dated November 10, 2021
- Declaration of Cynthia Ogle dated November 10, 2021
- Declaration of David Casselton dated November 10, 2021
- Declaration of Dawn Casselton dated November 10, 2021
- Transcript of deposition of Yolanda Riggs taken in *Riggs v. UCOR*

4.     For the duration of each named Plaintiff's employment, please describe in detail his/her duties. If those duties changed over time, please separate your answer into relevant periods and provide a detailed explanation of the job duties for each period. (Your answer should not include a blanket reference to a written job description unless such job description is narrowly tailored to the tasks such Plaintiff actually performed regularly).

**ANSWER:** Defendant objects to this request as overly broad and not seeking information that is proportional to the needs of this case to the extent it seeks information regarding job duties Plaintiffs may have performed in any time period prior to the events in this litigation. Subject to and as limited by these objections, Defendant states that generally each Plaintiff's job duties at the time of their separation from employment included:

5

- Speer: Special Lead Rad Tech XA (Instrument Tech). Speer worked on maintaining and calibrating more sophisticated equipment.
- Dennis: SR RAD Tech XA (Instrument Tech). Dennis managed the air samples, including the count room equipment and database entries.
- Duncan: Building Service Worker (Materials Clerk). Duncan drove a box truck/flat bed/fork lift and delivered materials on site where they were needed.

Defendant will, pursuant to Rule 33(d), produce records from which additional information responsive to this request may be ascertained or derived.

5.     Please identify each person, including such person's job title and contact information, who decided, provided meaningful input regarding, or who was otherwise involved in the decision to terminate those persons who remained unvaccinated against COVID-19 beyond the deadline set by Defendant.

**ANSWER:** Defendant objects to this request to the extent it seeks information regarding individuals other than the named Plaintiffs. Defendant further objects to this interrogatory to the extent it seeks information protected from disclosure by the attorney/client privilege and attorney work product doctrine. Defendant's legal counsel provided "meaningful input" in the form of legal advice with regard to the termination of Plaintiffs. Defendant also objects to providing contact information for current management employees of Defendant. Such individuals may be contacted through counsel for Defendant. Subject to and without waiving these objections, People who were involved in the COVID-19 vaccination policy and/or exemption request process that ultimately led to the termination of Plaintiffs' employment for refusing to receive the vaccine include:

Roger Jarrell: General Counsel.
Alexander Nicoll: Associate General Counsel.
Dacey Cockrill: Associate General Counsel.
Len Morgan: Labor Relations.
Ray Parrish: Labor Relations and Management.
Mary Alice Douglass: Human Resources.

6

Ken Rueter: Chief Executive Officer.
Charles Malarkey: Administrative Services Manager.
Clint Wolfley: Safety Systems and Services Manager.
Vanessa Holsomback: Human Resources.
Walter Czakaj: Environmental Health and Safety.
Rodney Kingrea: Industrial Hygiene.
Ed Dietrich: Safeguards, Security & Emergency Services Manager.

6.     Please identify each person who, since November 1, 2020, was responsible for evaluating, offering meaningful input, or making decisions about vaccination waivers (both in terms of the policies and procedures that would apply to your consideration of waiver requests, as well as actually acting upon employee requests for waivers) for employees, staff augmentation personnel, and/or independent contractors working on Defendant's behalf.

ANSWER: Defendant objects to this request as overly broad and not proportional to the needs of this litigation to the extent it seeks information regarding individuals other than the named Plaintiffs, such as staff augmentation personnel and independent contractors. Defendant further objects to this interrogatory to the extent it seeks information protected from disclosure by the attorney/client privilege and attorney work product doctrine. Defendant's legal counsel provided "meaningful input" in the form of legal advice with regard to the vaccine exemption process. Defendant also objects to providing contact information for current management employees of Defendant. Such individuals may be contacted through counsel for Defendant. Subject to and without waiving these objections, Defendant refers Plaintiffs to Defendant's response to Interrogatory No. 5.

7.     Please identify and describe all communications to, from, between, or involving any of the named Plaintiffs and any supervisor, human resources employee, or management-level employees of Defendant regarding COVID-19 vaccinations, exemptions therefrom, and/or any

7

issues relevant to this litigation from March 1, 2020, through today.

**ANSWER:** Defendant objects to this interrogatory as overly broad as to its temporal scope. Defendant further objects to this request as it would be unduly burdensome to require Defendant to canvas all of its employees to determine if any employee has been involved in any communication with any named Plaintiff regarding any issues related to this litigation. Subject to and without waiver of the foregoing objections, Defendant will, pursuant to Rule 33(d), produce documents related to communications to/from Defendant's Human Resources Department and/or Accommodations Review Committee to/from the named Plaintiffs from which information responsive to this interrogatory may be ascertained or derived.

8.      Please identify and describe all additions/deletions, revisions, and updates to Defendant's vaccination policy from November 1, 2020, to today.

**ANSWER:** Defendant objects to this request as overly broad in temporal scope. Defendant objects to this request to the extent it seeks information protected from disclosure by the attorney/client privilege and the work product doctrine. Subject to and without waiving this objection, Defendant will, pursuant to Rule 33(d), produce documents from which information responsive to this interrogatory may be ascertained or derived.

9.      Please describe the current status of Defendant's vaccine policy, including whether a mandate is still in place, and if not, please describe the process involved in making the decision to repeal the mandate, the date the mandate was repealed, the person(s) involved in making such decision, and the facts and data relied upon.

**ANSWER:** Defendant ceased management of the DOE Oak Ridge cleanup operations on May 23, 2022. As such, there is no "current" status of Defendant's vaccine policy.

10.     For each named plaintiff, please describe each precaution you used at any time from

8

March 2020 through September 1, 2021 to mitigate his or her risk of contracting and/or spreading COVID-19, and for each such precaution, please describe the cost and burden your business suffered because of the precaution.

**ANSWER**: During the pandemic, UCOR utilized a multi-faceted approach to protect employee safety and health. UCOR reduced the work it was performing. It also adjusted schedules to minimize the number of people that were on site. UCOR required masks and social distancing for those on site, along with reporting and testing of any suspected COVID exposures or infections. Finally, UCOR encouraged employees to receive the COVID-19 vaccination. These measures resulted in a reduction of work performed, extra cost of PPE and testing, and lost time. Pursuant to Rule 33(d), Defendant will produce documents, including Defendant's Standing Order COVID-19 Enhanced Mission Ready Requirements, from which additional information responsive to this interrogatory may be ascertained or derived.

11.   If Defendant has repealed its vaccine mandate, please identify and describe as specifically as possible the costs and burdens involved in protecting Defendant's workforce from COVID-19 since the date of your repeal.

**ANSWER:** Defendant objects to this interrogatory as seeking information that is not relevant to the claims or defenses of any party and is overly broad as to its temporal scope. This interrogatory seeks to compare steps Defendant took to protect its workforce during a pandemic with current circumstances beyond the end of the pandemic. Subject to and without waiving these objections, Defendant ceased management of the DOE Oak Ridge cleanup operations on May 23, 2022.

12.   Besides the vaccine mandate, please identify each precaution, policy, practice, device, PPE, technology, and the like, that you implemented, required, or began using since March

9

2020 to prevent the spread of COVID-19 and which is still used, in effect, or required today.

      **ANSWER**: Defendant ceased management of the DOE Oak Ridge cleanup operations on May 23, 2022. As such it does not have policies, precautions or practices in place today. During the pandemic, UCOR utilized a multi-faceted approach to protect employee safety and health. UCOR reduced the work it was performing. It also adjusted schedules to minimize the number of people that were on site. UCOR required masks and social distancing for those on site, along with reporting and testing of any suspected COVID exposures or infections. Finally, UCOR encouraged employees to receive the COVID-19 vaccination. Pursuant to Rule 33(d), Defendant will produce documents, including Defendant's Standing Order COVID-19 Enhanced Mission Ready Requirements, from which additional information responsive to this interrogatory may be ascertained or derived.

      13.    Please identify each employee, staff augmentation personnel, and subcontracted employee (including such person's job title, employer's name, and contact information) who requested an exemption from Defendant's COVID-19 vaccine mandate for a reason other than religion and was granted such exemption.

      **ANSWER:** Defendant objects to this request as seeking information that is not relevant to the claims or defenses of any party, not proportional to the needs of this case and as seeking private, confidential information about non-parties.

      14.    For each person listed in response to the previous interrogatory, please identify and describe the accommodation(s) provided and the costs and burdens (including financial and logistical costs and burdens) attributable to the accommodation(s).

      **ANSWER:** Defendant objects to this request as seeking information that is not relevant to the claims or defenses of any party, not proportional to the needs of this case and as seeking private,

<div align="center">10</div>

confidential information about non-parties. The standards for evaluating undue burden are not the same for religious and disability accommodations.

15. If you contend that providing any of the Plaintiffs an accommodation for their religious objection to the vaccine would have imposed an undue hardship upon the conduct of Defendant's business, please identify and describe the basis for the contention, including supporting facts, documents, and witnesses.

**ANSWER:** Defendant directs Plaintiff to the declaration of Charles Malarkey and exhibits thereto, including Exhibit 15 for information responsive to this interrogatory.

16. Please identify each person who concluded that each accommodation considered in response to the respective Plaintiff's request to remain unvaccinated posed an undue hardship on Defendant.

**ANSWER:** The Accommodation Review Committee was primarily involved in the accommodation review process for each named Plaintiff. The Committee included:

Len Morgan: Labor Relations and Management.
Mary Alice Douglass: Human Resources.
Vanessa Holsomback: Human Resources.
Ray Parrish: Labor Relations
Charles Malarkey: Administrative Services Manager.

Roger Jarrell (General Counsel) and Clint Wolfley (Safety Systems & Services Manager) also provided advice and input regarding the accommodation review process.

17. For the person(s) identified in the previous interrogatory, please describe how he/she applied the de minimis and/or undue hardship test to the respective Plaintiff's requested accommodation(s), including each metric, datapoint, factor, expense, budget line item, and similar

11

consideration to which the de minimis and/or undue hardship test was applied.

   **ANSWER**: The people above relied on the matrix created by Charlie Malarkey and used it to guide the discussion about the possible accommodations and their impact. They also assessed how the potential accommodations would have affect each person's workgroup. Finally, they also considered the aggregate impact on the business.

   18.    Please identify each person who made a decision or had meaningful input into deciding whether an employee's religious belief(s) was sincerely held for purposes of potentially accommodating the employee, and identify each factor he/she considered in making or offering input into such a decision.

   **ANSWER**: At the accommodation review stage, Defendant accepted without question that each employee's asserted religious beliefs were sincerely held.

   19.    If you contend that providing an accommodation for those who sought exemption from Defendant's vaccine mandate based on their religious beliefs would pose a greater hardship than accommodating those who sought an exemption on the basis of a disability, please identify and describe the basis for that contention, including supporting facts, documents, and witnesses.

   **ANSWER:** Defendant objects to this interrogatory as seeking information that is not relevant to the claims or defenses of any party. This interrogatory also misconstrues the applicable legal standards. Under the law in effect at the time of the consideration of Plaintiffs' accommodation requests (and currently), the threshold for what constitutes an undue hardship as to religious accommodation requests is less than the threshold for undue hardship as to accommodation requests for disabilities, not greater.

   20.    To the extent not already answered, please identify and describe the costs associated with each accommodation requested by each named Plaintiff, including a description of the

manner and method used by Defendant to calculate such cost.

**ANSWER:** Defendant objects to this request as vague. Subject to this objection, Defendant states that financial costs were considered in conjunction with the effect on business operations, employee morale and the risk to the health and safety of Defendant's workforce. In further answer to this interrogatory, Defendant directs Plaintiffs to the Declaration of Charles Malarkey and the exhibits thereto as well as the Declaration of Clinton Wolfley.

