| | | |
|---|---|---|
| CARLTON SPEER, MALENA | ) | |
| DENNIS, and ZACHARIAH DUNCAN, | ) | Case No. 3:22-cv-426 |
| individually and on behalf of all | ) | |
| others similarly situated, | ) | Judge Travis R. McDonough |
| | ) | |
| *Plaintiffs*, | ) | Magistrate Judge Jill E. McCook |
| | ) | |
| v. | ) | |
| | ) | |
| UCOR LLC, | ) | |
| | ) | |
| *Defendant*. | ) | |

## MEMORANDUM OPINION

Before the Court is Defendant UCOR LLC's motion for summary judgment (Doc. 101).

For the reasons set forth below, the motion (*id.*) will be **GRANTED IN PART** and **DENIED IN PART**.

## I.    BACKGROUND

Defendant UCOR LLC is a contractor for the Department of Energy ("DOE") that provides nuclear and environmental cleanup services at the East Tennessee Technology Park, the Oak Ridge National Laboratory, and the Y-12 National Security Complex. (Doc. 103-1, at 46.) Plaintiffs Carlton Speer, Malena Dennis, and Zacharia Duncan are former UCOR employees. (*Id.* at 48–52.) Speer worked as a Senior Radiological Protection Special Technical Lead and was responsible for calibrating equipment used to detect radiation at the work site. (*Id.* at 48.) Dennis was a Senior Radiation Protection Technician and was responsible for testing workers for radioactive contamination. (*Id.* at 49.) Duncan was a Material Clerk and was responsible for transporting materials to and from various worksites. (*Id.* at 51.)

On August 26, 2021, Defendant announced that it would require all employees and subcontracted employees to be fully vaccinated against Covid-19 by November 1, 2021. (*Id.* at 162–163.) Defendant chose to implement this policy after reviewing information from the Center for Disease Control and Prevention ("CDC"), among other sources, which indicated that the Covid-19 Vaccine was the "most effective control to mitigate the spread of [Covid]-19." (*Id.* at 106.) In announcing its new policy, Defendant informed employees that it would "accept requests for exemptions due to disability/medical reasons or sincerely held religious beliefs and w[ould] review those on a case-by-case basis." (*Id.* at 163.) Plaintiffs each requested a religious exemption. (*Id.* at 48–52.)

Defendant used a multi-step process to evaluate religious-exemption requests. As an initial step, employees were required to submit an "Exemption Request Form" in which they described their religious beliefs and how these beliefs conflicted with Defendant's vaccine policy. (*Id.* at 169.) Duncan based his request, in large part, on his belief that "[he] cannot knowingly receive any form of medical treatment that would cause [him] to benefit from an abortion." (Doc. 113-1, at 4.) Speer similarly based his request on his belief that "taking an injection into [his] body that was produced, manufactured, or developed using the cells derived from an abortion . . . [is] a sin." (*Id.* at 1.) Dennis also stated that she believed that the vaccine was developed "using aborted fetal cells" and therefore taking the vaccine would go against her Christian faith. (Doc. 103-1, at 192.)

The exemption-request forms were then sent to the "Accommodation Review Committee" ("the Committee"), which consisted of Defendant's human-resources staff. The Committee considered the exemption-request forms as they came in and, in rare cases, requested additional information about employees' beliefs. (*Id.* at 84.) After this initial intake process, a

Committee member conducted a one-on-one interview with each employee who requested an exemption in order to determine which accommodations were possible. (*See*, *e.g.*, *id.* at 186.) In this meeting, each employee filled out a form indicating whether she was "able and/or willing" to follow a list of nine possible accommodations. (*Id.*) These accommodations included: "weekly testing, enhanced face coverings, mask-fit tests, limited task reassignment, job reassignment, work-location adjustments, isolation, distancing, leaves of absence, daily self-health checks, and telework."[1] (*Id.*) Employees could suggest accommodations that they "[felt] would be appropriate to allow [them] to perform [their] job functions." (*Id.*) Vanessa Holsomback, a member of UCOR's human-resources department, collected the forms and entered the information into a spreadsheet with the names of the employees redacted. (*Id.* at 82–84.)

A different Committee member interviewed each Plaintiff. (*See id.* at 186, 194, 200.) Speer met with Ray Parrish on September 21, 2021. (*Id.* at 186–87.) Speer indicated that he was willing to follow all nine possible accommodations and also proposed that he be given a "personal office" and that groups of unvaccinated employees be trained together. (*Id.* at 186.) Dennis met with Mary Alice Douglass on September 15, 2021, and indicated she could follow all listed accommodations except for telework. (*Id.* at 194–96.) Like Speer, Dennis suggested that all unvaccinated employees be grouped together to "ease other people's fears." (*Id.* at 194.) Finally, Duncan met with Holsomback on June 15, 2021, and agreed with all potential accommodations except for "isolation or distancing." (*Id.* at 200–01.)

After each interview, the Committee member filled out an "Exemption & Accommodation Review Summary" in which they assessed whether each Plaintiff's belief constituted a "Sincerely-Held Religious Belief," as well as the viability of the possible

---

[1] Weekly testing and wearing a mask were both marked as "mandatory." (Doc. 103-1, at 186.)

3

accommodations.  (*Id.* at 352.)  The Committee members noted that they believed Plaintiffs' objections to the vaccine were based on sincerely-held religious beliefs.[2]  (*See id.* at 188, 196, 209.)  The Committee members, however, determined that some of the listed accommodations were not viable for Plaintiffs.  Parrish indicated that job reassignment, limited task assignment, and telework were not viable accommodations for Speer.  (*Id.* at 188.)  Douglass indicated that job reassignment, leave of absence, and telework were not viable for Dennis.  (*Id.* at 196.)  Finally, Holsomback found that telework was not a viable accommodation for Duncan.  (*Id.* at 209.)

Defendant summarized its evaluations in a spreadsheet.  (*Id.* at 172.)  This spreadsheet listed possible accommodations on one axis and the impact of each accommodation on the other axis.  (*Id.*)  First, Defendant considered the monetary cost of potential accommodations such as providing weekly testing and N-95 facemasks.  (*Id.*)  Defendant assessed that the cost of providing these accommodations would be $19,719 per employee per year.  (*Id.*)  Defendant then considered whether exempting employees would:  (1) decrease workplace efficiency; (2) infringe on the rights of other employees; (3) require other employees to do more difficult work; (4) conflict with a law or regulation; and (5) compromise workplace safety or increase the risk of legal liability.  (*Id.*)  Defendant found that the monetary cost of providing accommodations and the risk that exemptions would compromise workplace safety were "greater than de minimis"

---

[2] There is some dispute as to what this determination looked like.  Charles Malarkey, UCOR's Administrative Services Manager, averred that, "[f]or the purposes of the accommodation process, UCOR did not dispute that each religious-exemption request was based upon a sincerely-held belief."  (Doc. 103-1, at 48.)  However, Malarkey also averred that "[t]he committee reviewed each [request] individually to make a determination on whether or not the employee's request was based on a sincerely-held religious belief."  (*Id.* at 47.)  Malarkey further testified that in a "few cases where it wasn't obvious whether it was a sincerely-held religious belief or not [ ] we asked [for] more information."  (*Id.* at 83.)  It is unclear from the record if Plaintiffs were among these "few cases."

costs.[3]  (*Id.*)  Defendant reviewed the collective costs and impacts and then, in a separate spreadsheet, confirmed on a person-by-person basis that that an exemption could not be granted without undue hardship.  (*Id.* at 89–90, 172–73.)  Defendant found that accommodating each Plaintiff was a "more than [] De Minimis Cost/Burden" and determined that Plaintiffs' requests should be denied.  (*Id.* at 173.)