21.     From January 1, 2019, though today, please state Defendant's annual operating cost, annual revenue, annual profit or loss, and (approximate) number of employees.

**ANSWER:** Defendant objects to this request as not seeking information relevant to the subject matter of the claims or defenses of any party, nor proportional to the needs of the case and overly broad as to the temporal scope. Moreover, even limited information related to Defendant's net worth is not subject to being produced until Plaintiffs have shown a reasonable likelihood that they may be entitled to an award of punitive damages against Defendant. Subject to and as limited by these objections and upon the Court's entry of the parties' proposed protective order, Defendant will provide information as to its operating costs during 2020 and 2021 and its average number of employees during that time frame.

22.     Please identify each employee, staff augmentation personnel, and subcontracted employee, including each such person's contact information (address, email address, and phone number) who was terminated from his or her employment or otherwise not allowed to perform work on Defendant's behalf because of his or her violation of Defendant's vaccine policy for the stated reason of his or her religious-based objection to receiving the vaccine.

**ANSWER:** Defendant objects to this interrogatory as seeking information that is not relevant to the claims or defenses of any party, is not proportional to the needs of this case and

13

seeks private confidential information of non-parties. The Court has denied Plaintiffs' motion for class certification.

RESPECTFULLY SUBMITTED,

*/s/ William S. Rutchow*
William S. Rutchow
Darrius Walker, Jr.
401 Commerce Street, Suite 1200
Nashville, TN 37219
William.rutchow@ogletree.com
Darrius.walker@ogletree.com

Luci L. Nelson
300 North Main St., Suite 500
Greenville, SC 29601
luci.nelson@ogletree.com

## CERTIFICATE OF SERVICE

I certify that this document or pleading was served via email and/or U.S. Mail on all users authorized and directed to receive such service.

Dated: December 5, 2023.

JESSE D. NELSON (BPR # 025602)
CLINT J. COLEMAN (BPR # 038413)
NELSON LAW GROUP, PLLC
10263 Kingston Pike
Knoxville, TN 37922
(865) 383-1053
jesse@nlgattorneys.com
clint@NLGattorneys.com

*/s/ William S. Rutchow*

14

**OGLETREE, DEAKINS, NASH,**
**SMOAK & STEWART, P.C.**

*Attorneys at Law*

SunTrust Plaza
401 Commerce Street, Suite 1200
Nashville, TN 37219-2446
Telephone: 615-254-1900
Facsimile: 615-254-1908
www.ogletree.com

# Ogletree
# Deakins

Darius Walker, Jr.
615-687-2219
darius.walker@ogletree.com

January 10, 2022

**VIA EEOC Respondent Portal**
Stephen Liston, Investigator
U.S. Equal Employment Opportunity Commission
Nashville Area Office
220 Athens Way
Suite 350
Nashville, TN 37228

> RE:  **Carlton Speer v. UCOR LLC**
> **EEOC Charge No. 494-2022-0060**

Dear Mr. Liston:

Our law firm represents the Respondent UCOR LLC ("Respondent" or "UCOR"), in the above-referenced charge of discrimination (the "Charge") filed by Carlton Speer ("Charging Party" or "Mr. Speer"). This Position Statement constitutes UCOR's written response pursuant to the request of the Commission.[1]

As we've all seen over the past 20 months, the COVID-19 pandemic has posed a grave threat to the health and safety of Americans and across the world. Even in completely healthy individuals, COVID-19 can be fatal. As of December 28, 2021, Tennessee has seen 1,388,601 confirmed COVID-19 cases and 20,738 deaths. *See* TN Novel Coronavirus, https://www.tn.gov/health/cedep/ncov.html (last visited December 28, 2021). Moreover, as of December 28, 2021, the United States has seen over 52.8 million confirmed COVID-19 cases and 816,239 deaths. *See* Centers for Disease Control

---

[1] This position statement is based on information available to UCOR at this time, and is intended to assist the Commission in investigating this Charge. UCOR reserves the right to amend or supplement its response based on subsequently discovered information. Inclusion of information in this position statement does not constitute a waiver of any objection as to the timeliness of the Charge, sufficiency of the Charge or any other legal argument which UCOR may assert in the future, nor does it constitute a waiver of any objection UCOR may have in response to future discovery or information requests, or to the introduction of evidence in any subsequent proceeding. Furthermore, this position statement, while believed to be true and correct in all respects, does not constitute an affidavit or admission, and it is not intended to be used as evidence in any court or other proceedings. UCOR submits this position statement subject to all applicable confidentiality requirements with the express understanding that it will not be released to any individual or entity, including the Charging Party or any attorney representing him.

Atlanta ▪ Austin ▪ Berlin (Germany) ▪ Birmingham ▪ Boston ▪ Charleston ▪ Charlotte ▪ Chicago ▪ Cleveland ▪ Columbia ▪ Dallas ▪ Denver ▪ Detroit Metro ▪ Greenville ▪ Houston ▪ Indianapolis ▪ Kansas City ▪ Las Vegas ▪ London (England) ▪ Los Angeles ▪ Memphis ▪ Mexico City (Mexico) ▪ Miami ▪ Milwaukee ▪ Minneapolis ▪ Montréal (Canada) ▪ Morristown ▪ Nashville ▪ New Orleans ▪ New York City ▪ Oklahoma City ▪ Orange County ▪ Paris (France) ▪ Philadelphia ▪ Phoenix ▪ Pittsburgh ▪ Portland, ME ▪ Portland, OR ▪ Raleigh ▪ Richmond ▪ St. Louis ▪ St. Thomas ▪ Sacramento ▪ San Antonio ▪ San Diego ▪ San Francisco ▪ Seattle ▪ Stamford ▪ Tampa ▪ Toronto (Canada) ▪ Torrance ▪ Tucson ▪ Washington

and Prevention, COVID Data Tracker, https://covid.cdc.gov/covid-data-tracker-/#datatracker-home (last visited December 28, 2021).

UCOR is subject to the workplace health and safety standards promulgated by both the Department of Energy ("DOE") and the U.S. Occupational Safety and Health Administration ("OSHA"). These standards include requirements set forth in the DOE's COVID-19 Workplace Safety Plan, which incorporates, among other things, the requirements established in President Biden's Executive Orders. UCOR also complies with the General Duty Clause embodied in the standards of OSHA and the DOE. UCOR must furnish to each employee employment and a place of employment which are free from recognized hazards that are causing or likely to cause death or serious physical harm. This obligation includes protecting UCOR's workforce from the recognized health hazards caused by SARS-CoV-2, the potentially deadly virus that can lead to COVID-19.

UCOR has aggressively and effectively worked to protect its workforce since the onset of the pandemic in early 2020. The cornerstone to these controls includes required use of physical distancing, facial coverings, and a COVID-19 vaccination program. UCOR has continually encouraged the workforce to become vaccinated as vaccinations became widely available in early 2021. UCOR began providing vaccination on a voluntary basis to the workforce at UCOR's onsite medical clinic in March 2021. During the late summer of 2021, as the increased positivity rate and spread of the Delta variant across the country and local community resulted in unnecessary loss of life and increased healthcare costs, UCOR made a decision to require COVID-19 vaccinations as a condition of employment. This decision was made based on the pro-vaccination studies from the Centers for Disease Control and other medical organizations strongly recommending and supporting mandatory vaccinations.

In his Charge, Mr. Speer alleges that he was subject to religious discrimination in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"). However, the records show Mr. Speer was let go after he refused to adhere to the legally instituted Vaccination Policy and that it would be an undue hardship for UCOR to accommodate Mr. Speer. Under Title VII, **an accommodation constitutes an undue hardship if it imposes more than a *de minimis* burden on the employer.** *See Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63 (1977) (emphasis added). Notably, this is a different and much lower standard than what is required under the American with Disabilities Act ("ADA"). *Compare e.g.*, 42 U.S.C. § 12111(10)(A) ("[Under the ADA] the term 'undue hardship' means an action requiring significant difficulty or expense[.]"); *with Hardison*, 432 U.S. at 84, (under Title VII anything more than *de minimis* expense is an undue hardship).

As detailed below, Mr. Speer's discharge was not motivated by discrimination towards his religion. Following the notice that UCOR provided to all employees about the Vaccination Policy, Mr. Speer requested a religious accommodation for an exemption from complying with the Vaccination Policy. Ultimately, Mr. Speer's request for accommodation was appropriately denied. UCOR could not reasonably accommodate his exemption request without undue hardship because his request imposed more than a *de minimis* cost on UCOR and its other employees. Because non-compliance with the Vaccination Policy was a justified basis to sever the employment relationship with Mr. Speer, the charge of discrimination should be dismissed in its entirety.

# I.   RELEVANT FACTUAL BACKGROUND

### A.   *The Nature of UCOR's Business*

UCOR is a joint venture between Amentum Services, Inc. and Jacobs Engineering Group, Inc. The purpose of the joint venture is to perform work under the Oak Ridge National Laboratory ("ORNL") Operations Clean-Up Enterprise ("OOCE") located at the DOE's Oak Ridge National Laboratory in Oak Ridge, Tennessee. Specifically, UCOR specializes in the safe decommissioning and demolition of former nuclear facilities.

### B.   *UCOR's Commitment to Equal Employment Opportunity and Promoting a Discrimination and Harassment-Free Workplace*

UCOR is a federal government contractor and maintains strict equal employment opportunity policies, including an explicit Equal Employment Opportunity Policy.  *See* POL-HR-105 – Equal Employment Opportunity - **Exhibit A**. UCOR strictly prohibits unlawful discrimination and harassment of any kind based on religion.  *See id.; see also* **Exhibit B** – POL-HR-304 – Anti-Harassment Policy.

If an employee has questions about any aspect of UCOR's commitment to workplace fairness or believes unlawful discrimination occurred, UCOR offers an Employee Concerns hotline to receive complaints of alleged violations of employment policies, without fear of retaliation. *See* **Exhibit C** - Employee Concerns Program. In short, UCOR is committed to equal employment and promoting anti-discrimination, anti-harassment, and anti-retaliation. UCOR enforces these commitments through its policies and by providing ways for employees to raise concerns and report issues.

### C.   *Mr. Speer's Employment at UCOR*

1. *Mr. Speer's duties as a Senior Radiological Protection Special Technical Lead required in-person collaboration and working closely with others, as well as on-site instrumentation calibration.*

Mr. Speer was an at-will employee, meaning either he or UCOR could terminate the employment relationship at any time for any reason not prohibited by law. As such, Mr. Speer knew (or should have known) that termination for violation of a policy or procedure (such as, the Vaccination Policy) was permissible and even probable under the law.

Mr. Speer worked as a Senior Radiological Protection Special Technical Lead. In this position, Mr. Speer performed the functions of a Radiological Protection Technician and an Instrumentation Technician at an advanced level. His job responsibilities included responsibility for personnel, environmental and site area radiological protection, including contamination and radiation exposure control at on-site work locations. Mr. Speer was also responsible for the calibration of instrumentation located in various locations on-site; instrumentation that cannot be calibrated off-site. *See* Job

Function Description for the Radiation Protection Technician Job, attached as **Exhibit D**; and the Speer Memorandum of Agreement, attached as **Exhibit E**.