Defendant denied Plaintiffs' exemption requests on October 4, 2021, citing "[u]ndue hardship to UCOR" as the reason for the denial.[4]  (*Id.* at 189.)  Defendant informed Plaintiffs that they had until October 7, 2021, to provide proof that they received the first dose of the vaccine and warned Plaintiffs that if they did not do so, they "[would] enter the progressive discipline process."  (*Id.*)  Plaintiffs did not receive the vaccine by the deadline, and Defendant sent them another letter warning that they would be placed on administrative leave if they did not provide proof of vaccinate by October 14, 2021.  (*Id.* at 190.)  When Plaintiffs again failed to provide proof of vaccination, Defendant gave them a last warning that they would be terminated on November 1, 2021, if they "[did] not initiate the vaccine process" by that date.  (*Id.* at 191.)  Plaintiffs did not receive the vaccine and were terminated on November 1, 2021.  (*Id.* at 63.)

Employees seeking a medical exemption, as opposed to a religious exemption, were required to go through a distinct process.  (*Id.* at 170.)  First, they had to have a doctor certify that they had a medical condition that would prevent them from complying with the vaccine requirement.  (*Id.* at 171.)  The doctor was required to describe the condition, note how long the

---

[3] Defendant also noted that allowing employees to take a leave of absence would result in a "great than De Minimis [cost] from an efficiency perspective."  (Doc. 103-1, at 172.)

[4] There is some dispute over who made the final decision to deny Plaintiff's exemption requests. Plaintiff argues that the Committee did not make the decision as a group as Defendant asserts. (Doc. 112, at 11 n.4.)  It is immaterial to the Court's analysis which employee or employees made the final decision.

condition would last, and recommend changes to the employee's work environment or job responsibilities that "would enable the employee to perform their job safely in a manner to better protect themselves and others from COVID-19." (*Id.*) Defendant's in-house medical staff then reviewed the request and determined whether an accommodation was appropriate based on the medical condition. (*See id.* at 79; Doc. 113-1, at 95; Doc. 138-3, at 1.) As it did for religious-exemption requests, Defendant summarized its undue-hardship evaluation in a spreadsheet. (*See* Doc. 138-3, at 1–5; Doc. 138-4, at 1.) Defendant evaluated undue hardship using the Americans with Disabilities Act's ("ADA") standard of "significant difficulty/burden or expense." (Doc. 138-4, at 1.)

In total, Defendant considered ninety-eight religious-exemption requests (Doc. 103-1, at 87) and seventy medical-exemption requests (Doc. 113-1, at 95). Defendant denied all ninety-eight religious-exemption requests and sixteen medical-exemption requests.[5] (*Id.*) Of the fifty-four medical exemptions Defendant granted, nineteen were permanent exemptions. (*Id.*) The other thirty-six exemptions were "classified as 'temporary approvals' based on medical evaluation from the individuals['] [primary care provider] and concurred [sic] by UCOR [medical staff]." (*Id.*)

On November 29, 2022, Plaintiffs filed a putative class-action complaint, asserting claims against Defendant pursuant to Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.*, and the Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. § 2000bb, *et seq.*[6] (Doc. 1.) On February 13, 2023, the Court granted Defendant's motion to dismiss Plaintiffs' RFRA claim pursuant to Federal Rule of Civil Procedure 12(b)(6). (Doc. 25.) As a

---

[5] Fifty-three employees chose to receive the vaccine after their exemption requests were denied. (Doc. 113-1, at 95.)

[6] The Court denied Plaintiffs' motion to certify the class on November 6, 2023. (Doc. 52.)

result, the only claims remaining are Plaintiffs' Title VII claims. (*See* doc. 12, at 9–10.) On June 3, 2024, Defendant moved for summary judgment. (Doc. 101.) Defendant's motion is now ripe.

## II. STANDARD OF REVIEW

### A. Summary Judgment

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court views the evidence in the light most favorable to the nonmoving party and makes all reasonable inferences in favor of the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Nat'l Satellite Sports, Inc. v. Eliadis Inc.*, 253 F.3d 900, 907 (6th Cir. 2001). The moving party bears the burden of demonstrating that there is no genuine dispute as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Leary v. Daeschner*, 349 F.3d 888, 897 (6th Cir. 2003). The moving party may meet this burden either by affirmatively producing evidence establishing that there is no genuine issue of material fact or by pointing out the absence of support in the record for the nonmoving party's case. *Celotex*, 477 U.S. at 325. Once the movant has discharged this burden, the nonmoving party can no longer rest upon the allegations in the pleadings; rather, it must point to specific facts supported by evidence in the record demonstrating that there is a genuine issue for trial. *Chao v. Hall Holding Co., Inc.*, 285 F.3d 415, 424 (6th Cir. 2002).

At summary judgment, the Court may not weigh the evidence; its role is limited to determining whether the record contains sufficient evidence from which a jury could reasonably find for the non-movant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986). A mere scintilla of evidence is not enough; the Court must determine whether a fair-minded jury could

return a verdict in favor of the non-movant based on the record. *Id.* at 251–52; *Lansing Dairy, Inc. v. Espy*, 39 F.3d 1339, 1347 (6th Cir. 1994). If not, the Court must grant summary judgment. *Celotex*, 477 U.S. at 323.

## III. ANALYSIS

### A. Failure to Accommodate

Defendant first argues that it is entitled to summary judgment on Plaintiffs' failure-to-accommodate claim because: (1) Plaintiffs cannot establish that their objections to Defendant's vaccination policy were based on a sincerely held religious belief; and (2) Defendant could not have accommodated Plaintiffs without undue hardship. (Doc. 102, at 21, 23.)

To establish a *prima facie* case for a failure-to-accommodate claim under Title VII, a plaintiff must show:

> (1) He holds a sincere religious belief that conflicts with an employment requirement;
> (2) He has informed the employer about the conflict; and
> (3) He was discharged or disciplined for failing to comply with the conflicting employment requirement.