> 2. *In the face of the surging COVID-19 Delta variant, UCOR issued its Vaccination Policy and Mr. Speer requested a religious accommodation to exempt him from the Policy.*

During the late summer of 2021, as the increased positivity rate and spread of the Delta variant across the country and local community resulted in unnecessary loss of life and increased health care costs, UCOR made a decision to require COVID-19 vaccinations as a condition of employment. The U.S. Centers for Disease Control and Prevention ("CDC") has repeatedly confirmed that the best way to slow the spread of COVID-19 and prevent infection by the Delta variant or other variants is to be vaccinated. The effectiveness of the vaccine to reduce the infection rate and significantly reduce the severity of the illness, including hospitalization and death, has been well documented in numerous scientific studies. Unvaccinated Tennesseans are at least six times more likely to catch COVID-19. *See* The Tennessean, FOR THE UNVACCINATED, THE DELTA SURGE WAS THE WORST OF COVID-19. FOR THE REST, IT WAS BARELY A SURGE AT ALL, https://www.tennessean.com/story/news/health/2021/11/28/tennessee-covid-19-delta-variant-surge-unvaccinated-cases-deaths/6234597001/ (last visited December 29, 2021). Particularly concerning, the risks vary dramatically by county, "at least in part because of increased vaccine hesitancy in rural and more conservative areas of Tennessee" including those counties that surround the Oak Ridge National Laboratory in East Tennessee. "Vaccinated people who live in poorly vaccinated counties were significantly more likely to catch a breakthrough infection because of constant contact with unvaccinated neighbors and *co-workers*, narrowing the gap between these groups." *Id.*

On August 30, 2021, UCOR announced to its employees the mandatory vaccination program. *See* Information Packet distributed to employees, attached as **Exhibit F**. Employees were required to receive their first vaccine dose by October 1, 2021. UCOR also announced to employees that they could apply for a religious exemption by completing the appropriate form. *See* Form-3604 UCOR COVID-19 Vaccination Religious Exemption Request Form, attached as **Exhibit G**. Requests for religious exemptions were due to be returned by September 14, 2021.

To evaluate the exemption requests, UCOR created an Accommodation Review Committee ("Committee") made up of experienced Human Resources professionals. The Committee had significant experience addressing accommodation requests, including engaging in the interactive process. In total, 98 UCOR employees requested religious accommodations. UCOR considered the monetary costs, both as to each individual accommodation and the cumulative cost of multiple accommodation requests. The Committee reviewed each Religious Exemption Request individually to make a determination on whether or not the employee's request was based upon a sincerely-held religious belief. For the purposes of the accommodation process, UCOR did not dispute each employee's assertion that each religious exemption request was based upon a sincerely-held religious

belief.[2] On September 13, 2021, Mr. Speer submitted his Religious Exemption request. *See* Mr. Speer's Religious Exemption Request Documentation, attached as **Exhibit H**.

> 3. *Mr. Speer's religious accommodation was denied as it posed an undue hardship on UCOR, and Mr. Speer was terminated for failing to comply with the Vaccination Policy.*

On September 21, 2021, a member of the Committee engaged in an interactive discussion with Mr. Speer regarding his exemption request, including potential accommodations. *See* **Exhibit H**. To evaluate whether the accommodations would impose an undue hardship that was greater than a *de minimis* cost/burden for UCOR, UCOR developed a matrix to evaluate possible accommodations. UCOR incorporated into the matrix the following potential accommodations: Weekly Testing; Enhanced Face Coverings (KN-95 Masks); Mask Fit Tests; Limited Task Reassignment; Job Reassignment; Work Location Adjustments, Isolation and Distancing; Leave of Absence; Daily Self Health Check; and Telework. UCOR ultimately determined that the accommodations available for Mr. Speer's position would create an undue hardship to UCOR due to safety concerns and costs.

As a result, on October 4, 2021, another member of the Committee sent Mr. Speer a notification that his request for accommodation had been denied. Mr. Speer was given an additional week to receive the vaccination or enter into the progressive discipline process. On October 11, 2021, Mr. Speer had failed to receive the vaccination and UCOR gave him a written warning. This written warning notified Mr. Speer that if he continued to fail to comply with the vaccination requirement, he would be subject to additional discipline, up to and including termination. As of October 18, 2021, Mr. Speer had still failed to receive the vaccination and he was placed on a leave of absence to allow him time to comply with the vaccination requirement. On October 25, 2021, Mr. Speer was placed on an unpaid suspension through October 31, 2021. At this time, Mr. Speer was informed that if he had not initiated the vaccination process prior to November 1, 2021, his employment with UCOR would be terminated effective November 1, 2021. *See* **Exhibit H**. Mr. Speer declined to comply with the UCOR Vaccination Policy, entered into UCOR's progressive discipline process, and was terminated from employment with UCOR effective November 1, 2021.

## II.    LEGAL ANALYSIS

Under Title VII, only beliefs that are religious qualify for accommodation. *See* 42 U.S.C. § 2000e-2(a) (prohibiting employment practices that discriminate against job candidates or employees due to their "religion"). In establishing a *prima facie* failure-to-accommodate claim of religious discrimination under Title VII, a plaintiff must show: (1) he holds a sincere religious belief that conflicts with an employment requirement; (2) he has informed the employer about the conflict; and (3) he was discharged or disciplined for failing to comply with the conflicting employment requirement. *Tepper v. Potter*, 505 F.3d 508, 514 (6th Cir. 2007). Only after the plaintiff is successful in establishing a *prima facie* case does the burden shift to the employer to show that it could not reasonably accommodate the employee without undue hardship. *Id.* (quoting *Virts v. Consol.*

---

[2] UCOR does not waive its right to require Charging Party to carry his burden to prove that his request for an accommodation was based upon a sincerely held religious belief in this or subsequent proceedings.

*Freightways Corp.*, 285 F.3d 508, 516 (6th Cir. 2002)). Even assuming *arguendo* that Mr. Speer could establish a *prima facie* case—which UCOR denies—UCOR could not reasonably accommodate Mr. Speer without suffering undue hardship.

From the outset, the Commission has established that Title VII religious accommodation requests are reviewed from an entirely different lens than ADA disability accommodation requests. *Compare e.g.*, 42 U.S.C. § 12111(10)(A) ("[Under the ADA] the term 'undue hardship' means an action requiring significant difficulty or expense[.]") *with Hardison*, 432 U.S. at 84 (under Title VII anything more than *de minimis* expense is an undue hardship).

Indeed, the bar is quite low for an employer to show undue burden for a religious accommodation request. The concept of a *de minimis* cost in the Title VII context was established more than forty years ago. *See Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 84 (1977) ("To require TWA to bear more than a *de minimis* cost in order to give Hardison Saturdays off is an undue hardship"). The Sixth Circuit has echoed this holding, noting that "[t]o require an employer to bear more than a *de minimis* cost in order to accommodate . . . is an undue hardship." *Cooper v. Oak Rubber Co.*, 15 F.3d 1375, 1378 (6th Cir. 1994) (citing *Hardison*, 432 U.S. at 84 (1977)) (emphasis added). This bar is low for an employer. "*De minimis*" means a "very small or trifling matter[.]" *Small v. Memphis Light, Gas & Water*, 952 F.3d 821, 828 (6th Cir. 2020) (Thapar, J., concurring) (citing Black's Law Dictionary 388). For example, in *El-Amin v. First Transit, Inc.*, the court found that requiring an employer to pay $25 per day for every day an employee worked in violation of the grooming policy would ultimately amount to more than a *de minimis* cost to the employer. *El-Amin v. First Transit, Inc.*, No. 1:04-CV-72, 2005 WL 1118175, at *6 (S.D. Ohio May 11, 2005) (citing *Hardison*, 432 U.S. at 84 (1977)). This sets a low bar for employers in showing that a requested religious accommodation imposes more than a *de minimis* burden cost.

Notably, the EEOC issued recent guidance with regard to undue hardship and *de minimis* cost during the COVID-19 pandemic – specifically:

> Costs to be considered include not only direct monetary costs but also the burden on the conduct of the employer's business – including, in this instance, the risk of the spread of COVID-19 to other employees or to the public.

> Courts have found Title VII undue hardship where, for example, the religious accommodation would impair workplace safety, diminish efficiency in other jobs, or cause coworkers to carry the accommodated employee's share of potentially hazardous or burdensome work . . .

> An employer will need to assess undue hardship by considering the particular facts of each situation and will need to demonstrate how much cost or disruption the employee's proposed accommodation would involve. An employer cannot rely on speculative hardships when faced with an employee's religious objection but, rather, should rely on objective information. Certain common and relevant considerations during the COVID-19 pandemic include, for example, whether the employee requesting a religious accommodation to a COVID-19 vaccination requirement works

outdoors or indoors, works in a solitary or group work setting, or has close contact with other employees or members of the public (especially medically vulnerable individuals). Another relevant consideration is the number of employees who are seeking a similar accommodation (i.e., the cumulative cost or burden on the employer).

U.S. Equal Employment Opportunity Commission, WHAT YOU SHOULD KNOW ABOUT COVID-19 AND THE ADA, THE REHABILITATION ACT, AND OTHER EEO LAWS, https://www.eeoc.gov/wysk/what-you-should-know-about-covid-19-and-ada-rehabilitation-act-and-other-eeo-laws#L (last visited December 29, 2021).

UCOR expressly incorporated these guidelines into its process for considering religious accommodations. UCOR included in its matrix each of the criteria in the EEOC's guidance, including monetary cost impacts, decreases in workplace efficiency, infringements on rights of other employees, requiring another employee to do more hazardous or burdensome work, conflicts with other law or regulation, and compromises in workplace safety.

Here, Mr. Speer's accommodation would constitute more than a *de minimis* cost for at least three reasons.

<u>First</u>, as stated above, the Senior Radiological Protection Special Technical Lead is not a remote position. Mr. Speer's position required on-site collaboration and contact with other workers to provide personnel, environmental and site area radiological protection. Mr. Speer's position also included contamination and radiation exposure control at on-site work locations, air monitoring, dosimetry, calibration of instrumentation and equipment at various site locations, and radiological characterization/survey planning, performance and direction at multiple project areas throughout the worksite. The instrumentation for which Mr. Speer is responsible is located on-site and cannot be calibrated off-site. Mr. Speer's position required him to be readily available to be in the field to troubleshoot instrumentation. As a result, Mr. Speer performed his job duties on-site throughout the pandemic. Mr. Speer's job duties must be performed on-site; they are not amenable to being performed remotely. Therefore, a remote accommodation here would cause an undue hardship on UCOR.

<u>Second</u>, UCOR faced a cumulative burden to accommodate all of the requests demanding exemption from the Vaccination Policy. As mentioned above, 98 UCOR employees requested religious accommodations. UCOR determined that the individual costs for each employee and the total costs for the 98 employees that requested religious accommodations included:

- $370 per employee, per week for testing; $19,240 per year/per employee; and $1,855,520 per year for weekly testing for the 98 employees that sought a religious exemption from receiving the vaccine.
- $10,192 per year for two KN-95 masks per week for 98 employees.
- $375 for an annual mask fit per employee; $36,750 for 98 employees.

If UCOR chose to have employees go off-site to receive their weekly tests, UCOR would face uncontrolled third-party costs and potential issues with the rural areas that do not have testing sites readily available. These realities are important considerations that also show accommodation constitutes more than a *de minimis* monetary cost.

**Third**, providing Mr. Speer's religious exemption would cause workplace safety issues. The health hazard to UCOR's employees posed by COVID-19 is real, and it is a hazard from which UCOR – pursuant to OSHA's and DOE's General Duty Clause – has a duty to protect its employees. Again, Tennessee has had 1,388,601 confirmed COVID-19 cases and 20,738 deaths. Employees across Tennessee are missing work or dying, and exposure is inherent to employees working in-person and in close proximity (as Mr. Speer did at UCOR). To protect the safety and health of its employees, UCOR issued its mandatory Vaccination Policy. This Policy puts safety first, as masking alone is imperfect, social distancing is not always possible, and testing only gives a snapshot in time. The three reasons detailed above show that UCOR faced more than a *de minimis* cost in considering Mr. Speer's requested religious accommodation.

Accordingly, because Mr. Speer could not be reasonably accommodated without undue hardship to UCOR and its other employees, his religious discrimination claim fails.