*Bolden v. Lowes Home Centers, LLC*, 783 F. App'x 589, 597 (6th Cir. 2019) (citations omitted). After a plaintiff establishes a prima facie case, the burden shifts to the employer to show that it could not reasonably accommodate the employee without "undue hardship." *Tepper v. Potter*, 505 F.3d 508, 514 (6th Cir. 2007). If the employer demonstrates that any accommodation would cause undue hardship, then it is not liable, even if no accommodation is provided. *See Smith v. Pyro Min. Co.*, 827 F.2d 1081, 1086 (6th Cir. 1987) ("An employer may nonetheless establish undue hardship without actually putting an accommodation into effect").

###### 1.    Sincerely Held Religious Beliefs

Defendant argues that Plaintiffs have not established that their objections to the vaccine requirement were based on a sincerely held religious belief.[7]  (Doc. 102, at 21.)

To establish the threshold element in a failure-to-accommodate claim, a plaintiff must prove to the factfinder "(1) [] the belief for which protection is sought [is] religious in [a] person's own scheme of things, and (2) [it] is [] sincerely held."[8][9]  *Redmond v. GAF Corp.*, 574 F.2d 897, 901 n.12 (7th Cir. 1978) (quotations omitted).  "Religion" is defined broadly under Title VII to include "all aspects of religious observance and practice, as well as belief."  42 U.S.C. § 2000e(j).  A factfinder cannot determine if a belief is religious by simply looking to an "external set of forces and rules that compel an individual to act one way or another," such as the official doctrine of a religious sect.  *Jones v. First Ky. Nat'l Corp.*, No. 84-5067, 1986 WL 398289, at *4 (6th Cir. July 17, 1986); *see also Yaacov v. Mohr*, No. 16-4361, 2018 WL 6333604, at *2 (6th Cir. June 5, 2018) ("Courts are not arbiters of scriptural interpretation . . .

---

[7] There is no question that Plaintiffs informed Defendant that their beliefs conflicted with Defendant's vaccination policy or that they were fired when they refused to comply.

[8] Indeed, there can be no religious discrimination without this proof because only beliefs that fall within the statutory definition of "religion" qualify for protection under Title VII.  *See* 42 U.S.C. § 2000e(j) ("The term 'religion' includes all aspects of religious observance and practice, as well as belief"); *Peterson v. Wilmur Commc'ns, Inc.*, 205 F. Supp. 2d 1014, 1018 (E.D. Wis. 2002) ("As a threshold matter, the plaintiff must show that his or her beliefs constitute a 'religion' under the meaning of Title VII.").

[9] While neither the Supreme Court nor the Sixth Circuit has spoken at length about what it means to have a "sincerely held" religious belief in the Title VII context, both have extensively discussed the issue in the context of the Constitution and the Religious Land Use and Institutionalized Persons Act.  *See United States v. Seeger*, 380 U.S. 163, 185 (1969); *see Cavin v. Mich. Dep't of Corr.*, 927 F.3d 455 (6th Cir. 2019).  The language of "sincerely held religious belief" is identical in Title VII, so it is appropriate to apply precedent from these contexts here. *See also Redmond*, 574 F.2d at 901 n.12 ("We believe the proper test to be applied to the determination of what is 'religious' under [Title VII] can be derived from the Supreme Court decisions [addressing religion outside of the Title VII context]").

9

and they must not presume to determine the place of a particular belief in a religion") (quotations and citations omitted).  Instead, the question is "whether the belief or practice asserted is 'religious' in the 'person's own scheme of things.'" *Jones*, 1986 WL 398289 at *3 (quoting *Seeger*, 380 U.S. at 185).

While this means that "religion" is broadly defined, the definition "does not expand to include every belief, opinion, or ideology." *Prida v. Option Care Enterprises, Inc.*, No. 5:23-CV-00905, 2023 WL 7003402, at *4 (N.D. Ohio Oct. 24, 2023).  Beliefs that are "political, sociological, or philosophical" are not "religious" within the meaning of Title VII. *Id.* (citations and internal quotations omitted).  Therefore, in the context of an accommodation request, a court must determine that the belief in conflict with an employment requirement is religious rather than merely political or ideological.  *See Holt v. Hobbs*, 574 U.S. 352, 360–61 (2015) ("[O]f course, a [plaintiff's] request for an accommodation must be sincerely based on a religious belief and not [based on] some other motivation.") (citing *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 717 n.28 (2014)); *Wisconsin v. Yoder*, 406 U.S. 205, 216 (1972) (noting that "a choice [that] was philosophical and personal" does not "rest on a religious basis").

If a plaintiff asserts a belief that is religious on its face, she must then demonstrate that it is "sincerely held," not merely a "pretextual assertion of a religious belief in order to obtain an [accommodation]." *Burwell*, 573 U.S. at 717 n.28.  "[S]incerity is a factual finding," and while proving sincerity is typically "not a difficult hurdle," the factfinder "need not take a [plaintiff] at his word" that he is sincere in his beliefs.  *See Ackerman v. Washington*, 16 F.4th 170, 180–81 (6th Cir. 2021) (citing *Cavin v. Mich. Dep't of Corr.*, 927 F.3d 455, 459 (6th Cir. 2019).  Instead, a factfinder must "determine whether the line drawn by the plaintiff between conduct consistent and inconsistent with her or his religious beliefs reflects an honest conviction." *Id.*  To do so, the

factfinder looks at a variety of factors such as the plaintiff's "length of adherence, knowledge about the belief system, and the existence of religious literature and teachings supporting the belief." *Id*. A factfinder may also consider a plaintiff's past behavior, including whether they have "wavered in their dedication" to the belief. *Id*.

Here, Defendant argues that the beliefs of all three Plaintiffs are neither religious nor sincerely held, but rather ideological and opportunistically adopted. (Doc. 102, at 21.) The Court will consider each Plaintiff's beliefs in turn.[10]

Duncan based his accommodation request on his belief that "[he] cannot knowingly receive any form of medical treatment that would cause [him] to benefit from an abortion." (Doc. 113-1, at 4.) Duncan cited a variety of religious sources which informed his beliefs. (Doc. 113-1, at 3–7.) In his deposition, Duncan testified that his belief the vaccine was sinful was informed by months of studying the Bible, finding "examples of other Christians who felt the same, [and] see[ing] what their arguments were for or against [vaccination]." (Doc. 103-1, at 38.) Courts routinely accept that opposition to vaccination based on purportedly religious concerns over abortion constitute beliefs that are religious on their face. *See Williams v. Blue Cross Blue Shield of Michigan*, No. 23-CV-12066, 2024 WL 1994258, at *4 (E.D. Mich. May 6,

---

[10] Plaintiffs treat this element of their case as a foregone conclusion and suggest that the Court may not evaluate whether or not Plaintiffs' beliefs are religious or sincerely held. (*See* Doc. 112, at 2.) This is an inaccurate statement of the law. While it is not the place of a court to disregard or reject a belief as not "religious" simply because it does not fall squarely within a well-known religious doctrine, a court must still evaluate whether the belief is religious in nature and whether it is sincerely held. *See Seeger*, 380 U.S. at 185 (1965) (describing sincerity as a "threshold question . . . which must be resolved in every case"). Indeed, "courts in the Sixth Circuit have dismissed claims brought by plaintiffs seeking accommodations by cloaking their secular beliefs in the language and protections of Title VII." *Prida*, 2023 WL 7003402, at *4 (collecting cases). Plaintiffs bear the burden of providing enough evidence for a reasonable jury to conclude that their beliefs are religious and sincerely held. For whatever reason, they have made very little effort to do so.