### III.    CONCLUSION

Because Mr. Speer's claim of religious discrimination is without merit, UCOR respectfully requests that the Commission issue a finding of No Probable Cause and that the Charge be promptly dismissed in its entirety. If you have any questions, please let me know.

Sincerely,

*s/ Darius Walker, Jr.*

Darius Walker, Jr.

DWJ
Attachments

OGLETREE, DEAKINS, NASH,
SMOAK & STEWART, P.C.
*Attorneys at Law*

SunTrust Plaza
401 Commerce Street, Suite 1200
Nashville, TN 37219-2446
Telephone: 615-254-1900
Facsimile: 615-254-1908
www.ogletree.com

# Ogletree
# Deakins

Darius Walker, Jr.
615-687-2219
darius.walker@ogletree.com

January 10, 2022

**VIA EEOC Respondent Portal**
Stephen Liston, Investigator
U.S. Equal Employment Opportunity Commission
Nashville Area Office
220 Athens Way
Suite 250
Nashville, TN 37228

RE:   **Malena Dennis v. UCOR LLC**
       **EEOC Charge No. 494-2022-00682**

Dear Mr. Liston,

Our law firm represents the Respondent UCOR LLC ("Respondent" or "UCOR"), in the above-referenced charge of discrimination (the "Charge") filed by Malena Dennis ("Charging Party" or "Ms. Dennis"). This Position Statement constitutes UCOR's written response pursuant to the request of the Commission.[1]

As we've all seen over the past 20 months, the COVID-19 pandemic has posed a grave threat to the health and safety of Americans and across the world. Even in completely healthy individuals, COVID-19 can be fatal. As of December 30, 2021, Tennessee has seen 1,398,794 confirmed COVID-19 cases and 20,776 deaths. *See* TN Novel Coronavirus, https://www.tn.gov/health/cedep/ncov.html (last visited December 30, 2021). Moreover, as of December 30, 2021, the United States has seen over 53.7 million confirmed COVID-19 cases and 820,355 deaths. *See* Centers for Disease Control

---

[1] This position statement is based on information available to UCOR at this time, and is intended to assist the Commission in investigating this Charge. UCOR reserves the right to amend or supplement its response based on subsequently discovered information. Inclusion of information in this position statement does not constitute a waiver of any objection as to the timeliness of the Charge, sufficiency of the Charge or any other legal argument which UCOR may assert in the future, nor does it constitute a waiver of any objection UCOR may have in response to future discovery or information requests, or to the introduction of evidence in any subsequent proceeding. Furthermore, this position statement, while believed to be true and correct in all respects, does not constitute an affidavit or admission, and it is not intended to be used as evidence in any court or other proceedings. UCOR submits this position statement subject to all applicable confidentiality requirements with the express understanding that it will not be released to any individual or entity, including the Charging Party or any attorney representing her.

Atlanta ▪ Austin ▪ Berlin (Germany) ▪ Birmingham ▪ Boston ▪ Charleston ▪ Charlotte ▪ Chicago ▪ Cleveland ▪ Columbia ▪ Dallas ▪ Denver ▪ Detroit Metro ▪ Greenville ▪ Houston ▪ Indianapolis ▪ Kansas City ▪ Las Vegas ▪ London (England) ▪ Los Angeles ▪ Memphis ▪ Mexico City (Mexico) ▪ Miami ▪ Milwaukee ▪ Minneapolis ▪ Montréal (Canada) ▪ Morristown ▪ Nashville ▪ New Orleans ▪ New York City ▪ Oklahoma City ▪ Orange County ▪ Paris (France) ▪ Philadelphia ▪ Phoenix ▪ Pittsburgh ▪ Portland, ME ▪ Portland, OR ▪ Raleigh ▪ Richmond ▪ St. Louis ▪ St. Thomas ▪ Sacramento ▪ San Antonio ▪ San Diego ▪ San Francisco ▪ Seattle ▪ Stamford ▪ Tampa ▪ Toronto (Canada) ▪ Torrance ▪ Tucson ▪ Washington

and Prevention, COVID DATA TRACKER, https://covid.cdc.gov/covid-data-tracker/#datatracker-home (last visited December 30, 2021).

UCOR is subject to the workplace health and safety standards promulgated by both the Department of Energy ("DOE") and the U.S. Occupational Safety and Health Administration ("OSHA"). These standards include requirements set forth in the DOE's COVID-19 Workplace Safety Plan, which incorporates, among other things, the requirements established in President Biden's Executive Orders. UCOR also complies with the General Duty Clause embodied in the standards of OSHA and the DOE. UCOR must furnish to each employee employment and a place of employment which are free from recognized hazards that are causing or likely to cause death or serious physical harm. This obligation includes protecting UCOR's workforce from the recognized hazards caused by SARS-CoV02, the potentially deadly virus that can lead to COVID-19.

UCOR has aggressively and effectively worked to protect its workforce since the onset of the pandemic in early 2020. The cornerstone to these controls includes required use of physical distancing, facial coverings, and a COVID-19 vaccination program. UCOR has continually encouraged the workforce to become vaccinated as vaccinations became widely available in early 2021. UCOR began providing vaccination on a voluntary basis to the workforce at UCOR's onsite medical clinic in March 2021. During the late summer of 2021, as the increased positivity rate and spread of the Delta variant across the country and local community resulted in unnecessary loss of life and increased healthcare costs, UCOR made the decision to require COVID-19 vaccinations as a condition of employment. This decision was made based on the pro-vaccination studies from the Centers for Disease Control and other medical organizations strongly recommending and supporting mandatory vaccinations.

In her Charge, Ms. Dennis alleges that she was subject to religious discrimination in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"). However, the records show that Ms. Dennis was let go after she refused to adhere to the legally instituted Vaccination Policy and that it would be an undue hardship for UCOR to accommodate Ms. Dennis. Under Title VII, **an accommodation constitutes an undue hardship if it imposes more than a** *de minimis* **burden on the employer**. *See Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63 (1977) (emphasis added). Notably, this is a different and much lower standard than what is required under the American with Disabilities Act ("ADA"). *Compare e.g.*, 42 U.S.C. § 12111(10)(A) ("[Under the ADA] term 'undue hardship' means an action requiring significant difficulty or expense[.]"); *with Hardison*, 432 U.S. at 84, (under Title VII anything more than *de minimis* expense is undue hardship).

As detailed below, Ms. Dennis's discharge was not motivated by discrimination towards her religion. Following the notice that UCOR provided to all employees about the vaccination Policy, Ms. Dennis requested a religious accommodation for an exemption from complying with the Vaccination Policy. Ultimately, Ms. Dennis's request for accommodation was appropriately denied. UCOR could not reasonably accommodate her exemption request without undue hardship because her request imposed more than a *de minimis* cost on UCOR and its other employees. Because non-compliance with the Vaccination Policy was a justified basis to sever the employment relationship with Ms. Dennis, the charge of discrimination should be dismissed in its entirety.

# I.  RELEVANT FACTUAL BACKGROUND

## A.  *The Nature of UCOR's Business*

UCOR is a joint venture between Amentum Services, Inc. and Jacobs Engineering Group, Inc. The purpose of the joint venture is to perform work under the Oak Ridge National Laboratory ("ORNL") Operations Clean-Up Enterprise ("OOCE") located at the DOE's Oak Ridge National Laboratory in Oak Ridge, Tennessee. Specifically, UCOR specializes in the safe decommissioning and demolition of former nuclear facilities.

## B.  *UCOR's Commitment to Equal Employment Opportunity and Promoting a Discrimination and Harassment-Free Workplace*

UCOR is a federal government contractor and maintains strict equal employment opportunity policies, including an explicit Equal Employment Opportunity Policy. *See* POL-HR-105 – Equal Employment Opportunity - **Exhibit A**. UCOR strictly prohibits unlawful discrimination and harassment of any kind based on religion. *See id.; see also* **Exhibit B** – POL-HR-304 – Anti-Harassment Policy.

If an employee has questions about any aspect of UCOR's commitment to workplace fairness or believes unlawful discrimination occurred, UCOR offers an Employee Concerns hotline to receive complaints of alleged violations of employment policies, without fear of retaliation. *See* **Exhibit C** - Employee Concerns Program. In short, UCOR is committed to equal employment and promoting anti-discrimination, anti-harassment, and anti-retaliation. UCOR enforces these commitments through its policies and by providing ways for employees to raise concerns and report issues.

## C.  *Ms. Dennis's Employment at UCOR*

1.  *Ms. Dennis's duties as a Senior Radiation Protection Technician required in-person collaboration and working closely with others, as well as on-site radiological surveying of work areas and equipment.*

Ms. Dennis was an at-will employee, meaning either she or UCOR could terminate the employment relationship at any time for any reason not prohibited by law. As such, Ms. Dennis knew (or should have known) that termination for violation of a policy or procedure (such as, the Vaccination Policy) was permissible and even probable under the law.

Ms. Dennis worked as a Senior Radiation Protection Technician. In this position, Ms. Dennis's job duties included performing radiological surveys of areas and equipment; pulling air samples in work areas for airborne contamination; and radiological surveys of work areas for radiation exposure to the workers and contamination surveys to ensure that workers do not contaminate themselves during work evolutions. Ms. Dennis also was responsible for performing surveys of workers exiting areas to ensure that contamination remains in contamination areas and that good radiological work practices are validated. In the event of a personnel contamination, Radiological Technicians (such as Ms. Dennis) take the lead in decontamination of the individual and subsequent

follow-up with dosimetry for follow-on testing at UCOR's work sites at ORNL. See Job Function Description for the Radiation Protection Technician Job, attached as **Exhibit D**.

   *2. In the face of the surging COVID-19 Delta variant, UCOR issued its Vaccination Policy and Ms. Dennis requested a religious accommodation to exempt her from the Policy.*

   During the late summer of 2021, as the increased positivity rate and spread of the Delta variant across the country and local community resulted in unnecessary loss of life and increased health care costs, UCOR made a decision to require COVID-19 vaccinations as a condition of employment. The U.S. Centers for Disease Control and Prevention ("CDC") has repeatedly confirmed that the best way to slow the spread of COVID-19 and prevent infection by the Delta variant or other variants is to be vaccinated. The effectiveness of the vaccine to reduce the infection rate and significantly reduce the severity of the illness, including hospitalization and death, has been well documented in numerous scientific studies. Unvaccinated Tennesseans are at least six times more likely to catch COVID-19. *See* The Tennessean, FOR THE UNVACCINATED, THE DELTA SURGE WAS THE WORST OF COVID-19. FOR THE REST, IT WAS BARELY A SURGE AT ALL,
https://www.tennessean.com/story/news/health/2021/11/28/tennessee-covid-19-delta-variant-surge-unvaccinated-cases-deaths/6234597001/ (last visited December 29, 2021). Particularly concerning, the risks vary dramatically by county, "at least in part because of increased vaccine hesitancy in rural and more conservative areas of Tennessee" including those counties that surround the Oak Ridge National Laboratory in East Tennessee. "Vaccinated people who live in poorly vaccinated counties were significantly more likely to catch a breakthrough infection because of constant contact with unvaccinated neighbors and *co-workers,* narrowing the gap between these groups." *Id.*

   On August 30, 2021, UCOR announced to its employees the mandatory vaccination program. *See* Information Packet distributed to employees, attached as **Exhibit E**. Employees were required to receive their first vaccine dose by October 1, 2021. UCOR also announced to employees that they could apply for a religious exemption by completing the appropriate form. *See* Form-3604 UCOR COVID-19 Vaccination Religious Exemption Request Form, attached as **Exhibit F**. Requests for religious exemptions were due to be returned by September 14, 2021.