2024) ("Courts have held that a plaintiff sufficiently pleads the first element of a failure to accommodate religious beliefs claim when the COVID-19 vaccine objection is based on a religious belief regarding the use of aborted fetal cells.") (collecting cases).

Defendant notes, however, that Duncan testified at deposition that he would "probably" continue to take his migraine medicine even if he learned it was developed using aborted fetal cells. (Doc. 103-1, at 43.) Duncan also testified that he did not attempt to do any research to determine whether the medicine he was currently using was developed using fetal cells. (*Id.*) This suggests a degree of insincerity in the beliefs at issue in Duncan's claim. *See Ackerman*, 16 F.4th at 182 (noting that "wavering dedication might suggest insincerity"). Duncan also noted in his exemption request that "[a]ny 'scientific' claims that tout the future safety and efficacy of the COVID vaccines are pure speculation," which would tend to suggest that his objection was based on something other than religion. (Doc. 103-1, at 203.) And he testified that such concerns "weighed into" his decision to refuse the vaccine." (*Id.* at 43.) Although contradictory, this evidence is not so overwhelming that a reasonable jury could not choose to credit Duncan's testimony that his belief was religious and sincerely held, and there is a genuine dispute of material fact which is not appropriate for summary judgment.

Speer similarly based his accommodation request on his belief that "taking an injection into [his] body that was produced, manufactured, or developed using the cells derived from an abortion . . . [is] a sin" and cited Bible passages as the source of his beliefs. (*Id.* at 185.) Speer testified that he did not want to get the vaccine partially because "[he] didn't believe it was safe or effective." (*Id.* at 11.) Speer further testified that "right" leaning political websites influenced his decision to refuse the vaccine. (*Id.* at 13–14.) As with Duncan, this conflicting evidence

creates a dispute of material fact which a jury must resolve. [11]

Dennis's beliefs pose a more difficult question. Like Duncan and Speer, Dennis based her objection on a belief that the vaccine was developed "using aborted fetal cells" and that taking the vaccine would go against her Christian faith. (*Id.* at 192.) She similarly cites the Bible as the source of her belief. (*Id.*) Dennis therefore states a belief which is religious on its

---

[11] Defendant argues that "Speer and Duncan's alleged belief that their bodies are 'a temple of the Holy Spirit'" do not constitute religious beliefs. (Doc. 102, at 23 (citation omitted).) However, the Sixth Circuit recently found that a plaintiff's belief that "[her] body is the temple of the Holy Spirit, and taking the COVID-19 vaccine, would be defiling [her] body" constituted a facially-religious belief. *Sturgill v. Am. Red Cross*, No. 24-1011, 2024 WL 3886589, at *3 (6th Cir. Aug. 21, 2024). The court did, however, suggest that in certain circumstances this "body-as-a-temple" belief may be too broad to qualify as a religious belief that an employer was required to accommodate, as it would amount to a de facto privilege for an employee to dictate almost all aspects of her work environment. *See id.* at *5.

Duncan's belief arguably approaches this extreme. He states that "[t]he Holy Spirit guides me through my decision making in everyday life . . . If I believe a product (ie: alcohol, drugs etc) could potentially harm or defile the Temple of the Holy Spirit (my body), then it is my responsibility as a Christian to stay away from that product." (Doc. 113-1, at 3.) Duncan is essentially asserting that he can make any decision he wants related to his health and an employer is bound to accommodate him. The Court is skeptical that Title VII extends so far. *See Yoder*, 406 U.S. at 215–16 ("[T]he very concept of ordered liberty precludes allowing every person to make his own standards on matters of conduct in which society as a whole has important interests").

Moreover, the Sixth Circuit in *Sturgill* stated that "we need not define the outer limits of Title VII's scope on this point." 2024 WL 3886589, at *5. The court in *Sturgill* held that the body-as-a-temple belief is religious if an employee seeks to avoid vaccination, but also suggested that it may not be if, for instance, "an employee claims she cannot perform work on a particular day based on environmental concerns." *Id.* As a result, according to the Sixth Circuit, whether this belief is "religious" appears to depend partly on the accommodation an employee seeks. When the body-as-a-temple belief is asserted to refuse a vaccination, it qualifies as a religious belief, but it may not so qualify when different accommodations are sought. In other words, the determination of whether a belief is religious depends on what it conflicts with, not the belief itself. This analysis is more akin to whether an accommodation constitutes an undue hardship, not whether the belief is religious in the first place. To be useful, precedent considering the body-as-a-temple belief must acknowledge it either as religious or, as is consistent with the majority of caselaw, too broad to constitute a religious belief regardless of the context in which it is asserted. *See, e.g., Yoder*, 406 U.S. at 215–16. Fortunately, the Court need not determine the precise meaning of *Sturgill*, because Duncan has stated a facially religious belief based on abortion.

face. The real issue is sincerity. There is a great deal of evidence that Dennis's objection to the vaccine was rooted in ideological or political, not religious, concerns. On October 12, 2021, Dennis created a Telegram group chat with other UCOR employees entitled "Take This Jab and Shove It." (Doc. 103-1, at 268.) Dennis frequently posted about the vaccine in the group chat, with most of her posts being overtly political.[12] These posts culminated in Dennis writing a thirty-five-line poem entitled "Don't Trust Their Science,"[13] in which she encouraged opposition to the Covid-19 vaccine without a mention of any religious belief; instead, her poem portrayed Covid-19 and the vaccines as the political left's attempt to ensure conformity and compliance following recent political unrest. (*Id.* at 27, 299–300.) The poem reads in full:

> Hello COVID, we're not friends
> Your variants will never end
> You've come back as Delta and Omicron
> Winter's coming and it's game on
> I'm freaking sick of what fake news is showing
> They are lame
> They need us to trust the science
>
> The commies need to leave this place
> I want them all out of my face
> They all run when I talk about
> The stolen election really freaks them out
> They're working hard on the great reset to get back in line
> So little time
> They need us to trust the science
>
> Like will they try to force the jab
> Will we be banned from taxi cabs
> People lining up for the juice
> People pushing for masks and boosts
> People need to hold the line and grow a pair
> If they dare
> You can shove your science

---

[12] Dennis posted under the acronym "T." (*See id.*)

[13] Dennis testified that that "their science" refers to the Covid-19 vaccine. (Doc. 103-1, at 29.)