   To evaluate the exemption requests, UCOR created an Accommodation Review Committee ("Committee") made up of experienced Human Resources professionals. The Committee had significant experience addressing accommodation requests, including engaging in the interactive process. In total, 98 UCOR employees requested religious accommodations. UCOR considered the monetary costs, both as to each individual accommodation and the cumulative cost of multiple accommodation requests. The Committee reviewed each Religious Exemption Request individually to make a determination on whether or not the employee's request was based upon a sincerely-held religious belief. For the purposes of the accommodation process, UCOR did not dispute that each employee's assertion that each religious exemption request was based upon a sincerely-held religious

belief. [2] On September 7, 2021, Ms. Dennis submitted her Religious Exemption request. *See* Ms. Dennis's Religious Exemption Request Documentation, attached as **Exhibit G**.

3. *Ms. Dennis's religious accommodation was denied as it posed an undue hardship on UCOR, and Ms. Dennis was terminated for failing to comply with the Vaccination Policy.*

On September 15, 2021, a member of the Committee engaged in an interactive discussion with Ms. Dennis regarding her exemption request, including potential accommodations. *See* **Exhibit G**. To evaluate whether the accommodations would impose an undue hardship that was greater than a *de minimis* cost/burden for UCOR, UCOR developed a matrix to evaluate possible accommodations. UCOR incorporated into the matrix the following potential accommodations: Weekly Testing; Enhanced Face Coverings (KN-95 Masks); Mask Fit Tests; Limited Task Reassignment; Job Reassignment; Work Location Adjustments, Isolation, and Distancing; Leave of Absence; Daily Self Health Check; and Telework. In addition to these potential accommodations, Ms. Dennis requested an accommodation that UCOR "put all unvaccinated in training rooms together to eliminate any concerns for exposure – ease other people's fears." *See* **Exhibit G**. This suggestion illustrates the burden on workplace safety posed by Ms. Dennis's requested accommodations. Concentrating all unvaccinated employees together would dramatically increase the risk to those employees posed by exposure to COVID-19. UCOR Ultimately determined that the accommodations available for Ms. Dennis's position would create an undue hardship to UCOR due to safety concerns and costs.

As a result, on October 4, 2021, a member of the Committee of the Committee sent Ms. Dennis a notification that her request for accommodation had been denied. Ms. Dennis was given an additional week to receive the vaccination or enter into the progressive discipline process. On October 11, 2021, Ms. Dennis had failed to receive the vaccination and UCOR gave her a written warning. This written warning notified Ms. Dennis that if she continued to fail to comply with the vaccination requirement, she would be subject to additional discipline, up to and including termination. As of October 18, 2021, Ms. Dennis had still failed to receive the vaccination and she was placed on a leave of absence to allow her time to comply with the vaccination requirement. On October 25, 2021, Ms. Dennis was placed on an unpaid suspension through October 31, 2021. At this time, Ms. Dennis was informed that if she had not initiated the vaccination process prior to November 1, 2021, her employment with UCOR would be terminated effective November 1, 2021. *See* **Exhibit G.** Ms. Dennis declined to comply with the UCOR Vaccination Policy, entered into UCOR's progressive discipline process, and was terminated from employment with UCOR effective November 1, 2021.

## II.    LEGAL ANALYSIS

Under Title VII, only beliefs that are religious qualify for accommodation. *See* 42 U.S.C. § 2000e-2(a) (prohibiting employment practices that discriminate against job candidates or employees due to their "religion"). In establishing a *prima facie* failure-to-accommodate claim of religious discrimination under Title VII, a plaintiff must show: (1) she holds a sincere religious belief that

---

[2] UCOR does not waive its right to require Charging Party to carry his burden to prove that his request for an accommodation was based upon a sincerely held religious belief in this or subsequent proceedings.

Stephen Liston, Investigator
January 10, 2022
Page 6

conflicts with an employment requirement; (2) she has informed her employer about the conflict; and (3) she was discharged or disciplined for failing to comply with the conflicting employment requirement. *Tepper v. Potter*, 505 F.3d 508, 514 (6th Cir. 2007). Only after the plaintiff is successful in establishing a *prima facie* case does the burden shift to the employer to show that it could not reasonably accommodate the employee without undue hardship. *Id.* (quoting *Virts v. Consol. Freightways Corp.*, 285 F.3d 508, 516 (6th Cir. 2002)). Even assuming *arguendo* that Ms. Dennis could establish a *prima facie* case—which UCOR denies—UCOR could not reasonably accommodate Ms. Dennis without suffering undue hardship.

From the outset, the Commission has established that Title VII religious accommodation requests are reviewed from an entirely different lens than ADA disability accommodation requests. *Compare e.g.*, 42 U.S.C. § 12111(10)(A) ("[Under the ADA] the term 'undue hardship' means an action requiring significant difficulty or expense[.]") *with Hardison*, 432 U.S. at 84 (under the Title VII anything more than *de minimis* expense is an undue hardship).

Indeed, the bar is quite low for an employer to show undue burden for a religious accommodation request. The concept of a *de minimis* cost in the Title VII context was established more than forty years ago. *See Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 84 (1977) ("To require TWA to bear more than a *de minimis* cost in order to give Hardison Saturdays off is an undue hardship"). The Sixth Circuit has echoed this holding, noting that "[t]o require an employer to bear more than a *de minimis* cost in order to accommodate . . . is an undue hardship." *Cooper v. Oak Rubber Co.*, 15 F.3d 1375, 1378 (6th Cir. 1994) (citing *Hardison*, 432 U.S. at 84 (1977)) (emphasis added). This bar is low for an employer. "*De minimis*" means a "very small or trifling matter[.]" *Small v. Memphis Light, Gas & Water*, 952 F.3d 821, 828 (6th Cir. 2020) (Thapar, J., concurring) (citing Black's Law Dictionary 388). For example, in *El-Amin v. First Transit Inc.*, the court found that requiring an employer to pay $25 per day for every day an employee worked in violation of the grooming policy would ultimately amount to more than a *de minimis* cost to the employer. *El-Amin v. First Transit, Inc.*, No. 1:04-CV-72, 2005 WL 1118175, at *6 (S.D. Ohio May 11, 2005) (citing *Hardison*, 432 U.S. at 884 (1977)). This sets a low bar for employers in showing that a requested religious accommodation imposes more than a *de minimis* burden or cost.

Notably, the EEOC issued recent guidance with regard to undue hardship and *de minimis* cost during the COVID-19 pandemic – specifically:

Costs to be considered include not only direct monetary costs but also the burden on the conduct of the employer's business – including, in this instance, the risk of the spread of COVID019 to other employers or to the public.

Courts have found Title VII undue hardship where, for example, the religious accommodation would impair workplace safety, diminish efficiency in other jobs, or cause coworkers to carry the accommodated employee's share of potentially hazardous or burdensome work . . .

An employer will need to assess undue hardship by considering the particular facts of each situation and will need to demonstrate how much cost or disruption the

employee's proposed accommodation would involve. An employer cannot rely on speculative hardships when faced with an employee's religious objection but, rather, should rely on objective information. Certain common and relevant considerations during the COVID-19 pandemic include, for example, whether the employee requesting a religious accommodation to a COVID-19 vaccination requirement works outdoors or indoors, works in a solitary or group work setting, or has close contact with other employees or members of the public (especially medically vulnerable individuals). Another relevant consideration is the number of employees who are seeking a similar accommodation (i.e., the cumulative cost or burden on the employer).

U.S. Equal Employment Opportunity Commission, WHAT YOU SHOULD KNOW ABOUT COVID-19 AND THE ADA, THE REHABILITATION ACT, AND OTHER EEO LAWS, https://www.eeoc.gov/wysk/what-you-should-know-about-covid-19-and-ada-rehabilitation-act-and-other-eeo-laws#L (last visited December 31, 2021).

UCOR expressly incorporated these guidelines into its process for considering religious accommodations. UCOR included in its matrix each of the criteria in the EEOC's guidance, including monetary cost impacts, decreases in workplace efficiency, infringements on rights of other employees, requiring another employee to do more hazardous or burdensome work, conflicts with other law or regulation, and compromises in workplace safety.

Here, Ms. Dennis's accommodation would constitute more than a *de minimis* cost for at least three reasons.

**First**, as stated above, the Senior Radiation Protection Technician is not a remote position. Ms. Dennis's position required on-site collaboration and contact with other workers. Ms. Dennis's position also required performing radiological surveys of areas and equipment; pulling air samples in work areas for airborne contamination; and radiological surveys of work areas for radiation exposure to the workers and contamination surveys to ensure that workers do not contaminate themselves during work evolutions. Further, Ms. Dennis was responsible for performing surveys of workers exiting areas to ensure that contamination remains in contamination areas and that good radiological work practices are validated. In the event of a personnel contamination, Radiological Technicians (such as Ms. Dennis) take the lead in decontamination of the individual and subsequent follow-up with dosimetry for follow-on testing at UCOR's work sites at ORNL. As a result, Ms. Dennis performed her job duties on-site throughout the pandemic. Ms. Dennis's job duties must be performed on-site; they are not amenable to being performed remotely. Therefore, a remote accommodation here would cause an undue hardship on UCOR.

**Second**, UCOR faced a cumulative burden to accommodate all of the requests demanding exemption from the Vaccination Policy. As mentioned above, 98 UCOR employees requested religious accommodations. UCOR determined that the individual costs for each employee and the total costs for the 98 employees that requested religious accommodations included:

- $370 per employee, per week for testing; $19,240 per year/per employee; and $1,855,520 per year for weekly testing for the 98 employees that sought a religious exemption from receiving the vaccine.
- $10,192 per year for two KN-95 masks per week for 98 employees.
- $375 for an annual mask fit per employee; $36,750 for 98 employees.

If UCOR chose to have employees go off-site to receive their weekly tests, UCOR would face uncontrolled third-party costs and potential issues with the rural areas that do not have testing sites readily available. These realities are important considerations that also show accommodation constitutes more than a *de minimis* monetary cost.

**Third,** providing Ms. Dennis's religious exemption would cause workplace safety issues. The health hazard to UCOR's employees posed by COVID-19 is real, and it is a hazard from which UCOR – pursuant to OSHA's and DOE's General Duty Clause – has a duty to protect its employees. Again, Tennessee has had 1,398,794 confirmed COVID-19 cases and 20,776 deaths. Employees across Tennessee are missing work or dying, and exposure is inherent to employees working in-person and in close proximity (as Ms. Dennis did at UCOR). To protect the safety and health of its employees, UCOR issued its mandatory Vaccination Policy. This Policy puts safety first, as masking alone is imperfect, social distancing is not always possible, and testing only gives a snapshot in time. The three reasons detailed above show that UCOR faced more than a *de minimis* cost in considering Ms. Dennis's requested religious accommodations.

Accordingly, because Ms. Dennis could not be reasonably accommodated without undue hardship to UCOR and its other employees, his religious discrimination claim fails.

### III.    CONCLUSION

Because Ms. Dennis's claim of religious discrimination is without merit, UCOR respectfully requests that the Commission issue a finding of No Probable Cause and that the Charge be promptly dismissed in its entirety. If you have any questions, please let me know.

Stephen Liston, Investigator
January 10, 2022
Page 9

                                                Sincerely,

                                                *s/ Darius Walker, Jr.*

                                                Darius Walker, Jr.