We have to take it all back
Work hard to make an impact
We have to stand for our nation
Just say no to their oppression
But we're all just waiting for that tweet
On the edge of my seat
And ignore their science

As a country we all prayed
Make Biden Joe go away
Take Kamala with you too
The CDC and The Who
And the sign said, the words Let's Go Brandon was written on the subway wall
Hear them call
[Fuck Joe Biden][14] don't trust his science[.][15]

(*Id.* at 299–300.)  Notably absent is any reference to abortion or the sinfulness of receiving the

vaccine.  (*Id.*)

---

[14] Dennis used the acronym "FBJ," which she testified stands for "Fuck Joe Biden":

Defense Counsel:  What is FBJ?
Dennis:  Well, it was a phrase that was going around at the time.
Defense Counsel:  Does that stand for fuck Joe Biden?
Dennis:  Yes.

(Doc. 103-1, at 29.)

[15] Dennis's explanation of her poem undercuts her credibility.  Dennis testified that her poem is a "parody song."  (Doc. 103-1, at 24.)  However, Dennis failed to explain what the poem was parodying while also claiming that it "didn't mean anything" or that she chose certain words simply because they rhymed:

Defense Counsel:  How does this – what does that mean, "We have to stand for our nation?"
Dennis:  I don't know.  It fit in the line, to be honest with you.
Defense Counsel:  Did you write this or did you copy and paste it from somewhere else?
Dennis:  I wrote it.
Defense Counsel:  "Just say no to their oppression?"  Whose oppression?
Dennis:  There again, it was a parody.  It wasn't talking about anyone in particular.  In general.
Defense Counsel:  The next line is, "But we're all just waiting for that tweet."  What Tweet?
Dennis:  I have no idea.  It rhymed.  I needed to figure out something that would fit in there.
Defense Counsel:  And then it says, "And ignore their science."  What does that mean?
Dennis:  It doesn't mean anything because it's a parody.

(*Id.* at 27–28.)

This was not Dennis's only ideological post regarding the vaccine. She also posted about a Pfizer patent application, questioning, "[i]s the purpose of this [patent application] to remote contact trace all vaccinated humans worldwide who are or will be connected to the 'internet of things' by frequencies? Read and decide for yourself." (*Id.* at 280.) Dennis further espoused her belief that "this 'vaccine' is gene-therapy and destroys your ability to fight off the variants." (*Id.* at 290.) Despite the frequency of her posts, Dennis never mentioned abortion or her belief that fetal cells were used in developing the vaccine. (*See generally id.* at 268–300.)

This evidence leaves a factfinder with substantial evidence of insincerity and pretext on one side, and Dennis's unsupported, self-serving testimony on the other side.[16] *See Davis v. Gallagher*, 951 F.3d 743, 750 (6th Cir. 2020) ("[W]here self-serving testimony is blatantly and demonstrably false, it understandably may not create a genuine issue of material fact, thereby allowing a court to grant summary judgment.") (citations omitted). However, sincerity is a question of credibility that is best left, at present, to a jury.[17]

---

[16] Plaintiffs also point to facts which tend to show that Dennis is a Christian. (Doc. 113-1, at 8–15.) For instance, Dennis testified in her deposition that she was baptized and taught Sunday school for approximately three years. (*Id.* at 9.) However, in a failure-to-accommodate case, the fact that an employee can demonstrate that she belongs to a religious sect can only go so far. The question is whether a person's particular *belief* is religious and sincerely held. *Bolden*, 783 F. App'x at 597 (6th Cir. 2019) ("[a] plaintiff must show that [] he holds a sincere religious belief that conflicts with an employment requirement") (citations and internal quotations omitted). A religious person's beliefs are not religious simply because the person is. For instance, a devout Muslim's belief that strawberry is the best ice-cream flavor could hardly be considered a religious belief just because the man who holds it is devoutly religious. The question for the jury is whether Dennis's own *specific belief* regarding the vaccine is sincerely held.

[17] If, at trial, Defendant believes that it is entitled to judgment on this issue, it may make a motion for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50.

Because there is a genuine issue of material fact as to whether Plaintiffs sincerely held a religious belief which conflicted with the vaccine requirement, summary judgment in favor of Defendant is not appropriate.[18]

### 2. Undue Hardship

Defendant next argues that it has established that it could not accommodate Plaintiffs without undue hardship. (Doc. 102, at 23.)

In a failure-to-accommodate case, an employer is not liable for failing to provide an accommodation if it proves that any accommodation would cause its business undue hardship. *See Smith*, 827 F.2d at 1086. The burden is on the employer to establish undue hardship. 42 U.S.C. § 2000e(j). Until 2023, undue hardship was defined as a more than "a de minimis cost." *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 84 (1977). However, *in Groff v. DeJoy*, the Supreme Court announced a new standard: an employer must show that "a burden is *substantial* in the overall context of an employer's business." 600 U.S. 447, 468 (2023) (emphasis added).

---

[18] Plaintiffs argue that summary judgment is not appropriate because "Defendant has misrepresented the matter of its acceptance of Plaintiffs' sincerity." (Doc. 112, at 4.) Plaintiffs claim that, because Defendant determined their beliefs were sincerely held at the time it considered Plaintiffs' accommodation requests, Plaintiffs no longer bear the burden of proving the sincerity and religious nature of their beliefs. (*Id.* at 5.) Plaintiffs essentially are saying that summary judgment on the issue of sincerity is never appropriate if an employer has attempted to accommodate an employee's religious beliefs.

Even if Defendant believed that each Plaintiffs' belief was sincere when it reviewed their exemption requests, Plaintiffs cite no caselaw stating that an employer's acceptance of an employee's beliefs during the accommodation process somehow relieves Plaintiffs of their burden of proof at trial. (*See id.* at 4–5.) No such rule exists, for good reason. Employers would be far less likely to accept an employee's beliefs as sincere and attempt to accommodate them if they knew that doing so would be open themselves up to increased liability. Instead, employers would be incentivized to treat any belief with suspicion, likely requiring a great deal of proof and slowing down what is ideally an informal, open, and relatively painless accommodation process. A rule discouraging an employer from accommodating an employee's religious beliefs would hardly be in line with the goals of Title VII. There is no good reason to preclude an employer who discovers proof of an employee's insincerity from raising the issue in litigation.

In announcing this standard, the court specifically declined to adopt the ADA undue-hardship standard and instead "[left] it to the lower courts to apply [the] clarified context-specific standard." *Id.* at 470–73. However, the court explained that the undue-hardship test must be applied "in a manner that takes into account all relevant factors in the case at hand, including the particular accommodations at issue and their practical impact in light of the nature, size, and operating cost of an employer." *Id.* at 470–71. The court also explained that, while the bar for undue hardship had been raised, the factors employers could consider when assessing undue hardship were not rendered irrelevant. *See id.* at 471 ("We have no reservations in saying that a good deal of the EEOC's guidance [on undue hardship] is sensible and will, in all likelihood, be unaffected by our clarifying decision today.").