DW:
Attachments


49876449.1

**OGLETREE, DEAKINS, NASH,
SMOAK & STEWART, P.C.**

*Attorneys at Law*

SunTrust Plaza
401 Commerce Street, Suite 1200
Nashville, TN 37219-2446
Telephone: 615-254-1900
Facsimile: 615-254-1908
www.ogletree.com

# Ogletree
# Deakins

Darius Walker, Jr.
615-687-2219
darius.walker@ogletree.com

January 10, 2022

**VIA EEOC Respondent Portal**
Mr. Stephen Liston, Investigator
U.S. Equal Employment Opportunity Commission
Nashville Area Office
220 Athens Way
Suite 350
Nashville, TN 37228

> RE:  **Zachariah Duncan v. UCOR LLC**
>       **EEOC Charge No. 494-2022-00694**

Dear Mr. Liston:

Our law firm represents the Respondent UCOR LLC ("Respondent" or "UCOR"), in the above-referenced charge of discrimination (the "Charge") filed by Zachariah Duncan ("Charging Party" or "Mr. Duncan"). This Position Statement constitutes UCOR's written response pursuant to the request of the Commission.[1]

As we've all seen over the past 20 months, the COVID-19 pandemic has posed a grave threat to the health and safety of Americans and across the world. Even in completely healthy individuals, COVID-19 can be fatal. As of December 31, 2021, Tennessee has seen 1,427,052 confirmed COVID-19 cases and 20,880 deaths. *See* TN Novel Coronavirus, https://www.tn.gov/health/cedep/ncov.html (last visited December 31, 2021). Moreover, as of December 31, 2021, the United States has over 53.7 million confirmed COVID-19 cases and 820,355 deaths. *See* Centers for Disease Control and

---

[1] This position statement is based on information available to UCOR at this time, and is intended to assist the Commission in investigating this Charge. UCOR reserves the right to amend or supplement its response based on subsequently discovered information. Inclusion of information in this position statement does not constitute a waiver of any objection as to the timeliness of the Charge, sufficiency of the Charge or any other legal argument which UCOR may assert in the future, nor does it constitute a waiver of any objection UCOR may have in response to future discovery or information requests, or to the introduction of evidence in any subsequent proceeding. Furthermore, this position statement, while believed to be true and correct in all respects, does not constitute an affidavit or admission, and it is not intended to be used as evidence in any court or proceedings. UCOR submits this position statement subject to all applicable confidentiality requirements with the express understanding that it will not be released to any individual or entity, including the Charging Party or any attorney representing him.

Atlanta ▪ Austin ▪ Berlin (Germany) ▪ Birmingham ▪ Boston ▪ Charleston ▪ Charlotte ▪ Chicago ▪ Cleveland ▪ Columbia ▪ Dallas ▪ Denver ▪ Detroit Metro ▪ Greenville ▪ Houston
Indianapolis ▪ Kansas City ▪ Las Vegas ▪ London (England) ▪ Los Angeles ▪ Memphis ▪ Mexico City (Mexico) ▪ Miami ▪ Milwaukee ▪ Minneapolis ▪ Montréal (Canada) ▪ Morristown
Nashville ▪ New Orleans ▪ New York City ▪ Oklahoma City ▪ Orange County ▪ Paris (France) ▪ Philadelphia ▪ Phoenix ▪ Pittsburgh ▪ Portland, ME ▪ Portland, OR ▪ Raleigh ▪ Richmond
St. Louis ▪ St. Thomas ▪ Sacramento ▪ San Antonio ▪ San Diego ▪ San Francisco ▪ Seattle ▪ Stamford ▪ Tampa ▪ Toronto (Canada) ▪ Torrance ▪ Tucson ▪ Washington

Prevention, COVID DATA TRACKER, https://covid.cdc.gov/covid-data-tracker/#datatracker-home (last visited December 31, 2021).

UCOR is subject to the workplace health and safety standards promulgated by both the Department of Energy ("DOE") and the U.S. Occupational Safety and Health Administration ("OSHA"). These standards include requirements set forth in the DOE's COVID-19 Workplace Safety Plan, which incorporates, among other things, the requirements established in President Biden's Executive Orders. UCOR also complies with the General Duty Clause embodied in the standards of OSHA and the DOE. UCOR must furnish to each employee employment and a place of employment which are free from recognized hazards that are causing or likely to cause death or serious physical harm. This obligation includes protecting UCOR's workforce from the recognized health hazards caused by SARS-CoV-2, the potentially deadly virus that can lead to COVID-19.

UCOR has aggressively and effectively worked to protect its workforce since the onset of the pandemic in early 2020. The cornerstone to these controls includes required use of physical distancing, facial coverings, and a COVID-19 vaccination program. UCOR has continually encouraged the workforce to become vaccinated as vaccinations became widely available in early 2021. UCOR began providing vaccination on a voluntary basis to the workforce at UCOR's onsite medical clinic in March 2021. During the late summer of 2021, as the increased positivity rate and spread of the Delta variant across the country and local community resulted in unnecessary loss of life and increased healthcare costs, UCOR made a decision to require COVID-19 vaccinations as a condition of employment. This decision was made based on the pro-vaccination studies from the Centers for Disease Control and other medical organizations strongly recommending and supporting mandatory vaccinations.

In his Charge, Mr. Duncan alleges that he was subject to religious discrimination in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"). However, the records show Mr. Duncan was let go after he refused to adhere to the legally instituted Vaccination Policy and that it would be an undue hardship for UCOR to accommodate Mr. Duncan. Under Title VII, **an accommodation constitutes an undue hardship if it imposes more than a *de minimis* burden on the employer**. *See Trans World Airlines, Inc. v. Hardison*, 432 U.S. 62 (1977) (emphasis added). Notably, this is a different and much lower standard than what is required under the American with Disabilities Act ("ADA"). *Compare e.g.*, 42 U.S.C. § 12111(10)(A) ("[Under the ADA] the term 'undue hardship' means an action requiring significant difficulty or expense[.]"); *with Hardison*, 432 U.S. at 84, (under Title VII anything more than *de minimis* expense is an undue hardship).

As detailed below, Mr. Duncan's discharge was not motivated by discrimination towards his religion. Following the notice that UCOR provided to all employees about the Vaccination Policy, Mr. Duncan requested a religious accommodation for an exemption from complying with the Vaccination Policy. Ultimately, Mr. Duncan's request was appropriately denied. UCOR could not reasonably accommodate his exemption request without undue hardship because his request imposed more than a *de minimis* cost on UCOR and its other employees. Because non-compliance with the Vaccination Policy was a justified basis to sever the employment relationship with Mr. Duncan, the charge of discrimination should be dismissed in its entirety.

# I.    RELEVANT FACTUAL BACKGROUND

### A.    *The Nature of UCOR's Business*

UCOR is a joint venture between Amentum Services, Inc. and Jacobs Engineering Group, Inc. The purpose of the joint venture is to perform work under the Oak Ridge National Laboratory ("ORNL") Operations Clean-Up Enterprise ("OOCE") located at the DOE's Oak Ridge National Laboratory in Oak Ridge, Tennessee. Specifically, UCOR specializes in the safe decommissioning and demolition of former nuclear facilities.

### B.    *UCOR's Commitment to Equal Employment Opportunity and Promoting a Discrimination and Harassment-Free Workplace*

UCOR is a federal government contractor and maintains strict equal employment opportunity policies, including an explicit Equal Employment Opportunity Policy *See* POL-HR-105 – Equal Employment Opportunity - **Exhibit A.** UCOR strictly prohibits unlawful discrimination and harassment of any kind based on religion. *See id.; see also* **Exhibit B** – POL-HR-304 – Anti-Harassment Policy.

If an employee has questions about any aspect of UCOR's commitment to workplace fairness or believes unlawful discrimination occurred, UCOR offers an Employee Concerns hotline to receive complaints of alleged violations of employment policies, without fear of retaliation. *See* **Exhibit C** - Employee Concerns Program. In short, UCOR is committed to equal employment and promoting anti-discrimination, anti-harassment, and anti-retaliation. UCOR enforces these commitments through its policies and by providing ways for employees to raise concerns and report issues.

### C.    *Mr. Duncan's Employment at UCOR*

*1.    Mr. Duncan's duties as a Material Clerk required in-person coordination with project teams throughout the UCOR worksites and working closely with others, as well as processing, transporting, and disposing of materials.*

Mr. Duncan was an at-will employee, meaning either he or UCOR could terminate the employment relationship at any time for any reason not prohibited by law. As such, Mr. Duncan knew (or should have known) that termination for violation of a policy or procedure (such as, the Vaccination Policy) was permissible and even probable under the law.

Mr. Duncan worked as a Material Clerk. In this position, Mr. Duncan's job duties included physically receiving and offloading deliveries to worksites, delivering and offloading materials and equipment to project teams throughout the UCOR worksites, including ORNL and the Y-12 National Security Complex, performing physical inventories of personnel property, processing and disposing of excess materials and equipment and transporting material via trucks and forklifts. *See* Staffing Requisition for the Material Clerk position, attached as **Exhibit D**.

*2.    In the face of the surging COVID-19 Delta variant, UCOR issued its Vaccination Policy and Mr. Duncan requested a religious accommodation to exempt him from the Policy.*

During the late summer of 2021, as the increased positivity rate and spread of the Delta variant across the country and local community resulted in unnecessary loss of life and increased health care costs, UCOR made a decision to require COVID-19 vaccinations as a condition of employment. The U.S. Centers for Disease Control and Prevention ("CDC") has repeatedly confirmed that the best way to slow the spread of COVID-19 and prevent infection by the Delta variant or other variants is to be vaccinated. The effectiveness of the vaccine to reduce the infection rate and significantly reduce the severity of the illness, including hospitalization and death, has been well documented in numerous scientific studies. Unvaccinated Tennesseans are at least six times more likely to catch COVID-19. *See* The Tennessean, FOR THE UNVACCINATED, THE DELTA SURGE WAS THE WORST OF COVID-19. FOR THE REST, IT WAS BARELY A SURGE AT ALL, https://www.tennessean.com/story/news/health/2021/11/28/tennessee-covid-19-delta-variant-surge-unvaccinated-cases-deaths/6234597001/ (last visited December 31, 2021). Particularly concerning, the risks vary dramatically by county, "at least in part because of increased vaccine hesitancy in rural and more conservative areas of Tennessee" including those counties that surround the Oak Ridge National Laboratory in East Tennessee. "Vaccinated people who live in poorly vaccinated counties were significantly more likely to catch a breakthrough infection because of constant contact with unvaccinated neighbors and *co-workers*, narrowing the gap between these groups." *Id.*

On August 30, 2021, UCOR announced to its employees the mandatory vaccination program. *See* Information Packet distributed to employees, attached as **Exhibit E.** Employees were required to receive their first vaccine dose by October 1, 2021. UCOR also announced to employees that they could apply for a religious exemption by completing the appropriate form. *See* Form 3604 UCOR COVID-19 Vaccination Religious Exemption Request Form, attached as **Exhibit F.** Requests for religious exemptions were due to be returned by September 14, 2021.

To evaluate the exemption requests, UCOR created an Accommodation Review Committee ("Committee") made up of experienced Human Resources professionals. The Committee has significant experience addressing accommodation requests, including engaging in the interactive process. In total, 98 UCOR employees requested religious accommodations. UCOR considered the monetary costs, both as to each individual accommodation and the cumulative cost of multiple accommodation requests. The Committee reviewed each Religious Exemption Request individually to make a determination on whether or not the employee's request was based upon a sincerely-held religious belief. For the purposes of the accommodation process, UCOR did not dispute each employee's assertion that each religious exemption request was based upon a sincerely-held religious belief. [2] On September 8, 2021, Mr. Duncan submitted his Religious Exemption request. *See* Mr. Duncan's Religious Exemption Request documentation, attached as **Exhibit G.**

   3.   *Mr. Duncan's religious accommodation was denied as it posed an undue hardship on UCOR, and Mr. Duncan was terminated for failing to comply with the Vaccination Policy.*

On September 15, 2021, a member of the Committee engaged in an interactive discussion with Mr. Duncan regarding his exemption request, including potential accommodations. *See* **Exhibit**

---

[2] UCOR does not waive its right to require Charging Party to carry his burden to prove that his request for an accommodation was based upon a sincerely held religious belief in this or subsequent proceedings.