Undue hardship refers to more than just the economic cost of providing an accommodation. Employers may consider intangible costs like the loss of office efficiency and the safety risk an accommodation can pose to other employees. *See Hardison*, 432 U.S. at 84 (finding undue hardship "in the form of lost efficiency in other jobs"); *E.E.O.C. v. GEO Grp., Inc.*, 616 F.3d 265, 273 (3d Cir. 2010) ("A religious accommodation that creates a genuine safety or security risk can undoubtedly constitute an undue hardship"). Undue hardship is generally a fact-intensive inquiry, given that the cost of a given accommodation will "necessarily depend[] upon its own facts and circumstances, and . . . the unique circumstances of the individual employer-employee relationship." *Smith*, 827 F.2d at 1085 (quoting *Redmond*, 574 F.2d at 902–03).

Moreover, an employer does not need to prove that the costs of providing an accommodation are certain to occur. When an employer considers whether an accommodation will constitute an undue hardship, it is necessarily making a projection. Indeed, an employer is

not required to test the "actual costs" of an accommodation at all before denying an employee's request to accommodate them; it is entitled to rely on its projections. *See Virts v. Consol. Freightways Corp. of Delaware*, 285 F.3d 508, 519 (6th Cir. 2002) ("[I]t has been found that an employer does not have to actually experience the hardship in order for the hardship to be recognized as too great to be reasonable."); *Crider v. Univ. of Tennessee, Knoxville*, 492 F. App'x 609, 615 (6th Cir. 2012) ("[A]n employer may show undue hardship before an accommodation has been put into place") (citing *Draper v. United States Pipe and Foundry Co.*, 527 F.2d 515, 520 (6th Cir.1975)); *Cloutier v. Costco Wholesale Corp.*, 390 F.3d 126, 135 (1st Cir. 2004) (same). It would be unrealistic, and in some cases unsafe, to require an employer to suffer a foreseeable hardship before it can deny an accommodation.

Plaintiffs argue that, because Defendant evaluated undue hardship under the de minimis standard, it cannot succeed in showing undue hardship as a matter of law. (*See* Doc. 112, at 6 ("[N]o witness has testified that the accommodations at issue in 2021 posed an undue hardship according to *Groff's* standard. It cannot be overstated how fatal an evidentiary shortfall this is.") (emphasis in original).) Plaintiffs' argument is difficult to understand. Just because an employer does not use the magic words of "substantial costs" while evaluating an accommodation does not preclude them from establishing undue hardship. A hardship can be both substantial and greater than de minimis. Plaintiffs cite no precedent to the contrary. (*See* Doc. 112, at 6–8.) Neither caselaw nor common sense support Plaintiffs' argument.

Regardless, there is a dispute of material fact as to whether Defendant could have accommodated Plaintiffs without undue hardship. Defendant argues that there are several forms of undue hardship it would have suffered by granting Plaintiffs an exemption. Defendant first points to the monetary cost of providing accommodations ($19,719 per employee per year).

(Doc. 103-1, at 172.)  It is unclear whether this monetary cost is substantial "in light of the nature, size, and operating cost" of UCOR.  *Groff*, 600 U.S. at 470–71.  While this cost may constitute an undue hardship for a small company with limited resources, it may not for a large company with substantial profits.  A defendant is required to show that the cost of an accommodation is substantial in relation to its specific business.  *See Hayslett v. Tyson Foods, Inc.*, No. 1:22-CV-1123-STA-JAY, 2023 WL 11897503, at *13 (W.D. Tenn. Sept. 20, 2023) (denying summary judgment because the defendant had not established it "could [not] offer an accommodation to Plaintiff without substantially increasing [] costs at the Newbern plant.").  Neither party has provided the Court with evidence of the revenue, profitability, size, or operating costs of Defendant.  The Court cannot say, as a matter of law, whether this monetary cost constitutes a "substantial" burden in light of Defendant's unknown size and operating costs.[19]

Defendant next argues that allowing Plaintiffs to remain unvaccinated would pose a health and safety risk to other employees.  (Doc. 102, at 25.)  The nature of Plaintiffs' jobs meant that they had to be in person and be in at least occasional contact with others.  (*See* Doc. 103-1, at 48, 51.)  Exempting in-person employees from the vaccine requirement therefore increases the risk of Covid-19 spreading in the workplace to some extent.[20]  However, the parties fail to

---

[19] Plaintiffs argue that the DOE would likely have reimbursed Defendant for all costs associated with accommodating them and, therefore, "Defendant's cost to accommodate Plaintiffs would have been $0."  (Doc. 112, at 17 (emphasis in original).)  Plaintiffs point out that the DOE did in fact reimburse the costs Defendant incurred in accommodating other employees.  (*Id.* at 17–18.)  However, an employer is entitled to rely upon the projected costs of accommodating an employee and therefore the actual costs a defendant incurred are not dispositive.  *See Crider*, 492 F. App'x at 615.  Furthermore, while Defendant was in fact reimbursed, it could not have been sure it would be at the time it made the decision to accommodate its employees.

[20] Plaintiffs object to the testimony of various UCOR administrators that the Covid-19 vaccine decreases the risk of the virus being transmitted as opposed to other methods of prevention like

provide the Court with evidence as to how often Plaintiffs interacted with coworkers, how many coworkers they interacted with, and how long these interactions occurred. *See Taylor v. Milford Reg'l Med. Ctr., Inc.*, No. 4:23-CV-40009-MRG, 2024 WL 2111459, at *7 (D. Mass. May 10, 2024) (employer had not established undue hardship based on risk of Covid-19 transmission when it "has not conclusively established the nature of [the] Plaintiffs' former jobs"). Given this lack of evidence, the Court cannot say as a matter of law whether exempting Plaintiffs created an increased safety risk that constituted an undue hardship.

Relatedly, Defendant argues that exempting Plaintiffs would increase the risk of a workplace death, which could in turn cause it to lose its next DOE contract. (Doc. 102, at 26–27.) Len Morgan, a Committee member, testified that in his thirty years working with the DOE, "every time" a contractor had a workplace death, that contractor was not awarded the next contract they bid on. (Doc. 103-1, at 137.) The risk of losing a contract can constitute undue hardship. *See Cloutier*, 390 F.3d at 134 (noting that economic costs that may be considered under the undue-hardship analysis include "lost business"). Plaintiffs have not pointed to

---

masking. (Doc. 112, at 9–10.) Plaintiffs assert that this testimony constitutes specialized medical knowledge and is hearsay, and therefore the Court should not consider Defendant's assertion that exempting Plaintiffs would cause safety issues. (*Id.*) However, Plaintiffs do not argue that it takes specialized knowledge to testify that the vaccine is effective at preventing the spread of Covid-19 to some degree. Moreover, UCOR administrators are permitted to testify as to what facts they considered in their undue-hardship analysis.