**G**. To evaluate whether the accommodations would impose an undue hardship that was greater than a *de minimis* cost/burden for UCOR, UCOR developed a matrix to evaluate possible accommodations. UCOR incorporated into the matrix the following potential accommodations: Weekly Testing; Enhanced Face Coverings (KN-95 Masks); Mask Fit Tests; Limited Task Reassignment; Job Reassignment; Work Location Adjustments, Isolation and Distancing; Leave of Absence; Daily Self Health Check; and Telework. UCOR ultimately determined that the accommodations available for Mr. Duncan's position would create an undue hardship to UCOR due to safety concerns and costs.

As a result, on October 4, 2021, another member of the Committee sent Mr. Duncan a notification that his request for accommodation had been denied. Mr. Duncan was given an additional week to receive the vaccination or enter into the progressive discipline process. On October 11, 2021, Mr. Duncan had failed to receive the vaccination and UCOR gave him a written warning. This written warning notified Mr. Duncan that if he continued to fail to comply with the vaccination requirement, he would be subject to additional discipline, up to and including termination. As of October 18, 2021, Mr. Duncan had still failed to receive the vaccination and he was placed on a leave of absence to allow him time to comply with the vaccination requirement. On October 25, 2021, Mr. Duncan was placed on an unpaid suspension through October 31, 2021. At this time, Mr. Duncan was informed that if he had not initiated the vaccination process prior to November 1, 2021, his employment with UCOR would be terminated effective November 1, 2021. *See* **Exhibit G**. Mr. Duncan declined to comply with the UCOR Vaccination Policy, entered into UCOR's progressive discipline process, and was terminated from employment with UCOR effective November 1, 2021.

## II.    LEGAL ANALYSIS

Under Title VII, only beliefs that are religious qualify for accommodation. See 42 U.S.C. § 2000e-2(a) (prohibiting employment practices that discriminate against job candidates or employees due to their "religion"). In establishing a *prima facie* failure-to-accommodate claim of religious discrimination under Title VII, a plaintiff must show: (1) he holds a sincere religious belief that conflicts with an employment requirement; (2) he has informed the employer about the conflict; and (3) he was discharged or disciplined for failing to comply with the conflicting employment requirement. *Tepper v. Potter*, 505 F.3d 508, 514 (6th Cir. 2007). Only after the plaintiff is successful in establishing a *prima facie* case does the burden shift to the employer to show that it could not reasonably accommodate the employee without undue hardship. *Id.* (quoting *Virts v. Consol. Freightways Corp.*, 285 F.3d 508, 516 (6th Cir. 2002)). Even assuming *arguendo* that Mr. Duncan could establish a *prima facie* case—which UCOR denies—UCOR could not reasonably accommodate Mr. Duncan without suffering undue hardship.

From the outset, the Commission has established that Title VII religious accommodation requests are reviewed from an entirely different lens than ADA disability accommodation requests. *Compare e.g.*, 42 U.S.C. § 12111(10)(A) ("[Under the ADA] the term 'undue hardship' means an action requiring significant difficulty or expense[.]") *with Hardison*, 432 U.S. at 84 (under Title VII anything more than *de minimis* expense is an undue hardship).

Mr. Stephen Liston, Investigator
January 10, 2022
Page 6

Indeed, the bar is quite low for an employer to show undue burden for a religious accommodation request. The concept of a *de minimis* cost in the Title VII context was established more than forty years ago. *See Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 84 (1977) ("To require TWA to bear more than a *de minimis* cost in order to give Hardison Saturdays off is an undue hardship"). The Sixth Circuit has echoed this holding, noting that "[t]o require an employer to bear more than a *de minimis* cost in order to accommodate . . . is an undue hardship." *Cooper v. Oak Rubber Co.*, 15 F.3d 1375, 1378 (6th Cir. 1994) (citing *Hardison*, 432 U.S. at 84 (1977)) (emphasis added). This bar is low for an employer. "*De minimis*" means a "very small or trifling matter[.]" *Small v. Memphis Light, Gas & Water*, 952 F.3d 821, 828 (6th Cir. 2020) (Thapar, J., concurring) (citing Black's Law Dictionary 388). For example, in *El-Amin v. First Transit, Inc.*, the court found that requiring an employer to pay $25 per day for every day an employee worked in violation of the grooming policy would ultimately amount to more than a de minimis cost to the employer. *El-Amin v. First Transit, Inc.*, No. 1:04-CV-72, 2005 WL 1118175, at *6 (S.D. Ohio May 11, 2005) (citing *Hardison*, 432 U.S. at 84 (1977)). This sets a low bar for employers in showing that a requested religious accommodation imposes more than a *de minimis* burden cost.

Notably, the EEOC issued recent guidance with regard to undue hardship and *de minimis* cost during the COVID-19 pandemic – specifically:

Costs to be considered include not only direct monetary costs but also the burden on the conduct of the employer's business – including, in this instance, the risk of the spread of COVID-19 to other employees or to the public.

Courts have found Title VII undue hardship where, for example, the religious accommodation would impair workplace safety, diminish efficiency in other jobs, or cause coworkers to carry the accommodated employee's share of potentially hazardous or burdensome work . . .

An employer will need to assess undue hardship by considering the particular facts of each situation and will need to demonstrate how much cost or disruption the employee's proposed accommodation would involve. An employer cannot rely on speculative hardships when faced with an employee's religious objection but, rather, should rely on objective information. Certain common and relevant considerations during the COVID-19 pandemic include, for example, whether the employee requesting a religious accommodation to a COVID-19 vaccination requirement works outdoors or indoors, works in a solitary or group work setting, or has close contact with other employees or members of the public (especially medically vulnerable individuals). Another relevant consideration is the number of employees who are seeking a similar accommodation (i.e., the cumulative cost or burden on the employer).

U.S. Equal Employment Opportunity Commission, WHAT YOU SHOULD KNOW ABOUT COVID-19 AND THE ADA, THE REHABILITATION ACT, AND OTHER EEO LAWS, https://www.eeoc.gov/wysk/what-you-should-know-about-covid-19-and-ada-rehabilitation-act-and-other-eeo-laws#L (last visited December 31, 2021).

UCOR expressly incorporated these guidelines into its process for considering religious accommodations. UCOR included in its matrix each of the criteria in the EEOC's guidance, including monetary cost impacts, decreases in workplace efficiency, infringements on rights of other employees, requiring another employee to do more hazardous or burdensome work, conflicts with other law or regulation, and compromises in workplace safety.

Here, Mr. Duncan's accommodation would constitute more than a *de minimis* cost for at least three reasons.

**First**, as stated above, the Material Clerk position is not a remote position. Mr. Duncan's position required on-site coordination and contact with other teams and workers. Mr. Duncan's position required receiving and offloading deliveries to worksites, delivering and offloading materials and equipment to project teams throughout the UCOR worksites, performing physical inventories of personnel property, processing and disposing of excess materials and equipment and transporting materials via trucks and forklifts. As a result, Mr. Duncan's performed his job duties on-site throughout the pandemic. Mr. Duncan's job duties must be performed on-site; they are not amenable to being performed remotely. Therefore, a remote accommodation here would cause an undue hardship on UCOR.

**Second**, UCOR faced a cumulative burden to accommodate all of the requests demanding exemption from the Vaccination Policy. As mentioned above, 98 UCOR employees requested religious accommodations. UCOR determined that the individual costs for each employee and the total costs for the 98 employees that requested religious accommodations included:

- $370 per employee, per week for testing; $19,240 per year/per employee; and $1,855,520 per year or weekly testing for the 98 employees that sought a religious exemption from receiving the vaccine.
- $10,192 per year for two KN-95 masks per week for 98 employees.
- $375 for an annual mask fit per employee; $36,750 for 98 employees.

If UCOR chose to have employees go off-site to receive their weekly tests, UCOR would fact uncontrolled third-party costs and potential issues with the rural areas that do not have testing sites readily available. These realities are important considerations that also show accommodation constitutes more than a *de minimis* monetary cost.

**Third**, providing Mr. Duncan's religious exemption would cause workplace safety issues. The health hazard to UCOR's employees posed by COVID-19 is real, and it is a hazard from which UCOR – pursuant to OSHA's and DOE's General Duty Clause – has a duty to protect its employees. Again, Tennessee has had 1,427,052 confirmed COVID-19 cases and 20,880 deaths. Employees across Tennessee are missing work or dying, and exposure is inherent to employees working in-person and in close proximity (as Mr. Duncan did at UCOR). To protect the safety and health of its employees, UCOR issued its mandatory Vaccination Policy. This Policy puts safety first, as masking alone is imperfect, social distancing is not always possible, and testing only gives a snapshot in time. The three reasons detailed above show that UCOR faced more than a *de minimis* cost in considering Mr. Duncan's requested religious accommodation.

Mr. Stephen Liston, Investigator
January 10, 2022
Page 8

Accordingly, because Mr. Duncan could not be reasonably accommodated without undue hardship to UCOR and its other employees, his religious discrimination claim fails.

### III.    CONCLUSION

Because Mr. Duncan's claim of religious discrimination is without merit, UCOR respectfully requests that the Commission issue a finding of No Probable Cause and that the Charge be promptly dismissed in its entirety. If you have any questions, please let me know.

Sincerely,

*s/ Darius Walker, Jr.*

Darius Walker, Jr.

DW:
Attachments

49878896.1



**UCOR**
an Amentum-led partnership with Jacobs

**Exemption and Accommodation Review –
Interactive Process with Employee**

| Employee Name: | Carl Speer | Date: | 9-21-21 |
|---|---|---|---|
| Badge No.: | 710 297 | HR/LR Rep: | Ray Parrish |
| Job Title: | Instrumentation Specialist | Organization/Project: | Instrumentation |
| Work Location: | 100 VV | Religious or Medical? | Rel |

*The purpose of this meeting is to review your request for accommodation and discuss potential options for that accommodation, should your exemption be granted. This meeting on potential accommodations is an important part of the interactive process between the Employer, UCOR, and you, the employee. This discussion allows you to provide input regarding reasonable accommodations that you feel would help protect you and the workforce while performing your job duties. The exemption request is still under review, and you will be notified by UCOR if the exemption is granted or not. Until a determination on your exemption request is made, the October 1 deadline for the first vaccine dose is inapplicable. UCOR HR will communicate the final determination to you, in writing, which may include an updated vaccination deadline.*

| Would you be able and/or willing to follow any of the possible accommodations listed below? | | | |
|---|---|---|---|
| Weekly Testing (Mandatory) | ☑ Yes | ☐ No | ☐ Other: |
| KN95/N95 Mask Mandate | ☑ Yes | ☐ No | ☐ Other: |
| Mask Fit (if required) | ☑ Yes | ☐ No | ☐ Other: |
| Job Reassignment | ☑ Yes | ☐ No | ☐ Other: |
| Isolation or Distancing | ☑ Yes | ☐ No | ☐ Other: |
| Short-Term Disability (STD) | ☑ Yes | ☐ No | ☐ Other: |
| Daily Self Health Check | ☑ Yes | ☐ No | ☐ Other: |
| Telework (Temporary) | ☑ Yes | ☐ No | ☐ Other: |

**If you were to not be vaccinated, what accommodations do you feel would be appropriate to allow you to perform your job functions?**

- Mostly work alone. Has an office now. Gets personal office
- Training - In groups of unvaxed

```
Exhibit 6
SPEER
v. UCOR
```
*Allison Baker, LCR*

Form-3614 (9/21), Rev. 0 draft

Page 1 of 2

# EXEMPTION & ACCOMODATION REVIEW SUMMARY

| Employee Name:<br>Carl Speer<br>Badge#<br>710297 | Job Function:<br>Instrumentation Specialist<br>Project/Bldg. Location:<br>100 UV | Supervisor |
|---|---|---|
| Interactive Discussion<br>Held with affected<br>employee?<br><br>Yes ☒<br>No ☐ | Date of Discussion:<br>9/21/21<br>Discussion Interviewer:<br>Ray Parrish | Subject: COVID Vaccine Exemption Request |
| Office Worker ☒<br><br>Field Worker ☐ | Exemption Request Type<br><br>Religious ☒<br>Medical ☐ | Comments: |