Furthermore, the Court can take judicial notice of facts and statistics provided by the CDC related to Covid-19 to recognize that these resources existed at the time Defendant made its decision. *See* Fed. R. Evid. 201 (a court may take judicial notice of facts that are "not subject to reasonable dispute because [they] . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."); *R.K. by & through J.K. v. Lee*, 575 F. Supp. 3d 957, 966 n.3 (M.D. Tenn. 2021), *vacated on other grounds*, 53 F.4th 995 (6th Cir. 2022) (collecting cases in which courts took judicial notice of CDC statistics). Finally, insofar as Plaintiffs suggest that it takes expert knowledge to understand that vaccination decreases the risk of serious illness or death from Covid-19, this is incorrect, and, as stated previously, misses the point of the inquiry the Court must make at this stage. (*See* Doc. 112, at 19 n.10.)

evidence contradicting Morgan's testimony or which would tend to show that losing a future contract as a result of a Covid-19 death was not a real risk. (*See generally* Doc. 112.) In fact, Plaintiffs underscore the severity of this risk, noting that Defendant's sole source of revenue is a multi-billion-dollar Government contract. (*See id.* at 16.) An employee death could therefore jeopardize the entire business. However, for the reasons stated above, Defendant has not yet produced evidence that exempting Plaintiffs would have been likely to lead to the spread of Covid-19. There is a genuine issue of material fact as to whether Defendant could have exempted Plaintiffs without undue hardship.

Morgan further testified that a workplace exposure to Covid-19 could result in the DOE shutting down the entire project site for two weeks. (Doc. 103-1, at 140.) The risk of a worksite shutdown is a cost an employer may consider when analyzing undue hardship. *See Bordeaux v. Lions Gate Ent., Inc*., 703 F. Supp. 3d 1117, 1128 (C.D. Cal. 2023) (finding undue hardship when a positive Covid-19 test would lead to a television program shutting down a shoot). However, for the same reasons stated above, Defendant has not yet produced evidence that exempting Plaintiffs would have been likely to lead to a work shutdown.

Because there is a question of material fact as to whether exempting Plaintiffs would have caused Defendant undue hardship, summary judgment is not appropriate. This is especially true considering that the new *Groff* standard is not yet clearly defined.

## B.      Disparate Treatment

Defendant argues that (1) Plaintiffs have not made a prima facie case of disparate treatment and, (2) even if they had, Defendant provided a non-discriminatory reason for its decision to terminate them. (Doc. 102, at 15; Doc. 118, at 2 n.1.)

Title VII provides in relevant part that "[i]t shall be an unlawful employment practice for

an employer . . . to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . religion." 42 U.S.C. § 2000e-2(a). There are "two distinct types of Title VII employment discrimination: [1] disparate treatment and [2] disparate impact." *Serrano v. Cintas Corp.*, 699 F.3d 884, 892 (6th Cir. 2012) (citation and internal quotations omitted). A plaintiff alleging disparate treatment "must prove discriminatory motive or intent." *Id.* at 892–93. The plaintiff bears the initial burden of establishing a prima facia case of discrimination. *Id.* Because there is rarely direct evidence of discriminatory intent, a plaintiff often must rely on circumstantial evidence which creates an inference of discrimination in order to make her prima facia case. *Id.* at 892 ("[P]laintiffs [can] make their showing of discriminatory intent . . . either through direct or circumstantial evidence."). This showing typically proceeds under the "*McDonnell-Douglas* framework."[21] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

Under the *McDonnell-Douglas* framework, a plaintiff must show: "(1) that he was a member of a protected class, (2) that he experienced an adverse employment action, (3) that he was qualified for the position, and (4) . . . that he was treated differently than similarly situated employees." *Tepper*, 505 F.3d at 515 (citations omitted). For an employee to be considered

_____

[21] Because Plaintiffs do not claim to have direct evidence of discrimination (*see generally* Doc. 112), they must proceed using circumstantial evidence under the *McDonnell-Douglas* framework. While, in their motion to certify a class, Plaintiffs stated that they intended to proceed under the pattern-or-practice framework, it is well established that the pattern-or-practice framework is not available to individual plaintiffs. *See Williams v. Dearborn Motors 1, LLC*, No. 20-1351, 2021 WL 3854805, at *5 (6th Cir. Aug. 30, 2021) (noting that "the pattern-or-practice method is available only in class actions or suits by the government.") (citation omitted); *Phipps v. Wal-Mart Stores, Inc.*, 792 F.3d 637, 643 (6th Cir. 2015) ("[T]he pattern-or-practice theory is not available to individual plaintiffs") (citation omitted), *overruled on other grounds China Agritech v. Michael H. Resh*, 584 U.S. 732 (2018). It appears that Plaintiffs recognize they must proceed under the *McDonnell-Douglas* framework. (*See* Doc. 112, at 23 ("Plaintiffs agree they are required to make such comparisons of all material [aspects] and related circumstances for these [medical requestors]") (internal quotations omitted).)

similarly situated to a plaintiff, "the employee . . . must be similar in all of the relevant aspects [to the plaintiff]." *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998) (citations and internal quotations omitted). To determine if an employee is "similar in all of the relevant aspects," a court should "consider whether the employee[]: (1) engaged in the same conduct, (2) dealt with the same supervisor, and (3) w[as] subject to the same standards" as the plaintiff. *Johnson v. Ohio Dep't of Pub. Safety*, 942 F.3d 329, 331 (6th Cir. 2019) (citing *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992)). This is not an exhaustive list, and a court may consider additional factors "depending on the facts of each case." *Id.* (citing *Redlin v. Grosse Pointe Pub. Sch. Sys.*, 921 F.3d 599, 610 (6th Cir. 2019)).

After a plaintiff establishes her prima facia case, "the burden then shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment action." *Tepper*, 505 F.3d at 515 (citation omitted). Once the defendant has produced a legitimate, nondiscriminatory reason for the adverse action, "the plaintiff then must prove by a preponderance of the evidence that the stated reasons were a pretext for discrimination." *Redlin*, 921 F.3d at 607. Pretext can be shown "by demonstrating that the proffered reason (1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct." *Moore v. Coca-Cola Bottling Co. Consol.*, 113 F.4th 608, 623 (6th Cir. 2024) (citations and internal quotations omitted). "To survive summary judgment, a plaintiff must produce sufficient evidence from which a jury could reasonably reject [the defendant's] explanation of why it took an adverse employment action against the plaintiff." *Redlin*, 921 F.3d at 612 (citation and internal quotations omitted).

Here, Defendant argues that Plaintiffs have failed to show that they were treated less favorably than similarly situated employees. (Doc. 102, at 15.) The Court agrees. Plaintiffs

point to several employees with similar job responsibilities who were granted a medical

exemption. (Doc. 138, at 1–2.) However, these employees are not "similarly situated" for

several reasons.