## RELIGIOUS

| Is this a Sincerely-Held Religious Belief? | Yes ☒ | No ☐ | | |
|---|---|---|---|---|

| Possible Accommodations: | | | | |
|---|---|---|---|---|
| | Weekly Testing (Mandatory) | Yes ☒ | No | ☐ |
| | KN95/N95 Mask Mandate | Yes ☒ | No | ☐ |
| | Mask Fit (If Required) | Yes ☒ | No | ☐ |
| | Job Reassignment | Yes ☐ | No | ☒ |
| | Limited Task Assignment | Yes ☐ | No | ☒ |
| | Isolation or Distancing | Yes ☒ | No | ☐ |
| | Leave of Absence (LOA) | Yes ☒ | No | ☐ |
| | Daily Self Health Check | Yes ☒ | No | ☐ |
| | Telework (Temporary) | Yes ☐ | No | ☒ |

## Medical

| Did UCOR Health Services receive Form 3606? | Yes ☐ | No ☐ |
|---|---|---|
| Did UCOR Health Services approve the Request for Medical Exemption? | Yes ☐ | No ☐ |

| Possible Accommodations: | | | | |
|---|---|---|---|---|
| | Weekly Testing (Mandatory) | Yes ☐ | No | ☐ |
| | KN95/N95 Mask Mandate | Yes ☐ | No | ☐ |
| | Mask Fit (If Required) | Yes ☐ | No | ☐ |
| | Job Reassignment | Yes ☐ | No | ☐ |
| | Limited Task Assignment | Yes ☐ | No | ☐ |
| | Isolation or Distancing | Yes ☐ | No | ☐ |
| | Leave of Absence (LOA) | Yes ☐ | No | ☐ |
| | Short-Term Disability (STD) | Yes ☐ | No | ☐ |
| | Daily Self Health Check | Yes ☐ | No | ☐ |
| | Telework (Temporary) | Yes ☐ | No | ☐ |



**UCOR**
an Amentum-led partnership with Jacobs

**Exemption and Accommodation
Interactive Discussion Intake**

| Employee Name: | MALENA DENNIS | Date: | 9|15|21 |
|---|---|---|---|
| Badge No.: | 71284G | HR/LR Rep: | Mae |
| Job Title: | Sr. RPT | Organization/Project: | 100 UV |
| Work Location: | 100 UV | (Religious) or Medical? | |

*The purpose of this meeting is to review your request for accommodation and discuss potential options for that accommodation, should your exemption be granted. This meeting on potential accommodations is an important part of the interactive process between the Employer, UCOR, and you, the employee. This discussion allows you to provide input regarding reasonable accommodations that you feel would help protect you and the workforce while performing your job duties. The exemption request is still under review, and you will be notified by UCOR if the exemption is granted or not. Until a determination on your exemption request is made, the October 1 deadline for the first vaccine dose is inapplicable. UCOR HR will communicate the final determination to you, in writing, which may include an updated vaccination deadline.*

| Would you be able and/or willing to follow any of the possible accommodations listed below? | | | |
|---|---|---|---|
| Weekly Testing (Mandatory) | ☑ Yes | ☐ No | ☐ Other: |
| KN95/N95 Mask Mandate | ☑ Yes | ☐ No | ☐ Other: |
| Mask Fit (if required) | ☑ Yes | ☐ No | ☐ Other: |
| Job Reassignment | ☑ Yes | ☐ No | ☐ Other: |
| Isolation or Distancing | ☑ Yes | ☐ No | ☐ Other: Already isolated 99% the |
| Short-Term Disability (STD) | ☑ Yes | ☐ No | ☐ Other: |
| Daily Self Health Check | ☑ Yes | ☐ No | ☐ Other: |
| Telework (Temporary) | ☐ Yes | ☑ No | ☐ Other: |

| If you were to not be vaccinated, what accommodations do you feel would be appropriate to allow you to perform your job functions? |
|---|
| Work in country  ✗ put all unvaccin in ofr any rooms togehr to eliminate any concern for exposure — Ease other peoples fears |

Form-3614 (9/21), Rev. 0 draft

**Exhibit 8
SPEER
v. UCOR**
*Allison Baker, LCR*

Page 1 of 2

# EXEMPTION & ACCOMODATION REVIEW SUMMARY

| | | |
|---|---|---|
| Employee Name: Malena Dennis<br><br>Badge# 712849 | Job Function: Sr. RPT<br><br>Project/Bldg. Location: 100 UNV | Supervisor: Laura Williams |
| Interactive Discussion Held with affected employee?<br><br>Yes ☒   No ☐ | Date of Discussion: 9/15/21<br><br>Discussion Interviewer: MAD | Subject: COVID Vaccine Exemption Request - Religious |
| Office Worker ☒<br><br>Field Worker ☐ | Exemption Request Type<br><br>Religious ☒<br>Medical ☐ | Comments: |

## RELIGIOUS

Is this a Sincerely-Held Religious Belief?       Yes ☒       No ☐

| Possible Accommodations: | | | | | |
|---|---|---|---|---|---|
| | Weekly Testing (Mandatory) | Yes | ☒ | No | ☐ |
| | KN95/N95 Mask Mandate | Yes | ☒ | No | ☐ |
| | Mask Fit (If Required) | Yes | ☒ | No | ☐ |
| | Job Reassignment | Yes | ☐ | No | ☒ |
| | Limited Task Assignment | Yes | ☒ | No | ☐ |
| | Isolation or Distancing | Yes | ☒ | No | ☐ |
| | Leave of Absence (LOA) | Yes | ☐ | No | ☒ |
| | Daily Self Health Check | Yes | ☒ | No | ☒ |
| | Telework (Temporary) | Yes | ☐ | No | ☒ |

## Medical

| | | | | | |
|---|---|---|---|---|---|
| Did UCOR Health Services receive Form 3606? | | Yes | ☐ | No | ☐ |
| Did UCOR Health Services approve the Request for Medical Exemption? | | Yes | ☐ | No | ☐ |

| Possible Accommodations: | | | | | |
|---|---|---|---|---|---|
| | Weekly Testing (Mandatory) | Yes | ☐ | No | ☐ |
| | KN95/N95 Mask Mandate | Yes | ☐ | No | ☐ |
| | Mask Fit (If Required) | Yes | ☐ | No | ☐ |
| | Job Reassignment | Yes | ☐ | No | ☐ |
| | Limited Task Assignment | Yes | ☐ | No | ☐ |
| | Isolation or Distancing | Yes | ☐ | No | ☐ |
| | Leave of Absence (LOA) | Yes | ☐ | No | ☐ |
| | Short-Term Disability (STD) | Yes | ☐ | No | ☐ |
| | Daily Self Health Check | Yes | ☐ | No | ☐ |
| | Telework (Temporary) | Yes | ☐ | No | ☐ |

 **UCOR**
an Amentum-led partnership with Jacobs

# Exemption and Accommodation
# Interactive Discussion Intake

| Employee Name: | Zachariah Duncan | Date: | 9/15 |
|---|---|---|---|
| Badge No.: | 71456 | HR/LR Rep: | Vanessa Hulsombeck |
| Job Title: | Material Clerk | Organization/Project: | |
| Work Location: | | Religious or Medical? | Religious |

*The purpose of this meeting is to review your request for accommodation and discuss potential options for that accommodation, should your exemption be granted. This meeting on potential accommodations is an important part of the interactive process between the Employer, UCOR, and you, the employee. This discussion allows you to provide input regarding reasonable accommodations that you feel would help protect you and the workforce while performing your job duties. The exemption request is still under review, and you will be notified by UCOR if the exemption is granted or not. Until a determination on your exemption request is made, the October 1 deadline for the first vaccine dose is inapplicable. UCOR HR will communicate the final determination to you, in writing, which may include an updated vaccination deadline.*

| Would you be able and/or willing to follow any of the possible accommodations listed below? | | | |
|---|---|---|---|
| Weekly Testing (Mandatory) | ☑ Yes | ☐ No | ☐ Other: ~~Will Consider~~ CWK&D 9/15/21 |
| KN95/N95 Mask Mandate | ☑ Yes | ☐ No | ☐ Other: |
| Mask Fit (if required) | ☑ Yes | ☐ No | ☐ Other: |
| Job Reassignment | ☑ Yes | ☐ No | ☐ Other: |
| Isolation or Distancing | ☐ Yes | ☑ No | ☐ Other: |
| Short-Term Disability (STD) | ☑ Yes | ☐ No | ☐ Other: |
| Daily Self Health Check | ☑ Yes | ☐ No | ☐ Other: |
| Telework (Temporary) | ☐ Yes | ☐ No | ☐ Other: N/A |

| If you were to not be vaccinated, what accommodations do you feel would be appropriate to allow you to perform your job functions? |
|---|
| Under current controls you cant think of anything else. |

**Exhibit 9**
SPEER
v. UCOR

*Allison Baker, LCR*
Page 1 of 2

Form-3614 (9/21), Rev. 0 draft

# EXEMPTION & ACCOMODATION REVIEW SUMMARY

| Employee Name: *Zachariah Duncan* Badge# *71456* | Job Function: *Material Clerk* Project/Bldg. Location: *Matt Friley* | Supervisor |
|---|---|---|
| Interactive Discussion Held with affected employee?  Yes ☑  No ☐ | Date of Discussion: *9-15-21* Discussion Interviewer: *Vanessa Holsambach* | Subject: COVID Vaccine Exemption Request |
| Office Worker ☐  Field Worker ☑ | Exemption Request Type  Religious ☑  Medical ☐ | Comments: |

## RELIGIOUS

| Is this a Sincerely-Held Religious Belief? | Yes ☑ | No ☐ |
|---|---|---|

| Possible Accommodations: | | Yes | | No | |
|---|---|---|---|---|---|
| | Weekly Testing (Mandatory) | Yes | ☑ | No | ☐ |
| | KN95/N95 Mask Mandate | Yes | ☑ | No | ☐ |
| | Mask Fit (If Required) | Yes | ☑ | No | ☐ |
| | Job Reassignment | Yes | ☑ | No | ☐ |
| | Limited Task Assignment | Yes | ☑ | No | ☐ |
| | Isolation or Distancing | Yes | ☑ | No | ☐ |
| | Leave of Absence (LOA) | Yes | ☑ | No | ☐ |
| | Daily Self Health Check | Yes | ☑ | No | ☐ |
| | Telework (Temporary) | Yes | ☐ | No | ☑ |

## Medical

| Did UCOR Health Services receive Form 3606? | Yes ☐ | No ☐ |
|---|---|---|
| Did UCOR Health Services approve the Request for Medical Exemption? | Yes ☐ | No ☐ |

| Possible Accommodations: | | Yes | | No | |
|---|---|---|---|---|---|
| | Weekly Testing (Mandatory) | Yes | ☐ | No | ☐ |
| | KN95/N95 Mask Mandate | Yes | ☐ | No | ☐ |
| | Mask Fit (If Required) | Yes | ☐ | No | ☐ |
| | Job Reassignment | Yes | ☐ | No | ☐ |
| | Limited Task Assignment | Yes | ☐ | No | ☐ |
| | Isolation or Distancing | Yes | ☐ | No | ☐ |
| | Leave of Absence (LOA) | Yes | ☐ | No | ☐ |
| | Short-Term Disability (STD) | Yes | ☐ | No | ☐ |
| | Daily Self Health Check | Yes | ☐ | No | ☐ |
| | Telework (Temporary) | Yes | ☐ | No | ☐ |