First, Defendant considered medical-exemption requests under the ADA's undue-

hardship standard. (*See* Doc. 138-4, at 1 (evaluating medical-exemption requests using the

ADA's "significant difficulty/burden or expense" standard).) This is a higher standard than the

"de minimis cost" standard that Defendant used to evaluate Plaintiffs' religious-exemption

requests. *Compare* 42 U.S.C. § 12111(10)(A) ("The term 'undue hardship' means an action

requiring significant difficulty or expense.") *with Hardison*, 432 U.S. at 84 (finding that undue

hardship under Title VII is anything more than a "de minimis cost"). Because these employees

were not "subject to the same standards" as Plaintiffs, they are not similarly situated

comparators. *See Younis v. Pinnacle Airlines, Inc.*, 610 F.3d 359, at 364 (6th Cir. 2010) (co-

workers who were "not subject to the same testing standards" as the plaintiff were not-similarly

situated). The ADA and Title VII had (and continue to have) different accommodation

standards. *See Groff*, 600 U.S. at 470–73 (refusing to adopt the ADA accommodation standard

for Title VII). It is not disparate treatment to apply different legal standards to different types of

accommodation requests. *See Thompson v. Asante Health Sys.*, No. 1:23-CV-00486-CL, 2023

WL 7348812, at *7 (D. Or. Sept. 21, 2023) ("With legally separate and distinct standards by

which employers are evaluated for proper accommodation, then, these categories of employees

are not 'similarly situated.'"), *report and recommendation adopted*, No. 1:23-CV-00486-CL,

2023 WL 7326496 (D. Or. Nov. 7, 2023).

Plaintiffs argue that medical requestors are nevertheless appropriate comparators because

they are not truly disabled within the meaning of the ADA and, therefore, Defendant should not

have evaluated their requests using the ADA undue-hardship standard. (Doc. 138, at 2 n.1.) Plaintiffs point out that the majority of granted medical accommodations were classified as "temporary" and argue that, because most temporary conditions do not qualify as disabilities, these employees were not disabled. (*Id.*) However, even if Plaintiffs are correct, they run into another problem: employees requesting temporary exemptions are not engaged in the same conduct as employees requesting permanent exemptions. An employee who requests *one* Sunday off work for a medical reason is obviously not engaged in the same conduct as an employee who requests *every* Sunday off work for a religious reason. The fact that these employees requested a different accommodation than Plaintiffs is a material difference. *See Short v. Berger*, 593 F. Supp. 3d 944, 951 (C.D. Cal. 2022) ("Only *permanent* medical exemptions are analogous to religious exemptions . . . a temporary [vaccination] accommodation is much different—and likely much easier to accommodate—than a permanent one") (emphasis in original), *appeal dismissed*, No. 22-55339, 2022 WL 2421096 (9th Cir. May 17, 2022); *Moody v. Blue Cross/Blue Shield of Michigan*, 993 F. Supp. 1078, 1084 (W.D. Mich. 1998) (finding that employees who requested different types of accommodations, one of which was more burdensome, were not similarly situated).

Moreover, employees who were granted a medical exemption had a medical condition which prevented them from receiving the vaccine while Plaintiffs did not. For each medical-exemption request, an employee's primary care provider certified that she had "a medical condition that would prevent [her] from complying with the vaccine requirement." (*See* doc. 103-1, at 171.) Defendant's in-house medical staff then reviewed that doctor's recommendation and determined that an exemption was medically necessary. (*See id.* at 79; Doc. 113-1, at 95; Doc. 138-3, at 1.) Plaintiffs do not dispute that this process occurred (*see generally* Docs. 112,

138), and while Plaintiffs dispute that these conditions constitute "disabilities" under the ADA, they do not dispute that those employees had some sort of medical condition that prevented them from receiving the vaccine (*see* Doc. 112, at 2 n.1). Plaintiffs do not claim to have any such medical condition. (*See generally* Docs. 112, 138.) When one employee has a condition that prevents vaccination while another employee has no such condition, they are not similarly situated in all relevant respects.

Finally, even if Plaintiffs could point to a similarly situated comparator, Defendant has offered a legitimate non-discriminatory reason for why it granted an exemption to medical requestors but not Plaintiffs. Defendant argues, correctly, that at the time it evaluated Plaintiffs' requests, the standard for undue hardship was much higher in the ADA context than the Title VII context. Until 2023, undue hardship in the Title VII context was defined as a "more than a de minimis cost" to an employer. *Hardison*, 432 U.S. at 84. The de minimis standard was "'not a difficult threshold to pass.'" *GEO Grp., Inc.*, 616 F.3d at 273 (quoting *Webb v. City of Philadelphia*, 562 F.3d 256, 260 (3d Cir. 2009). Indeed, Courts routinely found that even modest costs constituted a more than de minimis cost. *See, e.g., El-Amin v. First Transit, Inc.*, No. 1:04-CV-72, 2005 WL 1118175, at * 6 (S.D. Ohio May 11, 2005) (a cost of $25 per day was "more than [] de minimis"); *Cloutier*, 390 F.3d at 136 (allowing an employee to wear jewelry constituted an undue hardship because it might "adversely affect the employer's public image"). Defendant's decision reflects the reality of Title VII and the ADA in 2021: an employer was required to only make minimal efforts to accommodate religious beliefs but was required to go to much more significant lengths to accommodate disabilities. Given how slight the de minimis standard was, it is not unexpected that an employer would reject religious-exemption requests while granting medical/disability-exemptions. This does not show animus; it shows an attempt

to comply with the law as it stood at the time. Plaintiffs do not point to evidence which would allow a reasonable jury to conclude that this explanation is pretextual. (*See generally* Docs. 112, 138.) In fact, Plaintiffs do not explicitly argue pretext at all. To the extent Plaintiffs' briefings can be construed as arguing that the de minimis standard "did not actually motivate" Defendant's decision to deny their requests, they have pointed to no evidence supporting such a conclusion. *Moore*, 113 F.4th at 623.

Because Plaintiffs have not provided a similarly situated comparator and have not shown that Defendant's legitimate, non-discriminatory reason for their termination was pretextual, summary judgment in favor of Defendant is appropriate.[22]

## IV. CONCLUSION

For these reasons, Defendant's motion for summary judgment (Doc. 101) is **GRANTED IN PART** and **DENIED IN PART**. Plaintiffs' disparate-treatment claim is **DISMISSED WITH PREJUDICE**. Only Plaintiffs' failure-to-accommodate claims remain.

**SO ORDERED.**

/s/ *Travis R. McDonough*
**TRAVIS R. MCDONOUGH**
**UNITED STATES DISTRICT JUDGE**

---

[22] Because the Court has determined that Plaintiffs have not made out a prima facia disparate-treatment claim, it need not reach the issue of whether this claim is duplicative of their failure-to-accommodate claim.